PAULA T. DOW
Attorney General of New Jersey
R.J. Hughes Justice Complex
P.O. Box 112
Trenton, New Jersey 08625-0112
Attorney for Defendant
North Jersey Developmental Center

By:   David Yi
      Deputy Attorney General
      (609) 292-9989
      David.yi@dol.lps.state.nj.us

| | | |
|---|---|---|
| PHYLLIS ATKINSON, | : | Civil Action No. 06-5485 (PGS) |
| Plaintiff, | : | Civil Action |
| v. | : | **STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| NORTH JERSEY DEVELOPMENTAL CENTER, | : | |
| Defendant. | : | |

Defendant North Jersey Developmental Center ("NJDC") submits this Statement of Material Facts in Support of Defendant's Motion for Summary Judgment.

**I.    PLAINTIFF'S ALLEGATIONS**

1.    Plaintiff, Phyllis Atkinson filed her Second Amended Complaint with this Court on or about April 21, 2009, alleging violations of her civil rights under Title VII of the Civil Rights Act of 1964 ("Title VII") on the basis of her race. (Yi Certification, Exhibit B at ¶ 1).[1]

2.    Specifically, Plaintiff alleges that beginning in the Fall of 2004, after she began reporting

---

[1] Plaintiff's New Jersey Law Against Discrimination claims (Counts Three and Four of Plaintiff's Second Amended Complaint) were dismissed by this Court with prejudice on June 2, 2009. Additionally, Plaintiff's lawsuit against the then-named defendant Carole Wolke was also dismissed with prejudice by this Court on June 2, 2009. Accordingly, the only remaining counts are Plaintiff's Title VII claims against Defendant NJDC.

to a new supervisor named Carole Wolke, she was subject to racial discrimination by Ms. Wolke and retaliated against for filing complaints with Defendant NJDC. (Yi Cert., Ex. B at ¶¶ 30-33, 36-38).

3.	Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 9, 2005. Specifically, Plaintiff alleged that she was subject to discrimination based on race and retaliation, and claimed that Ms. Wolke was the alleged perpetrator. Plaintiff listed the following incidents in support of her allegation of discrimination: 1) reduction of her performance evaluation in September 2004 by Ms. Wolke; 2) comments allegedly made by Ms. Wolke that Plaintiff perceived as retaliatory; 3) receiving a written warning on February 14, 2005, for her failure to appear for work; and 4) having her job duties taken from her when she returned from sick leave in June 2005. (Yi Cert., Ex. D)

## II.	THE PARTIES

4.	Carole Wolke was an Assistant Director of Nursing at Defendant NJDC. Ms. Wolke is Caucasian, and briefly supervised Plaintiff. She is currently retired. (Yi Cert., Ex. B at ¶ 10, Ex. C, Wolke Dep. at Response No. 2).

5.	Roxanne Lotts was the Director of Nursing at Defendant NJDC, and was Ms. Wolke's supervisor. Ms. Lotts is African-American. (Yi Cert., Ex. A Atkinson Dep. 52:25-53:2).

6.	Ms. Bivens is an African-American female who supervised Plaintiff at NJDC at one point until she retired in December 2003. (Yi Cert., Ex. A Atkinson Dep. 62:1-3).

7.	Donna Corrado is a registered nurse employed by NJDC, and at one time held the job title of HIPAA Officer. Ms. Corrado is Cacuasian. (Yi Cert., Ex. A Atkinson Dep. 47-12:22; 48:22-49:2; 88:25-89:5; 135:12-15; 172:22).

8.  Michael Buongornio is a nurse employed by NJDC, and briefly supervised Plaintiff from 2005 until her retirement. Mr. Buongornio is Caucasian. (Yi Cert., Ex. A Atkinson Dep. 47-12:22; 48:22-49:2; 88:25-89:5; 172:22; 190:14-19).

9.  Marcia Parchment is employed by NJDC as a Program Assistant Administrator and is also assigned with resolving workplace violence issues at NJDC. (Yi Cert., Ex. 4).

## III.   PROBLEMS ASSOCIATED WITH PLAINTIFF'S WORK PERFORMANCE

10. Plaintiff's primary job duties as a principal clerk transcriber were to answer telephones, fill out time sheets, input data sheets into the NJDC computer, complete medical transcriptions, and draft documents related to medical trips for NJDC patients. (Yi Cert., Ex. A Atkinson Dep. 20:12-22; 21:7-10).

### A.   Problems with Plaintiff's Work Performance

11. Plaintiff, Ms. Wolke, and Ms. Lotts met on November 26, 2003, to discuss Plaintiff's: 1) incomplete client data sheets; 2) inconsistent information of client data sheets; 3) inconsistencies in the client data books; 4) collection of files of client records in stacked folders; and 5) keeping deceased client information in the data books. At this meeting, Plaintiff insisted that she felt she did not have enough time within a thirty-five (35) hour work week to complete her assignment. (Yi Cert. Ex. 3).

12. Ms. Bivens abruptly retired at the end of 2003, and Ms. Wolke was assigned to supervise Plaintiff starting December 2003. (Yi Cert., Ex. A Atkinson Dep. 62:1-3; Ex. B at ¶ 10; Ex. C, Wolke Dep. at Response No. 3).

### B.   Plaintiff's Disagreement with Her 2003-04 PAR Score

13. On or about April 23, 2004, Ms. Wolke, in her capacity as Plaintiff's supervisor,

completed Plaintiff's Performance Assessment Review ("PAR") for the rating period between March 1, 2003 through February 28, 2004. (Yi Cert., Ex. 9 at *Atkinson PERS 112*).[2]

14. Plaintiff received a score of twenty-four (24) by Ms. Wolke. Ms. Wolke noted the following in the "Specified Areas Identified for Development" and "Specific Action to be Taken by [Plaintiff]" sections: "1) open communication with supervisor...2) input needs to be current in the computer and reviewed quarterly for any update." (Yi Cert., Ex. 9 at *Atkinson PERS 112*).

15. In deciding Plaintiff's PAR score, Ms. Wolke took into account Plaintiff's job responsibilities as detailed in her PAR. Ms. Wolke observed that Plaintiff made errors with client appointments which resulted in missed appointments, clients being unable to see specialists, information not being relayed to transport clients, which resulted in undue stress for the clients. (Yi Cert., Ex. C, Wolke Dep. at Response No. 7).

16. Plaintiff's prior supervisor (Ms. Bivins) previously noted that Plaintiff was instructed to input client data into the computer system. (Yi Cert., Ex. C, Wolke Dep. at Response No. 7).

17. Ms. Wolke also noted that Plaintiff did not input data into the computer system regarding client information, and accordingly, could not award her a higher score of twenty-seven (27) as Ms. Wolke believed that this score represented an "outstanding" rating that indicated that the employee performed her job responsibilities "without error and with no guidance from her supervisor." (Yi Cert., Ex. C, Wolke Dep. at Response No. 7).

18. Ms. Lotts, who supervised Ms. Wolke, approved her subordinate's decision to give Plaintiff a score of twenty-four (24) on her 2004 PAR score. (Yi Cert., Ex. A Atkinson Dep. 81:3-7).

---

[2] Defendant's exhibits, with the exception of Plaintiff's Second Amended Complaint and deposition, will be referred to by the bates-label at the bottom of each page (*i.e., Atkinson PERS 112).*

19.     Plaintiff disagreed with Ms. Wolke's PAR score of twenty-four (24), and requested a meeting to discuss the score. (Yi Cert., Ex. 9 at *Atkinson PERS 112*).

20.     After Plaintiff asked for a meeting to discuss her score, Ms. Lotts attempted in April, May, and June 2004 to meet with Ms. Wolke and Plaintiff to discuss Plaintiff's PAR score. However, Plaintiff never appeared for any of these meetings as she arrived to work late. (Yi Cert., Ex. 3 at *Atkinson EEO 15*).

21.     On or about September 28, 2004, Plaintiff wrote a letter to Ms. Lotts complaining that she felt that "I was scored unjustly on my par" and that she would like to know "what's up with the drop in my score?" (Yi Cert., Ex. 1 at *Atkinson EEO 87*).

22.     Plaintiff continued in her letter that she felt that Ms. Wolke "offended me in many ways; she appears to have no regard to the amount of work that I am responsible for doing...[and] demonstrate[s] to me that she has little or no respect for my job duties." Plaintiff further complained that she was "overwhelmed with paperwork" and that Ms. Lotts did not realize the "extent of my paperwork." (Yi Cert., Ex. 1 at *Atkinson EEO 87*).

23.     Plaintiff ***did not*** forward a copy of her September 28, 2004, letter to Ms. Wolke as she intended this letter to be strictly addressed to Ms. Lotts. Plaintiff testified that she did not know whether Ms. Wolke received this letter. (Yi Cert., Ex. A Atkinson Dep. 119:1-120:2).

24.     Ms. Wolke testified that she did not receive Plaintiff's September 28th complaint as it went directly to Ms. Lotts. (Yi Cert., Ex. C, Wolke Dep. at Response No. 10).

25.     Plaintiff also wrote that it appeared that Ms. Wolke dropped her PAR score for "some unknown reason to me," and that her final PAR score could only be lowered if she was presented with "warnings" to apprise her about problems. (Yi Cert., Ex. A Atkinson Dep. 88:1-4; Ex. 1 at *Atkinson EEO 87*).

26. Plaintiff testified that she did not "read the PAR" but just "looked at the score." (Yi Cert., Ex. A Atkinson Dep. 62:17-63:1)

### 1. Plaintiff's 2002-03 PAR Score

27. Plaintiff's previous PAR for the rating period of March 2002 to February 2003 period was scored by her then-supervisor Ms. Bivins. Ms. Bivins noted in the Final PAR for 2002-03, the following in the "specific areas identified for development" section of the PAR: 1) "continue entering clients…admissions data into Health Care Center computer;" 2) "enter required personal data pertinent to NJDC clients, please complete by the end of quarter." Plaintiff signed-off on the PAR, agreeing with the assessment. (Yi Cert., Ex. 8 at *Atkinson PERS 120*).

28. Plaintiff interim PAR score for this rating period was twenty-two (22), and she received a final PAR score of twenty-three (23). (Yi Cert., Ex. 7 at *Atkinson PERS 99, 123*).

### 2. Plaintiff's 2001-02 PAR Score

29. Plaintiff's 2001-2002 Final PAR, which covered the March 2001 to February 2002 period, noted in the "specific areas identified for development" section of the PAR that Plaintiff need to improve the following: 1) "add or delete clients in computer within first quarter of year;" 2) "record data when received;" and to 3) "update campus data sheets into Health Care Center computer." Plaintiff signed-off on the PAR, agreeing with the assessment. (Yi Cert., Ex. 7 at *Atkinson PERS 103*).

30. Plaintiff received an interim PAR score of twenty-two (22), and a final PAR score of twenty-one (21). (Yi Cert., Ex. 7 at *Atkinson PERS 97, 105*).

### C. Plaintiff's Complaints About Her Workload

31. After she wrote a letter of complaint to Ms. Lotts on September 28, 2004, Plaintiff met with Ms. Lotts and further complained that she felt she could not finish all her work within a thirty-five (35) hour workweek (Yi Cert., Ex. A Atkinson Dep. 37:9-13).

32.     Plaintiff admitted that she previously did not complain about her workload to Ms. Lotts, but only began complaining about her workload after her PAR score was reduced and because she felt she was not being "acknowledged" for her efforts.  (Yi Cert., Ex. A Atkinson Dep. 40:1-5, 46:14-21).

33.     Plaintiff then asked Ms. Lotts for overtime to complete her work which was required to be finished within her normal thirty-five (35) hour workweek, because Plaintiff felt she had a "lot of work to do."  (Yi Cert., Ex. A Atkinson Dep. 49:3-15).

34.     Plaintiff explained to Lotts that she did not believe she was receiving "more work," but felt overwhelmed by the "faster pace" of the type of work she was doing.  (Yi Cert., Ex. A Atkinson Dep. 50:16-51:7).

35.     Ms. Lotts told Plaintiff that she was having "problems" completing her work and that there were incomplete client data sheets, which Plaintiff did not deny.  (Yi Cert., Ex. A Atkinson Dep. 54:15-55:3).

36.     Plaintiff did not know if other principal clerk typists received overtime to complete their work.  (Yi Cert., Ex. A Atkinson Dep. 51:8-22).

37.     Plaintiff simply disagreed with how her supervisor rated her job performance because she believed she was a "model worker" although she did not complete her required assignments in the course of a work week. (Yi Cert., Ex. A Atkinson Dep. 59:4-11; 61:13-19).

38.     Plaintiff testified that she "did [her] job to the best of my ability.  Maybe not to theirs, but that's my opinion," and that when she did not enter data in the computer as required by her job and her work would "fall behind," she "did the best [she] could." (Yi Cert., Ex. A, Atkinson Dep. 59:4-11; 60:19-61:6).

### IV. PLAINTIFF'S ACCUSATIONS THAT CAUCASIAN CO-WORKERS WERE TREATED "BETTER"

#### A. Alleged Differentials in PAR Scores

39. Plaintiff alleges that Caucasian counterparts were treated in a more "favorable manner" than they Plaintiff was treated by Ms. Wolke. (Yi Cert., Ex. B at ¶ 37).

40. According to Plaintiff, Caucasian co-workers were "treated better" because Plaintiff alleges that Caucasian co-workers Donna Corrado, and Michael Buongiorno received higher PAR scores, and because her vacation request was denied by Wolke. (Yi Cert., Ex. A Atkinson Dep. 105:18-23; 129:23-25; 131:25-13:4).

41. However, Ms. Corrado and Mr. Buongiorno were not in a similar job title as Plaintiff, as Ms. Corrado and Mr. Buongiorno were nurses, and had completely different job duties than Plaintiff. (Yi Cert., Ex. A Atkinson Dep. 47-12:22; 48:22-49:2; 88:25-89:5; 172:22).

42. Plaintiff did not see Mr. Buongiorno or Ms. Corrado's PAR scores, nor did these individuals directly tell Plaintiff their respective PAR scores. (Yi Cert., Ex. A Atkinson Dep. 89:1-25; 98:22-99:3; 99:23-25; 101:3-7).

43. Instead, Plaintiff gauged their "scores" on whether they were "happy with their rating" even though she never saw their PAR scores and had no idea what score they received. (Yi Cert., Ex. A Atkinson Dep. 101:5-7; 102:20-23).

44. Nevertheless, Plaintiff took exception to Ms. Corrado's PAR score, because she felt that Ms. Corrado only did a portion of the amount of work Plaintiff did. (Yi Cert., Ex. A Atkinson Dep. 47:1-6).

45. Plaintiff's PAR score was eventually raised from twenty-four (24) to twenty-seven (27) and she was "happy" with the score. (Yi Cert., Ex. A Atkinson Dep. 101:18-20).

**B.    Donna Corrado's New HIPAA Officer Position, Desk, and Computer**

46.    Plaintiff felt like a "nobody" because she was allegedly informed by Wolke that Plaintiff "[didn't] need to have a office…don't need to have a desk…computer…"  (Yi Cert., Ex. A Atkinson Dep. 73:16-20).

47.    Plaintiff took exception to Ms. Corrado receiving a new desk, because Plaintiff believed she deserved new furniture over her based on the "years I have been there doing work." (Yi Cert., Ex. A Atkinson Dep. 141:19-142:1).

48.    Ms. Corrado had been selected by NJDC's Chief Executive Officer, Bruce Werkheiser, after Ms. Lotts recommended Ms. Corrado for a newly formed NJDC position designated as the "HIPAA officer." (Yi Cert., Ex. A Atkinson Dep. 135:12-15).

49.    Ms. Corrado was selected by Ms. Lotts for the HIPAA officer position because she believed Ms. Corrado was the "best qualified."  (Yi Cert., Ex. 6 at *Atkinson EEO 156*).

50.    Plaintiff never applied for the HIPAA officer position but believed she was "qualified" for the HIPAA position even though that position required the candidate to be a nurse.  (Yi Cert., Ex. A Atkinson Dep. 77:1-18; 147:8-17; Ex. 6).

51.    A number of NJDC employees were putting in requests for new desks.  However, Ms. Lotts, in her capacity as Director of Nursing Services decided that Ms. Corrado should receive new office space and furniture.  (Yi Cert., Ex. 6; Ex. C, Wolke Dep. at Response No. 13).

52.    Plaintiff eventually received a new desk after Ms. Corrado received hers.  In fact, Plaintiff testified that "everybody got [a new desk] after [Ms. Corrado]." (Yi Cert., Ex. A Atkinson Dep. 138:5-9).

53.    Plaintiff has no knowledge of whether Ms. Wolke had any role in assigning the distribution of office furniture.  (Yi Cert., Ex. A Atkinson Dep. 141:1-5).

54.    Plaintiff also testified that she had a desk and computer, and was not alleging that she did

not receive a desk because of her race.  (Yi Cert., Ex. A Atkinson Dep. 74:1-6; 131:19-22).

## V.   ALLEGED DENIAL OF PLAINTIFF'S VACATION REQUEST

55.   Per NJDC practice, annual vacation requests were to be submitted by employees to their supervisors no later than March 15, 2004.  However, Plaintiff submitted a vacation request form, which was dated March 22, 2004, but received on March 30, 2004, by Ms. Lotts.  (Yi Cert., Ex. C, Wolke Dep. at Response No. 14).

56.   Failure to submit a timely vacation request was a grounds for denial of a vacation request. (Yi Cert., Ex. A Atkinson Dep. 160:22-161:1; Ex. C, Wolke Dep. at Response No. 13).

57.   Subsequently, on November 19, 2004, Plaintiff requested compensatory time-off for the following dates: November 23, 24, 29, and 30, 2004, by way of a form labeled "Request for Time Off.."  Plaintiff's request was denied by Ms. Wolke on November 19, 2004.  (Yi Cert., Ex. C, Wolke Dep. at Response No. 14; Ex. 16).

58.   Plaintiff did not know whether Ms. Wolke was "backed up on her work" or being non-responsive to Plaintiff's request for vacations.  (Yi Cert., Ex. A Atkinson Dep. 151:6-10).

59.   Plaintiff believed she was entitled to her "annual vacation time" because her vacation time never "changed over all the years," and was like "clock-work," and would be automatically granted even though she had to make a formal request for vacation days.  (Yi Cert., Ex. A Atkinson Dep. 150:7-14; 152:19-22; 160:22-161:10).

60.   Ms. Wolke denied Plaintiff's November 19th request for vacation time because Plaintiff failed to follow procedure in filing a timely vacation request, and because there was a lack of staff coverage due to timely vacation requests made by other staff members for the same time period.  (Yi Cert., Ex. C, Wolke Dep. at Response No. 14).

61.   Donna Corrado and Michael Buonagurio's "annual" vacation requests were granted because they submitted timely requests for vacation prior to March 15, 2004.  (Yi Cert., Ex. C,

Wolke Dep. at Response No. 19).

62.     Plaintiff's request for vacation for November 23, 24, 29, and 30, 2004, were nonetheless granted.  (Yi Cert., Ex. A Atkinson Dep. 153:1-2).

**VI.     DECEMBER 1, 2004 INCIDENT**

63.     Plaintiff wrote a letter to Ms. Lotts on December 1, 2004, detailing an incident that allege occurred between Plaintiff and Ms. Wolke earlier that day.  (Yi Cert., Ex. 12).

64.     Plaintiff testified that previous to this incident, she had been telling her co-workers that she believed Ms. Wolke was a "racist."  (Yi Cert., Ex. A Atkinson Dep. 105:8-11).

65.     Plaintiff complained that Ms. Wolke "rudely blurted out to me that 'I will not be helping you out anymore because I am tried of you calling me a racist.'"  Plaintiff further wrote that Ms. Wolke accused her of "calling [Ms. Wolke] a racist" and that if Plaintiff "[kept] calling her a racist she would fix me."  (Yi Cert., Ex. 12 at *Atkinson EEO 89*).

66.     Plaintiff also confirmed at her deposition that Ms. Wolke told her "I'm tired of you calling me a racist" and that the two of them became "emotional.  Plaintiff admitted raising her voice.  (Yi Cert., Ex. A Atkinson Dep. 107:17-25; 113:1-3).

67.     Rizalina Orlanes, a Nursing Supervisor at NJDC was a witness to this incident and in her interview with DHS Investigator McCabe, Ms. Orlanes confirmed that both Ms. Wolke and Plaintiff were "arguing" and appeared "emotional."  (Yi Cert., Ex. 14 at *Atkinson EEO 171*).

68.     Soon after this incident, Ms. Wolke went out on sick leave in December 2004.  (Yi Cert., Ex. A Atkinson Dep. 159:14-160:3).

69.     Later that month during the 2004 Holiday season, Ms. Wolke gave Plaintiff a Christmas present and attached a small card which stated "Phyllis, Merry Christmas Happy Healthy and a Peaceful New Year to my friend of 20+ years.  Time to make amends during the season.  Love Carole."  (Yi Cert., Ex. 13).

70. Plaintiff believed Ms. Wolke's act of presenting a gift and a card was "deceptional" and that she was being "deceived" by Ms. Wolke. Plaintiff further testified this act on the part of Ms. Wolke was an effort to "pull me back into her web." (Yi Cert., Ex. A Atkinson Dep. 122:1-18).

### VII. PLAINTIFF'S TARDINESS ISSUES AND FEBRUARY 15, 2005, "RED A"

71. Plaintiff admitted that she "[didn't] always come in on time because I'm a foster parent and have child care issues." (Yi Cert., Ex. A Atkinson Dep. 30:13-16; Yi Cert. Ex 20 at *Atkinson EEO 147*).

72. During her employment with Defendant NJDC, Plaintiff was frequently fifteen to twenty minutes late to work, oftentimes several times a week. (Yi Cert., Ex. A Atkinson Dep. 163:3-11).

73. Ms. Lotts spoke with Plaintiff about her tardiness at the September 2004 meeting, and at various times in October and November 2004. (Yi Cert., Ex. A Atkinson Dep. 163:19-25; Ex. 3 at *Atkinson EEO 16*).

74. Furthermore, in December 2004, Ms. Wolke talked with Plaintiff about her continued tardiness. (Yi Cert., Ex. A Atkinson Dep. 16:12-15).

75. However, Plaintiff believed "nobody made no big things about data sheet….lateness" until she filed her complaint of receiving a lower PAR score. (Yi Cert., Ex. A Atkinson Dep. 166:15-20).

76. On February 15, 2005, Ms. Wolke issued a written warning to Plaintiff for being "absent from work as scheduled without permission and without giving proper notice of intended absence," in violation of "408, A-1." Ms. Wolke further noted that on February 14, 2005, Plaintiff "failed to notify the operator an hour prior to the beginning of your shift of your intended lateness." (Yi Cert., Ex. 3a).

77. The Disciplinary Action Booklet (Administrative Order 4:08) is published by the

Department of Human Services to assist "department supervisors meet their managerial responsibilities and to advise all employees of the Department's standards for on-the-job performance. (Yi Cert., Ex. 27 at *Atkinson NJDC Policies 30*).

78. Specifically, Section "A-1" states that a supervisor may issue a written warning or official reprimand if an employee is "Absent from work as scheduled without permission and without giving proper notice of intended absence." (Yi Cert., Ex. 27 at *Atkinson NJDC Policies 32*).

79. A "Red A" is issued to an NJDC employee when they take a day off from work without permission. (Yi Cert., Ex. C, Wolke Dep. at Response No. 35)

80. Ms. Wolke was directed by her superivsor Ms. Lotts to issue a "Red A." (Yi Cert., Ex. 5 at *Atkinson EEO 153*; Ex. 6 at *Atkinson EEO 156*).

81. Plaintiff's work shift was from 9 a.m. to 5 p.m. (Yi Cert., Ex. 3a)

82. Plaintiff failed to contact NJDC one hour before the beginning of her work shift on February 14, 2005. (Yi Cert., Ex. A Atkinson Dep. 169:17-20).

83. On February 14, 2005, Plaintiff left a phone message with an NJDC phone operator at 10:42 a.m., leaving a message to tell Ms. Lotts that she would be one hour late. (Yi Cert. Ex. 18).

84. Plaintiff did not feel she had to call earlier with respect to her tardiness because she believed she was only going to be late, not "missing the day." (Yi Cert., Ex. A Atkinson Dep. 178:9-13).

85. At approximately 1:20 p.m., Plaintiff contacted the Health Care Center requesting an emergency administrative leave day, which her supervisor Michael Buongornio granted. At 1:35 p.m., Plaintiff reported to work and cancelled her administrative leave request. Plaintiff signed in to work at 1:30 p.m. (Yi Cert., Exs. 17, 18, 19a).

86. Plaintiff stated to DHS Investigator McCabe that on February 14, 2005, she was late to

work because she had to be "in court" for one of her foster children. (Yi Cert., Ex. 20 at *Atkinson EEO 147*).

87. However, Plaintiff testified at her deposition that she did not appear for "court," but rather a meeting with one of her children's social workers and school officials. (Yi Cert., Ex. A Atkinson Dep. 168:15-22).

88. Plaintiff's "Red A" was eventually rescinded. (Yi Cert., Ex. A Atkinson Dep. 181:14-16).

## VIII.   MARCH 2005 AND BEYOND

89. By March 2005, Plaintiff was no longer supervised by Ms. Wolke. Her new supervisor was Michael Buongiorno. (Yi Cert., Ex. A Atkinson Dep. 190:14-19).

90. Plaintiff does not allege any discrimination against Mr. Buongiorno. (Yi Cert., Ex. A Atkinson Dep. 191:12-15).

91. However, Plaintiff alleges that Ms. Wolke continued to harass her through Ms. Wolke's supervision of Mr. Buongiorno. (Yi Cert., Ex. A Atkinson Dep. 191:8-11).

92. Specifically, Plaintiff testified that she felt she was being harassed by Ms. Wolke because Mr. Buongiorno told her to report to him about how much data work she was inputting because "I never had to do that before." (Yi Cert., Ex. A Atkinson Dep. 191:16-25).

93. However, Plaintiff has no knowledge about whether Ms. Wolke directed Mr. Buongiorno to make Plaintiff report to him about her data input. (Yi Cert., Ex. A Atkinson Dep. 192:19-23).

94. On March 3, 2005, Ms. Lotts contacted Ms. Wolke and Plaintiff and attempted to have the two parties meet with her to mediate their differences. (Yi Cert., Ex. 3 at *Atkinson EEO 17*).

95. However, Plaintiff told Ms. Lotts that she was sick and could not attend the meeting. (Yi Cert., Ex. A, Atkinson Dep. 182:1-17).

96. Thereafter, Plaintiff went on a lengthy leave of absence without pay from March 5 to May

31, 2005.  (Yi Cert., Ex. A Atkinson Dep. 197: 1-6; Ex. 26).

97.     While Plaintiff was on a leave of absence, Plaintiff filed a discrimination complaint against Ms. Wolke with the Department of Human Services on March 29, 2005.  (Yi Cert., Ex. A Atkinson Dep. 206:17-18).

98.     On April 8, 2005, Marcia Parchment, an NJDC employee tasked with resolving workplace violence issues at NJDC issued a Workplace Violence Report Summary, detailing the contentious relationship between Plaintiff and Ms. Wolke. (Yi Cert., Ex. 4).

99.     The Workplace Violence Report Summary noted the interventions taken by NJDC to alleviate increased workplace tensions between Plaintiff and Ms. Wolke.  That Report noted that Plaintiff was referred to NJDC's Employment Advisory Services to receive psychological assistance, and that an effort to separate Ms. Wolke and Plaintiff were rendered moot at that time because Plaintiff was on an extended sick leave.  (Yi Cert., Ex. 4 at *Atkinson EEO 24*).

100.    Additionally, the report noted that the Workplace Violence Report investigation was initiated on March 2, 2005, by the NJDC's Human Resource Manager Andrew Sarchio.  (Yi Cert., Ex. 4 at *Atkinson EEO 24*).

      A.     **Plaintiff's Return from March to June 2005 Sick Leave**

101.    Upon returning from her extended sick leave in June 2005, Plaintiff sent a letter of complaint to Ms. Lotts on June 17, 2005, complaining about her "job duties." (Yi Cert., Ex. 31 at *Atkinson EEO 11*).

102.    Plaintiff wrote in her letter that upon return from an extended leave of absence of over two months, she "did not receive [her] job duties back."  Plaintiff continued, "but I don't have a problem with that simply because my job duties were overwhelming." (Yi Cert., Ex. 31at *Atkinson EEO 11*).

103.    Plaintiff complained to Ms. Lott that her supervisor, Mike Buongornio, required her to

report to him the number of data sheets she entered in a day, which she considered "indirect discrimination, and harassment from Ms. Wolke." (Yi Cert., Ex. 31 at *Atkinson EEO 12*).

104. However, Plaintiff has no knowledge about whether Ms. Wolke directed Mr. Buongiorno to make Plaintiff report to him about her data input. (Yi Cert., Ex. A Atkinson Dep. 192:19-23).

105. Plaintiff also lamented that she had "zero tolerance for Ms. Wolke" and her "nit picking behavior." (Yi Cert., Ex. 31 at *Atkinson EEO 12* ).

106. Plaintiff further complained that "all the client's data information sheet in [her] computer no longer exist. This means that every client data information sheet on these grounds has to be restored back into the computer." Once again, Plaintiff accused Ms. Wolke of being complicit in the erasing of data on her computer. (Yi Cert., Ex. 31 at *Atkinson EEO 11*)

107. A meeting was held on June 28, 2005, with Ms. Lotts, Plaintiff's CWA Union representative, and Plaintiff, to address Plaintiff's complaints as stated in her June 17, 2005, letter. (Yi Cert., Ex. 36).

108. Ms. Lotts addressed Plaintiff's accusations that her job duties were being "taken" from her by another employee named Katia by informing Plaintiff that this employee had to assume Plaintiff's job duties while Plaintiff was on a leave of absence for approximately three months. (Yi Cert., Ex. 36, at *Atkinson EEO 34*).

109. Ms. Lotts further explained to Plaintiff that Katia was assigned to coordinate the scheduling of medical trips as Plaintiff was on a leave of absence, and that it was Ms. Lotts' decision to keep Katia in this role and have Plaintiff focus on completing data sheet as there was a "pending need" for the sheets. Ms. Lotts indicated that she took Plaintiff's previous complaints about "overwhelming" work loads into consideration in assigning tasks that were assigned to Plaintiff. (Yi Cert., Ex. 36 at *Atkinson EEO 34*).

110. Ms. Lotts also explained to Plaintiff that the reason why the client data information sheets

no longer existed on Plaintiff's computer was that the computer system had crashed while Plaintiff was away.  (Yi Cert., Ex. 36 at *Atkinson EEO 34*).

111.   Ms. Lotts further reiterated that Ms. Wolke no longer supervised Plaintiff.  (Yi Cert., Ex. 36 *Atkinson EEO 35*).

### B.   Plaintiff's "Kill the Snake" Threat Against Wolke

112.   Plaintiff's June 17, 2005, complaint to Ms. Lotts also contained a statement by Plaintiff that Ms. Wolke reminded Plaintiff of a "poison snake" and that the only way to "stop a snake from biting you is to kill it."  (Yi Cert., Ex. 31 at *Atkinson EEO 12*).

113.   When asked at her deposition whether this statement was appropriate to make about a fellow co-worker and supervisor, Plaintiff responded "I didn't find it inappropriate because I was only using it as an analogy."  (Yi Cert., Ex. A Atkinson Dep. 224:1-2).

114.   As a result of Plaintiff's "kill it" statement, a Workplace Violence investigation was instituted by Ms. Parchment and a final report was issued on July 15, 2005.  (Yi Cert., Ex. 32).

115.   The report noted that Ms. Wolke indicated that she was "fearful of some kind of physical harm based on the content of [Plaintiff's June 17th] memo.  (Yi Cert., Ex. 32 at *Atkinson EEO 1*).

116.   Plaintiff was temporarily reassigned to a different work station apart from Ms. Wolke, and Ms. Lotts was assigned direct supervision over Plaintiff.  (Yi Cert., Ex 32 at *Atkinson EEO 2*).

117.   Plaintiff apologized, not directly to Ms. Wolke, but in a supplemental letter she wrote on June 17, 2005.  In fact, Plaintiff only apologized for the "misunderstanding that it has caused." (Yi Cert., Ex. 33 at *Atkinson EEO 193*).

### IX.   PLAINTIFF'S LEAVES OF ABSENCES (2005-2007)

118.   Plaintiff took a leave of absence without pay from March 5 to May 31, 2005.  (Yi Cert., Ex. A Atkinson Dep. 197: 1-6; Ex. 26).

119. Plaintiff took a leave of absence without pay, citing personal illness, from July 2005 to January 6, 2006. (Yi Cert., Ex. A Atkinson Dep. 194:23-195:3).

120. Plaintiff took a leave of absence citing personal illness, from November 2006 until January 2007 without pay. (Yi Cert., Ex. A Atkinson Dep. 194: 10-14; Ex. 23).

121. Plaintiff took a leave of absence without pay from April 17 to May 1, 2007. (Yi Cert., Ex. A Atkinson Dep. 193:23-194:2; Ex. 22).

122. Plaintiff took a leave of absence from July 2007 until her retirement on September 1, 2007. (Yi Cert. Ex. 21; Ex. A Atkinson Dep. 193:4-10).

123. From the period of March 2005 to her retirement in early September 2007, Plaintiff only worked sixteen out of a total thirty months. (Yi Cert., Ex. A Atkinson Dep. 218: 2-7).

## X.   PLAINTIFF'S COMMENTS ABOUT WOLKE

124. Plaintiff testified that Ms. Wolke was "not a nice lady," and a "big liar." (Yi Cert., Ex. A Atkinson Dep. 70:6-10; 71:16-20).

125. Plaintiff believed Ms. Wolke had "emotional or mental issues." (Yi Cert., Ex. A Atkinson Dep. 113:20-23).

126. According to Plaintiff, Ms. Wolke never used the "N" word. (Yi Cert., Ex. A Atkinson Dep. 74:11.

127. According to Plaintiff, she never felt intimidated by Ms. Wolke. (Yi Cert., Ex. A Atkinson Dep. 158:17-19).

128. Plaintiff complained by letter to Ms. Lotts, calling Ms. Wolke "foolish and childish" and that her behavior "reminds me of a poison snake, the only way that you can stop a snake from biting you is to kill it." (Yi Cert., Ex. 31).

129. Plaintiff also lamented that she had "zero tolerance for Ms. Wolke" and her "nit picking behavior." (Yi Cert., Ex. 31).

130. At a meeting held in June 2005, with several other co-workers in attendance, Plaintiff stated that Ms. Wolke had "mental issues." (Yi Cert., Ex. 36).

## XI    RESULTS OF DHS' INTERNAL INVESTIGATION AND SUBSEQUENT UPHOLDING BY THE MERIT SYSTEM BOARD

131. On April 13, 2006, a letter was sent to Plaintiff by Alma M. Joseph, Assistant Commissioner for Human Resources (DHS), indicating that an investigation of Plaintiff's discrimination complaint did not corroborate her allegations of discrimination. (Yi Cert., Ex. 38 at *Atkinson EEO 39*).

132. On or about April 11, 2007, Plaintiff's appeal to the Merit System Board ("MSB") of her March 2005 discrimination complaint was unsuccessful. However, the MSB ordered that Plaintiff and Ms. Wolke be scheduled for conflict management and/or dealing with difficult people training. (Yi Cert., Ex. 39 at *Atkinson EEO 41)*.

133. Plaintiff elected for early retirement on September 1, 2007, and is currently receiving a pension from the State of New Jersey. (Yi Cert., Ex. A Atkinson Dep. 14:2-6; Ex. 29).

          **PAULA T. DOW**
          **ATTORNEY GENERAL OF NEW JERSEY**

By:   s/ David Yi
      David Yi
      Deputy Attorney General

Dated: May 21, 2010