1

1           UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF NEW JERSEY

3           CIVIL ACTION NO. 06-5485 (PGS)

4     PHYLLIS ATKINSON,

5                 Plaintiff,

6        vs.

7     NORTH JERSEY DEVELOPMENTAL

8     CENTER and CAROLE WOLKE,

9            Defendants.

10          DEPOSITION OF PHYLLIS ATKINSON taken

11    by and before TABITHA R. DENTE, a Certified

12    Shorthand Reporter and Notary Public of the

13    State of New Jersey, held at the Martin Luther

14    King Federal Building, 50 Walnut Street, Newark,

15    New Jersey, on Wednesday, October 28, 2009,

16    commencing at ten-thirty in the morning.

17               DEGNAN & BATEMAN

18          151 Fries Mill Road, Suite 506 B

19              Turnersville, NJ 08012

20                 (856) 232-7400

21    A P P E A R A N C E S :

22       PHYLLIS ATKINSON, Pro Se

23       317 East 30th Street

24       Paterson, New Jersey 07504

25       STATE OF NEW JERSEY

Page 2

1  DEPARTMENT OF LAW & PUBLIC SAFETY
2  DIVISION OF LAW
3  BY:  DAVID YI, ESQ.
4  DEPUTY ATTORNEY GENERAL,
5  P.O. Box 112
6  Trenton, New Jersey 08625
7  Attorney for the Defendants
8            I N D E X
9  WITNESS                         PAGE
10 PHYLLIS ATKINSON
11 Examination by Mr. Yi            7
12         E X H I B I T S

13 Defendant's
14 Exhibits
15 Exhibit A    Second Amended Complaint    7
16 Exhibit 1    Letter dated 9/28/04
17          to Mrs. Roxanne Lotts        38
18 Exhibit 2    Complaint of Discrimination
19          dated 3/28/05        42
20 Exhibit 3    Inter Office Communication
21          to Maria Parchment dated
22          4/4/05        52
23 Exhibit 3a   Written Warning dated
24          2/15/05 from Carole Wolke    171
25 Exhibit 4    Workplace Violence Report

Page 4

1            3/1/04 - 2/28/05        96
2  Exhibit 12   Letter of Complaint to
3          Ms. Roxanne Lotts dated
4          12/1/04        107
5  Exhibit 13   Christmas tag from
6          Carole to Phyllis        122
7  Exhibit 14   Statement of Rizalina
8          Orlanes dated 8/25/05    116
9  Exhibit 15   Statement of Sheila
10         McCray dated 6/7/05    138
11 Exhibit 16   Request for Time Off
12         dated 11/19/04 for
13         P. Atkinson        149
14         E X H I B I T S
15 Defendant's
16 Exhibits
17 Exhibit 17   Daily Sign-In Sheet
18         for 2/15/05        175
19 Exhibit 18   Phone Call Message
20         to Roxanne L. from
21         P. Atkinson dated 2/14
22         10:42 a.m.        173
23 Exhibit 19   Letter dated 2/27/05
24         to Mrs. Roxanne Lotts    178
25 Exhibit 19a  Confidential Incident

Page 3

1          Summary involving parties
2          Atkinson and Wolke    203
3  Exhibit 5    Statement of Carole Wolke
4          dated 6/7/05        188
5          E X H I B I T S
6  Defendant's
7  Exhibits
8  Exhibit 6    Statement of Roxanne
9          Boseman-Lotts dated
10         6/14/05        75
11 Exhibit 7    Performance Assessment
12         Review for P. Atkinson
13         3/1/01 - 2/28/02    82
14 Exhibit 8    Performance Assessment
15         Review for P. Atkinson
16         3/1/02 - 2/28/03    84
17 Exhibit 9    Performance Assessment
18         Review for P. Atkinson
19         3/1/03 - 2/28/04
20         (incomplete)        85
21 Exhibit 10   Performance Assessment
22         Review for P. Atkinson
23         3/1/03 - 2/28/04    93, 94
24 Exhibit 11   Performance Evaluation
25         System for P. Atkinson

Page 5

1          Statement for 2/14/05
2          re: P. Atkinson        176
3  Exhibit 20   Statement of P. Atkinson
4          dated 6/7/05        166
5  Exhibit 21   Leave Of Absence Request
6          re: P. Atkinson for
7          7/16/07 - 9/1/07    195
8  Exhibit 22   Leave Of Absence Request
9          re: P. Atkinson for
10         4/17/07 - 5/1/07    195
11 Exhibit 23   Leave Of Absence Request
12         re: P. Atkinson for
13         11/1/06 - 1/3/07    196
14 Exhibit 24   Leave Of Absence Request
15         re: P. Atkinson for
16         11/21/05 - 1/6/06    197
17 Exhibit 25   Leave Of Absence Request
18         re: P. Atkinson for
19         9/6/05 - 11/1/05    197
20 Exhibit 26   Leave Of Absence Request
21         re: P. Atkinson for
22         5/21/05 - 5/31/05    199
23 Exhibit 27   (No exhibit offered)    --
24         E X H I B I T S
25 Defendant's

Page 6

```
 1  Exhibits
 2  Exhibit 28   Leave Of Absence Request
 3          re:  P. Atkinson for
 4          11/4/05 - 1/6/06        200
 5  Exhibit 29   (No exhibit offered)      --
 6  Exhibit 30   Intermittent FMLA Approval
 7          dated 12/5/03           201
 8  Exhibit 31   Letter dated 6/17/05
 9          to Mrs. Lotts           218
10  Exhibit 32   Workplace Violence Report
11          Summary dated 7/15/05
12          involving parties Wolke
13          and Atkinson            227
14  Exhibit 33   Letter of addendum to
15          complaint dated 7/21/05
16          from P. Atkinson        230
17  Exhibit 34   (No exhibit offered)      --
18  Exhibit 35   Confidential email dated
19          2/25/06, 11:12:00       242
20  Exhibit 36   Meeting Minutes dated
21          6/30/05 re:  Meeting of
22          6/28/05                 221
23  Exhibit 37   (No exhibit offered)      --
24  Exhibit 38   Letter dated 4/13/06
25          to P. Atkinson          208
```

Page 7

```
 1  Exhibit 39   Advisory, Consultative or
 2          Deliberative Communication
 3          dated 4/11/07, re:  Appeal
 4          of P. Atkinson          211
 5  Exhibit 40   Dismissal & Notice of
 6          Rights dated 8/18/06    213
 7          (Whereupon, Exhibit A is marked for
 8      identification.)
 9  P H Y L L I S  A T K I N S O N,
10  residing at 317 East 30th Street, Paterson,
11  New Jersey, 07504, after having been duly sworn,
12  was examined and testified as follows:
13  EXAMINATION
14  BY MR. YI:
15      Q.    Good morning, Miss Atkinson.  My
16  name is David Yi, Deputy Attorney General, and
17  I'm representing North Jersey Developmental
18  Center in this lawsuit that you filed.
19          Have you ever been deposed before?
20  Have you ever been at a deposition before?
21      A.    No.
22      Q.    Okay.  And the court reporter just
23  swore you in and you promised that you would
24  tell the truth.  Will you tell the truth here
25  today?
```

Page 8

```
 1      A.    Yes.
 2      Q.    Okay.  The court reporter is here
 3  and she will take down everything that you say
 4  and everything that I say in this room here
 5  today.  Thus, anything that you say has to be
 6  verbal, meaning sometimes you might want to just
 7  nod or, you know, use your hands to answer a
 8  question.  The court reporter can't actually
 9  write that down because that's not verbal, so
10  everything that you say, you know, say yes, no,
11  kind of make every answer that you say today
12  verbal so that it will be taken down and put
13  into the transcript for all of us to see.
14      A.    Oh.
15      Q.    Okay?
16      A.    Yes.
17      Q.    If you don't understand a question
18  that I ask, let me know about that and I'll try
19  to rephrase it so that you could understand it
20  and if I ask you a question and you answer it,
21  I'm going to assume that you understood the
22  question that I asked you.
23          If you don't hear a question that
24  I ask, please let me know, again, and...often
25  times with these depositions, sometimes we're in
```

Page 9

```
 1  a back-and-forth, kind of a I ask you a question
 2  and you answer.  Sometimes we might be speaking
 3  over each other or we might be speaking at the
 4  same time.  That's going to make life difficult
 5  for the court reporter so I ask that you let me
 6  ask you the question first and then I'll give
 7  you time to answer so that let's make it a
 8  one-person-at-a-time kind of dialogue so it will
 9  be properly transcribed by the court reporter.
10          And sometimes you might be
11  anticipating an answer to a question that I'm
12  asking.  Once again, I'd just ask you to let me
13  finish the question, then you can have your
14  answer.
15          And if you're going to estimate
16  something, for example, the size of a table or
17  something, just let me know that you're
18  estimating that it is something so it makes it
19  clear that you're guessing or you're estimating
20  as to the answer.
21          And if you need a break, just let
22  me know and we can take a break.  I think it's
23  about 10:45 right now, we'll probably break --
24  what will be a good time?  Twelve-thirty for a
25  quick thirty-minute lunch and then we'll come
```

Page 10

1   back?
2           Is that okay with you?
3       A.   Yes.
4       Q.   And I'm anticipating that this
5   deposition will probably last until four o'clock
6   and then we have a status conference with Judge
7   Salas at that time.
8           Any questions you have before we
9   start?
10      A.   No.
11      Q.   Did you review any materials today
12  to prepare for this deposition?
13      A.   Yes.
14      Q.   And what materials did you review?
15      A.   My charges.
16      Q.   Okay.  So everything that you
17  reviewed you sent to us, right, in discovery and
18  so forth?
19      A.   Yes.
20      Q.   Okay.  Is there anything that will
21  prevent you today from understanding my
22  questions?
23      A.   No.
24      Q.   Are you taking any kind of
25  medicine, drugs, alcohol, that will prevent you

Page 11

1   from giving truthful answers?
2       A.   No.
3       Q.   Do you have any medical conditions
4   that would affect your ability to remember
5   anything today?
6       A.   No.
7       Q.   Are you taking any medications
8   that would prevent you from remembering anything
9   today?
10      A.   No.
11      Q.   Are you taking any medications
12  today?
13      A.   No.
14      Q.   Have you drank any alcohol within
15  the past twenty-four hours?
16      A.   No.
17      Q.   Forty-eight hours?
18      A.   No.
19      Q.   And have you taken any
20  non-prescription drugs in the past twenty-four
21  hours?
22      A.   No.
23      Q.   Okay, please state your full name
24  just for the record.
25      A.   Phyllis Atkinson.

Page 12

1       Q.   And have you been known by any
2   other names before?
3       A.   No.
4       Q.   Were you previously married?
5       A.   No.
6       Q.   Do you have any nicknames that
7   people have referred to you by?
8       A.   No.
9       Q.   And what's your present address?
10      A.   317 East 30th Street, Paterson,
11  New Jersey.
12      Q.   And how long have you been at that
13  address?
14      A.   Since 1995.
15      Q.   Do you live by yourself right now?
16      A.   No.
17      Q.   Who resides with you presently?
18      A.   My...oldest brother, my uncle, my
19  two nieces and my two children.
20      Q.   Okay.  Just to be clear, you
21  haven't had any divorce, separation, annulment,
22  any of those things?
23      A.   No.
24      Q.   Do you have any convictions of a
25  felony nature?

Page 13

1       A.   No.
2       Q.   Any convictions of a misdemeanor
3   nature?
4       A.   No.
5       Q.   Have you been arrested for
6   anything?
7       A.   No, I mean...what's misdemeanor?
8   Small...
9       Q.   Smaller than a felony.  Anything
10  like -- well, have you been arrested for
11  anything; let's just start with that.
12      A.   Yes.
13      Q.   Okay, when was that?
14      A.   Um...around about approximately...
15  probably maybe mid...mid or -- mid-eighties.
16      Q.   Okay, that's fine.  I'm not
17  looking -- it's no secret, I'm not trying to get
18  anything on you.
19          Okay, anything else in terms of
20  convictions, arrests?
21      A.   No.
22      Q.   Okay.  Are you currently employed?
23      A.   No.
24      Q.   Did you retire September 2007 from
25  service with the State of New Jersey?

Page 14

1   A.   Yes.
2   Q.   And you're receiving your pension?
3   A.   Yes.
4   Q.   Did you elect for early
5   retirement?
6   A.   Yes.
7   Q.   How many years had you put into
8   the system by that time?
9   A.   Twenty-seven.
10   Q.   Okay.  Did you attend college?
11   A.   Yes.
12   Q.   What college did you attend?
13   A.   Passaic County Community College.
14   Q.   Did you receive any kind of
15   vocational training?
16   A.   Yes.
17   Q.   Okay, what did you receive?
18   A.   Medical secretary.
19   Q.   Do you have any kind of
20   specialized certifications?
21   A.   Mm...I don't understand the
22   question.
23   Q.   You know, paralegal certificate,
24   something like that where you get a specialized
25   certification for a specialized field of study.

Page 15

1   Do you have any one of those kind of things?
2   A.   Medical secretary.
3   Q.   Okay.
4   A.   Medical certificate.
5   Q.   Okay.
6   A.   If that's the --
7   Q.   Have you ever served in the
8   military?
9   A.   No.
10   Q.   Okay.  Have you ever filed for
11   workers compensation?
12   A.   Is, is that when you get injured
13   on the job?
14   Q.   Basically, yes.
15   A.   Yes.
16   Q.   Okay.  Can you recall the
17   instances when you filed for workers
18   compensation?
19   A.   I don't really recall.
20   Q.   Do you -- is it true that you were
21   filing for two instances, one for exposure to
22   mold and another because you might have fallen?
23   A.   Yes.
24   Q.   Okay, and those instances, do you
25   recall when they were?

Page 16

1   A.   Well, the one for mold maybe was
2   2000 and...six it might be approximately, I'm
3   not for sure.
4   Q.   Okay.  Do you recall what was the
5   result of you filing for the workers
6   compensation?  Did you receive it?
7   A.   A day off of work?
8   Q.   Okay, so something minor.
9   A.   Um-hum.
10   Q.   Since your retirement in 2007 did
11   you receive any kind of income?  Besides your
12   pension.
13   A.   No.
14   Q.   Okay, so from that time since you
15   retired, the only income you received is your
16   pension income.
17   A.   Yes.
18   Q.   Is that correct, okay.  Have you
19   ever filed a lawsuit against anybody before?
20   A.   Mm...like, in a car accident or
21   something like that?
22   Q.   Any kind of lawsuit where you --
23   A.   Car accident.
24   Q.   And when was that?
25   A.   In the eighties is all I can say.

Page 17

1   Q.   Okay, that's good enough.  Any
2   other lawsuits that you filed?
3   A.   No.
4   Q.   Okay.  Have you ever been sued by
5   anybody?
6   A.   No.
7   Q.   Have you ever filed -- besides the
8   current lawsuit did you file any lawsuit against
9   the State of New Jersey?
10   A.   No.
11   Q.   And besides complaints and
12   grievances you might have filed pertaining to
13   the matter that you put in your lawsuit, have
14   you ever filed any grievances, complaints while
15   you were employed with the State of New Jersey?
16   A.   Oh, boy.  Talking about some
17   years.  Not that I recall.
18   Q.   Okay.  And what union were you
19   represented by when you were working for NJDC?
20   A.   I think it's CWA 1040.  Local
21   1040.
22   Q.   And who was the shop steward
23   during the time of the Complaint?
24   A.   I can't recall his name.
25   Q.   Okay.  But you were CWA 1040?

Page 18

1    A.    Um-hum.  Yes.
2    Q.    Did you file any grievances
3  through CWA 1040?
4    A.    No.
5    Q.    Okay.  Who was your first employer
6  when you graduated from Passaic?  Passaic County
7  Community you said, right?
8    A.    You talking about my first job I
9  ever had?
10    Q.    After you finished college.
11    A.    I didn't finish college; I went to
12  college.
13    Q.    Okay, so after that time.
14    A.    I don't recall the time line.
15    Q.    Okay.  Let's go back to the last
16  job before you started working for NJDC.  Do you
17  recall what that position was?
18    A.    Mm.  Maybe...let me see.  It's in
19  North Carolina, RJ Reynolds.
20    Q.    Okay.  And that was right before
21  you started working for NJDC?
22    A.    That's what I recall.
23    Q.    Okay.
24    A.    I'm not for sure.
25    Q.    And what were your job

Page 19

1  responsibilities there?
2    A.    Packing clerk maybe?
3    Q.    Okay.  While you were working for
4  that company, did you ever file any complaints,
5  grievances against that company?
6    A.    No.
7    Q.    Tell me about when you first
8  started working for NJDC, what was your first
9  title.
10    A.    Human Services?  HSS, yeah.
11    Q.    And how long did you work in that
12  job position for?
13    A.    Mm, I don't recall.
14    Q.    Okay.  What was the next title
15  after that?
16    A.    Housekeeping.
17    Q.    Okay.  And after housekeeping what
18  title did you go to?
19    A.    Secretary.  Senior clerk
20  transcriber.
21    Q.    Senior clerk transcriber?
22    A.    Um-hum.
23    Q.    And any other position after that?
24    A.    Principal clerk transcriber.
25    Q.    Okay, anything after that?

Page 20

1    A.    No.
2    Q.    Can you explain to me what the
3  difference between the senior clerk transcriber
4  and a principal clerk transcriber is?
5    A.    A senior -- a principal clerk
6  transcriber have more responsibilities than the
7  senior clerk.
8    Q.    Okay.
9    A.    And it's like a, maybe a...step
10  up, I guess, promotional.
11    Q.    Okay.  Can you just describe to
12  me -- I'm not familiar with the senior clerk
13  transcriber job -- what were some of the job
14  duties that you had to do as a senior clerk
15  transcriber?
16    A.    Answer the telephone, policy and
17  procedures, um...medical trips, mail.
18    Q.    Okay.  And as a principal clerk
19  transcriber what were your primary duties?
20    A.    Um...consent forms, uh.  Time
21  sheets, medical transcribing, answering the
22  phone, medical trips, also, transportation.
23    Q.    Okay.
24    A.    That's it.  That's all I can
25  recall right now.

Page 21

1    Q.    Tell me if this is true.
2  Inputting data into -- is it the HGC database;
3  is that what you would also do as a principal
4  transcriber?  HCC, I believe.  I might be saying
5  it wrong.
6    A.    Repeat that question?
7    Q.    Okay, I might be saying the wrong
8  acronym.  Was inputting data sheets into the
9  computer one of your important job duties?
10    A.    It was part of the job.
11    Q.    Okay.  And when did you get
12  promoted to the principal clerk position?
13    A.    I don't recall.
14    Q.    Was it after 2000?
15    A.    I think it was approximately, I'm
16  not for sure, '95, 1995, 1990 -- between 1994
17  and 1996, up in that, approximately somewhere
18  around there.
19    Q.    Okay.  Since you were promoted to
20  the principal clerk typist position, do you
21  remember your immediate supervisors?  To the
22  best of your ability can you remember who they
23  were?
24    A.    Repeat that question?
25    Q.    Since you were promoted to the

Page 22

1  principal clerk position in '94, '95, can you
2  remember the immediate supervisors that you had
3  since then?
4      A.   One of 'em was Daphne Hopkins.
5      Q.   Okay, and what was her race
6  ethnicity?
7      A.   Black.
8      Q.   Any other supervisors?
9      A.   Margaret Murphy.
10     Q.   Can you also tell me her
11 ethnicity?
12     A.   White.
13     Q.   Okay, any others?
14     A.   Yvonne Bivens.
15     Q.   Her race ethnicity?
16     A.   Black.
17     Q.   Okay.
18     A.   Miss Heese.
19     Q.   Can you spell that?
20     A.   H-e-e-s-e.
21     Q.   Okay, race and ethnicity?
22     A.   White.
23     Q.   Okay.  Anyone else?
24     A.   Let's see.  I can't recall any
25 more right now.

Page 23

1      Q.   Okay, I'm going to throw some
2  names, tell me if they may or may not have been
3  your supervisors.
4          Mike Buongiorno?
5      A.   Oh, yes.
6      Q.   What's his ethnicity?
7      A.   White.
8      Q.   Was Carole Wolke your immediate
9  supervisor for a short time?
10     A.   Yes.
11     Q.   Okay, and what's her ethnicity?
12     A.   White.
13     Q.   Was Miss Roxanne Lotts ever your
14 immediate supervisor for a time?
15     A.   I don't recall her being...I don't
16 recall her being immediate supervisor.
17     Q.   Okay.  With Daphne Hopkins, did
18 you ever file any grievances or complaints
19 against her?
20     A.   No.
21     Q.   Margaret Murphy?
22     A.   No.
23     Q.   Yvonne Bivens?
24     A.   No.
25     Q.   Miss Heese?

Page 24

1      A.   No.
2      Q.   Mike Buongiorno?
3      A.   No.
4      Q.   Carole Wolke?
5      A.   Yes.
6      Q.   Okay. So, to the best of your
7  ability, these are your supervisors you've had
8  since you became a principal clerk typist.
9      A.   That I recall.
10     Q.   Okay, if that's the best we --
11     A.   Could be more.
12     Q.   -- can do, that's the best we can
13 do.
14          Did you ever file for unemployment
15 benefits while you were taking any leaves of
16 absence or --
17     A.   No.
18     Q.   -- ever since you retired?
19     A.   Unemployment?
20     Q.   Yes.
21     A.   No.
22     Q.   Okay.  So have you ever collected
23 unemployment since you started working for NJDC?
24     A.   No.
25     Q.   Okay.  Were you ever suspended or

Page 25

1  terminated from New Jersey Developmental Center?
2      A.   No.
3      Q.   Were you ever disciplined at NJDC?
4      A.   Yes.
5      Q.   Okay, when were you disciplined?
6      A.   Ninety-four, '95.
7      Q.   Okay, what was --
8      A.   Approximately around that time.
9      Q.   What was the charge?
10     A.   Mm.  A verbal, a verbal abuse.
11 With another employee.
12     Q.   At that time were you a principal
13 clerk transcriber at that time?
14     A.   Yes.
15     Q.   Okay, who did you get into a
16 verbal abuse situation with?
17     A.   A coworker by the name of Jackie
18 MacMichael.
19     Q.   McMichael?
20     A.   MacMichael.
21     Q.   And what was her ethnicity?
22     A.   Black.
23     Q.   And what was the dispute about?
24     A.   She made a false accusation
25 against me.

Page 26

1    Q.    Okay, what did she say?
2    A.    A medical trip that was, was
3  scheduled, she accused me of not making the
4  arrangements.
5    Q.    Okay.
6    A.    Properly and...
7    Q.    What was Miss MacMichael's job
8  title?
9    A.    Transportation Agent.
10    Q.    Was she in a supervisory position
11  over you?
12    A.    No.
13    Q.    So was she, in your opinion, kind
14  of a similar level position as you?
15    A.    Yes.
16    Q.    Okay.  So was it a simple
17  disagreement or did things get out of hand and
18  voices were raised, tempers were raised?
19    A.    Oh, was raised temper.
20    Q.    Okay.  And who made the initial
21  accusation for discipline?
22    A.    Repeat that question.
23    Q.    Who made the charge or the
24  accusation that led to your discipline?
25    A.    She did.

Page 27

1    Q.    And what did she say was the
2  basis?
3    A.    I don't recall.
4    Q.    Okay, so what was the eventual
5  result of the discipline charge?
6    A.    Mm.  Repeat that question?
7    Q.    What was the result of that?  So
8  -- okay.
9        She makes an accusation against
10  you, you said you were disciplined for that.
11  What was the penalty for that?
12    A.    I don't recall.
13    Q.    Were you -- did you take time off
14  of work, were you suspended?
15    A.    I don't recall.
16    Q.    Was there a written warning?
17    A.    A written warning, I remember
18  that.
19    Q.    Okay.
20    A.    I recall that.
21    Q.    Did you appeal that?
22    A.    No.
23    Q.    Okay.  Why didn't you appeal that?
24    A.    Because I think my -- I handled it
25  the wrong way, I kinda lost it because of the

Page 28

1  accusation, so...
2    Q.    Okay.  So you talk about that
3  incident.  Any other instances where you were
4  disciplined by NJDC?
5    A.    Could be...could be, not that I
6  recall.
7    Q.    Okay.  All right, I'm going to
8  show you what's been marked as Defendant's
9  Exhibit A.  This is your second Amended
10  Complaint that you filed in court.  If you want
11  to take a moment to look at it, keep this by you
12  because we're just going to refer to it
13  throughout the course of this deposition.  So
14  (handing)...
15        If you want to take a moment and
16  just take a look at that document.
17    A.    I'm familiar with it.
18    Q.    Do you recall that document?
19    A.    Yes.
20    Q.    Okay.  I want to ask you a little
21  bit about your home life.  Do you have children
22  right now?
23    A.    Yes.
24    Q.    Okay, and if you recall, this
25  Complaint is basically centering around the

Page 29

1  period of 2004 until 2005; is that correct?
2    A.    Yes.
3    Q.    Okay.  At that time I want you to
4  recall were -- did you have any children living
5  with you at your house during 2004, 2005?
6    A.    Yes.
7    Q.    How many children did you have?
8    A.    Six.
9    Q.    Six children?
10    A.    Um-hum.
11    Q.    Were they all your children?
12    A.    Two grands, two nieces and my two
13  children.
14    Q.    Did you ever adopt any children
15  through foster care or --
16    A.    Yes.
17    Q.    Okay.  Were they living with you
18  at that time?
19    A.    Yes.
20    Q.    How many of them were living with
21  you?
22    A.    Two that I adopted.
23    Q.    Okay, so your children are two
24  adopted children?
25    A.    (Nodding in the affirmative).

Page 30

1    Q.    How old were they at that time?
2    A.    One is seventeen now and one is
3  fourteen, so you can do the calculation.
4    Q.    So around that time maybe twelve,
5  thirteen years old was the oldest.  Does that
6  sound about right?  Junior high school?
7    A.    Yes.
8    Q.    Okay.
9    A.    Approximately, I guess, I really
10  don't know because I'm not calculating.
11    Q.    Okay.
12    A.    In my head.
13    Q.    Did taking care of your foster
14  children affect your work attendance?
15    A.    A lot, yes.
16    Q.    And what do you mean by a lot?
17    A.    A lot of times I had to appear in
18  court, behavior problems, special -- children
19  that had special problems.  I had to appear in
20  court, I had to appear at school, uh...meet with
21  social workers.
22    Q.    And they just kind of -- these
23  situations just popped up?
24    A.    Yes.
25    Q.    Would that be fair to say?

Page 31

1    A.    Yes.
2    Q.    Okay.  And a lot of these
3  situations you could not really plan for.
4    A.    No.
5    Q.    Okay.
6    A.    Because they were special.
7    Q.    Did they have any kind of special
8  needs, these children?
9    A.    Yes.
10    Q.    What were their conditions?
11    A.    As -- um, emotional.
12    Q.    Okay.  How old were they when you
13  adopted them?
14    A.    Mm, four and eight.
15    Q.    And did you take great pride in
16  being a foster parent?
17    A.    Yes.
18    Q.    But it affected your work
19  attendance, though?
20    A.    Yes.
21    Q.    Okay.  What time was your shift
22  normally starting at NJDC?
23    A.    Nine.  Nine-fifteen.
24    Q.    Nine-fifteen?
25    A.    To five-fifteen.

Page 32

1    Q.    And let's just talk about a
2  hypothetical.
3        For instance, if something popped
4  up and you had to, say, appear in court for one
5  of your kids, how would you go about notifying
6  NJDC about that?
7    A.    If, if it was planned I would
8  notify them in a timely manner.  If it wasn't, I
9  will call, call out or either call in.
10    Q.    Okay.
11    A.    To let them know that something
12  has, you know, arised sic.
13    Q.    And when you had to call in who
14  would you normally call?
15    A.    The operator.
16    Q.    Would you call your immediate
17  supervisor to let them know?
18    A.    Some time.
19    Q.    Do you know what the policy was in
20  terms of letting your immediate supervisor know
21  if you're not coming in?
22    A.    No, I know you call the operator a
23  hour before, if you're gonna be out you call the
24  operator a hour before; if you gonna be late you
25  call the operator.  We don't have to call the

Page 33

1  immediate supervisors.
2    Q.    Okay.  Did your children's special
3  needs, did that make you show up to work late on
4  a lot of occasions?
5    A.    Well, those weren't the only two
6  children, I had lots of children.  Those are my
7  stabilized children, but I had lots of children
8  in and out of my home.
9    Q.    Okay.  So let's talk about that
10  time period, 2004 and '05.  There were the two
11  kids that you adopted.  Who else was with you at
12  that time?  You said two grandchildren and two
13  nieces?
14    A.    Um-hum.
15    Q.    Okay, so there were six children
16  at that point in your house?
17    A.    Um-hum.
18    Q.    Did you also have to take care of
19  your nieces and your grandchildren?
20    A.    Yes.
21    Q.    Did they have any issues as well?
22    A.    Uh, when children are not with
23  their parents they have emotional issues.
24    Q.    Did they also require court
25  appearances, school meetings?

Page 34

1    A.    School meetings.
2    Q.    Okay.  Were they planned?
3    A.    Sometimes.
4    Q.    Okay.  Were you the sole provider
5  for these six children?
6    A.    Yes.
7    Q.    Okay.  So their well-being was
8  your responsibility?
9    A.    Yes.
10   Q.    And we talked about, you know,
11  that affecting your showing up to work.  Did
12  that also affect you in the sense that you had
13  to sometimes leave early to go and handle some
14  business for these six children?
15   A.    Yes.
16   Q.    Okay, and how frequently would you
17  say that occurred?
18   A.    I don't recall.
19   Q.    Well, did it happen a lot?
20   A.    No.
21   Q.    So mostly it would happen in the
22  beginning of your shift rather than after.
23   A.    Some time, I really don't recall.
24   Q.    Did your supervisors have any
25  problems with your attendance because of, you

Page 35

1  know, having to take care of six kids?
2    A.    I really don't know, I -- you
3  know, I tried to present them with paperwork and
4  stuff to show them.  I guess they did, you know,
5  would question me on it.
6    Q.    We talked about your disciplines
7  and you said besides the 1994 incident you
8  didn't receive any disciplines, so did they ever
9  discipline you for, you know, for example, being
10  tardy to work because you had to show up for
11  your kids' court session?  Did they ever do
12  anything like that?
13   A.    No.
14   Q.    Would it be fair to say that they
15  were somewhat understanding of your situation?
16  That you had six kids that you had to take care
17  of?
18   A.    Who?
19   Q.    Just your immediate supervisors.
20   A.    Which one?
21   Q.    From '94 to the time you retired.
22  We're talking about Daphne Hopkins, all those
23  people that you told me.
24   A.    I would say it would be fair.
25   Q.    You told me some of your job

Page 36

1  duties as a principal clerk transcriber.  Did
2  you find some of those duties to be
3  overwhelming?
4    A.    It's hard to answer questions when
5  you don't...can't go into what you mean when you
6  say overwhelming.
7    Q.    That's fine.  Actually, let me
8  backtrack a little bit.
9          Was taking care of your six
10  children, was that a stressful experience for
11  you?
12   A.    Not to me, it didn't bother me.  I
13  enjoyed it.
14   Q.    Okay.
15   A.    I enjoy taking care of children.
16   Q.    Did you get any kind of emotional
17  stress from having to show up for court
18  appearances or going to counselling or school
19  sessions?
20   A.    I got emotionally stressed because
21  my job some time didn't understand.  That that
22  was more important to me than...
23   Q.    Than?
24   A.    Than being at work to answer the
25  phone.

Page 37

1    Q.    I see.
2    Q.    For that time.
3    Q.    Because you took great pride in
4  taking care of these six children.
5    A.    Yeah.
6    Q.    Okay, I understand.  All right, I
7  think your, your question is fair so I'm going
8  to rephrase that question about overwhelming.
9          Did you ever complain to anybody
10  that you felt like you couldn't finish all your
11  work within a 35-hour work week while you were
12  principal clerk transcriber?
13   A.    Yes.
14   Q.    And why did you feel that way?
15   A.    Not, not that I couldn't finish.
16  I didn't complain that I couldn't finish, it was
17  -- if they added something extra on to it or if
18  my workload that day was heavier than another
19  day...you know, if it was heavier.  Some days it
20  would be heavier as far as medical trips than it
21  would be another day.
22   Q.    Um-hum.
23   A.    So if it was -- if the
24  overwhelming of making a lot of medical trips
25  that day could have caused me not to finish

Page 38

1  something else.
2      Q.    Do you recall speaking with --
3  actually, before we start, what is -- Miss
4  Roxanne Lotts, what's her title?
5      A.    Director of Nursing.  She was
6  Director of Nursing Services.
7      Q.    Okay, so how many levels above you
8  would you say she was?
9      A.    Supervisor, assistant
10 director...it's me, then the supervisor, then
11 assistant director of nursing, then the director
12 of nursing, so three.
13     Q.    Okay, so -- all right.  Did you
14 speak with her on occasions about your job
15 duties?
16     A.    Yes.  When my PAR was reduced I
17 spoke with her.  Before then, no.
18     Q.    Okay.  I'm going to show you what
19 we're going to mark as Exhibit 1.
20         (Whereupon, Exhibit 1 is marked for
21 identification.)
22     Q.    Take a moment to look at this
23 (handing).
24     A.    I'm familiar with that.
25     Q.    Okay, are you good?

Page 39

1      A.    Yeah.
2      Q.    All right.  I want you to look
3  at -- towards the bottom of the page.  You say
4  in this letter -- is this a letter that you
5  wrote to Miss Roxanne Lotts?
6      A.    Yes.
7      Q.    Okay.  You say "there are about
8  250 clients that I'm responsible for scheduling
9  medical appointments which inclines preparing
10 paperwork, arranging transportation and doing a
11 weekly calendar and recording information on
12 desk calendar and nurses station.  In order for
13 me to ensure I have efficient and quality work,
14 I must spend time to read through all
15 appointments, consults and recording."
16         And if you look at the next page,
17 you say "I feel compelled to give you this
18 information because I don't believe you realize
19 the extent of my paperwork.  Please see attached
20 daily job duties."  And at the very bottom right
21 before you write "sincerely yours," it says "I
22 am overwhelmed with paperwork, but, yet, I never
23 complain about it."
24         So did you ever talk to Miss Lotts
25 about kind of being overwhelmed with paperwork?

Page 40

1      A.    After my PAR score was reduced,
2  that was -- this was the reaction of after my
3  PAR score being reduced because I felt like I'm
4  doing all this work, I never complained about it
5  until my PAR score was reduced.
6      Q.    Okay.  So you felt that --
7      A.    I never had a problem with my
8  work, I never complained about it until that
9  day.  That was the first complaint.
10     Q.    So you felt wronged because you're
11 saying, hey, I'm doing all this work, but, yet,
12 my PAR score's been reduced.
13     A.    Right.
14     Q.    So you were trying to tell Miss
15 Lotts that you had a lot of stuff to do because
16 in this letter you talk about basically all the
17 items that you need to take care of and you
18 felt...you were wronged because they weren't
19 acknowledging that.
20     A.    Right.
21     Q.    Would that be a fair assessment?
22     A.    That's -- this letter was a
23 response to my PAR score being reduced by Carole
24 Wolke.
25     Q.    And you felt that your previous

Page 41

1  supervisor, and you say in your letter Miss
2  Bivens, "gave me a fair rating according to my
3  work performance when she did my PAR," so you
4  felt that she was appreciating what you did.
5      A.    I always felt that it was a lot of
6  work, but I didn't have a problem with it
7  because I was being, uh...what's the word I'm
8  looking for.  I didn't have a problem with my
9  work being a lot of work, it always was a lot of
10 work, overwhelmed, a lot of work, but I didn't
11 have a problem with it as long as I was being
12 treated fairly as far as work performance.
13     Q.    Um-hum.
14     A.    But when Carole disregarded it, it
15 was -- the letter was wrote to show her that I
16 was being treated unfairly by Carole.
17     Q.    Okay.  And just for the record,
18 'Carole' is Carole Wolke?
19     A.    Wolke.
20     Q.    W-o-l-k-e.
21     A.    Yes.
22     Q.    And she was is the Assistant
23 Director of Nursing?
24     A.    Yes.
25     Q.    What do you call that ADON or...

Page 42

1    A.    Assistant Director of...
2    Q.    You have to say the whole word,
3  you don't say ADON?
4    A.    No, we just say assistant
5  director.
6    Q.    Assistant director?
7    A.    ADON.
8    Q.    So after you got your PAR score
9  reduced, you felt inclined to tell Miss Lotts,
10  hey, I'm doing a lot of work, but I feel
11  disrespected because my PAR has been reduced.
12    A.    (Nods in the affirmative).
13    Q.    Okay. I'm going to show you what
14  we're going to mark as Exhibit 2.
15       (Whereupon, Exhibit 2 is marked for
16  identification.)
17    Q.    I want you to take a look at it
18  (handing).
19       And, just for clarification, if
20  you look at the bottom you see that Atkinson EEO
21  72. We put stickers on it so that we can
22  identify the documents, so when I say if you can
23  turn to 74, just look at the bottom.
24    A.    Okay.
25    Q.    So it makes it easier for us to

Page 43

1  navigate through, so take your time and go over
2  the document.
3    A.    I'm familiar with it.
4    Q.    Okay. Just let me know when
5  you're ready.
6    A.    Okay, I'm ready.
7    Q.    If you turn to page 81, the last
8  page, is that your signature?
9    A.    Yes.
10    Q.    Okay, and you submitted this to
11  whom?
12    A.    Um...I don't recall whether it was
13  employee relations or whether it was Miss Lotts.
14    Q.    Okay.
15    A.    Could have been either one of
16  those two, or could have been both.
17    Q.    Okay. So in this letter that you
18  either submitted to the EEO office or Miss
19  Lotts, you indicate, and I'm reading here, when
20  I verbally inquired to Miss Wolke about my PAR
21  rating being dropped, her answer to me was that
22  you had a few problems.
23       What kind of problems did she say
24  you had?
25    A.    She never said it; that's why I

Page 44

1  called for a meeting. She shrugged her
2  shoulder.
3    Q.    Okay, but in this letter you said
4  that she had a few problems. She said to you
5  that you had a few problems.
6    A.    And I ask her what were the
7  problems.
8    Q.    And she didn't --
9    A.    She didn't...respond. She just
10  shrugged her shoulder and made a facial
11  expression.
12    Q.    Okay. And if you go to page 73,
13  the next page...
14    A.    (Witness complies).
15    Q.    You also then talk about your --
16  the letter we just saw, the September 28th
17  letter.
18    A.    Um-hum.
19    Q.    And you said -- and you basically
20  said that you met with Miss Lotts and Miss
21  Wolke. "At the meeting I explained to Miss
22  Lotts the amount of work that I am expected to
23  produce in a day and I also gave her an outline
24  of my job duties."
25       Why did you feel you had to do

Page 45

1  that?
2    A.    At this, at this meeting?
3    Q.    Right. You said this in your
4  letter and you're describing the meeting that
5  you had with Miss Wolke and Miss Lotts and you
6  write here "I explained to Miss Lotts the amount
7  of work that I am expected to produce in a day
8  and I also gave her an outline of my job
9  duties."
10       Why did you feel compelled to tell
11  Miss Lotts about that?
12    A.    Because, um, my PAR performance
13  score was being dropped and I'm, like, why is my
14  PAR performance score being dropped when I'm
15  producing all of this work and never had a
16  complaint about this work.
17    Q.    Um-hum.
18    A.    So I felt like she would, you
19  know, maybe she doesn't realize all what I'm
20  doing.
21    Q.    Okay. Right, because in this
22  letter you continue. If you look at page 73 --
23  so just stay on the page with me, we're going to
24  kind of go over the documents, and you put in
25  the middle "I was doing it all alone. Although

Page 46

1    I believe I was overworked, I never complained
2    about it until my PAR rating was dropped."
3        A.    Um-hum.
4        Q.    "How ironic is it that Mrs.
5    Corrado received a quarter of my workload and
6    her PAR rating is increased or left the same."
7            So why do you say that statement
8    in this letter?
9        A.    Because a new title position came
10   and it was -- in reference to the consent forms
11   and that were -- the job that Miss Corrado was
12   doing was the job that I was doing that was a
13   part of all this work, also.  I don't know if I
14   stated it in here...no, but, anyway, I didn't
15   even put that in here, but it was also a part of
16   my job and then they took a part of my job and
17   made it a whole job in itself.
18       Q.    Okay.  So you explained to her
19   that you believed you were overworked, but you
20   never complained about it.
21       A.    Yeah.
22       Q.    But -- you believed you were
23   overworked, but you --
24       A.    Oh, yeah, I believed I was
25   overworked, I had a lot of work.

Page 47

1        Q.    And you --
2        A.    I still believe that.
3        Q.    And you took exception when you
4    found out that Miss Corrado did only a portion
5    of your work, yet, her PAR was increased.
6        A.    Exactly.
7        Q.    Okay.
8        A.    And it was unfair.
9        Q.    Can you tell me what Mrs.
10   Corrado -- what's her first name, by the way?
11       A.    Donna.
12       Q.    Donna.  Was she also principal
13   clerk typist?
14       A.    No, she was a...I don't know
15   whether she was a LPN.  She could have been LPN
16   or RN, but she was a nurse.
17       Q.    She was a nurse, so she is in a
18   different job category than you?
19       A.    Yes.
20       Q.    And your job duties are completely
21   different.
22       A.    Yes.
23       Q.    And -- but she does some consent
24   form work?
25       A.    She started doing...consent forms,

Page 48

1    which I used to do, which was part of my job.
2        Q.    Do you -- okay, go ahead.  Do you
3    know who evaluated her for the PAR?
4        A.    Carole.
5        Q.    And is it because she's Assistant
6    Director of Nursing?
7        A.    I don't know.  I know she did it.
8        Q.    Let me rephrase it.
9            So as the Assistant Director of
10   Nursing, is Carole Wolke in charge of evaluating
11   the LPNs, the other nurses within her unit?
12       A.    Yes.
13       Q.    So Donna Corrado is an LPN?
14       A.    Possible.
15       Q.    Or --
16       A.    I'm not for sure.
17       Q.    Okay.  But she's a nurse.
18       A.    She's a nurse.
19       Q.    So then she would be under Carole
20   Wolke's director supervision.
21       A.    Yes.
22       Q.    And she's not a principal clerk
23   typist?
24       A.    No.
25       Q.    So she would have a completely

Page 49

1    different set of job titles and duties than you.
2        A.    Yes.
3        Q.    Okay.  Did you also speak with
4    Mrs. Lotts about possibly getting some overtime
5    just so that you could finish all the work that
6    was given to you in a 35-hour work week?
7        A.    Yes.
8        Q.    And why did you feel that you
9    deserved overtime to do that?
10       A.    It wasn't a matter of me deserving
11   it, they wanted the job done and I was telling
12   them I had a lot of work to do.  So it wasn't a
13   matter of whether I deserved it, it was in order
14   for me to get it done, I'm gonna need some
15   overtime to get it done.
16       Q.    And why did you feel like you
17   needed overtime to get it done?
18       A.    Because of all the workload I had,
19   because of my workload.
20       Q.    Were there other principal clerk
21   typists working with you?
22       A.    Yes.
23       Q.    Did they have the same duties as
24   you did?
25       A.    No.

Page 50

1    Q.    What were their duties relative to
2  yours that were different?
3    A.    I don't know, they -- I'm not for
4  sure.  They weren't doing the medical trips,
5  they weren't doing what I was doing, that's all
6  I can know.  Their -- my job was my job, their
7  job was their job.  Basically we might -- we do
8  the time sheets, we might have that as being the
9  same, answering the phone, we might have that as
10 doing the same, but details, we had different
11 responsibilities.
12   Q.    Okay, so there -- how many other
13 principal clerk typists would you say were
14 working with you in that unit?
15   A.    One that I know of.
16   Q.    And did you feel like you were
17 getting more work than that person was?
18   A.    Maybe not more work, but could
19 have been more -- coming at a more faster pace.
20   Q.    Okay.
21   A.    More demanding immediately
22 because, you know, the medical trips, if someone
23 gets hurt you have to stop whatever you're doing
24 right then and take care of it right then and
25 that could take maybe two hours out of your day

Page 51

1  of doing whatever you supposed to do because now
2  you have to get paperwork, you have to get
3  transportation, you know.
4    Q.    Okay.
5    A.    So it -- I wouldn't say maybe more
6  work, but...just need -- maybe need to be
7  immediately or something like that.
8    Q.    Do you know if that other
9  principal clerk typist asked for overtime to
10 complete their work?
11   A.    No, I'm not -- I don't...know
12 that.
13   Q.    Do you know of any other principal
14 clerk typist within NJDC who ever received
15 overtime to do work?
16   A.    I don't know, but I'm sure.
17   Q.    Okay, so you --
18   A.    I'm almost certain.
19   Q.    But it's a guess?
20   A.    It's a guess but, I --
21   Q.    That's fine.
22   A.    You know, I don't know.
23   Q.    So you do recall speaking with
24 Roxanne Lotts about asking for overtime?
25   A.    Yes.

Page 52

1    Q.    I'm going to show you what we're
2  going to mark as Exhibit 3.
3          (Whereupon, Exhibit 3 is marked for
4    identification.)
5    Q.    I want you to take a look at this
6  (handing).
7    A.    Um-hum.
8    Q.    Okay.  You've seen this before?
9    A.    No.
10   Q.    Okay, but --
11   A.    I mean, I've seen it after you
12 sent it.
13   Q.    Okay.
14   A.    With the production.
15   Q.    Can you explain to me your
16 relationship with Roxanne Lotts?
17   A.    In reference to?
18   Q.    Did you feel you could confide in
19 her?
20   A.    I did at that time.
21   Q.    And you felt you could go to her
22 to talk about problems you were having with
23 Wolke?
24   A.    Yes, I did at that time.
25   Q.    Okay.  And what is her ethnicity

Page 53

1  race?
2    A.    Black.
3    Q.    Okay.  And how did she -- let me
4  strike that question.  Did you have occasions to
5  meet with her in person to talk about issues?
6    A.    No.  Only...the meeting that I
7  called, this one (indicating).
8    Q.    Okay.  Did you meet with Miss
9  Lotts and Carole Wolke on November 26, 2003?
10   A.    I'm not for sure if that's the
11 PAR, I don't -- I'm kind of confused with the
12 dates.
13   Q.    Would you -- okay.  Would you have
14 reason to disbelieve what Miss Lotts wrote in
15 this memorandum?
16   A.    Yes.
17   Q.    Okay, why was it -- why would that
18 be?
19   A.    Why would what be?
20   Q.    That you think she is not being
21 credible or truthful in this?
22   A.    Just not the truth.
23   Q.    Okay, tell me what's not the
24 truth.
25   A.    There's a meeting, I remember this

Page 54

1  meeting.
2      Q.    Okay, you need to tell me which
3  one it is.
4      A.    December the 30th where there was,
5  um, Penny Brask, Emma Jones, Donna Corrado and
6  Carole Wolke, I remember we were all in that
7  meeting, which is the page fifteen, the...
8      Q.    Okay.
9      A.    Second paragraph.
10     Q.    But you don't recall the November
11  26th meeting, so that would be day after
12  Thanksgiving 2003.
13          Okay, let's not -- all right, I
14  won't dwell on whether you remember that date.
15          She lists that there were some
16  problems that you were having in terms of
17  completing your work, and tell me if you believe
18  these are true.  That you had incomplete client
19  data sheets.
20     A.    All of these, uh, listings that
21  she have came after my complaint of my -- this
22  was -- this meeting was in September
23  (indicating).  There's no -- none of these, I
24  never received any complaints about none of
25  these until after I made a complaint.

Page 55

1      Q.    Okay.  But you're not saying that
2  these are false, but you're saying --
3      A.    No.
4      Q.    -- this is the first time they
5  came up to your attention?
6      A.    This is the first time it came up
7  after my meeting in September (indicating).
8      Q.    Okay.
9      A.    And my complaint.  Before then,
10  none of this ever came up.
11     Q.    Okay, I want you to look at
12  Exhibit 1 again.  Can you tell me the date of
13  the letter that you wrote to Miss Lotts?  What
14  is the date of that?
15     A.    September 28th, 2004.
16     Q.    Okay, and this meeting on the
17  document that says Atkinson EEO 15, it says they
18  met -- that you met on November 26th, 2003, so
19  wouldn't it be fair to say that meeting was
20  before you made that 2004 letter?
21     A.    None of this wasn't discussed
22  (indicating).
23     Q.    Okay.
24     A.    Because none of this, this wasn't
25  discussed.

Page 56

1      Q.    So --
2      A.    In this meeting that we had.
3      Q.    So it's your contention that the
4  2003 meeting never happened?
5      A.    No, I don't recall having this
6  meeting about data sheets.
7      Q.    Okay.
8      A.    No.
9      Q.    That's fine.  If you go down, the
10  letter says -- I mean, this memo from Roxanne
11  Lotts says "Phyllis insisted on not having
12  enough time in her 35-hour work week to complete
13  her assignments.  She asked to come in on
14  Sundays for to begin December 7th, 2003."
15          Do you recall saying that to Miss
16  Lotts?
17     A.    I recall everything after this
18  (indicating).  Before this (indicating), the
19  only meeting that I recall is this meeting on
20  December of 2003, but I do not recall this
21  meeting right here where...before this meeting
22  (indicating).  This mighta came up after, but I
23  do not recall it being before.  I just don't
24  recall it.
25     Q.    Okay.  But you do recall telling

Page 57

1  Miss Lotts you might need -- you would like
2  overtime just to get your stuff done.
3      A.    I do recall that.
4      Q.    Do you remember if that was after
5  the September 2004 letter or before then?
6      A.    The reason why I say I remember it
7  being after this letter (indicating) was because
8  when we met with...when me and Carole met
9  about -- me, Carole and...Roxanne had a meeting
10  about my PAR rating score being dropped and I
11  remember saying to Roxanne that I got a unfair
12  rating by her and she doesn't have a reason why
13  she dropped my score and I remember that it came
14  up about the data sheets after.
15          And I remember saying if it was a
16  problem with that, then why wasn't I told about
17  it.
18     Q.    Okay.
19     A.    So that's why I just can't
20  remember this.
21     Q.    Okay.
22     A.    Coming after.
23     Q.    So maybe the dates we don't
24  remember, but let's talk about these five
25  specific things that she mentions.

Page 58

1      Incomplete data sheets, do you
2   disagree or agree that you were having issues
3   completing that?
4      A.    Disagree.
5      Q.    So you completed them all.
6      A.    Yeah.  You say incomplete number
7   one?
8      Q.    Yeah.
9      A.    Um-hum.
10     Q.    Number two, inconsistent
11  information of client data sheets.
12     A.    Disagree.
13     Q.    Inconsistencies with the client
14  data books.
15     A.    Disagree.
16     Q.    Stacks of files of client records
17  in folders.
18     A.    Because if it was, it was because
19  I didn't throw 'em away.  They were documents,
20  the -- they came out of the computer and they
21  were in the folder and I just didn't throw 'em
22  away so I don't know why they using it in a term
23  as if it was a stack of work piled up.
24     Q.    Okay.
25     A.    You know.

Page 59

1      Q.    And number five, expired clients
2   still in the computer and in the data books.
3      A.    Disagree.
4      Q.    So in your contention, you believe
5   you did all these, all these five things and
6   that you are a model worker?
7      A.    Yes, yes.
8      Q.    Okay.
9      A.    I did my job to the best of my
10  ability.  Maybe not to theirs, but that's my
11  opinion.
12     Q.    Okay.  But you felt -- I'm trying
13  to understand why you felt you needed to tell
14  Lotts that you needed overtime to complete your
15  work if you were getting all the work done like
16  you just said.
17     A.    Here it says...stacks of files,
18  clients' records, I mean, I don't really
19  understand what they mean.  Stacks, stacks?
20  Yeah, there was some work that required some
21  overtime, but it wasn't to the point that it was
22  just, you know, maybe a hour overtime when I
23  could just keep caught up, you know.  It wasn't
24  like it was just a whole lot of...
25     Q.    Okay.  Because you just testified

Page 60

1   that you did these five things that were listed
2   by Lotts that she said you weren't doing and you
3   also said that you were able to do all your work
4   and you also testified that --
5      A.    Well, I was doing 'em, but maybe I
6   wasn't doing 'em --
7      Q.    Let me finish my question.
8      A.    Okay.
9      Q.    That you were a model worker, but
10  then you said you needed more time to finish
11  your work.  Can you explain the discrepancy
12  here?
13     A.    You said I was a model worker, I
14  didn't say I was a model worker.  You said I was
15  a model worker.  I said that I did my work to
16  the best of my ability, may -- that was my
17  opinion.  Maybe it wasn't to their ability, but
18  to my opinion I needed it because if the day
19  ran -- if it was a heavy day and I didn't have
20  time to put data work in the computer that day
21  or maybe three days that week if it was heavy
22  and I didn't have time to enter data into the
23  computer, then there was three days that data
24  didn't -- that that part of the work didn't get
25  worked on, so if that happened the following

Page 61

1   week it will cause the work to fall behind, but
2   as far as keeping up I did the best I could, but
3   if they wanted it to, you know, to a tee and
4   didn't want any left over or didn't want --
5   empty folders, it was just impossible for me to
6   do that.
7      Q.    Okay.
8      A.    On a everyday basis.
9      Q.    I think you clarified it.  So to
10  your subjective opinion, you thought you were
11  doing a good job.
12     A.    Yes.
13     Q.    And -- but you disagreed with how
14  they viewed how you were doing a good job.
15     A.    Yes.
16     Q.    And so that was just a
17  disagreement between you and your supervisor
18  about how well you were doing your job?
19     A.    Yes, I -- I mean, no one -- this
20  never became a problem until I made a, you know,
21  complaint about my PAR rating.  I just, you
22  know, think that if it was a problem at that
23  time that why, why did it all come up after the
24  fact.
25     Q.    Okay.  Let's talk about Miss

Page 62

1   Yvonne Bivens.  You said she was an
2   African-American female?
3       A.   Yes.
4       Q.   Do you know why she resigned in
5   December 2003?
6       A.   No.
7       Q.   How many PAR evaluations did she
8   do for you?
9       A.   I don't recall.
10      Q.   Was it two or three?
11      A.   Maybe two; I'm not for sure.
12      Q.   Did you get along with her?
13      A.   Yes.
14      Q.   And you agreed with the way she
15  evaluated your PARs?
16      A.   Yes.
17      Q.   And you agreed -- you know, in the
18  PARs there's a section that says you need to
19  improve on certain things; you agreed with
20  whatever she put down?
21      A.   To be honest with you, I
22  really...didn't read the PAR, just looked at the
23  score and if the score was okay I left -- I
24  didn't actually ever read in detail what anyone
25  was writing until...

Page 63

1       Q.   Um-hum.
2       A.   You know, I got it in the mail.
3       Q.   But then you signed off on it
4   saying you agree.
5       A.   Because I agree.
6       Q.   The magic number was there.
7       A.   Right.  That's all I looked at.
8   As long as I was passing...
9       Q.   So the 2004, the interim PAR
10  evaluation where she gave you a twenty-seven,
11  Miss Bivens gave you twenty-seven, you agreed
12  with that one.
13      A.   Yes.
14      Q.   And you agreed with everything
15  else that she put in there.
16      A.   I don't really know really what
17  was in there.  Like I said, I --
18      Q.   We'll look about it later.
19      A.   -- just looked at the number, I
20  saw it was passing and that was well enough for
21  me.
22      Q.   You said passing?
23      A.   Well, you know, it wasn't, it
24  wasn't below satisfactory, it was above
25  satisfactory and that was all I was concerned

Page 64

1   about, just getting above satisfactory.
2       Q.   Okay.  Miss Wolke -- so now Miss
3   Bivens retires in 2003.  What happened after she
4   retired?  Or did she resign or retire; do you
5   know?
6       A.   I think she resigned.
7       Q.   Okay, so then who became your
8   supervisor after she resigned?
9       A.   Carole Wolke.
10      Q.   Okay.  And did anybody tell you
11  Wolke's going to come in and supervise you?
12      A.   I don't recall.  Maybe.
13      Q.   How long have you known Miss
14  Wolke?
15      A.   Hmm.  For as long as I worked at
16  the Health Care Center, I don't know...you ask
17  these numbers, this is like --
18      Q.   I know we're going through some,
19  you know, long dates and times.  Like I said, if
20  you -- you can guess, estimate.
21      A.   At least twenty years --
22      Q.   Okay.
23      A.   -- I can say, and I can be safe to
24  say at least twenty years.
25      Q.   Do you recall what position she

Page 65

1   was when she came in to work for NJDC?
2       A.   Mm, no.
3       Q.   Do you know if she --
4       A.   A nurse maybe?
5       Q.   Okay.  Does she have any family
6   connections to NJDC?  Like, was her father or
7   mother a previous NJDC employee?
8       A.   Yes, her father was
9   superintendent.
10      Q.   And what is...is that different
11  than a CEO?
12      A.   No, it's the same position, just
13  different names.
14      Q.   So at that time it was called
15  super --
16      A.   It was called superintendent.
17      Q.   Okay.  And do you think she got
18  her position there because her dad was the CEO
19  superintendent?
20      A.   It's possible, but I, I don't
21  know.
22      Q.   Was that a concern for you?
23      A.   No.
24      Q.   Okay.  Did you guys have any kind
25  of a relationship over these twenty years

Page 66

1 between you and Miss Wolke?
2    A.    Um.
3    Q.    Let me clarify that.  I understand
4 there's probably two sagas in your relationship
5 with her before these incidents as you list in
6 the Complaint and after, so can you tell me
7 before she became your supervisor in 2004 can
8 you describe the relationship that you guys had?
9    A.    Like, were we friends?
10    Q.    Whatever you want to say about it.
11    A.    Coworkers.
12    Q.    Was she ever your direct
13 supervisor before 2004?
14    A.    Mm, I don't recall.
15    Q.    How big is the Health Care Center?
16 You can say big facility, small facility...
17    A.    It's a, it's the, it's a building.
18    Q.    Okay.  So are you guys on the
19 same -- were you guys always on the same floor
20 or different floors?
21    A.    No.  I was on the first floor, she
22 was on the second floor.
23    Q.    Okay.  How many times would you
24 say you would see her on an average workday
25 shift?

Page 67

1    A.    Mm, numbers, everything is
2 numbers.  Pffff.  Like from the beginning, from
3 the morning 'til it's time to go home?
4    Q.    Yeah.  An estimate is fine.
5    A.    An estimate maybe five or six,
6 seven times?
7    Q.    Okay.  And like you testified, she
8 was the assistant director of nursing and she
9 supervised the nurses?
10    A.    Yes.
11    Q.    So would it -- where were the
12 nurses located?  First, second floor?
13    A.    First.
14    Q.    Okay.
15    A.    The nurses station was on the
16 first floor.
17    Q.    So was she going around to the
18 nurses station and making sure that the nurses
19 were doing their jobs?
20    A.    I don't know.  I really don't know
21 what she was doing.
22    Q.    Okay, but she wasn't supervising
23 you before 2004.
24    A.    I don't think so.
25    Q.    Okay.

Page 68

1    A.    I doubt it.
2    Q.    Did she ever help you with your
3 foster kids?
4    A.    No.
5    Q.    She ever send any gifts during
6 Christmas?
7    A.    No.
8    Q.    Did you ever socialize with her at
9 the office, go out to lunch, go for coffee?
10    A.    No.
11    Q.    All right, I want you to turn to
12 what was marked as 3, right there (indicating),
13 on page -- on the bottom page 16.
14    A.    Um-hum.
15    Q.    Now, you said you do remember a
16 meeting after you wrote the September 2004
17 letter, correct?
18    A.    Um-hum.
19    Q.    So at this meeting, this is Mrs.
20 Lotts recalling in this memo, she says "at this
21 meeting Phyllis asked Carole why she didn't like
22 her and Carole explained to her that that was
23 not true.  Phyllis started crying and so did
24 Carole.  Carole told Phyllis that it hurts her
25 when she tells everybody she's a racist.  Carole

Page 69

1 said sobbing, if I was a racist, would I be
2 helping you with your work all the time, would I
3 help you with your foster kids and would I buy
4 you food all the time."
5         Do you disagree with that?
6    A.    I disagree.  I mean, one time, um,
7 my, um, grandchildren house had caught on fire
8 and she gave some funds to help with that.  That
9 was a one-time situation, um.  Maybe she brought
10 some food in and we all, you know, in the
11 lunchroom and all the employees go in and get
12 some, um...what else up here?
13         Oh, and as far as helping with the
14 medical trips, she would, um -- if a patient
15 that she was close to had difficult times in
16 accepting going out on a medical trip, I might
17 mention it to her and tell her maybe you can
18 comfort this -- you know, the patient, the
19 client and that's what she's talking about.
20         It's nothing detailed, it's -- you
21 know, these are one-time situations here and
22 it's nothing detailed like there was this chummy
23 relationship going on 'cause, you know, her
24 character is too far out there for me.
25    Q.    Okay.

Page 70

1    A.    To be chummy with.
2    Q.    Now, why do you say her character
3  is 'too far out there' for you?
4    A.    Her...what you call it, her,
5  um...my personal opinion?
6    Q.    Yeah, your opinion.
7    A.    My opinion she's just not a nice
8  lady, she likes -- she's just not a, she's just
9  not a nice lady.  She does too many mean things
10 to people that I've known in the past.
11   Q.    Word on the street is Miss Wolke
12 won some kind of a lottery.  Do you know about
13 that?
14   A.    Yes, I heard.
15   Q.    How much did she win; do you know?
16   A.    Over a million maybe?  That's what
17 I heard.
18   Q.    And do you know as the assistant
19 director of nursing how much she was making?
20   A.    No, not really.
21   Q.    Did people around the office kind
22 of whisper rumors about, oh, so-and-so is making
23 this amount of money?
24   A.    No, I really don't engage in that
25 kind of conversation.  My life was so busy I

Page 71

1  neer really had time for all that kind of stuff,
2  so I --
3    Q.    Okay.
4    A.    -- really didn't...
5    Q.    Did you ever have bitterness
6  saying, Wolke, wow, she got a million bucks.
7    A.    No, never paid attention.
8    Q.    Okay.
9    A.    That never meant anything to me.
10   Q.    So you said she was not a nice
11 person, she was mean.  What kind of stuff would
12 she say to you that made you come to this
13 conclusion today that she's a mean person?
14   A.    The mean things that she did to
15 people, other people that she...you know, did to
16 me.  She's a big liar, she lies to --
17 manipulates to, uh, make...herself look like the
18 righteous person and the other person look like
19 the bad person.  She has abuse of her authority,
20 you know.
21   Q.    You said some of the mean things
22 she did to other people.  Do you know -- did you
23 witness those firsthand?
24   A.    Yes.
25   Q.    Can you describe some of those

Page 72

1  incidents?
2    A.    Well, it was a lady that --
3  another employee who used to work there and she
4  got really sick, the lady.  She used to --
5  Carole used to be really close to her really
6  good -- close to her?  Well, I don't know if she
7  was really close to her, but it appeared they
8  were friends and she used to handle this nurse
9  business for her because the nurse had issues,
10 she had problems and Carole used to handle her
11 business for her, like, kinda control her life
12 for her.  And then the nurse didn't...just cut
13 her off and told her she didn't want her to do
14 it and Carole got -- I guess she probably got
15 angry about it.
16        And then the nurse end up getting
17 really, really sick, she ended up in a nursing
18 home, and I ask her, you know, I said, aren't
19 you gonna go see her and she said, no, I
20 don't...I don't care if I -- I don't care if I
21 ever see her again.  It just wasn't nice what
22 she said considering the...position that -- you
23 know, you used to be her friend and now this
24 lady is sick and...
25   Q.    Right.

Page 73

1    A.    Need a friend and what she say
2  just wasn't nice...
3    Q.    Okay.
4    A.    To her.
5    Q.    So that's something that she said
6  to someone else.  Can you tell me the things
7  that she said to you that you felt were very
8  mean?
9    A.    Uh, she used to...she used to make
10 little remarks, little racial, racial remarks,
11 but I really didn't pay 'em no attention 'cause
12 I always just took it like it was a...it just
13 didn't -- I just shove it off, like she, she
14 just say little things that would belitter sic
15 me like I was nobody.
16        Like, even in the meeting we had
17 here, she said I don't need to have a office, I
18 don't need to have a desk, I don't need to have
19 a computer, um...I could just work in the nurses
20 station.  Like I was nobody, um.
21   Q.    Let me just follow up on that.  So
22 you didn't have a desk?
23   A.    I had one, but she said I didn't
24 need one.
25   Q.    But you had one.

1    A.    I had one.  I had a computer, too.

2    Q.    And you said she said you didn't

3  have to have a computer?

4    A.    She said I didn't need one.

5    Q.    But you had a computer.

6    A.    But I had one.

7    Q.    Okay.  And you said that she said

8  certain racial things.  Did she overtly say

9  anything racial like the 'N' word or any other

10  comments like that?

11    A.    She never used the 'N' word.

12    Q.    So you're saying -- but she would

13  say these comments that made you feel belittled?

14    A.    Derogatory...

15    Q.    Go ahead.

16    A.    Derogatory, like -- it always

17  seemed like she was trying to make me feel like

18  I wasn't good enough to, to standard of a white

19  person.  To, you know.

20    Q.    And what does that mean, 'the

21  standard of a white person'?

22    A.    Like, I didn't deserve, like,

23  um...for example...well, I'll just answer the

24  question.

25    Q.    Okay.

1    A.    What was the question again?

2    Q.    I was asking you what statements

3  that she said made you feel that she was a mean

4  person so you were talking about certain

5  instances.

6    A.    Oh.  Yeah.

7    Q.    Okay.  I want you to look at what

8  we are going to --

9          (Whereupon, an off-the-record

10        discussion takes place.)

11    Q.    All right, this is going to be

12  called Exhibit 6.

13          (Whereupon, Exhibit 6 is marked

14        for identification.)

15    Q.    Take a look at this one, Mrs.

16  Atkinson.

17    A.    All right.

18    Q.    Okay, and I sent this to you

19  during the course of our document exchange,

20  correct?

21    A.    Yes.

22    Q.    And this is a statement by Miss

23  Lotts to Mr. Ed McCabe.  Do you remember who Mr.

24  Ed McCabe is?

25    A.    Yes.

1    Q.    Was he the DHS investigator?

2    A.    Yes.

3    Q.    For your discrimination complaint.

4    A.    Yes.

5    Q.    And obviously you wouldn't have

6  known about this interview that Lotts had with

7  Mr. McCabe.

8    A.    No.

9    Q.    After reading this, do you believe

10  what Miss Lotts has to say in this interview ?

11    A.    Not with...

12    Q.    Tell me what you disagree with and

13  we can start from there.

14          All right, I can ask you a

15  question.  Is it true that Miss Lotts selected

16  Donna Corrado to be the HIPAA complaints

17  officer?

18    A.    I don't know.

19    Q.    Was it your understanding that

20  Miss Wolke selected her?

21    A.    No.  Never was my understanding to

22  that.

23    Q.    Okay.  And do you have any reason

24  to disagree with Miss Lotts when she says "a new

25  job title came out for HIPAA officer which

1  required new office space and furniture"?  Do

2  you disagree with that statement?

3    A.    No.

4    Q.    Okay.  And did you ever apply for

5  this position that Miss Corrado got?

6    A.    It was never, um, posted to be

7  applied for.

8    Q.    Were you qualified for that

9  position?

10    A.    Yes, I was qualified, of course, I

11  was qualified, it was a job I was doing already.

12    Q.    Okay, but you never applied for

13  it.

14    A.    I never seen a posting, if it --

15    Q.    Did you file a complaint with the

16  Department of Personnel about not seeing this

17  posting and having someone else get the job?

18    A.    No.

19    Q.    Okay.

20    A.    It wasn't a issue for me.

21    Q.    What do you mean by that?

22    A.    Her getting this job was not a

23  issue for me.

24    Q.    But her getting furniture, did

25  you -- was that an issue for you?

Page 78

1    A.    Not really.
2    Q.    Is it true that within six months
3  you got new furniture as well?
4    A.    Possible.
5    Q.    Okay.  I want you to look at the
6  question that was asked by Mr. McCabe.  He says
7  "was Phyllis told why her PAR was reduced."
8  Miss Lotts answers, "she was told about her
9  failing to enter data."
10    A.    Yes, I disagree.
11    Q.    So you were never told that you
12  were failing to enter data.
13    A.    After I wrote the letter and we
14  were at the meeting, when I met with Carole,
15  Carole never told me, but when we met with
16  Roxanne, Carole told Roxanne that that was the
17  reason and then Roxanne used that.  It was no
18  discussion about data until after...
19    Q.    Okay.
20    A.    After I -- after my PAR rating.
21  There was never any discussion about data.
22    Q.    I'm trying to understand it now
23  and I think you're clarifying it for me.
24        So before the PAR rating that you
25  got reduced, no one -- you're saying no one told

Page 79

1  you about your failing to enter data?
2    A.    No, they, they didn't say I was
3  failing to enter data, they were saying the data
4  need to be...the data needs to be input into the
5  computer.
6    Q.    Okay.
7    A.    And that's when I was asking for
8  overtime, to get that job done.
9    Q.    Okay.
10    A.    But no one never made a complaint
11  like this was a real problem and a real big
12  issue and, um, I got warned about it.  None of
13  that never happened.
14    Q.    But after you wrote this letter in
15  September 2004, you're testifying that then they
16  started saying, hey, your data's not done, this
17  is not done?
18    A.    Yeah, then it became a real big
19  issue.
20    Q.    Isn't it true that although your
21  initial PAR was reduced from twenty-seven to
22  twenty-four, after you complained they decided
23  to raise it back to twenty-seven?
24    A.    Yeah, because they -- excuse me.
25  They didn't have any grounds of, of -- they

Page 80

1  didn't do it the right protocol, they didn't go,
2  uh, through the process of what they should
3  have had done -- what they should have done so
4  it was only fair they would put it back.
5    Q.    Um-hum?
6    A.    Because I didn't get any warning
7  if -- I didn't get any warning that, that, um, I
8  was gonna get a lower PAR scoring because of
9  data information not being input.
10    Q.    And is a score of twenty-four
11  above satisfactory?
12    A.    Yes.
13    Q.    Okay.  And is it true that Miss
14  Wolke got counselled about going to a class to
15  learn how to fill out these PARs more properly?
16  Do you know?
17    A.    I don't know.  I just know from
18  information that I read.
19    Q.    Okay.
20    A.    That you -- from the product,
21  productive, um, papers, work you sent me.
22    Q.    Okay.
23        MR. YI:  Let's take a quick two-,
24    three-minute break and then go back on the
25    record and take a lunch break at one.

Page 81

1        (Whereupon, a brief recess is
2    taken.)
3    Q.    We were talking about your 2004
4  PAR.  Is it your understanding today that Miss
5  Lotts approved Miss Wolke's decision to reduce
6  the PAR from twenty-seven to twenty-four?
7    A.    Yes, she approved it, I guess.
8    Q.    Okay.  Yet, when you filed this
9  initial lawsuit, you only included Miss Wolke.
10  Are you saying Miss Lotts wasn't part of this
11  alleged discrimination against you by approving
12  the lowered PAR score?
13    A.    No, because it was a number of
14  things, it just wasn't the PAR score, it
15  was...more than the PAR score.
16    Q.    Okay, but we -- I just want to
17  focus on the PAR issue.  So you didn't believe
18  that she was a part of any kind of
19  discrimination in having a part in lowering your
20  PAR score.
21    A.    No, she didn't have any part in
22  it.
23    Q.    Even though she might have
24  approved it?
25    A.    I don't know if she approved it or

Page 82

1  not, I don't know --
2      Q.    But if she did, would you believe
3  that she was part of it?
4      A.    No.
5      Q.    I want you to look at what I'm
6  going to be marking at Exhibit 7, we're going
7  out of order again.
8          (Whereupon, Exhibit 7 is marked
9      for identification.)
10     Q.    Just tell me when you're ready.
11     A.    I'm ready.
12     Q.    Okay. Is this your final PAR for
13 the rating period of March 2001 to February
14 2002?
15     A.    I guess.
16     Q.    And Yvonne Bivens was your
17 supervisor then?
18     A.    Yes.
19     Q.    And you signed off on this PAR,
20 agreeing with everything?
21     A.    Yes.
22     Q.    Okay. Can you look in the area
23 that says "specific areas identified for
24 development"?
25     A.    Um-hum, yes.

Page 83

1      Q.    Number three, can you read what
2  number three says?
3      A.    "Add or delete clients in computer
4  within first quarter of year."
5      Q.    Okay. Can you also read number
6  one?
7      A.    "Record data when received."
8      Q.    I can't read what that is.
9      A.    "Consult."
10     Q.    Okay.
11     A.    "Inform cottage nurse of
12 needed...dates are consent to be signed."
13     Q.    On the left-handed side, it says
14 "specific areas identified for development."
15 Can you read number three?
16     A.    "Update campus data sheets into
17 Health Care Center computer."
18     Q.    And that's what the HCC stands
19 for, correct?
20     A.    Um-hum.
21     Q.    Okay. I want to show you what I'm
22 going to mark as Exhibit 8.
23         (Whereupon, Exhibit 8 is marked for
24     identification.)
25     Q.    And let me know when you're ready.

Page 84

1      A.    Okay, I'm ready.
2      Q.    Okay. And is this the final PAR
3  evaluation for the rating period of March 2002
4  to February 2003?
5      A.    Yes, I guess.
6      Q.    Okay, and your supervisor then was
7  Yvonne Bivens.
8      A.    Yes.
9      Q.    And you signed off on it agreeing
10 with the ratings. Justification and development
11 plan.
12     A.    Yes.
13     Q.    Can you look at the area that says
14 "specific areas identified for development" and
15 read number one?
16     A.    "Please continue entering
17 clients...admissions data into Health Care
18 Center computer."
19     Q.    Okay. And on the specific action
20 to be taken by ratee, which is you, it says
21 "enter required personal data pertinent to NJDC
22 clients, please complete by the end of quarter."
23         Is that correct?
24     A.    Yes.
25     Q.    Okay. I'm going to show you now

Page 85

1  what's going to be marked as Exhibit 9.
2          (Whereupon, Exhibit 9 is marked
3      for identification.)
4      A.    Um-hum.
5      Q.    Okay. Actually, can you explain
6  for me, I don't understand the complete PAR
7  rating system, what does a two mean? On the
8  previous ones you were given a two. What does
9  that mean?
10     A.    Well, that was before they started
11 using the number system. They used to be one,
12 two, three, four.
13     Q.    And which one was the best score?
14     A.    Um...it maybe was one, two, three.
15 Three would be above -- three would be
16 satisfactory -- or either two would be
17 satisfactory, I don't know, I can't really
18 remember, but that's what takes.
19     Q.    So two was above satisfactory.
20     A.    Two probably was satisfactory.
21     Q.    Okay.
22     A.    And maybe three was above
23 satisfactory.
24     Q.    Okay. But you were not below
25 satisfactory.

Page 86

1    A.    No.
2    Q.    Okay.
3    A.    Never.
4    Q.    Okay. This one -- you've taken a
5  moment to look at it?
6    A.    Yes.
7    Q.    And this one is twenty-four.
8  Would this be the final PAR rating for the 2004
9  cycle?
10   A.    Yes.
11   Q.    And instead of Bivens, now we have
12  Carole Wolke on the bottom signing off on it,
13  correct?
14   A.    Yes.
15   Q.    And you did not agree with the
16  twenty-four PAR rating?
17   A.    No.
18   Q.    Okay, and why did you not agree
19  with it?
20   A.    The rating had dropped from
21  twenty-seven to twenty-four.
22   Q.    What do you mean it dropped?
23   A.    It was twenty-seven.
24   Q.    When was it twenty-seven?
25   A.    When Yvonne was doing it.

Page 87

1    Q.    Okay. So it was dropped from the
2  interim of a twenty-seven to the final of a
3  twenty-four.
4    A.    Yeah.
5    Q.    Have you ever seen anybody's PAR
6  evaluation drop from an interim score to the
7  final score?
8    A.    No.
9    Q.    Do you believe that it's possible
10  for it to drop from interim to final score?
11   A.    No.
12   Q.    Why not?
13   A.    Unless...oh, I don't know. Do I
14  believe -- could you repeat the question?
15   Q.    Do you believe that it is possible
16  that one's score from the interim could be
17  dropped in the final?
18   A.    From the beginning you mean? From
19  the very beginning to the --
20   Q.    From the interim score to the
21  final. Is it possible that one score could
22  become lower than it was in the interim, in the
23  final?
24   A.    Oh, yes, it's possible.
25   Q.    Okay.

Page 88

1    A.    But with the, you know, right
2  proceedings before all that. Not just dropped,
3  you know, abruptly, but dropped with warnings
4  and, you know, you're expected to, you know....
5    Q.    So you had problems with the way
6  the procedure was done.
7    A.    I had problems with it being
8  dropped, period, not the proceedings.
9    Q.    Because you felt what?
10   A.    Because I felt like...here was a
11  white employee who had a quarter of my job who
12  either got a satisfactory or more. My job,
13  which I have been doing for over twenty-seven
14  years or fifteen years or how many ever years
15  I've been doing it, and that's all she's doing
16  as far as paperwork with consents, which was
17  part of my job, gets a higher score or either
18  her score stays the same.
19   Q.    Okay.
20   A.    And mine's get dropped, was
21  unfair.
22   Q.    Who is this white person that
23  you're talking about?
24   A.    Donna Corrado.
25   Q.    Didn't you also testify that she

Page 89

1  was a nurse?
2    A.    Yes.
3    Q.    And in a totally different job
4  function.
5    A.    Yes.
6    Q.    Okay, did you see her actual PAR?
7    A.    No, but I did speak with her.
8    Q.    Okay. What did she say?
9    A.    When I aks sic her?
10   Q.    Yes.
11   A.    About her rating?
12   Q.    Um-hum.
13   A.    I aks sic her was she happy
14  about her rate, did she get a good rating from
15  Carole Wolke, she said yes.
16   Q.    Did you see her interim PAR which
17  would list areas of development, et cetera?
18   A.    No.
19   Q.    So you never saw any of her PAR
20  documents.
21   A.    No.
22   Q.    Did you speak with her about what
23  her interim score was?
24   A.    No, I didn't go into specifics. I
25  just aksed sic was she satisfied with what

1 Carole had gave her because I knew what Carole
2 had gave me.
3     Q.   Right. And you said she only did
4 a quarter of the work that you did.
5     A.   She received a quarter of -- not a
6 quarter of work, but she receive a quarter of my
7 work, not even maybe a quarter, just a small
8 portion of my work.
9     Q.   Okay.
10     A.   Which was turned into a whole job.
11     Q.   Okay. But we're talking about
12 2004, I'm not talking about when she became the
13 HIPAA consent person.
14     A.   Um-hum.
15     Q.   So at that time in '04 she was
16 still an LPN or RN, correct? A nurse?
17     A.   I don't know anything about her
18 before then.
19     Q.   Okay.
20     A.   Only from the time that, you know,
21 my PAR rating was dropped.
22     Q.   Okay.
23     A.   That's when I...
24     Q.   So you were comparing your PAR to
25 her PAR.

1     A.   Right.
2     Q.   And you thought it was unfair that
3 she had -- she was happy with her score and you
4 were unhappy with your score.
5     A.   No, I thought it was unfair that
6 my PAR rating was being dropped and hers was not
7 being dropped or staying the same, whichever it
8 was.
9     Q.   But you just testified you didn't
10 see --
11     A.   No.
12     Q.   -- her PAR?
13     A.   -- I didn't see it.
14     Q.   Okay.
15     A.   That's why I say it either was
16 better, it either was up or either it stayed the
17 same. She was happy with what she had.
18     Q.   Did she tell you what her actual
19 score was?
20     A.   No, I didn't aks sic and she
21 didn't tell me and I didn't even tell her what
22 mine's was. I didn't mention anything, I was
23 just curious to know, you know.
24     Q.   I'm going to ask you a question
25 and you probably won't know the answer. Is it

1 possible that Corrado might have got a
2 twenty-three or twenty-four?
3     A.   That's possible. But I doubt it.
4     Q.   Okay. But you don't have any --
5 you haven't seen any documents --
6     A.   I don't have proof of that, but I
7 doubt it very seriously.
8     Q.   I'm --
9     A.   Just knowing the relationship.
10     Q.   Actually,let's look at that
11 document I just handed to you. Number nine
12 document?
13     A.   Um-hum.
14     Q.   Can you read to me specific action
15 to be taken by ratee, number two?
16     A.   "Input needs to be current in the
17 computer and reviewed quarterly for any
18 updates."
19     Q.   Okay. And is it also policy that
20 not only does the immediate supervisor sign off
21 on the rating, but then the supervisor of that
22 person has to also sign off on it? Which in
23 this case is Miss Roxanne Lotts.
24     A.   Yes.
25     Q.   Okay. And did she sign off on

1 this one?
2     A.   Yes.
3     Q.   I want to show you what's going to
4 be marked as Exhibit 10.
5         (Whereupon, Exhibit 10 is marked
6     for identification.)
7     Q.   Just let me know when you're
8 ready.
9     A.   It's the same thing.
10     Q.   Okay. The score on there is a
11 twenty-seven, though, correct?
12     A.   No.
13     Q.   Look at Number 10. Exhibit 10.
14     A.   Yeah, it's the same.
15     Q.   Did I give you the wrong one? Let
16 me see.
17     A.   (Showing).
18     Q.   I'm sorry, I gave you the wrong
19 document.
20         (Whereupon, Exhibit 10 is
21     re-marked for identification.)
22     Q.   Tell me when you're ready.
23     A.   I'm ready.
24     Q.   Okay. This is the interim score,
25 correct?

Page 94

1  A.  Um-hum.
2  Q.  And this one --
3  A.  Yes.
4  Q.  -- was not by Carole Wolke.  This
5  is the one where you got a twenty-seven,
6  correct?
7  A.  Yes.
8  Q.  And Miss Bivens was your rater on
9  this one?
10  A.  Yes.
11  Q.  Okay.
12  A.  Um-hum.
13  Q.  And on the specific actions to be
14  taken by ratee, it says on number two,
15  complete -- and the 'complete' is underlined; is
16  that right.
17  Do you see the underline under
18  complete?
19  A.  Yes.
20  Q.  "Complete before this year's end
21  2003 the required information in the first floor
22  HCC's nursing computer data sheets."
23  And you signed off on this interim
24  PAR evaluation, correct?
25  A.  Um-hum.

Page 95

1  Q.  And you agreed with the
2  justification and the development plans?
3  A.  Um-hum.
4  Q.  Okay.  Now, I want to show you
5  what's going to be marked as Exhibit 11.
6  (Whereupon, Exhibit 11 is marked
7  for identification.)
8  Q.  And just let me know when you're
9  ready.
10  A.  I'm ready.
11  Q.  Okay.  Is this your interim PAR
12  for the 2004-2005 cycle?
13  A.  Yes.
14  Q.  And at this time it's Michael
15  Buongiorno, right?  It's your new supervisor?
16  A.  Yes.
17  Q.  And he notes in the specific areas
18  identified for development, number two, "enter
19  and update as needed names, medical information
20  in the computer data sheets."  Is that correct?
21  A.  Yes.
22  Q.  And you agreed with that, that you
23  need to work on that area for development.
24  A.  Um-hum.
25  Q.  Okay.  I want you to look at

Page 96

1  Exhibit 1 which is the Complaint --
2  A.  I didn't agree with it.  If I can
3  go back to that, I didn't agree with it, it
4  always was put there because I was -- my other
5  workload always took priority so this was always
6  not the priority.  It was done, it was always
7  done and kept up, it was no problem with it
8  being behind and they go into the computer and
9  they find that this person is not in the
10  computer.  It wasn't that a patient, a client,
11  had to go out to the emergency room and they
12  went through the computer and that person wasn't
13  found.
14  Q.  Okay.
15  A.  It was not like that, it just
16  always needed to be improved and updated all the
17  time, that was just a part of what needed to be
18  done.
19  Q.  Okay.
20  A.  It wasn't like it wasn't getting
21  done, it wasn't like it wasn't being addressed.
22  That's why the whole purpose of me asking for
23  overtime --
24  Q.  Okay.
25  A.  -- in it.

Page 97

1  Q.  I want you to look at the
2  Complaint, Exhibit 1, again.  This one
3  (indicating).
4  A.  Um-hum.
5  Q.  You mention in Paragraph 12 -- I
6  want you to turn to twelve.
7  A.  The number 12?
8  Q.  Paragraph 12.
9  A.  Oh, okay.
10  Q.  I -- just for the record, I have
11  to inform you that you can't use your notes.
12  A.  Oh.
13  Q.  Because if you use them I am
14  allowed to see them in a deposition.
15  A.  Okay.
16  Q.  So I'm going to give you an
17  opportunity to just put them away and if you
18  need recollection, then we can work on that.
19  A.  Okay.
20  Q.  Let's look at Paragraph 12.  In
21  your Complaint, you state "Wolke decreased your
22  performance assessment rating while increasing
23  her counterparts who were not African-American."
24  Who were these people?
25  A.  Michael, Mike the nurse.  Donna

Page 98

1  Corrado, Linda Grevald.
2       Q.   How do you spell that?
3       A.   Grevald.
4       Q.   So is it your assertion that no
5  African-Americans had their PAR rating increased
6  or favorable?
7       A.   No.  Say -- repeat that question?
8       Q.   So are you saying that only white
9  people had good PAR evaluations and
10 African-Americans had bad ones?
11      A.   I'm saying I had a bad one.
12      Q.   Okay.
13      A.   And all the white, all the white
14 employees that I know had satisfactory.
15      Q.   Okay, let's talk about these
16 people.  We've already talked about Donna
17 Corrado.  Mike Buongiorno, you say he's a nurse?
18      A.   Um-hum.  Yes.
19      Q.   So he's not a principal clerk
20 typist?
21      A.   No.
22      Q.   And, actually, he was a supervisor
23 of yours at one point.
24      A.   Yes.
25      Q.   Did you look at his PAR?

Page 99

1       A.   No.
2       Q.   Did you look at his interim PAR?
3       A.   No.
4       Q.   Did you have occasion to super --
5  look at how he's operating as a nurse?
6       A.   Yes.
7       Q.   Okay.  And you thought he didn't
8  deserve a good PAR evaluation?
9       A.   I didn't think anything.
10      Q.   Okay.  But you don't give him a
11 PAR evaluation, do you, as a principal --
12      A.   No.
13      Q.   Did you have any occasion to look
14 at any comments or rationale that supported
15 their PAR grade?
16      A.   Well, she gave them excellent.
17 That I know if anyone was to go back and look at
18 all the white ratings that she gave, she put in
19 nothing but positive comments about them.
20      Q.   Okay, but I asked did you --
21      A.   And I don't have to see them or
22 know that.
23      Q.   But I asked you did you actually
24 look at those.
25      A.   No.

Page 100

1       Q.   Okay, so, then, how do you know
2  they were excellent?
3       A.   I know her.
4       Q.   Okay, so your basis for saying
5  that white coworkers had higher PARs is that you
6  know her?  What does that mean?
7       A.   That she, she's partial, she's
8  partial to...me as being black and them as being
9  white.
10      Q.   Okay, so you're saying they were
11 not evaluated based on their merits.  Only
12 because they had a certain skin color that they
13 had a good PAR score?
14      A.   That's my opinion.
15      Q.   Okay, but what facts do you have
16 to support that?
17      A.   That they got ratings and good
18 comments from her and I didn't.
19      Q.   Okay --
20      A.   For no reason.
21      Q.   But you just testified you didn't
22 see any of these papers that had the comments
23 or --
24      A.   Well, I spoke with them and they
25 all got satisfactory, they all told me they got.

Page 101

1       Q.   Okay, did --
2       A.   I spoke with all of them.
3       Q.   Did Donna Corrado tell you her
4  score?
5       A.   No, they didn't give me their
6  score, they got satisfaction or above, they were
7  set -- they were happy with their rating.
8       Q.   And --
9       A.   I asked each one of them how did
10 Carole rate you, did you pass.  Yes.
11      Q.   So your score of twenty-four, you
12 testified that's above satisfactory.
13      A.   Yes.
14      Q.   And you also testified eventually
15 they changed your score from twenty-four to
16 twenty-seven.
17      A.   Yes.
18      Q.   And you were happy with that
19 score?
20      A.   Yes.
21      Q.   Okay, and that's higher -- way
22 above satisfactory at twenty-seven.
23      A.   No.
24      Q.   What is it based out of, a
25 thirty-point system?

Page 102

1    A.   I'm not for sure.
2    Q.   Okay, but twenty-seven represents
3  a score that's higher than twenty-four.
4    A.   Yes.
5    Q.   And you didn't get to see Donna
6  Corrado's score.  And you didn't see Mike
7  Buongiorno's PAR score.
8    A.   No.
9    Q.   But you think they were happy with
10  it?
11    A.   I aksed sic them.
12    Q.   But never told you what --
13    A.   I aksed sic Linda, I aksed sic
14  Donna.
15    Q.   Okay.
16    A.   Were they happy with what Carole
17  rated them.
18    Q.   Okay.
19    A.   And they said yes.
20    Q.   But you don't know if they got a
21  twenty, a twenty-one and --
22    A.   I don't know what their number
23  was.
24    Q.   Okay.  Can you look at Paragraph
25  14 of your Complaint?  Just a couple of lines

Page 103

1  down.
2         "On or about September 2004,
3  plaintiff made an informal complaint with Miss
4  Roxanne Lotts that she was being discriminated
5  by Wolke.  NJDC by and through its agent,
6  servant, employee, Miss Roxanne Lotts, took no
7  action in response to plaintiff's informal
8  complaint."
9         This is the September 2004 letter
10  that you were talking about, correct?
11    A.   Yes.
12    Q.   Okay.  Was a copy of that sent to
13  Carole Wolke?
14    A.   A copy of my letter?
15    Q.   Yeah.
16    A.   No.
17    Q.   Did you carbon-copy it, for
18  instance, saying to Miss Lotts and at the end of
19  the letter cc --
20    A.   No.
21    Q.   Okay.  Was it intended for Miss
22  Lotts's eyes only?
23    A.   This letter (indicating)?
24    Q.   The September 2004 letter.
25    A.   Exhibit 1?

Page 104

1    Q.   Yes.
2    A.   Yes, it was addressed to Miss
3  Lotts.
4    Q.   Okay.  So there was no expectation
5  that you wanted her to show it to everybody
6  because you wanted to confide in Miss Lotts; is
7  that right?
8    A.   Yes.
9    Q.   Okay.  Do you know if Miss Wolke
10  ever saw that letter?
11    A.   I'm not for sure.
12    Q.   Okay.  And that complaint in '04
13  was about the PAR evaluation, correct?
14    A.   Yes.
15    Q.   Can you look at 14 again?
16  Actually fifteen.
17         "Thereafter Wolke learned about
18  the informal complaint that plaintiff made with
19  Director of Nursing Miss Lotts.  Thereafter,
20  Wolke made plaintiff's life miserable by
21  verbally threatening her by stating I'll fix you
22  or I'll get you one way or another and through
23  other acts or threats of retaliation.
24  Additionally, throughout this time, plaintiff
25  continued to observe that Wolke continued to

Page 105

1  treat her differently than her office
2  counterparts who are not African-American."
3    A.   Um-hum.
4    Q.   When did Wolke say 'I'll fix
5  you'?
6    A.   Around about...it was after
7  September.
8    Q.   Were you going around telling your
9  coworkers that Wolke was a racist?
10    A.   I told them I feel like she's a
11  racist.  I didn't say she was a racist, I said
12  she makes me feel like a racist.
13    Q.   Because of the PAR evaluation.
14    A.   No, because of several incidents.
15    Q.   Okay, let's go over each one of
16  those now;  what were the incidents that made
17  you feel that she was a racist.
18    A.   Because of the way she treated me.
19  She didn't -- belittered sic me, she always
20  made me feel like I was less than nothing next
21  to her, you know, white counterparts.
22    Q.   And her white counterparts are
23  Corrado, Buongiorno and Gervald.
24    A.   That were worked -- that worked
25  right with me, yes.

Page 106

1      Q.     Okay.  I'm going to show you
2   what's going to be marked as Exhibit 12.
3           (Whereupon, Exhibit 12 is marked for
4   identification.)
5      Q.     Let me know when you're ready.
6      A.     I'm ready.
7      Q.     Okay.  This is a letter you sent,
8   once again, to Miss Roxanne Lotts on December
9   1st, 2004?
10     A.     Yes.
11     Q.     And is this a letter that you
12  sent?
13     A.     Yes.
14     Q.     And what were you complaining
15  about?
16     A.     Oh, when she threatened me.
17     Q.     Okay.  First of all, what time is
18  your normal shift at NJDC?
19     A.     Five-fifteen -- nine-fifteen to
20  five-fifteen.
21     Q.     Okay, on this letter you start off
22  on December 1st, 2004 at 5:45 p.m..  What were
23  you doing at NJDC at 5:45 p.m.?
24     A.     'Cause I came in late that day.
25     Q.     Okay.  So you were staying a

Page 107

1   little bit extra to meet --
2      A.     Yeah.
3      Q.     All right.  So tell me about the
4   incident.
5      A.     What?
6      Q.     What happened?  Why did you write
7   this complaint?  Tell me --
8      A.     Oh, because I was, um, doing the
9   medical trips for the next day and, um...okay, I
10  was doing medical trips for the following day
11  and one of the patients Carole is...I guess
12  kinda close with, she has a relationship with
13  the client, Patricia Brady was the client, was
14  going out on a medical trip and sometimes she
15  refuses, but if Carole talk to her she maybe
16  will go out.
17          So I approached Carole and I aksed
18  sic, I let her know that Patricia Brady will
19  be going out on a medical trip the following day
20  and you might want to talk with her so we won't
21  have no problems with her refusing to go out on
22  this medical trip and I think at that point she
23  blurted out to me I'm not helping you do
24  anything, um...I'm not gonna help you do
25  anything, I'll tired of you calling me a racist.

Page 108

1           And I said to her I'm not calling
2   you a racist, I said you make me feel like you
3   are a racist the way you treat me.
4      Q.     Okay, let me just stop you right
5   there.
6           So you just testified that you
7   weren't calling her a racist, but you were
8   telling some coworkers 'I feel like Wolke is
9   doing racist things because of X, Y and Z'?
10     A.     Treating me differently.
11     Q.     Did you ever tell that to Wolke to
12  her face before this incident?
13     A.     Before December incident?
14     Q.     Yeah.
15     A.     I think I have, and, um --
16     Q.     And how did she react to that when
17  you told her that?
18     A.     She said she, she, um, didn't --
19  she didn't think she was treating me like she
20  was a racist.
21     Q.     Okay.  Okay.  And then what
22  happened after she said I'm tired of you calling
23  me a racist?  What did you say?  What happened?
24     A.     I said I'm not calling you a
25  racist, I said you make me feel like you a

Page 109

1   racist.
2      Q.     Okay.
3      A.     The way you treat me, you treat me
4   different from, you know, all your other
5   workers, I said that.
6      Q.     And what happened after that?
7      A.     Oh, she said but I will get you, I
8   will -- I'm, I'm gonna get you for that, I'm
9   gonna fix you one way or another, she made a
10  threat and I gotta afraid of that threat because
11  knowing her position she could get me and, you
12  know...
13     Q.     Does this document help you recall
14  what she might have said?  Because this is
15  written on the day of the incident, correct?
16     A.     Which one is that?
17     Q.     This one (indicating).
18     A.     December?
19     Q.     December 1st letter.  So you wrote
20  this letter pretty much after it happened.
21     A.     Yes.
22     Q.     So --
23     A.     No, I wrote it, I think, the next
24  day.
25     Q.     Does this refresh your memory?

Page 110

1     A.    I think I did it.
2     Q.    Would it refresh your memory as to
3  exactly what she said?  Because you wrote it
4  pretty close to the event?
5     A.    Well, I just remember her saying
6  I'll fix you, I'll, I'll get you, I'll get you
7  one way or another.
8     Q.    Okay.
9     A.    And I just remember it felt
10  threatening, that's what I remember about it.
11    Q.    Let's just read this sentence
12  here.  I just want -- the words are very
13  important right now.
14    A.    Oh.
15    Q.    You said in your letter to Miss
16  Lotts, you said "Miss Wolke continued the
17  conversation by accusing me of calling her a
18  racist.  She stated to me if I keep calling her
19  a racist she would fix me."
20        Is that what she said?  Is that
21  what Miss Wolke said to you?
22    A.    Yeah, it could have been.
23    Q.    Okay.
24    A.    If I wrote it, then this what she
25  said to me.

Page 111

1     Q.    Okay.  So what happened after that
2  when she said 'I'll fix you' or words to that
3  effect?
4     A.    What happened after she made that
5  statement?
6     Q.    Yeah, right.
7     A.    I think, um, we got a little
8  emotional about --
9     Q.    Crying?
10    A.    No, we weren't crying.  I think we
11  got emotional.  I just remember thinking, wow,
12  she sounds like she's gonna do something
13  terrible to me.  I already know she doesn't like
14  me, it seems like.
15    Q.    Where were you guys when this
16  incident happened?
17    A.    In the nurses station.
18    Q.    Is that near any of the clients?
19    A.    No.
20    Q.    So they weren't witness to that
21  scene.
22    A.    Um, the nurses were there, it was
23  two, three nurses were there.
24    Q.    Do you remember which nurses were
25  around?

Page 112

1     A.    Alana -- Arissa Alanis, Judy
2  Hernandez and I think Alan, I can't remember
3  Alan's last name.
4     Q.    So would it be fair to say that
5  you said you were emotional, that it was an
6  argument?
7     A.    I said it could have gotten
8  emotional, I just can't really call it clearly,
9  I just remember...mainly I'll fix you, I'll get
10  you one way or another.  I can't remember
11  exactly what was my statement after that or what
12  was her -- oh, I know what my statement was.  I
13  said are you making a threat.  That's what my
14  statement was, I said --
15    Q.    Were you --
16    A.    -- is that a threat.
17    Q.    Were you close to each other when
18  you are saying this?
19    A.    About the distance me and you are.
20    Q.    So about two feet.
21    A.    Yeah.
22    Q.    Did you ever get up to each
23  other's face?
24    A.    No.
25    Q.    Was anybody's voice raised?

Page 113

1     A.    Hers -- maybe probably -- I talk
2  loud anyway so I'm sure my voice was raised if
3  not hers.
4     Q.    So did it look like both of you
5  were a little bit distressed about the
6  situation?
7     A.    No, I was kinda upset because it
8  just came out of nowhere, I'm talking about job
9  related work and somehow or another she has it
10  in her head that -- I don't know whether it was
11  because of -- I really don't know what stemmed
12  it off.
13    Q.    Um-hum.
14    A.    Because I were -- I approached her
15  in a, in a -- as a coworker presenting job work
16  related information and then...
17    Q.    Um-hum.
18    A.    Whatever was going on in her head
19  I have not a clue, but she blurted out this.
20    Q.    Did you ever at a meeting
21  basically say 'I think Carole Wolke has
22  emotional or mental issues'?
23    A.    Oh, yeah.
24    Q.    Why do you think so?
25    A.    Because of that incident and

Page 114

1  previous incidents she just, you know.
2       Q.    You think her mental issues made
3  her incapable of doing her job?
4       A.    Yes.
5       Q.    You think it made her -- strike
6  that question, okay.
7            You said there were a couple of
8  witnesses standing around you, right?
9       A.    Yes.
10      Q.    Do you have any reason to believe
11 that any of those witnesses would have sided
12 with Carole or sided with you?
13      A.    Some time people just don't want
14 to get involved; I believe that.
15      Q.    Okay.
16      A.    Because a lot of times I don't
17 want to get involved, so...not that they want to
18 side with anyone, they just don't want to be
19 involved in it.
20      Q.    Okay.  So your recollection of the
21 event is you had a business question, you said
22 what do I do with this medical trip?
23      A.    Um-hum.
24      Q.    Then she started saying?
25      A.    No, I aksed sic -- I said you

Page 115

1  might want to talk with...Patricia Brady.
2       Q.    Okay.
3       A.    She has a medical appointment.
4       Q.    So you were talking business.
5       A.    Right, I was talking --
6       Q.    Nothing personal.
7       A.    No.
8       Q.    Then she came out and said I'm
9  tired of you calling me a racist?
10      A.    Yes.
11      Q.    So in your opinion you feel that
12 elevated everything?
13      A.    That's where it started at.
14      Q.    Okay.
15      A.    And she said I'm not helping you
16 with anything anymore.
17      Q.    Okay.
18      A.    Because I'm tired of you calling
19 me a racist.
20      Q.    I'm --
21      A.    So I don't know --
22      Q.    -- going to show you what's going
23 to be marked Exhibit 14.
24           (Whereupon, Exhibit 14 is marked
25      for identification.)

Page 116

1       Q.    Just let me know when you're
2  ready.
3       A.    I'm ready.
4       Q.    Does Miss Rizalina Orlanes, was
5  she a witness to that event on December 1st?
6       A.    Yes.
7       Q.    And what was her position?
8       A.    I think she was supervisor of
9  nursing.
10      Q.    Was she a nursing supervisor?
11      A.    Yes.
12      Q.    What's her ethnicity?
13      A.    Asian, uh...
14      Q.    Philippino?
15      A.    Philippino.
16      Q.    Okay.  What was your relationship
17 with her?
18      A.    It was okay, coworker
19 relationship.
20      Q.    Okay, so she was there at the
21 scene.  And, like I asked you before, do you
22 remember Ed McCabe?
23      A.    Yes.
24      Q.    He's the DHS investigator?
25      A.    Yes.

Page 117

1       Q.    So he spoke with Miss Orlanes
2  because you said that she was present there at
3  the incident, right?
4       A.    Yes.
5       Q.    All right.  So Mr. McCabe asks
6  her, did you hear Carole Wolke tell Phyllis
7  Atkinson I'll fix you and Alanis says, yes, it
8  was words to that effect, they were both
9  arguing, they were both emotional, Carole said
10 it.
11           Is that an accurate statement?
12      A.    Could be.
13      Q.    Were you both arguing?
14      A.    I was responding to her.  I
15 wouldn't say I was arguing with her, I was
16 responding to her reaction to what she just
17 said, so I wouldn't say I was arguing with her
18 'cause what would there be to argue with her
19 about.
20      Q.    Were you --
21      A.    -- I was responding.
22      Q.    Were you in disbelief when she was
23 talking about non-business stuff back to you?
24      A.    I was upset because she said I'll
25 fix you, I'll get you one way or another and I

Page 118

1  know her position, I know her title and it,
2  like...upset me because she said that.
3      Q.    Okay.  And then you wanted to let
4  her know are you threatening me.
5      A.    Right.
6      Q.    In response, okay.
7      A.    Because --
8      Q.    I want to show you what's -- go
9  ahead.
10      A.    Because she know I already made a
11  complaint against her about the PAR rating and I
12  made complaints verbally over and over about how
13  she treats me partially, different from
14  her...from the other coworkers, so I'm --
15      Q.    Let me ask you --
16      A.    -- thinking that came from...that
17  outburst.
18      Q.    Right.
19      A.    Came from previous...
20      Q.    Right.  Because you're saying she
21  retaliated against you because of the letter,
22  the PAR letter.
23      A.    Yes.
24      Q.    Now, if you go back to that
25  letter, I think it's Exhibit 1, September 20th,

Page 119

1  2004, who is it addressed to?
2      A.    It's addressed to, uh Miss Roxanne
3  Lotts.
4      Q.    Did you carbon copy or send a
5  correspondence copy to Carole Wolke?
6      A.    No.
7      Q.    Okay, why didn't you do that?
8      A.    Because I wasn't interested in
9  sending her a letter, I just wanted to have a
10  meeting.  I requested a meeting from Roxanne
11  Lotts --
12      Q.    Okay.
13      A.    -- with her about the letter.  She
14  was, uh, she was Carole's superior and she
15  could -- if there was anything that could be
16  done about it she would be the one that could
17  be -- do something about it.
18      Q.    Okay.  So you felt like sending
19  this to Wolke wouldn't have been productive?
20      A.    Mm, no, because I already felt
21  hostile...from her so I didn't think she was
22  interested in, um, helping me out.
23      Q.    So do you know if Wolke ever
24  received a copy of this?
25      A.    I know we had a meeting on it, I

Page 120

1  don't know if she ever received a copy, but I do
2  know --
3      Q.    Okay.
4      A.    -- she know the contents of it
5  because we were sitting in the meeting together
6  with it, when Roxanne -- you know.
7      Q.    And when she said I'll fix you,
8  did she talk about the PAR incident?
9      A.    No.
10      Q.    Isn't it true that she was talking
11  about maybe it was her incorrect perception that
12  you were going around calling her a racist?
13  Isn't that what sparked this whole December 1st
14  incident about I'll fix you?
15      A.    No, I wasn't going around telling
16  everybody she was a racist.  I told her to her
17  face.
18      Q.    Right, I just want you to listen
19  to the question carefully.
20          Isn't it true that the reason why
21  this December 1st 2004 incident happened is
22  because she felt like you were going around
23  calling her a racist?
24      A.    I don't know what she felt.
25      Q.    Okay.

Page 121

1      A.    I have not a clue what she felt.
2      Q.    All right.  But she didn't bring
3  up anything about how dare you write that letter
4  about the PAR evaluation, et cetera, did she?
5  Did she mention that on December 1st?
6      A.    I don't recall.
7      Q.    Okay.  But she did mention I'm
8  sick and tired of you calling me a racist?
9      A.    Yeah.
10      Q.    Or words to that effect.
11      A.    To that effect, yeah.
12      Q.    I want to show you what's going to
13  be marked as 13.
14          (Whereupon, Exhibit 13 is marked for
15  identification.)
16      Q.    Tell me when you're ready.
17      A.    I'm ready.
18      Q.    Do you remember this?
19      A.    Yes, I do.
20      Q.    What is this?
21      A.    It was a tag from a Christmas
22  present that she gave me.
23      Q.    What did she give you?
24      A.    What did she give me?  I don't
25  even recall.

Page 122

1    Q.    Did you feel that it was a hostile
2  act when she gave you a present?
3    A.    Well, it was a deceptional sic,
4  I felt that it was a deceptional act, but I felt
5  like if she was -- I'm a Christian and if she
6  felt she wanted to try to make amends, then I
7  will try to make amends.  I didn't know I was
8  being deceived until what she was plotted in her
9  head.
10   Q.    Okay.  So she put time to make
11 amends during the...
12   A.    Holidays.
13   Q.    Season.
14   A.    And that's all she was talking
15 about during that time.
16   Q.    And you felt that was deceptive?
17   A.    Yeah, she was just, um, pulling me
18 back into her web because after the letter I did
19 not even bother, um...dealing with her at all, I
20 just, you know.  No conversation at all with
21 her, I just go to work and not be bothered with
22 her at all.
23   Q.    Okay.  So you're saying after the
24 12/1 incident, you basically steered -- you said
25 I'm not --

Page 123

1    A.    No, before the 12/1 incident.
2    Q.    Okay.
3    A.    This is when she requested to --
4  this happened after, this is when she requested
5  to, um...let's, let's make amends.
6    Q.    Okay.  And that was 2004 Christmas
7  time.  Around then, right?  Was that after the
8  I'll fix you incident?
9    A.    Say that again?  Repeat that?
10   Q.    You say after she sent you this
11 card because it has to be, what, late December,
12 right?
13   A.    Yeah, it was, hmm...
14   Q.    So she gives you a gift and this
15 was attached to it.  At that time you thought
16 this was deceptive?  Or now you think it's
17 deceptive?
18   A.    No, at that time I wrote it in my
19 notes somewhere that she just tricked me into
20 being deceptive.  At the time I didn't -- I was
21 kinda leery at accepting it because I didn't
22 know what her motives were, but being a
23 Christian, if she wants to make amends and make
24 peace, you know, it was part of my
25 responsibility to do that, so that's what I was

Page 124

1  doing.
2    Q.    So were you kind of...receptive to
3  the idea that maybe you guys could just start
4  anew?
5    A.    Yeah, I just was gonna kinda feed
6  her with a long handle...a long wooden spoon and
7  not allow her --
8    Q.    At arm's length?
9    A.    -- to get too close to me anymore
10 because it looks like she out to hurt me and...
11   Q.    But at that time you were possibly
12 thinking -- you were cautious about thinking
13 that this could settle your problems.
14   A.    Well, I was hoping that, um...I
15 was hoping that it could, you know, just...erase
16 everything and...kinda, you know, move on.
17   Q.    Okay.  And you say in Paragraph 14
18 of your Complaint, the lawsuit Complaint
19 (indicating)...you might just keep that by you
20 so you can look at it at all times.
21   A.    Fourteen.
22   Q.    It's Exhibit A.
23   A.    Is it more than two pages?
24   Q.    It might be down here somewhere
25 (indicating).

Page 125

1          In 14, you say that Miss Lotts was
2  notified about your PAR incident, right?
3  Because you sent her an informal complaint.
4  Correct?
5    A.    Yes.
6    Q.    And you say in your lawsuit on
7  Paragraph 14, "however, Miss Lotts took no
8  action in response to plaintiff's informal
9  complaint."
10         Isn't it true that she changed
11 eventually your PAR back to twenty-seven,
12 though?
13   A.    When I wrote the letter, December
14 letter, she never took any action.  That had
15 nothing to do with this (indicating).  This was
16 not changed back during that time.
17   Q.    When was it changed back?
18   A.    That was changed back after my
19 discrimination charges, everything was changed
20 after my discrimination charge.  Nothing was
21 changed beforehand.
22   Q.    Okay.
23   A.    Everything came after.
24   Q.    So -- wait, I just want to stop
25 you there.

Page 126

1    So your problem is not that they
2 didn't take action, but they didn't take it
3 quickly enough?
4    A.    They allowed all this to happen to
5 me and then they tried to correct everything
6 after everything happened to me.
7    Q.    After you filed the
8 discrimination --
9    A.    After I filed the discrimination,
10 when --
11    Q.    Okay, I understand that now.
12    A.    When I wrote the December letter
13 that was between me and her.  She never did
14 anything about it then.
15    Q.    I'm sorry, her meaning?
16    A.    Roxanne Lotts.
17    Q.    Okay.
18    A.    She never did anything about it,
19 you know.
20    Q.    About the I'll fix you incident?
21    A.    Right, she never did anything.
22 And then this letter came after that (showing).
23 And it was just...quiet, you know, I didn't push
24 for her to do anything, you know, but in the
25 back of my head...

Page 127

1    Q.    Okay.  Isn't it true, though, that
2 eventually Miss Lotts consulted with Marcia
3 Parchment about -- she's the hostile work
4 environment coordinator, right?  Someone whose
5 job is to stop --
6    A.    Yes.
7    Q.    -- hostile work environment?
8    A.    Yes.
9    Q.    Or -- actually, strike that.
10    Workplace violence, she's tasked
11 at NJDC with preventing that.
12    A.    Yes.
13    Q.    So isn't it true that Lotts
14 eventually talked with Marcia Parchment about
15 this issue, the I'll fix you issue?
16    A.    After.  After.  Everything came
17 after.
18    Q.    Okay.
19    A.    Nothing in between from the letter
20 of September to the letter of December, nothing,
21 there was one meeting which was September, the
22 meeting I requested, but from this meeting
23 (indicating) to December there was nothing...uh,
24 changed or nothing happened.
25    Q.    So the --

Page 128

1    A.    Now, the fact that things was
2 getting even more heated up in between, between
3 that with my vacation and with my Christmas,
4 everything was just getting out of control, and
5 even at that point I still was not pushing, it
6 was only when she...disciplinary came
7 (indicating) that I had to...
8    Q.    So you said that there was a
9 meeting in response to the September --
10    A.    Yes, there was a meeting.
11    Q.    But you weren't satisfied with the
12 results.
13    A.    Yeah, I ended up, um, I think I
14 ended up signing the PAR because I had refused
15 to sign it at one point --
16    Q.    Okay.
17    A.    -- when...
18    Q.    Correct.
19    A.    And then I think after -- I think
20 I did end up signing it.
21    No, I never did sign it because it
22 had rested itself and it was no longer...didn't
23 matter at that point.
24    Q.    Okay.
25    MR. YI:  It's one o'clock so let's

Page 129

1 break for a half an hour break and then
2 let's start and we're gonna have to move a
3 little bit quicker to finish up at four,
4 otherwise, I'm going to ask the judge for
5 another day to finish this up.
6    All right, so we'll be back in half
7 an hour.
8    (Whereupon, a lunch recess is
9 taken.)
10    Q.    Ready to go?
11    A.    Ready or not, doesn't matter,
12 right?
13    Q.    Okay, back on the record.  All
14 right, can you turn with me to Exhibit A, your
15 Complaint that you filed in Federal Court?  And
16 let's go to Paragraph 15, I think it's...third
17 page.  Paragraph 15, please.
18    Okay, I'll read it.
19 "Additionally, throughout this time plaintiff
20 continued to observe that Wolke continued to
21 treat her differently than her office
22 counterparts who are not African-American."
23    Can you tell me what exactly, some
24 specific incidents, that led you to conclude
25 that.

Page 130

1    A.    Oh, she denied my vacation time
2  and, um...my Christmas vacation, the vacation
3  time, just every -- anything that she can -- is
4  it all right I drink my water?
5    Q.    Yeah, go ahead.
6    A.    Anything that, um...
7    Q.    I kind of need you to be precise
8  here because you say you --
9    A.    She denied my vacation time twice.
10   Q.    Okay, twice?
11   A.    For no reason at all.  I had put
12 it in enough time for it to be approved or not
13 approved and she never did give it -- she
14 approved everybody else's in a timely manner,
15 but she didn't mine's and then when I had --
16 because of that I had to put in, uh, re...put in
17 my vacation time and then it was denied and it
18 was...then she lied on me and said I didn't put
19 it in on time, so it's just a lot of little,
20 little things that she were doing.
21   Q.    Okay.  So I'm going to ask you are
22 those the two incidents that -- where you say
23 that she treated other counterparts who are not
24 African better than you?
25   A.    That's two of 'em.

Page 131

1    Q.    I want you to name them all now.
2  It's your opportunity to tell me what happened,
3  so you tell me about two vacations?
4    A.    I'll just answer the question,
5  whatever question you aks sic me.
6    Q.    So I'm asking you the other one,
7  you have two vacation incidents and what else?
8    A.    Um...two vacation incidents, what
9  else did she do?
10   Q.    Do you want me to just ask you
11 questions?
12   A.    Yes.
13   Q.    The PAR evaluation, is that part
14 of that, too?  That you said Donna Corrado, Mike
15 Buongiorno and Linda Grevald were treated
16 better?  Is that part of your assertion that
17 white counterparts were it treated better?
18   A.    Yes.
19   Q.    Okay, what else is there?  How
20 about the desk?  Are you saying that white
21 counterparts were given desks and you weren't?
22   A.    No.
23   Q.    All right.
24   A.    That never was --
25   Q.    Anything else besides the two

Page 132

1  vacation times, the PAR and incident and what
2  else?
3    A.    I can't recall right from the top
4  of my head.
5    Q.    Okay.
6    A.    I know it was more, um, my job
7  duties were taken away from me and that was,
8  um...people who were out sick and they came back
9  to their job duty responsibilities is -- were
10 given back to them, but that was taken away from
11 me.
12   Q.    Okay.
13   A.    Um...let me see.
14   Q.    But I want you to focus
15 specifically on your assertion that you said
16 white office counterparts were treated
17 differently and better than African-American
18 ones.
19   A.    What I'm saying is they have been
20 out on sick leave, these other people have been
21 out on sick leave and when they came back they
22 job responsibilities was given back to them.
23 That didn't happen to me.
24   Q.    Okay.
25   A.    Mine's was taken away from me.

Page 133

1    Q.    So you're saying it for you, but
2  have you observed African-Americans who also
3  went out on sick leave and were not given their
4  job responsibilities back?
5    A.    I don't know because I work in the
6  building with --
7    Q.    So -- go ahead.
8    A.    With...you know.
9    Q.    So you can only testify about what
10 happened to you so that's what you were
11 testifying to.
12   A.    Yeah, my experience.
13   Q.    Um --
14   A.    And -- well...
15   Q.    All right, we can move on from
16 there.  I want you to look at what's already
17 been marked as Exhibit 2.  I think it should be
18 there.
19        Can you please turn to the bottom
20 page that says Atkinson 74?  So you make a
21 statement "it is my belief that because I am
22 black she sees me to be inferior to her and
23 other white people."  You also say that "she
24 makes statements as I don't need my own computer
25 or my own desk."

Page 134

1     And then at the bottom of that
2 paragraph, you write "Miss Wolke was certainly
3 in a hundred percent agreement with Miss Corrado
4 receiving her own office and everything new."
5     So are you testifying that that's
6 not a problem to you now anymore, that she
7 received -- Mrs. Corrado received a desk and you
8 didn't?  A new desk.
9     A.   I don't understand the question.
10 What I'm saying is that the desk issue was one
11 of the issues, but it wasn't a big issue, it was
12 just a opinion that one of the things that I see
13 that she did, she was not happy about me not
14 having -- uh, she made a statement that I don't
15 need a desk and I have been working in that
16 position for over twenty-something years or
17 however many years I been working and she makes
18 a statement saying I don't need a desk, but then
19 the white...my white co-employee, she was happy
20 when she got all her desk, so she, like, it's
21 better for her to have one than me, you know.
22     Q.   And I just want to refer you to --
23 we looked at the document where Roxanne Lotts
24 testified to Ed McCabe and she said that she
25 approved the hiring of Donna Corrado, correct?

Page 135

1 Do you remember that document?
2     A.   Yes.
3     Q.   And that as a result she got a new
4 office and a new desk.
5     A.   Yes.
6     Q.   Is that correct, okay.  Now, isn't
7 it --
8     A.   Not true.
9     Q.   Go ahead.
10     A.   It's not true.
11     Q.   What's not true?
12     A.   That, um...um, Roxanne appointed
13 Donna.  She might have been part of it, but Mr.
14 Wirkenheiser was the one chose Donna for that
15 position.
16     Q.   So are you now saying that Mr.
17 Wirkheiser is part of a...the discrimination
18 against you?
19     A.   No, I'm not saying that.  I'm
20 saying that's not the statement Roxanne stated
21 that...
22     Q.   Okay.
23     A.   She was the one that chose Donna
24 is not fully true.
25     Q.   But would you be in a position to

Page 136

1 know if she did make that decision or not?
2     A.   Only by hearsay.
3     Q.   Is it also true that Sheila
4 McCrea -- what was her position?
5     A.   She was principal clerk
6 transcriber.
7     Q.   And is that a similar position as
8 you?
9     A.   Yes, that's the same.
10     Q.   And she's also African-American?
11     A.   Yes.
12     Q.   And you made an assertion that she
13 didn't receive a desk as well?
14     A.   No, not at the time.
15     Q.   Okay.  But isn't it true that she
16 eventually did get a new desk?
17     A.   We all got desks after Donna got
18 her desk.
19     Q.   Okay.  But Sheila is a principal
20 transcriber, correct?
21     A.   Yes.
22     Q.   And you are a principal
23 transcriber.
24     A.   Yes.
25     Q.   But Donna Corrado is -- she was a

Page 137

1 nurse at that time and then she got a new
2 position called the HIPAA consent office --
3     A.   Yes.
4     Q.   Okay, so she was a different
5 position than you two.
6     A.   Yes.
7     Q.   I want you to look at what I'm
8 going to mark as 15.
9         (Whereupon, Exhibit 15 is marked
10 for identification.)
11     Q.   Tell me when you're ready.
12     A.   I'm ready.
13     Q.   Okay.  And this is another
14 statement taken by the investigator Ed McCabe of
15 Sheila McCrea; is that correct?
16     A.   Yes.
17     Q.   And look at the bottom.  Mr.
18 McCabe asks her, "was there a problem with your
19 not getting a desk while a white employee did."
20 Miss McCrea responds "no, I didn't need a desk,
21 but I got one soon after Miss Corrado."
22         Do you have any disagreement with
23 that statement?
24     A.   No, it's just what I said, we got
25 one after Miss Corrado.

Page 138

1    Q.    Okay.
2    A.    We got one after her.  We been
3  there for years doing the job and we got one
4  after her, new desks came after, not before.
5    Q.    Did everybody else in the office
6  get a new desk at the same time you and Sheila
7  got new desks?
8    A.    Yeah, everybody got one after
9  Donna and --
10    Q.    So Donna got the first new desk?
11    A.    Right.
12    Q.    And --
13    A.    Because there was a complaint and
14  everyone else got one after Donna.
15    Q.    And by everybody else, who else?
16    A.    Linda Grevald, Emma Jones, Sheila
17  McCrea and myself.
18    Q.    Okay.  So all the principal...
19    A.    No, two nurses.
20    Q.    Okay.
21    A.    And two principal clerk
22  transcribers.
23    Q.    Okay.  Can you please look at
24  Exhibit 6 again?
25    A.    Six?

Page 139

1    Q.    Yeah, it's already been entered.
2        Okay, and this is the statement by
3  Miss Lotts to Investigator McCabe.
4    A.    Um-hum.
5    Q.    Do you remember this document?  At
6  the bottom had Mr. McCabe asks "was there a
7  problem with her not getting a desk while a
8  white employee did."  And by 'her' she means
9  you, right?
10        And Miss Lotts replies "everyone
11  was putting in for getting new desks.  A new job
12  title came out for a HIPAA officer which
13  required new office space and furniture.  I
14  selected Miss Corrado for the job because she
15  was the best qualified.  Phyllis never even
16  applied for the job.  Phyllis did one part of
17  the consent and that was now given to Miss
18  Corrado.  With Miss Corrado there was an urgent
19  need for the furniture and she got it first.
20  Phyllis and everyone downstairs got their new
21  furniture and computers eventually."
22    Q.    Is that an accurate statement now
23  that you've said everybody got their furniture
24  after Donna did?
25    A.    Some parts of it.

Page 140

1    Q.    Okay, which parts do you contend
2  are not true?
3    A.    I wasn't qualified.
4    Q.    Did you apply for it, though?
5    A.    I didn't know about it.
6    Q.    Okay, and we discussed this and
7  you testified you didn't file an appeal with the
8  Department of Personnel or anything, you just
9  said so be it, it just happened, so that was
10  that?
11    A.    It wasn't a problem until they
12  strike me down when Carole treated me
13  impartially sic.
14    Q.    But you never applied for it,
15  though, that's the conclusion, right?  You never
16  applied for that job.
17    A.    I didn't know about it.  I
18  couldn't apply for something I didn't know
19  about.
20    Q.    Okay.
21    A.    If I would have knew about it I
22  probably would have applied.
23    Q.    How do you know it was Carole
24  Wolke who assigned office furniture to people?
25    A.    Furniture?

Page 141

1    Q.    Yeah.  Are you saying that Wolke
2  was the reason why you didn't get your
3  furniture?
4    A.    She could have played a part, I'm
5  not for sure.  One hundred percent.
6    Q.    So what's your basis for thinking
7  that --
8    A.    I believe she was the one
9  that...my basis is that it was made clear that
10  Donna Corrado gets her desk, computer and
11  everything first.
12    Q.    Okay, and you saw Miss Lotts'
13  statement to Ed McCabe explaining that there was
14  an urgent need for her to get the furniture?
15    A.    She said that, but...
16    Q.    And you disagree with Miss Lotts'
17  decision?
18    A.    Yeah, I disagree, you know.
19    Q.    You thought you should have gotten
20  one over Miss Corrado?
21    A.    Pffff, yes.
22    Q.    And why is that?
23    A.    The years I been there doing the
24  work, I mean, I've requested a desk, years and
25  years of requesting a desk and I never got

Page 142

1  anything -- got one.
2      Q.    How many years did Sheila McCrea
3  have in the State system?
4      A.    Probably, maybe a little more than
5  I, I have twenty-seven.
6      Q.    So could she have gotten it --
7      A.    I said the same thing; she should
8  have, too.
9      Q.    So it's your testimony today that
10  it's your opinion that based solely on seniority
11  McCrea and you should have gotten it over
12  Corrado, a new desk.
13      A.    Well, I think I should have
14  because I requested one.  I don't know if Miss
15  McCrea ever requested a desk, but I know I've
16  requested a desk.  Long before Miss Corrado got
17  a position and long before Miss Corrado...got
18  the, uh, position in that office I requested and
19  I didn't get one.
20      Q.    Did you feel upset when Donna
21  Corrado took all of your medical consent
22  responsibilities?
23      A.    Oh, no, never.  Never, ever.
24      Q.    You were happy that she did that?
25      A.    It was, it was okay, I was fine

Page 143

1  with it.  It was never a problem until my PAR
2  rating was dropped.  That's when the problem
3  started, all of this.  Donna had her desk, she
4  had her title, her job, she had all that and I
5  never made a complaint.  It was only when my PAR
6  rating was dropped that it became a problem.  I
7  knew that I was being treated differently, I was
8  gonna deal with it.
9      Q.    You mentioned that some of your
10  job responsibilities were taken away when you
11  came back from leaves.  Was that one of the job
12  responsibilities that was taken away, the
13  medical consent?
14      A.    No.  That was already given to
15  Donna.
16      Q.    We can discuss that later, but I
17  just wanted to know that specifically.
18      A.    Oh, okay.
19      Q.    So you didn't feel less important
20  now that Donna was taking all your medical
21  consent.
22      A.    Oh, no, that had nothing to do
23  with it.  I, I felt like, you know, it was wrong
24  at the time that it was all happening, but it
25  was no issue, it was no big deal because as long

Page 144

1  as I still had a job and as long as there were
2  my work performance...nobody was intervening
3  with that or showing partianality sic, it was
4  never a problem for me.
5      Q.    And you mentioned there was
6  another principal clerk typist.  Or transcriber
7  with --
8      A.    Senior clerk transcriber.
9      Q.    But you said there were different
10  job responsibilities and you had certain extra
11  responsibilities; is that an
12  accurate...statement there?
13      A.    Similar, some of our
14  responsibilities were similar --
15      Q.    Right.
16      A.    -- but there -- some of 'em
17  were...different, like.  For example, I was
18  solely the main one that would do the medical
19  trips.  That was not --
20      Q.    Okay.
21      A.    -- anyone else's responsibility.
22      Q.    Is that any different than the
23  medical consent?  I'm trying to understand the
24  difference.
25      A.    No.

Page 145

1      Q.    They're the same thing.
2      A.    Medical consents is when you get
3  permission from a guardian to do a procedure.
4      Q.    Okay.
5      A.    And medical trips is when you're
6  scheduling patients to go out to the hospital
7  for procedures to be done.
8      Q.    Okay.  And out of your job duties,
9  what percentage of it was taken up by doing
10  medical consent?
11      I understand it's not an exact
12  science, you could...ballpark figure is fine.
13      A.    I don't understand the question,
14  like.  What are you asking me?
15      Q.    If you -- was it half of your job
16  responsibilities to do medical consent, was it
17  one-fourth of your job, was it a hundred percent
18  of your job to do medical consent?
19      A.    It would depend on...I could say a
20  hundred percent because it was part of the
21  medical, preparing paperwork for a patient.
22      Q.    Okay.
23      A.    To process for a patient.
24      Q.    I just want to make sure we're
25  understanding the issue.

Page 146

1          So you're saying one hundred
2    percent of -- when you showed up to work at
3    nine-fifteen, a hundred percent of your job
4    duties was to do medical consent for the rest of
5    the day?  Is that what you're trying to tell me
6    or...
7          A.    You could make it all day.  Job.
8          Q.    Okay, but let's look at over the
9    course of a whole year because sometimes you're
10   probably doing one thing on one day, another
11   thing -- because you told me sometimes the
12   medical trips pop out and you're out for two or
13   three hours, right?
14         A.    Yeah.
15         Q.    For a year time, how much of that
16   time is taken up doing medical consent?
17         A.    Probably...maybe, um, a little
18   more than a quarter.
19         Q.    Okay, so did you consider that
20   somewhat substantial amount of work because it's
21   one out of every four things you have to do
22   you're saying is a medical consent issue.
23         A.    Um-hum.
24         Q.    So would that be a fair
25   assessment?

Page 147

1          A.    Yes.
2          Q.    Okay.  And when that was all of a
3    sudden taken from you and now Donna Corrado was
4    going to handle that one hundred percent of the
5    time, you were okay with that.
6          A.    Um-hum.
7          Q.    And you didn't feel any --
8          A.    I mean, at the time it wasn't
9    right that I didn't get an opportunity to, you
10   know -- it wasn't discussed, like...it was just
11   told to me that a new law came out and they
12   needed, uh, a nurse to do this position so it
13   was left that it could -- I wouldn't have been
14   eligible -- the only -- that's the only thing I
15   can -- that's the only reason I can think she's
16   saying I'm not qualified because I'm not a
17   nurse.
18         Q.    Okay.
19         A.    That's the only other thing other
20   than -- it couldn't have been not from my work
21   performance because I knew the job, but --
22         Q.    So your understanding is that the
23   HIPAA consent person had to be filled with a
24   nurse.
25         A.    That's my understanding --

Page 148

1          Q.    Okay.
2          A.    -- to it.
3          Q.    All right, that makes sense now.
4          You mentioned about your November
5    2004 Thanksgiving vacation time off.  When do
6    you contend was the first date of your
7    submission for that vacation request?
8          A.    March of 2004.
9          Q.    Okay.
10         MR. YI:  Sixteen.
11         (Whereupon, Exhibit 16 is marked for
12   identification.)
13         Q.    Do you recall that form, Ms.
14   Atkinson?
15         A.    Yes.
16         Q.    Okay.  And can you tell me the
17   date on the top that this form was made by you?
18         A.    11/19/04.
19         Q.    And you asked for which dates?
20         A.    11/24, 11/23, 11/29, 11/30.
21         Q.    And on the bottom, can you tell me
22   what date Carole Wolke denied this?
23         A.    11/19.
24         Q.    Okay, but your contention is you
25   filed this in March?

Page 149

1          A.    This is not the original one, we,
2    we receive, uh, vacation requests, everyone,
3    every employee receives a vacation request which
4    they have to complete and give back to their
5    superior and then it gets approved, but I never
6    received mine's back and because I never
7    received mine's back I had to do it over again.
8          Q.    So when was the first time when
9    you realized, my goodness, they don't have my
10   Thanksgiving request, I better do something
11   about that?
12         A.    I don't know, because -- I can't
13   remember exact date, but I remember requesting
14   and letting Roxanne know that I didn't receive
15   my vacation request back.
16         Q.    Okay, I'm just trying to
17   understand.  You said in March of 2004 -- that's
18   eight months.
19         A.    Right.
20         Q.    -- before Thanksgiving you said
21   that you put in your request.  You haven't heard
22   back from anyone for a long, long time.  When is
23   the first time you basically informed them I'm
24   taking these days off and they said, uh, no,
25   you're not because you never gave us a form?

Page 150

1    A.    They never said that because I did
2  give them a form and they had my form and I have
3  proof that they had my -- that Carole withheld
4  my vacation time because I wanted another day
5  off and --
6    Q.    And what proof is that?
7    A.    The proof is that when I --
8  Christmas when I requested time off, also,
9  because my vacation never change over all the
10  years that I've been out there, I always took
11  this time off and always...uh, it's like
12  clock-work, November and December I always took
13  the same days off, same time off, never had a
14  problem with no supervisor.
15        And when I got ready to take my
16  vacation for Christmas, somewhere around that
17  time, which was in '04, also, yeah, it was in
18  '04, Carole denied it again and I went to
19  Roxanne and I stated to her that my vacation
20  time was denied and she -- what did she say to
21  me?
22    Q.    I think we're confusing two
23  issues.  I want to talk specifically about the
24  Thanksgiving one and then we can move on to the
25  Christmas issue.

Page 151

1    A.    Okay.
2    Q.    In March you file it.  When is the
3  first time where you -- where someone said we
4  don't have it in the books that you requested
5  the time?
6    A.    They don't keep it in a book.  She
7  just was backed up on her work, Carole was just
8  really backed up or either just holding mine's,
9  I don't know whether she was backed up on her
10  work or just holding my vacation.
11    Q.    Um-hum.
12    A.    It appeared to me that she was
13  holding my vacation slip and I had proof that
14  she has my vacation slip because Roxanne made a
15  remark when I requested for my Christmas
16  vacation.
17    Q.    Okay, so then was it around
18  November the first time you discovered that it
19  was not going to be approved?
20    A.    Yes.
21    Q.    Okay, so prior to then, you didn't
22  make any inquiries about --
23    A.    Yes, I did, my vacation.
24    Q.    When?
25    A.    Uh, I'm not for sure of the time,

Page 152

1  but I did request, you know, I made...I
2  approached her, Carole, a couple times asking
3  her when am I gonna get my vacation time back.
4    Q.    And what did she say?
5    A.    Like she always does
6  (indicating) --
7    Q.    I'm busy?
8    A.    -- she always hutched sic.  No,
9  she didn't say I'm busy.  She just hutched sic
10  her shoulder (indicating).
11    Q.    Okay.  And what did you take that
12  to mean?
13    A.    I don't know what I take it to
14  mean.
15    Q.    Did you inform her -- like inform
16  her just like you told me that like clock-work
17  you took these --
18    A.    Yes.
19    Q.    -- days off in November?  If --
20  even if it was clock-work, did you still have to
21  make the official request for those days?
22    A.    Yes.
23    Q.    Okay.  So you didn't get the time
24  that you wanted that according to Exhibit 16 you
25  wanted these four days.  Did you end up getting

Page 153

1  those four days?
2    A.    I think I did.
3    Q.    Okay.  And you had to go through
4  Roxanne to get those four days?
5    A.    Um...I'm almost sure I did.
6    Q.    And to this date Carole never gave
7  you an explanation of what happened?
8    A.    No.
9    Q.    Okay.  And she shrugged the only
10  time you asked her.
11    A.    Yeah.
12    Q.    Paragraph 16 of the Complaint that
13  you filed, you state "for example, in November
14  of 2004 plaintiff requested vacation time off.
15  This request was denied by Miss Carole Wolke
16  even though submitted far in advance.
17  Additionally, plaintiff alleges that the
18  vacation requests of plaintiff's
19  non-African-American counterparts were approved
20  by defendant Wolke."
21        Who are these people that had
22  their vacation approved?
23    A.    Linda Grevald and Donna.  They
24  white.
25    Q.    Do you know when they --

Page 154

1    A.    Coworkers.
2    Q.    -- submitted their vacation
3  requests?
4    A.    We all submit 'em in March.   We
5  all have to, we all get them at the beginning of
6  the year, I think in January, and we have to
7  have 'em back to the supervisor by March, uh,
8  15th.
9    Q.    So then everybody can kind of
10  plan --
11    A.    Yeah.
12    Q.    -- the rotations?
13    A.    Yes.
14    Q.    Do you know if Sheila got a
15  vacation at that time?
16    A.    I don't recall.
17    Q.    Do you recall...what other
18  principal transcribers were there with you at
19  that moment?  During that time.  It was
20  Sheila...
21    A.    That's, that's it.  Just me and
22  Sheila work in the nursing department.
23    Q.    So it's possible that she got her
24  vacation, but you don't know.
25    A.    I don't think so.  I don't know.

Page 155

1  I really don't know.
2    Q.    You don't know because you
3  don't --
4    A.    I'm not gonna answer to that.
5    Q.    You didn't check her attendance
6  records or anything like that?
7    A.    No.
8    Q.    But you eventually got the four
9  days that you asked that was initially denied,
10  but Roxanne said I'm going to give them to you?
11    A.    Yes.
12    Q.    Tell me more about the December
13  vacation request.
14    A.    I had to do another slip like
15  this.
16    Q.    Also in March?
17    A.    In -- no.  I didn't have my
18  original vacation slip because I never -- it was
19  never returned back to me, so I, I had to do the
20  extra one which is these forms, you, you -- when
21  you asking for time off, request for time off.
22  And...I requested for that time off and it was
23  denied by Carole again.
24    Q.    Um-hum.
25    A.    And I tried to explain to Roxanne

Page 156

1  that Carole never gave me my annual, annual
2  vacation request back and I requested for this
3  time way off in advance why am I being denied.
4    Q.    Um-hum.
5    A.    And she told me Carole said that I
6  did not request for this time off, so that let
7  me know if Carole knew that I didn't request for
8  this time off she must have had my vacation
9  request.
10    Q.    But you never talked to Carole.
11  This is just what you're hearing off of Roxanne.
12    A.    Yeah, from Roxanne, because
13  Roxanne told me she was not gonna approve it,
14  she told me to call, she told me to call Carole
15  at home and, um, and...she told me to call
16  Carole at home and if Carole changes it she'll
17  change it.  And I told her I'm not calling
18  anyone at home to request -- I called the CEO,
19  um, Bernice Davis?
20    Q.    The assistant.
21    A.    Assistant CEO?  And I got it
22  straightened out through her.
23    Q.    Let me ask you a question.  This
24  is December of 2004, correct?
25    A.    Um-hum.

Page 157

1    Q.    And we talked about at length the
2  December 1st incident where Carole came up to
3  you and made a non-business comment and said I'm
4  tired of you calling me a racist and then she
5  said I'll fix you, right?  So that happened
6  immediately before your vacation, right?  In
7  December?  Or it happened around that time in
8  December.
9    A.    Yes.
10    Q.    Okay.  So by that time Carole had
11  already denied your Thanksgiving vacation,
12  correct?  She had already done that?
13    A.    Yes.
14    Q.    So if you knew or had suspicions
15  that Carole was discriminating against you by
16  not giving you your vacation time, why did you
17  go to someone else to ask for your vacation time
18  if you believed that Carole was going to
19  discriminate against you?
20    A.    I tried to go to Roxanne and she
21  told me I had to deal with Carole.  Over and
22  over I tried to tell her it's not working
23  between me and Carole, I'm not getting along
24  with her, we're -- you know, she's treating me
25  different.

Page 158

1    Q.    And especially after the December
2  1st I'll fix you incident?
3    A.    Yeah, and she kept referring me
4  back to Carole.
5    Q.    Did you and Carole, after that
6  incident, did you guys have any contact with
7  each other or were you avoiding each other?
8    A.    Well, she walk, go in the office,
9  I walk, go in the office because...
10    Q.    Because you said you felt
11  threatened by her when she said I'll fix you?
12  You didn't know what that meant, but you felt
13  threatened?
14    A.    Threatened to what she was gonna
15  try to do to me and get me fired or get a
16  disciplinary...you know.
17    Q.    So you felt intimidated by Carole,
18  safe to say?
19    A.    Not intimidated.  Just knowing,
20  knowing the authority that she has over -- her
21  title, her position.  I would -- I didn't feel
22  intimidated as to -- I just thought she might
23  make up some lies or cause -- you know, cause me
24  to have problems like she was in -- because I
25  was having so much problem and Roxanne kept

Page 159

1  referring me back to her, that's how the
2  assistant --
3    Q.    Okay.
4    A.    -- director of nursing...
5    Q.    Did you get your time eventually
6  that you asked for?
7    A.    She gave it to me because she told
8  me the assistant director of nursing, um, gave
9  it to me because I told Roxanne, I said, if
10  Carole knows that I didn't request for this time
11  off, then she's, she has -- you should know
12  that -- no, this was another time, now I'm
13  getting time confuse.
14    Carole -- I think Roxanne approved
15  the December time off, it seem like Roxanne
16  maybe approved time off, because I say Carole
17  was out sick and I needed the time off and she
18  said that Carole said I didn't request for that
19  time off and I said, well, did she show you
20  any -- did she show you proof, did she show you
21  my vacation time so that you can see that I
22  didn't request and she said no.  And that's how
23  she approved it.
24    Q.    So you brought up something new
25  that I didn't know.  You said that Carole took

Page 160

1  sick time in December?
2    A.    She was out sick during that time
3  that the re -- I was requesting...
4    Q.    So she never actually saw the
5  request, then, because she was out sick.
6    A.    She had denied it.  Already.
7    Q.    But if she was out sick, how did
8  she get the request from you for the December
9  vacations?
10    A.    She denied my vacation time in
11  December so now I was going to Roxanne to get
12  her to overturn it.  Roxanne was saying that she
13  was not gonna overturn it because Carole said
14  that I did not have this time, I didn't request
15  for this time.  And I said if Carole is saying
16  that I didn't request for this time, how come
17  she didn't give me my annual vacation time back
18  and if she knows that I didn't request for this
19  time, then that's proof that she has my
20  vacation -- my annual vacation request.  She has
21  it.
22    Q.    Let me ask you a question.  From
23  all the years that you worked at NJDC, do
24  supervisors have the ability to deny someone's
25  vacation time?

Page 161

1    A.    Yes.
2    Q.    But did you feel like in this
3  situation, had Carole given an explanation for
4  the November 2004 request, would that have been
5  sufficient to you?
6    A.    No.  Because I was asking her for
7  my annual vacation time because the CEO said
8  when you don't receive your annual vacation
9  request back with -- where it says not approved
10  you can assume that it's approve.
11    Q.    Okay, but my question was you just
12  testified that supervisors do have the ability
13  to deny your vacation.
14    A.    During the annual vacation
15  request.  That's the whole purpose of putting it
16  in early in March so if she had the, she had the
17  authority to deny it in March, but not at the
18  time that I request it because I should have
19  received it back by then.
20    Q.    So you were upset that for eight
21  months you were almost led on to believe you had
22  the time.
23    A.    That it was approved, that it was
24  okay, it was time I took every year at the same
25  time, so...

Page 162

1    Q.    So if Carole had come back to you
2 in June or April and said I'm not going to give
3 it to you, then you would have felt like that
4 would have been more appropriate because she
5 was --
6    A.    It would have been more lined --
7 it would have been more lined up with what
8 her...
9    Q.    I understand.
10   A.    Job duty is.
11   Q.    Okay, thank you.  I want to talk
12 about the red A incident.  In October and
13 November of 2004, were you told by Roxanne Lotts
14 that...were you told about your continuous
15 tardiness to work by Roxanne Lotts?
16   A.    October to February 15th?
17   Q.    No, October to...in October or
18 November of 2004 did you have discussions with
19 Miss Lotts wherein she said you're having some
20 issues with tardiness?
21   A.    It could have been during the
22 meeting, the September meeting.  That's the only
23 time it could have been.
24   Q.    Right.
25   A.    And then the next time she was

Page 163

1 talking about my tardiness was when -- February
2 the 15th when another incident occur.
3    Q.    Were you ever tardy to work?
4    A.    Of course.  Yes.
5    Q.    How many times a week would you be
6 tardy?
7    A.    Oh...I don't know, several times,
8 I --
9    Q.    How many times?
10   A.    -- have my times changed -- maybe
11 ten, fifteen, twenty some time.
12   Q.    Did your supervisors write you up
13 when you came in ten, twenty minutes late?
14   A.    No.
15   Q.    Did they understand you had foster
16 children and six children and you might have
17 some issues with that?
18   A.    Mm...it was always a issue.
19   Q.    Okay.  But did Lotts ever talk
20 with you in October or November of 2004
21 basically telling you you gotta watch out about
22 tardiness?
23   A.    Yeah, I kinda recall her -- not at
24 a meeting or anything, but maybe, maybe one day
25 when I came in --

Page 164

1    Q.    Right.
2    A.    -- and I maybe met her in the
3 crossway and aksed sic her about can I change
4 my time or something and giving her a reason
5 why.
6    Q.    So she wasn't threatening with a
7 discipline, but she was giving you kind of a
8 heads up that you were being --
9    A.    Something has to be.
10   Q.    You're being tardy on a constant
11 maybe, let's maybe work on that.
12   A.    Yeah.
13   Q.    Did you meet with Investigator Ed
14 McCabe and give him a statement in support of
15 your discrimination complaint?
16   A.    Yes.
17   Q.    Okay.
18          MR. YI:  That's going to be marked
19 Exhibit 20.
20          (Whereupon, Exhibit 20 is marked for
21 identification.)
22   Q.    And just let me know when you're
23 ready.
24   A.    I'm ready.
25   Q.    Please turn to the second page of

Page 165

1 that statement.  Question by Mr. McCabe.  "You
2 received a red A for attendance which you
3 dispute.  Do you come in on time."  And you
4 answered "I don't always come in on time because
5 I'm a foster parent and have child care issues.
6 However, I always call when I won't be on time
7 and I work my seven hours."
8          Do you recall making that
9 statement?
10   A.    Yes.
11   Q.    So you basically told him I might
12 come in late, but I always make sure to catch up
13 with my seven hours of work, correct?
14   A.    Yeah, get my work duties done.
15   Q.    Okay.  Can you turn to Exhibit 3
16 which has already been marked.
17          And just to refresh your memory,
18 this is an interoffice memo from Miss Lotts to
19 Marcia Parchment who is the work violence
20 prevention coordinator, something to that
21 effect, right?  And if you look at page sixteen,
22 this is Miss Lotts giving her account of the
23 situation with you.
24          "In October and November of 2004
25 Phyllis was told of her continued tardiness.

Page 166

1  Phyllis came to me in December about Carole
2  speaking to her about concerning her lateness
3  and incomplete data sheets.  I spoke to Phyllis
4  about the importance of arriving to work on
5  time.  Then she says in January of 2005 Phyllis'
6  tardiness grew progressively worse."
7          Do you recall -- you already
8  testified, I'm sorry, that you did pass on
9  occasions with Roxanne and talked about
10 tardiness, correct?
11     A.    Yes.
12     Q.    Okay.  And do you recall in
13 December talking to Carole about your tardiness
14 and lateness?
15     A.    Yeah, but all of this tardiness
16 and lateness, all of this came after my charges,
17 nobody made no big things about data sheet,
18 nobody made big things about lateness until
19 after I brought discrimination charges against
20 the, uh, institution and Carole.
21     Q.    Okay, but you don't dispute the
22 fact that you were tardy on occasions?
23     A.    No, I don't dispute it at all.
24     Q.    Okay.  Can you tell me what a red
25 A is?

Page 167

1     A.    No-call/no-show.  No call and --
2     Q.    Just elaborate.  I'm trying to
3  understand what a red A is, I've never seen it
4  before.
5     A.    A red -- you can be given...three
6  red A's and that will -- that's a call from
7  being terminated from your job, if you get three
8  red A's on your record.
9     Q.    How many red A's have you had?
10    A.    Never had any.  Oh, red A is for
11 no call and no show.  That mean if you don't
12 call in and let them -- a hour before and let
13 them know that you're gonna -- you're not gonna
14 come to work or if you don't call and let them
15 know you gonna be late it can require -- I don't
16 know about late, but I just know --
17    Q.    Okay.
18    A.    -- really no-show.
19    Q.    So the one hour is important?
20    A.    One hour's important that you
21 call.
22    Q.    So you start at nine-fifteen,
23 correct?
24    A.    Yes.
25    Q.    So if you wanted to call in,

Page 168

1  according to the way you described it, it should
2  be around eight-fifteen saying --
3     A.    If I'm not gonna be to work at
4  all.
5     Q.    Okay.  And the date that this
6  happened, the red A that was issued was February
7  14th, 2005?
8     A.    Yes.
9     Q.    Is that Valentine's day it was
10 done?
11    A.    Yes.
12    Q.    And on that day you said you had
13 an issue that you had to go to court, correct?
14    A.    Yes.
15    Q.    When did you find out about the
16 court appearance?
17    A.    Not court, it was, um, a hearing
18 with the, with the, um...one of the children
19 were acting out and I had to meet with the
20 social worker and the school officials on how to
21 resolve, um...it's like a room, it wasn't like
22 going in a courtroom and sitting in the court.
23    Q.    And when did these individuals
24 tell you about this meeting?
25    A.    Well, when the child acted up in

Page 169

1  school, I had to, you know...
2     Q.    And what time was that?
3     A.    Shortly after the child got to
4  school, shortly after.
5     Q.    And what time approximately would
6  that be?
7     A.    Mm.  Probably -- I don't know, it
8  was so many incidents where I, I had, uh, to, to
9  just...was on my way out to go to work and had
10 to reverse and go the opposite way.
11    Q.    Okay, but --
12    A.    So.
13    Q.    Did you call NJDC before you
14 headed out to go to that hearing?  Hearing or
15 whatever meeting you had to go to.
16    A.    Yeah.
17    Q.    Did you give them a call?  Before
18 eight-fifteen?
19    A.    No, because I was planning on
20 coming to work.
21    Q.    Okay.  Did you have a cell phone
22 at that time?
23    A.    What year was it?
24    Q.    2005.
25    A.    Yes.

Page 170

1    Q.    Okay.  I want you to see...
2          MR. YI:  I'm going to have this
3    marked as 3a.
4          (Whereupon, Exhibit 3a is marked for
5    identification.)
6    Q.    Take a look at that, tell me when
7    you're ready.
8    A.    I'm ready.
9    Q.    Okay.  Is this the written warning
10   that Carole Wolke issued to you on February 15,
11   2005?
12   A.    Yes.
13   Q.    And she describes the incident on
14   February 14th, 2005 that you failed to notify
15   the operator an hour prior to the beginning of
16   your shift of your intended lateness.  You came
17   to work and signed in at one-thirty p.m.  Your
18   shift is nine o'clock to five o'clock p.m.  You
19   received a red A for the day.  Now, let's break
20   this down.
21         Did you notify NJDC an hour before
22   the beginning of your shift?
23   A.    I didn't have to, I was not gonna
24   be absent from work, I was gonna be late, so
25   when you're late you don't have to...if you got

Page 171

1    a emergency or something you don't have to
2    notice -- you don't know you're gonna have a
3    emergency, so you can't call a hour before
4    something you don't know gonna happen.
5    Q.    Okay, but you didn't call, though,
6    until later, right?
7    A.    I did, I did call.
8    Q.    Until later?
9    A.    I called the nurse, Mike.
10   Q.    Buongiorno?
11   A.    Yeah, Mike, I call him, and told
12   him I was gonna be late.
13   Q.    All right, so at eight-fifteen did
14   you call NJDC?
15   A.    I...
16   Q.    Around that time.
17   A.    No, I called my supervisor and let
18   me supervisor know --
19   Q.    At eight-fifteen?
20   A.    I don't know, I can't remember
21   what time it was.
22   Q.    Okay.
23   A.    But I know I called, I called him
24   twice.  To let him know that I was dealing with
25   a situation.

Page 172

1          MR. YI:  I'm going to show you
2    what's going to be marked as Exhibit 18.
3          (Whereupon, Exhibit 18 is marked for
4    identification.)
5    Q.    Okay.  Do you recall this
6    document?
7    A.    Okay, yeah.
8    Q.    So would it be accurate to say
9    that you called in at 10:42 a.m. that morning to
10   let them know you were going to be one hour
11   late?
12   A.    Possible.
13   Q.    Okay.  I also want you to take a
14   look at...
15   A.    But I possibly could have called
16   Mike before this time.
17   Q.    Okay.  But this is a record
18   showing that at 10:42 you called.  At the very
19   least.
20   A.    Well, I could have called the
21   operator, too.
22   Q.    Right.
23   A.    So there could have been a call to
24   the operator, could have been a call to my
25   supervisor first and then to the operator.

Page 173

1    Q.    And this says it's for Roxanne L,
2    so I guess you called for Roxanne to let her
3    know?
4    A.    No.  She's my director of nursing,
5    she's over me, so this would go to her.
6    Q.    Okay.  So by that time at 10:42
7    you're a couple of hours late already, right,
8    because your shift starts at nine, nine-fifteen?
9    A.    Um-hum.  But I called Mike earlier
10   and told him because I requested for time off,
11   um, a personal day, so...
12   Q.    I want to show you what's been
13   marked as 17.  Or going to be marked as 17.
14         (Whereupon, Exhibit 17 is marked
15   for identification.)
16   Q.    Let me know if you're ready.
17   A.    Okay.  Um-hum.
18   Q.    So that shows that you
19   signed in at one-thirty, though, right?
20   A.    Yes.
21   Q.    So you eventually did show up even
22   though you said you were gonna take an A day?
23   A.    No, I called back and cancelled
24   the A day.
25   Q.    When did you call in and say you

Page 174

1    were going to take an administrative day.
2        A.    I requested an administrative day.
3        Q.    When was that again?
4        A.    That was in the morning.
5        Q.    Okay.
6        A.    When I was dealing whatever I was
7    dealing with.  It was, um...I don't know exactly
8    what time, but I know I called three times, I
9    called the operator and I called Mike twice.
10       Q.    Okay, and you signed in at
11   one-thirty, though, right?
12       A.    Yeah, that's when I came to work.
13       Q.    And did you have any problems with
14   Mike and your supervisor?
15       A.    No, he was all right.
16       Q.    Did you think he was being unfair
17   to you or anything like that?
18       A.    No.
19       Q.    So he's...pretty much you were
20   cool with him?
21       A.    Neutral.
22       Q.    I want to show you what's marked
23   as 19a.
24           (Whereupon, Exhibit 19a is marked
25       for identification.)

Page 175

1        Q.    And tell me when you're ready.
2            Okay?  You just testified that you
3    considered Mike to be neutral and that you
4    didn't have problems with him, correct?
5        A.    Right.
6        Q.    Is this a confidential incident
7    statement filed by Mike Buongiorno?
8        A.    Um-hum.
9        Q.    For the red A incident, correct?
10       A.    Yes.
11       Q.    And he writes in his statement "on
12   2/14/05, 1:20 p.m. Phyllis Atkinson had called
13   the HCC requesting an emergency AL day to
14   complete a pending personal matter with her
15   adopted children.  This writer had granted the
16   AL day.  At 1:35 p.m. Miss Atkinson reported to
17   work cancelling the AL day and stating that
18   shortly after calling the hearing took place and
19   she was able to come to work."
20           So this is a statement by Mike
21   whom you considered a neutral person and you
22   didn't have problems with.  Do you disagree with
23   his recollection of the incident?
24       A.    No, I don't.
25       Q.    Okay.  So, then, is it true that

Page 176

1    at 1:20 you called HCC requesting the AL day?
2        A.    If he -- if that's the time, I'm
3    not -- I don't recall what time it was.
4        Q.    Okay.
5        A.    If --
6        Q.    And you didn't call Carole Wolke,
7    though, right?
8        A.    No.
9        Q.    You called the operator because
10   you say you normally just call in to the
11   operator.  But you also called Mike.
12       A.    Um-hum.
13       Q.    Okay.
14       A.    I called the operator first, if,
15   if you going by these times I called the
16   operator first.  Because I called the operator
17   first, I guess.
18       Q.    Did you write a letter to Miss
19   Lotts about this incident?
20       A.    Yes.
21           MR. YI:  I'm going to show you
22       what's going to be marked as 19.
23       A.    At her request.
24       Q.    Okay.
25           (Whereupon, Exhibit 19 is marked for

Page 177

1    identification.)
2        Q.    So you just said that Miss Lotts
3    asked for your recollection of the day, correct?
4        A.    Yes.
5        Q.    And this is a letter that I'm
6    showing to you, Exhibit 19, February 27th, 2005.
7        A.    Um-hum.  Yes.
8        Q.    And you sent that directly to Miss
9    Lotts?
10       A.    Yes.
11       Q.    Not to Wolke?
12       A.    No.
13       Q.    Okay, so in this letter you
14   describe, if you look at the very bottom, it
15   says "on February 14th, 2005 I had an emergency.
16   I realized that I was not going to be on duty at
17   my scheduled time so I made a call to the NJDC
18   operator informing her that I was going to be
19   late.  After a short while had passed I was
20   dealing with my crisis so I made a call back to
21   NJDC and spoke directly to my supervisor.  I
22   requested for an administrator leave day, but
23   immediately after calling that call my problem
24   was resolved, so I called back to my work area
25   and spoke with my supervisor again requesting

Page 178

1  him to cancel the administrative leave day
2  because I am able to come on duty."
3       Is that a fair assessment of what
4  you felt happened on that day?
5       A.   Yes.
6       Q.   Okay.  So when you came back to
7  work, you signed in at one-thirty?
8       A.   Yes.
9       Q.   And you didn't feel that you had
10  to call earlier to tell them that you were
11  possibly going to be missing the day because
12  you --
13       A.   No.
14       Q.   Because you said you only called
15  if you were going to be late, right?
16       A.   No, you only have to call one hour
17  before time if you're not gonna be in...you not
18  gonna be on duty at all.
19       Q.   Okay, so your understanding --
20       A.   The policy is stated call one hour
21  before an absence to let the --
22       Q.   But you didn't think you were
23  going to be absent, just late.
24       A.   Right.
25       Q.   Okay.

Page 179

1       A.   I knew I just was gonna be late.
2       Q.   And do you believe that when Wolke
3  issued that written warning to you she was
4  retaliating against you?
5       A.   Oh, yes.
6       Q.   And what is the basis for that?
7       A.   Because the evening before, the
8  evening of...
9       Q.   The day before Valentine's Day?
10       A.   No, I think it was this...it was
11  the same day, it was that same day.
12       Q.   Valentine's Day.
13       A.   February 14th.
14       Q.   Okay.
15       A.   That evening when I was leaving,
16  to go off duty, I aksed sic Carole because she
17  signed me out because I was going to the
18  administration building to do the mail and I
19  don't know, I -- it was pouring out raining and
20  I don't want to have to come all the way back
21  over to sign out.  And she nodded her head, yes,
22  she will sign me out.
23       And when I came back, when I got
24  to work that morning it was told that I had a
25  red A and I immediately called Carole and I

Page 180

1  aksed sic Carole, I said did you sign me out?
2  She said no.  I said why not.  She say I forgot.
3  She just said, you know, I forgot.  I was doing
4  something.  Knowing that she had already set me
5  up, she just said I, I didn't, um...you know, I
6  forgot, something to that effect.
7       Q.   Okay, look at the front of your
8  letter, the same letter February 27th, 2005
9  letter.  You write "I feel that this is" --
10  speaking about the red A.  "I feel that this is
11  retaliation from Miss Wolke because of my
12  previous complaint letters that I wrote against
13  Miss Wolke on September 28th, 2004 and December
14  1, 2004."
15       Isn't it true at that time Wolke
16  wasn't even your supervisor anymore and it was
17  Mike Buongiorno?
18       A.   She still was in charge, it, he,
19  he -- she might have not been my direct
20  supervisor to do, to do my PAR, to sign my PAR,
21  but she still was in charge...she can give me
22  instructions on work that needed to be done or
23  give me permission to go home and all that, I
24  didn't have to --
25       Q.   Because she was Mike Buongiorno's

Page 181

1  supervisor.
2       A.   Right, so...
3       Q.   And you say that she retaliated
4  against you specifically because you wrote those
5  two letters in 2004.
6       A.   Yes.
7       Q.   What's your factual basis that she
8  gave you a red A because of those letters?
9       A.   Because she said she was gonna fix
10  me, she was gonna get me one way or another, so
11  this to me, since she made that statement, this
12  was one way that I feel that she was gonna get
13  me, by putting a red A on my record.
14       Q.   Okay.  And wasn't the red A
15  rescinded?
16       A.   Yes.
17       Q.   It was taken off?
18       A.   Yes, yes.
19       Q.   So you didn't suffer any pay loss
20  for that.
21       A.   Well, I did, but they increased
22  that, also.
23       Q.   Okay.
24       Okay, so we have this incident
25  that happens Valentine's Day 2005.  Do you

Page 182

1 recall in March of 2005 when Lotts wanted to
2 have a meeting between you and Carole and Miss
3 Lotts.
4    A.    Yes.
5    Q.    Okay.  And did she tell you why
6 she wanted to hold that meeting?
7    A.    No.
8    Q.    Did you attend the meeting?
9    A.    No.
10   Q.    Why not?
11   A.    I was sick that day, I had a
12 doctor appointment on that day that was
13 scheduled before I even knew about a meeting, so
14 when I came in that morning I already knew I
15 wasn't gonna be there the whole day, not having
16 any knowledge of a meeting that she scheduled at
17 the last minute.
18   Q.    Okay.  You made some statements in
19 your Complaint that you felt Miss Lotts never
20 did anything about your complaints, correct?
21   A.    Correct.
22   Q.    And when she scheduled this
23 meeting, did you feel like that was doing
24 something to address your complaints?
25   A.    It was all after the fact.  At

Page 183

1 this point I was suffering headaches and anxiety
2 attacks and it was all after.
3    Q.    Okay.
4    A.    Nothing, nothing happened from
5 September '04 'til December '04.  Nothing
6 happened.
7    Q.    Okay, but --
8    A.    Only thing things started,
9 meetings started occurring after.
10   Q.    Okay, but you're saying there were
11 meetings.
12   A.    Well, meeting -- she -- well,
13 there was -- let me see.  I didn't meet with her
14 that day because I had to go to the doctor.
15 March, whatever day that was, March...
16   Q.    Did you actually write a letter to
17 Miss Lotts kind of saying how surprised you were
18 that she was questioning you about not showing
19 up for that meeting?
20   A.    Yes, because there was -- this was
21 a last-minute meeting that she -- she didn't
22 pre-plan this meeting.  This was a meeting she
23 just called out on the phone and said I need to
24 meet with -- I need to meet with you and -- you
25 and Carole and I told her I couldn't meet

Page 184

1 because I have a doctor appointment which was
2 scheduled way before she even said anything
3 about a meeting.
4         So I don't know whether she
5 thought that was something that I just made up
6 out of my head or, or -- I don't know, you know,
7 where her thought was in that.
8    Q.    Do you believe that Miss Lotts
9 approved Wolke's filing of the written warning
10 for the red A?
11   A.    Approved?  Yes.
12   Q.    Okay.
13   A.    She approved it.
14   Q.    And did you consider that
15 discriminatory that Lotts was supporting Wolke
16 in filing this against you?
17   A.    No, I think she was misled by
18 miss, um, information.  I don't think she had
19 correct information when she allowed Miss Wolke
20 to do that.  I think Miss Wolke deceived her in
21 the story that she told because I wrote a letter
22 to Miss Lotts explaining to her that what Miss
23 Wolke was saying was not true.
24   Q.    So when she wrote this red A, did
25 she mention -- when Wolke wrote this red A

Page 185

1 warning, did she mention to you that she was
2 doing this because she wanted to retaliate
3 against you for the September and December '04
4 letters?
5    A.    I don't think she would do that.
6    Q.    Okay.  So this is just your
7 opinion that you think the red A was because you
8 complained?
9    A.    Well, everything happened after --
10 you know, everything happened after I wrote the
11 letter.
12   Q.    So you're saying because -- you
13 kinda looked at it as a cause and effect; you
14 sent the letter and all of a sudden you're
15 getting a red A?
16   A.    No, I said she threatened me and a
17 red A is not a -- it's a serious, you know,
18 offense on your record and my concern was is
19 this what she means when she says she's gonna
20 fix me.
21   Q.    Okay, but the red A was taken off
22 after you grieved it.
23   A.    Yes.
24   Q.    Okay.  And was it determined that
25 there was communication problems between

Page 186

1  Buongiorno, the operator, Wolke and all those
2  involved that went into the issuing of the
3  written warning?  Is that why they rescinded it?
4       A.    No, because it's not appropriate.
5  I was -- a red A is for no-show at work, I did
6  show at work.  If I wasn't supposed to be at
7  work, Carole had seen me several times that day
8  and it could have been corrected right then and
9  there.  You don't let me come to work and work
10 all day and then the next day you give me a red
11 A and say I wasn't supposed to be there or
12 whatever.  It just wasn't done right.  It wasn't
13 following procedures.
14       MR. YI:  I'm going to show you what
15       I want to mark as Exhibit 5.
16       (Whereupon, Exhibit 5 is marked for
17       identification.)
18       Q.    This is a statement given by Wolke
19 to Ed McCabe.  Tell me when you're ready.
20       A.    I'm ready.
21       Q.    Look at page Atkinson EEO 153.
22       A.    Um-hum.
23       Q.    The question was to Miss Wolke,
24 why was Miss Atkinson given a red A.  Answer by
25 Miss Wolke, that is a day off without pay for

Page 187

1  attendance problem.  I was told to do it by Miss
2  Lotts, Director of Nursing.
3       Do you disagree with that?
4       A.    She was told to do it after what
5  she told Miss Lotts.  Miss Lotts.
6       Q.    Okay.
7       A.    She was -- Miss Lotts was going on
8  information that was received by Carole.
9       Q.    Okay, but Miss Lotts could have
10 ordered Wolke, then, say, go ahead, make the red
11 A?
12       A.    Yeah, she was acting on, acting
13 upon what Carole Wolke had told her.
14       Q.    This is not related to the red A
15 issue, but I -- the question asked by Ed McCabe
16 is Miss Atkinson alleged that you unfairly rated
17 her on her March 2004 PAR.  What were the
18 circumstances.  I dropped her from a
19 twenty-seven to a twenty-four.  She failed to
20 enter data in the computer about client status.
21 When I reported this to the director of nursing
22 she said I should mention it on her PAR.  She
23 was given various options for entering the data,
24 but refused unless she was given overtime.
25 After she spoke with Miss Lotts and me she

Page 188

1  signed the PAR.
2       Did you refuse to enter the
3  data --
4       A.    No.
5       Q.    -- unless you were given overtime?
6       A.    No.  I told them I wouldn't be
7  able to do it unless it was doing overtime
8  because of my workload during the day, that I
9  didn't have the time, but I never refuse.
10      Q.    Okay, you said you couldn't do it
11 in your regular --
12      A.    I wouldn't be able to do it.
13      Q.    So did you do it?
14      A.    Yeah, I did it.
15      Q.    Okay.  I want you to look at
16 Paragraph 18 in your Complaint.  Exhibit A
17 Paragraph 18.  You wrote in your Complaint "in
18 2005 in light of the ongoing problems plaintiff
19 initiated a job transfer to another position so
20 that she would be reporting to a different
21 supervisor.  Plaintiff's request for transfer
22 was never responded to by NJDC."
23      When did you request for a job
24 transfer?
25      A.    When this situation occurred, when

Page 189

1  a lot of problems start occurring.  I'm not for
2  sure, but it was, it was within the time frame
3  of September and -- September '04 and...August
4  of '05.  It was within that time frame.
5       Q.    Did you put it in writing, the job
6  request?
7       A.    Oh...I put in one writing to Bruce
8  Wirkenheiser, I put in a request, hmm...
9       Q.    You've worked there for
10 twenty-plus years.
11      A.    Um-hum.
12      Q.    Do you see people just when they
13 ask for a transfer, are they granted it on a
14 whim?  Do they just give it to them?
15      A.    Yeah.  I've seen it.
16      Q.    Who was transferred?  Tell me some
17 examples.
18      A.    All throughout the years I've seen
19 people transferred, I don't know.  Can't recall.
20 Names and times and dates.
21      Q.    Okay.
22      A.    I just know it -- you know.
23      Q.    Did you sign up for civil service
24 exams to, you know, maybe go to a different
25 position?

Page 190

1    A.   Uh, I don't -- maybe, I think I
2  have, yes, throughout my years.
3    Q.   Isn't it true, though, in March of
4  2005 basically the day of -- or the day after
5  you couldn't go to the meeting, right, because
6  you had a doctor's appointment you took an
7  extended leave of absence?
8    A.   Yes.
9    Q.   So were you...so did you ask for a
10  transfer while you were out on leave of absence?
11   A.   No, I don't think so.  I, I think
12  I just aksed sic for Carole Wolke not to be my
13  supervisor.  That I don't have to report to her.
14   Q.   But isn't it true at that time
15  that in 2005 Mike Buongiorno was your immediate
16  supervisor?
17   A.   But she was his supervisor and she
18  still was supervising me indirectly.
19   Q.   Okay, but isn't it her job duty to
20  supervise Mike Buongiorno?
21   A.   But she was questioning Mike
22  getting him to harass me about little...things.
23   Q.   You gotta answer my question.
24       MR. YI:  Can you read back the
25  question?

Page 191

1       (Whereupon, the pending question is
2    read back by the reporter.)
3    A.   Yes.
4    Q.   Okay.  So you're saying by her
5  supervising Mike that was harassing you?
6    A.   No.  She was getting him to harass
7  me in a sense.
8    Q.   So now you're saying Mike
9  Buongiorno racially harassed you?
10   A.   Not intentionally.  He didn't know
11  what was going on.
12   Q.   I'm not concerned about
13  intentionally or unintentionally.  Are you now
14  alleging that --
15   A.   No, no.
16   Q.   So what did he do to harass you,
17  then?
18   A.   Um, he said that all the data work
19  that I put in had to be -- I had to report to
20  him and let him know how much data work that I'm
21  putting in, um...
22   Q.   And you consider that harassment?
23   A.   Yeah, because I never had to do
24  that before so it's a lot of little things that
25  were happening that just wasn't happening

Page 192

1  before.
2    Q.   So when your supervisor told you
3  to do certain things, you construed that to be a
4  harassing --
5    A.   No, yeah, because it wasn't
6  happening before, it was little tiny things, you
7  know, a lot of little small things that are
8  going on.
9    Q.   So what --
10   A.   I can't remember specifically all
11  the little things, but it was just a lot of
12  little things that were making me uncomfortable
13  there, that I knew Carole was behind.
14   Q.   And how do you know that she
15  specifically ordered him?
16   A.   Well, when I ask him he say I
17  have, I have a job to do, too, does it really
18  matter.
19   Q.   Did he tell you specifically that
20  Carole's order made to harass you?
21   A.   He's not gonna say that.
22   Q.   Yes or no.
23   A.   No.
24   Q.   I'm going to show you -- this is
25  going to be very quick -- twenty-one or what's

Page 193

1  going to be marked as 21.
2       (Whereupon, Exhibit 21 is marked for
3    identification.)
4    Q.   This is just the leave of absence
5  form and I just want to confirm that these dates
6  you were on leave.  On this document, is it true
7  that from July of 2007 until the date of your
8  retirement, September 1st, 2007, you were on
9  leave without pay?
10   A.   Yes.
11   Q.   And that was for personal reasons.
12   A.   Yes.
13   Q.   Did you have any income coming in
14  to the house when you were on that leave?
15   A.   Mm, no.
16   Q.   How did you pay for your rent, any
17  daily amenities that you needed?
18   A.   I have a savings.
19   Q.   Okay.  I want to show you what's
20  going to be marked as Exhibit 22.
21       (Whereupon, Exhibit 22 is marked for
22    identification.)
23   Q.   And this is another leave of
24  absence form stating that you were out without
25  pay April 17th, 2007 to May 1, '07; is that

Page 194

1  correct?
2      A.    Yes.
3      Q.    Okay.  And at that time were you
4  caring for your mother?  In North Carolina?
5      A.    Yes.
6      Q.    Okay.  I want to show you what's
7  going to be marked as Exhibit 23.
8          (Whereupon, Exhibit 23 is marked for
9      identification.)
10     Q.    This is another leave of absence
11 form indicating that from November of 2006 until
12 January of 2007 you were out without pay,
13 personal illness.  Does that sound right?
14     A.    Uh, yes.
15     Q.    Okay.  And at that time you
16 weren't being supervised by Carole Wolke, were
17 you?
18     A.    I don't recall.
19     Q.    I want to show you what's going to
20 be marked as Exhibit 24.
21         (Whereupon, Exhibit 24 is marked for
22     identification.)
23     Q.    This is another leave of absence
24 form stating that you were on leave without pay
25 from July of 2005 all the way up to January 6,

Page 195

1  2006?  Does that sound right?  On personal
2  illness?
3      A.    Yes.
4      Q.    Okay.
5      A.    This is all stemming -- my
6  personal illness was stemming, though, from
7  my...harassment from Carole Wolke during that
8  time.
9      Q.    Except for the times that you were
10 caring for your mother?
11     A.    Except for the times that I was
12 caring for my mother, yeah.
13     Q.    I want to show you what's been
14 marked or is going to be marked Exhibit 25.
15         (Whereupon, Exhibit 25 is marked for
16     identification.)
17     Q.    Just to kind of give you a
18 heads-up, the next four or five these are the
19 same kind of documents, I just want you to
20 confirm or deny whether these dates are true.
21         So this is a form, leave of
22 absence form, again, you were without pay on
23 personal illness leave from September 6, '05
24 until November of 2005.  Does that sound about
25 right?

Page 196

1      A.    I don't know, somewhere up in here
2  I had surgery, I can't remember exactly, it's --
3      Q.    What kind of surgery did you have?
4      A.    Uh, personal surgery.
5      Q.    Okay, what kind of surgery was
6  that?
7      A.    Female surgery.
8      Q.    And was that because of Carole
9  Wolke that you had to have surgery?
10     A.    No.
11     Q.    And when would -- when was that
12 surgery?
13     A.    That might have been in November,
14 uh, it just seem like it -- it was around
15 November and I came back to work in January, so
16 I don't...
17     Q.    Okay.
18     A.    I'm trying to...
19     Q.    I want to show you what's going to
20 be marked --
21     A.    Yeah, it was this one, November
22 1st.
23         MR. YI:  Okay, twenty-six.
24         (Whereupon, Exhibit 26 is marked for
25     identification.)

Page 197

1      Q.    This is a leave of absence showing
2  that you were out without pay from March 5th,
3  2005 until May 31st, 2005.
4      A.    Um-hum.
5      Q.    Sound correct?
6      A.    Yes.
7      Q.    And March 5th was the day that
8  Lotts wanted you to meet with her and Carole
9  Wolke.
10     A.    Yes.
11     Q.    Okay.  I'm going to show you
12 what's going to be marked...as 28.
13         (Whereupon, Exhibit 28 is marked for
14     identification.)
15     Q.    This is a form that you filled out
16 on November 4th, 2005 and you said you were
17 suffering under temporary depression?
18     A.    Um-hum.
19     Q.    And what was that depression
20 stemming from?
21     A.    Because of everything that had
22 happened on my job.
23     Q.    At that time was Carole Wolke
24 supervising you?
25     A.    I don't remember at that time, I

Page 198

1  was very confused and things just were outta
2  control and I really don't remember, um -- I
3  don't even remember -- I know at some point
4  she -- they, they stop her from being my
5  supervisor, but...
6      Q.    Do you recall when that was?
7      A.    Maybe when I came back to work...I
8  was out from March 'til May.  Then I went back
9  out.
10     Q.    Isn't it true after the red A
11 incident on Valentine's Day 2005, that was the
12 last time Wolke was to have any kind of
13 supervisory contact with you?
14     A.    No.
15     Q.    Okay.  But isn't it also true soon
16 after the March -- I mean, soon after the
17 Valentine's '05 red A you went out on an
18 extended leave?  Of absence.
19     A.    March.  I think it was in March I
20 went out.  To, to June, I think, I'm not for
21 sure.
22     Q.    Okay.
23     A.    I'm not really sure about the
24 dates.
25     Q.    So are you saying that when you

Page 199

1  were on leave at home, Wolke was still harassing
2  you?
3      A.    No, I was just sick from the whole
4  thing, what had happened, I just got sick.
5      Q.    Okay.  And I want to show you
6  what's marked as Exhibit 30.
7            (Whereupon, Exhibit 30 is marked for
8      identification.)
9      A.    I was sick from the lies and
10 everything that was happening.
11     Q.    And was this an intermittent FMLA
12 approval so that you could use it to take care
13 of your son?  October 30th, '03 up until April
14 30th.
15     A.    Yes.
16     Q.    And what was that issue for?
17     A.    What issue?
18     Q.    What was the reason that you
19 needed to take care of your son?
20     A.    He was in a motorcycle accident.
21     Q.    Did that cause you grief when he
22 got hurt?
23     A.    Well, that was in '98 when it
24 happened, it left him disabled.
25     Q.    Okay.

Page 200

1      A.    And neurological problems, so...
2      Q.    So you have no stress resulting
3  from taking care of someone who's disabled?
4      A.    Well, he's not totally disabled,
5  he just needed to get to the doctor and -- I
6  mean...he had neurological disability, but he's
7  not total where he had to...
8      Q.    Okay.  I'm going to show you what
9  I'm going to mark as Exhibit 4.
10           (Whereupon, Exhibit 4 is marked for
11     identification.)
12     Q.    Let me know when you're ready,
13 ma'am.
14     A.    I'm ready.
15     Q.    Okay.  This is a workplace
16 violence report summary from Marcia Parchment
17 and if you look at Atkinson page EEO 225, it
18 says the date of the report is April 8, 2005; is
19 that correct?
20     A.    Where am I looking?
21     Q.    The last page of this exhibit.
22     A.    Oh.
23     Q.    The date of that report is April
24 8th, 2005.
25     A.    Yes.

Page 201

1      Q.    And at that time you were on leave
2  of absence, correct?
3      A.    Yes.
4      Q.    Okay.  So -- all right, I want you
5  to look at -- it says "a brief summary of
6  incident."  And Marcia Parchment writes "the
7  documents in question are three memos dated
8  September 30th, 2004, December 1, 2004 and
9  February 27, 2005.  Miss Atkinson's unjust
10 treatment from Miss Wolke as it relates to her
11 performance evaluation, obvious favoritism,
12 being threatened and harassed in the presence of
13 others and being unfairly disciplined for a red
14 A day based on miscommunication."
15           Does that summarize the
16 allegations that you had against Miss Wolke that
17 you wanted NJDC to correct?
18     A.    Yes.
19     Q.    Okay.  And at the bottom it
20 says -- towards the bottom, it says "Mrs. Lotts
21 also indicated that she offered Miss Atkinson
22 the opportunity to transfer to another area on
23 campus if she was so unhappy with her current
24 work situation."
25           What happened?  Did she ever offer

Page 202

1  you the transfer?
2      A.    I don't recall her offering me.
3      Q.    So you think Miss Lotts was making
4  this up?
5      A.    I don't know what she was doing,
6  but I don't recall her offering me.
7      Q.    Did she ever say you can just --
8  we can get you out of this work situation to
9  another place?
10     A.    She never gave me anything in
11 writing and I don't recall her saying it to me.
12     Q.    Okay.  And it continues towards
13 the very bottom of the page.  "Miss Lotts
14 indicated that she was involved in the last
15 incident which was brought to her attention as a
16 red A day due to Miss Atkinson's late call which
17 is currently in dispute.  She attempted to
18 follow through on this issue by serving Miss
19 Atkinson with a written warning.  Mrs. Lotts
20 reports that she was then advised to remove this
21 from Miss Atkinson's records due to some of the
22 confusion around communication and approved time
23 off."
24         Do you dispute that Miss Lotts
25 wanted to get that red A on your record?

Page 203

1      A.    Could you rephrase the question?
2      Q.    Do you dispute this report which
3  says Miss Lotts -- I'm going to read it again,
4  "attempted to follow through on this issue by
5  serving Miss Atkinson with a written warning."
6  Do you dispute that?
7      A.    That she tried to give me a red A?
8  No.
9      Q.    Okay.  And I want you to look at
10 the last page, twenty-five.  Well, actually,
11 look at twenty-four again.  It says
12 "interventions taken."  "In effort to ensure
13 that both parties are separated was not
14 necessary due to Miss Atkinson's sick leave.
15         Wasn't that correct, that you were
16 on sick leave so how can you separate somebody
17 when they're not even at work; is that correct?
18     A.    If you say so.
19     Q.    No, I'm asking you.  Were you on
20 sick leave?
21     A.    Yes.
22     Q.    Okay.  So there was no way to
23 technically separate you when you're not even at
24 work.
25     A.    If you say so.

Page 204

1      Q.    Do you dispute that they -- Miss
2  Parchment made an intervention request that you
3  two be separated?
4      A.    She did.  According to this --
5      Q.    I can read the document.  "In
6  effort to ensure that both parties" --
7      A.    But I wasn't involved in this, I
8  wasn't there, so --
9      Q.    I'm not asking if you were
10 involved.  I'm asking if Miss Parchment as the
11 workplace violence coordinator made this --
12     A.    This was long after the fact, this
13 was long after my injuries and everything, after
14 I suffered terrible headaches and after my blood
15 pressure, yes, they all tried to do things after
16 the fact.  I agree, I never disputed that nobody
17 tried to do anything.
18     Q.    Right.
19     A.    But it was, it was like long
20 after.
21     Q.    Okay.
22     A.    Everything.
23     Q.    And if you look at page
24 twenty-five, recommendations, "Miss Wolke should
25 be referred to EAS, Miss Wolke would benefit

Page 205

1  from additional supervisory training on PAR, PEZ
2  conference review."
3         So do you agree that they
4  recommended that had Miss Wolke be kind of
5  trained on these issues?
6      A.    Yeah, after she harassed me and
7  almost ran me crazy.
8      Q.    You dispute that they made these
9  recommendations?
10     A.    After the fact.  They made the
11 recommendations.
12     Q.    I don't think you're understanding
13 my questions.  Did they ever make a
14 recommendation that Miss Wolke be trained, go to
15 EAS, get trained on PAR, PEZ conference review?
16     A.    Yes, after my damage, after my
17 emotional trauma.
18     Q.    Okay.
19     A.    They did all these things.  But
20 nobody did anything when I was begging for help
21 long before I had emotional trauma.
22     Q.    I want you to look at...what I'm
23 going to mark as 38.
24         (Whereupon, Exhibit 38 is marked
25 for identification.)

Page 206

1    Q.    Tell me when you're ready.
2    A.    I'm ready.
3    Q.    Do you recall receiving this
4  letter from the DHS basically saying they did an
5  investigation and based upon that investigation,
6  and I'm going to read from it towards the
7  bottom, "based on the results of the
8  investigation, it cannot be substantiated that
9  Carole Wolke violated the New Jersey State
10 policy prohibiting discrimination, harassment or
11 hostile environments in the workplace.  However,
12 the appropriate administrative and/or
13 disciplinary action will be taken regarding the
14 inappropriate remark made by Miss Wolke to you."
15       Do you remember receiving this?
16    A.    Yes.
17    Q.    And did you file your initial DHS
18 discrimination complaint in March 29, 2005?
19    A.    I don't exactly recall the date.
20    Q.    Did you file that report while you
21 were on sick leave?
22    A.    Did I file this report?
23    Q.    The DHS complaint.  If that date
24 is correct, weren't you on sick leave?
25    A.    This date right here?

Page 207

1    Q.    Right, March 2005.  That's when
2  they say they received your complaint.  Does
3  that sound like the right date for you?
4    A.    It probably is, but I just can't
5  really recall.
6    Q.    But you were, you were on sick
7  leave at that point, right?  Since March the
8  5th --
9    A.    Well, I have to refer to some of
10 my paperwork.
11    Q.    Okay.
12    A.    I just can't refer from the top of
13 my head.
14    Q.    We just went over the leaves of
15 absence and you agreed that Exhibit 26, if you
16 want to look at it, you were on leave from March
17 5th, 2005 to May 31st, 2005.  Correct?
18    A.    Yes.
19    Q.    So you were on sick leave when you
20 filed your complaint.  Correct?
21    A.    My original complaint?
22    Q.    Your complaint dated March 29,
23 2005 was filed while you were on sick leave.
24    A.    Yes.
25    Q.    Okay, that's all I'm -- there's no

Page 208

1  trick question.
2    A.    No, I don't under -- I don't
3  understand which one you say I file.  We reading
4  this one, but it seems like you talking about
5  another one.
6    Q.    No.
7    A.    Not this right here.
8    Q.    Did you file an appeal of that?
9    A.    This is a appeal, I think
10 (indicating).
11    Q.    Okay, so you did appeal because
12 you didn't agree with their finding that --
13    A.    Right, yes.
14    Q.    Okay, I'm going to show you what's
15 going to be marked as Exhibit 39.
16       (Whereupon, Exhibit 39 is marked
17       for identification.)
18    Q.    And let me know when you're ready.
19    A.    I'm ready.
20    Q.    So you filed an appeal because you
21 disagreed with their decision that they found
22 no --
23    A.    Yes.
24    Q.    Okay.  So this is April 11th,
25 2007, so your appeal to the merit system board

Page 209

1  was denied.  Do you remember getting informed
2  about that?
3    A.    Yes.
4    Q.    Okay.  And the merit system denied
5  it because it said it could not find a violation
6  of the State policy prohibiting discrimination,
7  harassment or hostile environments in the
8  workplace.  However, in rendering their final
9  decision, the MSB also ordered that Miss
10 Atkinson and Miss Wolke be rescheduled for
11 training in conflict management and/or dealing
12 with difficult people."
13       Were you out on sick leave...in
14 April of 2007?  When you received notice that
15 your merit system board appeal was denied.
16    A.    April of 2007?
17    Q.    Seven.
18       All right, let me strike that
19 question.  Did you ever go to the training for
20 conflict management.
21    A.    No.
22    Q.    Okay.  But you...this letter says,
23 though, "Miss Wolke is to be scheduled for
24 training for conflict management," correct?
25 Exhibit Number 39.

Page 210

1    A.    I don't think I ever got this
2  letter.  I never received this letter.
3    Q.    Right, it's not addressed to you,
4  but I'm saying --
5    A.    Right.
6    Q.    -- the letter says Miss Wolke
7  was --
8    A.    This was a different letter, I
9  never knew about that.
10    Q.    But it says that Miss Wolke is
11  supposed to be trained for conflict management
12  and/or dealing with difficult people.  Is that
13  what the letter says?
14    A.    Yes.
15    Q.    Okay.  Did you file an EEOC
16  complaint?
17    A.    Yes.
18    Q.    Okay.  And what happened to that
19  complaint?  What was the result of it?
20    A.    I can't recall.  I just, um...it
21  was an investigation.
22    Q.    Okay.
23    A.    Done.
24    Q.    All right, let me just show you
25  what's going to be marked Exhibit 40.

Page 211

1       (Whereupon, Exhibit 40 is marked
2  for identification.)
3    Q.    Let me know when you're ready.
4    A.    I'm ready.
5    Q.    Is this a dismissal of your EEOC
6  complaint?
7    A.    Yeah, the closing on the --
8  closing, the EEO was closing its file on this
9  charge for the following reasons.
10    Q.    And it says "based upon its
11  investigation, the EEOC is unable to conclude
12  that the information obtained establishes
13  violations of the statutes."
14    A.    Um-hum.
15    Q.    So you filed an EEOC complaint,
16  but that was dismissed, correct?
17    A.    Yes, it also says this does not
18  certify that the respondent is in compliance
19  with the statute.
20    Q.    Okay.
21    A.    It also says that, too.
22    Q.    I want to take you back to the
23  Complaint, Exhibit A.  Paragraph 25 of your
24  Complaint that you filed in Federal Court
25  (showing), Exhibit A...yeah, that one.

Page 212

1    A.    Paragraph what?
2    Q.    Twenty-five.  Okay, let's actually
3  start from the end of 24.  "Plaintiff asserts
4  that the wrongful action of defendants caused
5  plaintiff to be out of work from March 2005
6  through June 1st, 2005.  Thereafter, plaintiff
7  returned to work on June 1st, 2005 and remained
8  employed by NJDC until September 1st, 2007.
9  Plaintiff contends that upon her return to work
10  on June 1st, 2005 and until she ended her
11  employment on September 1st, 2007 all of her job
12  duties, responsibilities were taken away from
13  her."
14       Which job duties -- you said all
15  of them were taken away from you.  Tell me which
16  ones were taken.
17    A.    All of them.  I was only allowed
18  to do data, except entering data.
19    Q.    Okay, but wasn't that a
20  responsibility you had to do before?
21    A.    Yeah, that was a small part of it.
22    Q.    So is it accurate, therefore, to
23  say that everything was taken away from you?
24    A.    Yes, everything was taken away
25  from me because the -- when I returned

Page 213

1  everything in the computer, there was no data
2  sheet at all in the computer, everything had
3  been wiped out and now it was being given to me.
4       I don't know if that was part of
5  their conspiracy to annoy me, harass me or
6  continue to keep me in emotional trauma, but
7  everything was -- nothing was in the computer,
8  there was no data or information on the clients
9  at all in the...in the computer.
10    Q.    And weren't you out for two months
11  approximately from March 'til June?
12    A.    Yes.
13    Q.    And was it your anticipation that
14  no one should be doing your duties --
15    A.    No.
16    Q.    -- when you were gone?
17    A.    No, no.  Because people go out on
18  leave all the time.
19    Q.    Okay.
20    A.    Maternity leaves and somebody's
21  given a job and when you come back you get your
22  job back.  That was always happen.  It didn't
23  happen with me, but that's usually what happens.
24    Q.    So let me understand this.  We
25  went through some of your complaints where you

Page 214

1   indicated that you had too much work that you
2   needed overtime to do it, so now when you come
3   back from your two-month leave you're
4   complaining you have nothing to do?
5        A.    I had nothing -- none of my job
6   duties, none of my job duties, the only job duty
7   I had was somebody wiped out all the data
8   information on the clients in the computer,
9   which I believe was a conspiracy, and wanted me
10  to do that.
11       Q.    Okay.  Who wiped out the data?
12       A.    I have no idea.  They don't know,
13  I asked Roxanne, I --
14       Q.    Are you saying it's Wolke who did
15  it?
16       A.    Could be, I don't know.
17       Q.    Do you have any factual basis for
18  that?
19       A.    No, that's why I said it could be,
20  I don't know.
21       Q.    Okay.  Were you getting paid the
22  same salary when you came back?
23       A.    Yes.
24       Q.    But you were doing only one thing
25  now instead of all the other things you had to

Page 215

1   do before.
2        A.    Yes.
3        Q.    And you were able to do that
4   within a 35-hour work week.
5        A.    Yes.
6        Q.    All right, I'm going to show you
7   what's going to be marked as Exhibit 31.
8             (Whereupon, Exhibit 31 is marked for
9        identification.)
10            MR. YI:  And just to kind of give
11       you a road map, we're about a half an hour
12       away from finishing, so just letting you
13       guys know.
14       Q.    Tell me when you're ready.
15       A.    I'm ready.
16       Q.    June 17th, 2005, that was after
17  you came back from your leave, correct?
18       A.    Yes.
19       Q.    And this is the letter that you
20  wrote to Miss Lotts?
21       A.    Yes.
22       Q.    Because you were saying somebody's
23  taking all my job responsibilities.  That sound
24  about right?
25       A.    Yes.

Page 216

1        Q.    And in this letter you write "I
2   returned to work off of a leave of absent on
3   June 1st, 2005.  Upon my return, I did not
4   receive my job duties back which I'm not sure
5   what this is all about, but I don't have a
6   problem with that simply because my job duties
7   were overwhelming and before I resume them back,
8   I would like my job duties to be reevaluated to
9   lighten the load on me."
10            Were you complaining to her that
11  your job duty was taken when you were also
12  saying that you felt --
13       A.    Only after they did my PAR.  That
14  was the only time I had a complaint.  When -- I
15  figure if I'm gonna do all this work and you're
16  gonna allow someone to, um, unjustly score me,
17  then you know what, then I need to make a
18  complaint about being overwhelmed and, yes, it
19  was overwhelming, it was a lot of work, but I
20  had no complaint all the years that I was there
21  doing it until they -- Carole was allowed to
22  mess with my PAR rating and --
23       Q.    Well, you testified that the PAR
24  rating was changed to twenty-seven.
25       A.    Yeah, it was changed back.

Page 217

1        Q.    And you were --
2        A.    But there were a number of other
3   issues started coming up, you know, a lot of,
4   um, nitpicking became a part of, um, her
5   daily...
6        Q.    And you wrote in this letter "but
7   I don't have a problem with that."  The fact
8   that they took your job duties.  And you
9   actually said to "lighten the load on me, I
10  would like my job duties to be reevaluated" --
11       A.    Lighter, yes.
12       Q.    So let me just understand this.
13  You complained that your job responsibilities
14  are taken...
15       A.    Um-hum.
16       Q.    But then in this June 17th letter
17  you say that you're fine with that.
18       A.    I'm okay with it.
19       Q.    Okay.
20       A.    But I'd like them to be
21  reevaluated because of all the complaints
22  they're making now about me not doing the data,
23  me not doing things, so let's just sit down and
24  let's just reevaluate my whole work and find
25  out.  What's overwhelming me, what's not, you

Page 218

1  know.
2      Q.    Okay.  Isn't it true -- we went
3  over all the leaves of absence that you had --
4  from the period of March 2005 to September 2007
5  you only worked sixteen out of the thirty
6  months?
7      A.    Probably.
8      Q.    Okay.  So was it your expectation
9  that when you were gone that nothing should be
10  touched that you were working on.
11      A.    That's not true.
12      Q.    Okay.
13      A.    No.
14      Q.    I want to show you what I'm going
15  to mark as 36.
16          (Whereupon, Exhibit 36 is marked
17      for identification.)
18      Q.    You tell me when you're ready.
19      A.    I'm ready.
20      Q.    This is a meeting summary and you
21  had a meeting with Bruce Wirkheiser, Bernice
22  Davis, Marcia Parchment, Gary Engle, yourself,
23  Teresa Wellington and Mike Buongiorno and
24  Roxanne Lotts; is that correct?
25      A.    Yes.

Page 219

1      Q.    And that was after the letter you
2  wrote to Roxanne saying, hey, let's figure out
3  what's my job duties, correct?
4      A.    Um-hum.
5      Q.    Did you tell those people that you
6  felt Carole Wolke had mental issues?
7      A.    No.
8      Q.    Can you read the first sentence of
9  this memorandum?
10      A.    I remember telling Roxanne that, I
11  don't remember telling all these people,
12  maybe -- maybe it was said in the meeting,
13  but...
14      Q.    So you told at least Roxanne that
15  you --
16      A.    I know I say it to Roxanne.  I
17  know I wrote a letter, I think, stating it to
18  Roxanne, I don't remember saying it in the
19  meeting.  It's positively I did and...
20      Q.    Can you --
21      A.    I don't recall.
22      Q.    -- go to page thirty-four in a
23  section that says "the job duties."
24      A.    Okay.
25      Q.    "Roxanne stated that while Phyllis

Page 220

1  was on leave of absence the work had to be done
2  because this is a business."
3          You agree with that, right?
4      A.    I agree.
5      Q.    Okay.  "Roxanne reiterated that
6  she has Katia to coordinate the trips because of
7  the leave of absence."
8          Do you agree with that?
9      A.    I agree.
10      Q.    Okay.  And then at the bottom of
11  that, it says "Phyllis returned to work on
12  Wednesday, June 1st, 2005.  On Friday, June 3rd,
13  2005 Roxanne left Phyllis a voice message
14  stating that she would not be doing the medical
15  trips until further notice, but that Roxanne
16  wanted her to focus on the data sheets because
17  there had been a pending need for the sheets to
18  be updated into the computer.  Phyllis's
19  previous complaints were of overwhelming
20  workloads and this is Roxanne's rationale for
21  her decision."
22      A.    Hum.
23      Q.    So isn't it true that Roxanne made
24  that decision that you should be doing data
25  sheets?

Page 221

1      A.    I don't know, because it was
2  rumors that my job was gonna be taken away while
3  I was out, I heard rumors that Carole was gonna
4  fix it where I wouldn't be able to get my job
5  back, and then when I got back I even wrote
6  Roxanne and told her that before this even
7  happened, so...
8      Q.    Okay.
9      A.    I don't know, maybe she was a part
10  of it, I don't know.  Maybe from what Carole --
11      Q.    So you --
12      A.    -- was telling her, I'm just
13  thinking all of Roxanne actions is based on what
14  her response was from what Carole Wolke was
15  telling her.
16      Q.    Okay.  But you don't recall
17  Roxanne telling you 'I want you to focus on data
18  sheets' because previously you told me you said
19  the work was overwhelming?
20      A.    Yeah, but that was way back in '04
21  when I was telling her that.  Now '05 after I'm
22  being harassed and beaten up, now everybody want
23  to do something about it.
24      Q.    You were beaten up?  Physically?
25      A.    Well, emotionally, not physically

Page 222

1   beaten up.  But emotionally I was beaten up and
2   now everybody want to do something now, I feel
3   like I'm being -- I'm, I'm -- I feel like a dog
4   that's down and being kicked while I'm down.
5       Q.    I want you to look at that
6   document 31, the previous document that we
7   entered as an exhibit.  This is a letter that
8   you wrote June 17, 2005 to Miss Lotts that's
9   about fifteen days after you returned back from
10  your leave of absence.  Can you turn to the
11  second page?  Right above your signature.
12      A.    Um-hum.
13      Q.    You say "I have zero tolerance for
14  Miss Wolke unprofessional, nitpicking behavior.
15  Her ways are foolish and childish.  She has no
16  intent on ceasing this behavior.  She reminds me
17  of a poison snake.  The only way that you can
18  stop a snake from biting you is to kill it."
19          Did you feel that that was an
20  appropriate statement to be making about a
21  fellow coworker?
22      A.    Well, I was making it in
23  reference -- I was using it as an analogy
24  because a snake will not stop unless you kill
25  it.  You're not gonna get a snake to sit down,

Page 223

1   you're not gonna say leave me alone and it's
2   gonna stop.
3       Q.    Okay.
4       A.    And I was saying to them if you's
5   don't reprimand Carole, because it follows right
6   after, if you don't take that, if you continue
7   the whole context of the letter you will say and
8   until Miss Wolke, which is a human being, is
9   reprimanded, not killed, but is reprimanded to
10  the fullest extent of the law, her behavior will
11  continue on this way.
12      Q.    So if Miss Wolke had written a
13  letter and said that you reminded her of a
14  poisonous snake and that the only way to stop it
15  is to kill it --
16      A.    The character, the character.
17  Very underhanded and conniving and deceptional.
18      Q.    Well, let me ask you this
19  question.  Is it appropriate to use the word
20  'kill it' --
21      A.    Well, I --
22      Q.    -- when -- wait, let me finish my
23  question.
24          -- when describing a coworker.
25  Let alone your supervisor.

Page 224

1       A.    I didn't find it inappropriate
2   because I was only using it as an analogy, I
3   wasn't using it to actually mean physical harm
4   to her, I was just using the characteristic of a
5   snake and you can't stop a snake any other kind
6   of way.
7       Q.    Isn't it true that you were
8   investigated based upon this comment?
9       A.    Yes.
10      Q.    And that was by the workplace
11  violence coordinator?
12      A.    Yes.
13      Q.    Marcia Parchment?
14      A.    Yes.
15      Q.    I want you to look at what's going
16  to be marked Exhibit 32.
17          (Whereupon, Exhibit 32 is marked
18      for identification.)
19      Q.    Let me know when you're ready.
20      A.    I'm ready.
21      Q.    This is a statement July 15th,
22  2005 by Marcia Parchment.
23      A.    Um-hum.
24      Q.    Okay.  And the section that says
25  "brief summary of incident," it says "Miss

Page 225

1   Atkinson goes on to make a statement in her memo
2   that can be perceived as a threat." And then you
3   go back down to the summary of statements and
4   interview section.  It says "Miss Wolke goes on
5   to say that she is fearful of some kind of
6   physical harm based on the content of this memo
7   and the previous outstanding complaint.  Miss
8   Wolke indicated that since Miss Atkinson's
9   return from her sick leave on June 1st, 2005 she
10  has had no contact with Miss Atkinson."
11          And at the bottom, it says "Miss
12  Roxanne Lotts was notified to make an
13  arrangement for a temporary work site for Miss
14  Atkinson that would be outside of the HCC."
15          Did you get an office that was
16  temporarily outside of the HCC after the
17  incident?
18      A.    No.
19      Q.    Did you take into consideration
20  Miss Wolke's possible feelings when you wrote
21  the letter saying kill it?
22      A.    I didn't write the letter to Miss
23  Wolke.  I wrote the letter to Miss Lotts.
24      Q.    Okay.  I want you to turn to the
25  second page.  It says, right before the bullet

Page 226

1  points, "Miss Atkinson agreed to the following,
2  temporary reassignment to the office of MIS."
3      Did that happen?
4  A.    No.
5  Q.    Miss Roxanne Lotts, Director of
6  Nursing, would be her immediate supervisor.  Did
7  that happen?
8  A.    No.
9  Q.    Who was your immediate supervisor?
10  A.    I went on a leave, I wasn't even
11  here.  After this, after this confusion, after
12  they twisted, I think I went right --
13  Q.    Okay.
14  A.    I went on vacation, I went on -- I
15  had a vacation.  Right after that when I came
16  back and that was when I went on vacation.  For
17  that period and when I, um, came back from
18  vacation, if I'm recalling the dates right, I
19  went on a leave because I was sick again because
20  of how they tried to twist...this story about
21  when it was just used as an analogy and I was
22  just using the characteristic --
23  Q.    But you don't deny using the word
24  'kill it' --
25  A.    No, I don't deny it at all, I --

Page 227

1  Q.    Isn't it true we went over your
2  leaves of absence, you can look at Exhibit 24 if
3  you want, that you went out on leave from July
4  20th, 2005 to January 6, 2006?
5  A.    Um-hum.
6  Q.    So you had no contact with Wolke,
7  right?
8  A.    From July of 2000 --
9  Q.    When you were on a leave did you
10  have contact --
11  A.    No.
12  Q.    Okay.
13  A.    I was sick from what she had did
14  to me and all the lies that had been told, trust
15  me when I tell you.
16  Q.    I want you to look at what's going
17  to be marked as Exhibit 33.
18      (Whereupon, Exhibit 33 is marked
19      for identification.)
20  A.    Every threat she made --
21  Q.    I'm sorry, there's no question
22  pending.
23  A.    Oh, okay.
24  Q.    Take a look at the document and
25  let me know when you're ready.

Page 228

1  A.    Yeah, I'm ready.
2  Q.    Okay, is this a letter that you
3  sent -- who did you send this letter to?
4  A.    I think it was for, um, to, um,
5  I'm not for sure, I think it could have been
6  through Marcia Parchment.
7  Q.    Did you look at page 202, the very
8  last page of that exhibit?  It says "this letter
9  is carbon-copied to Ed McCabe, Federal Office of
10  EEO, Commissioner Davey of Department of Human
11  Services, Teresa C. Wilson, Deputy commission
12  Governor's office, Mr. Wirkheiser CEO, Miss
13  Parchment, Miss Evans, Union, Mr. G. Engle, ERO,
14  and Miss Lotts.
15      So you sent a copy of this letter
16  to all these individuals?
17  A.    I could have; I don't recall.
18  Q.    Okay.  But if this document
19  indicates that you did, you might have sent it
20  to these people?
21  A.    It's possible.
22  Q.    Why did you send it to so many
23  people?
24  A.    Because these are the people that
25  are -- that I was requesting help from.  Because

Page 229

1  I was being railroaded by Carole taking the
2  context out of --
3  Q.    But isn't it true that Carole
4  wasn't investigating you, it was Marcia
5  Parchment, because she's a workplace violence
6  coordinator?
7  A.    But she was making the accusation
8  that, um --
9  Q.    Isn't it true that you made the
10  letter that said she's like a snake and the only
11  way to deal with it is to kill it?  Didn't you
12  write that letter?
13  A.    The only way to deal with what?
14  The only way to deal with Carole?  No, I didn't
15  make the statement the only way to deal with
16  Carole is to kill it.  I said the only way to
17  deal with Carole is to have her reprimanded.
18  Q.    All right, we can read 31 again.
19  I want to get the exact words you put.  Exhibit
20  31 at the end, "she reminds me of a poison
21  snake.  The only way that you can stop a snake
22  from biting you is to kill it."
23  A.    Um-hum.
24  Q.    So you don't deny that you sent
25  that?

Page 230

1      A.    No, I don't deny making that and I
2    don't deny that comes right after that and
3    unless Miss Wolke is reprimanded to the fullest
4    extent of the law she will continue with this
5    behavior, that's in an analogy.
6      Q.    I'm not concerned with that.
7      A.    Yes.
8      Q.    And Marcia Parchment, because it's
9    her job to stop workplace violence, conducts an
10   investigation into what you said, correct?
11     A.    Right.
12     Q.    So are you saying Marcia Parchment
13   was discriminating or harassing you by
14   investigating you for that?
15     A.    No.  No.
16     Q.    Are you -- do you have proof that
17   Carole Wolke initiated this investigation
18   against you?
19     A.    Yes.
20     Q.    What's the proof?
21     A.    The proof is the letter.  She made
22   the accusation.
23     Q.    You wrote the letter.
24     A.    I wrote the letter.  She stole the
25   letter out of, um, Miss Lotts', uh, mailbox

Page 231

1    that's how --
2      Q.    But she --
3      A.    That's how she knew the context of
4    the letter, but if the letter was addressed, if
5    the letter was addressed to Miss Wolke, how did
6    Carole get the contents of the letter?
7      Q.    You mean Miss Lotts?
8      A.    That letter was addressed to Miss
9    Lotts.
10     Q.    Right.
11     A.    How did the Carole get the
12   contents of what was in the letter?
13     Q.    Okay, I want you to look in 32.
14   On July 6, 2005, this writer, this is Marcia
15   Parchment, was informed of the recent memo from
16   Miss Atkinson," you, "that expressed her
17   discomfort from the way things were being
18   handled.  On July 1st, 2005 this writer met with
19   Carole Wolke to discuss her concerns as it
20   relates to the above stated documentation, a
21   memo addressed to Miss Roxanne Lotts."
22        So isn't it true that Miss Lotts
23   gave this to Miss Parchment, the letter?  That
24   Miss Lotts gave this letter to Miss Parchment,
25   the workplace violence coordinator?

Page 232

1      A.    It's possible.
2      Q.    Okay.  But you still insist that
3    Miss Wolke drove the investigation even though
4    she didn't write the letter and there's no proof
5    she...
6      A.    She had to, she had -- she...it
7    is, it is my belief that she had something to do
8    with it because she's stating she's afraid so
9    how does she even know what the context of a
10   letter that wasn't even addressed to her?
11     Q.    So it's your contention that --
12     A.    Either Roxanne told her what was
13   in the letter or either Miss Parchment told her
14   what was in the letter and I don't see nowhere
15   in any of this paperwork where either one of
16   them told Carole Wolke what was in the letter.
17     Q.    So you're saying that because you
18   wrote this letter to Miss Lotts that she had no
19   right to show it to Miss Wolke who was being
20   threatened?
21     A.    No, I'm not saying that.  No, I'm
22   not saying that.
23     Q.    Okay.  Look at the exhibit that's
24   in front of you, Exhibit 33.
25     A.    Um-hum.

Page 233

1      Q.    July 21st, 2005 letter.
2      A.    Um-hum.
3      Q.    You write I would like to say that
4    I regret the choice of words I used in the
5    letter of 6/17/05.
6      A.    Um-hum.
7      Q.    Why did you regret the choice of
8    words?
9      A.    Because the workplace violence,
10   Miss Parchment...representative said it was not
11   an appropriate word to use even though I was
12   using it as an analogy, she said it's not an
13   appropriate word to use.
14     Q.    Okay.  I want you to look at
15   Atkinson EEO page 199.  It's of the same
16   exhibit.  Look at the bottom 199.
17     A.    Yes.
18     Q.    You want to go to that page, 199?
19     A.    I'm here.
20     Q.    All right, you write in the
21   letter, this is an addendum, right?  You were
22   trying to explain what happened in that letter?
23     A.    Yes.
24     Q.    Where you said the only way to
25   deal with a snake is to kill it.

Page 234

1      A.    Yeah.
2      Q.    You write "Miss Wolke befriended
3  me, as I stated in my original complaint letter,
4  for the sole purpose of harming me.  When Miss
5  Wolke brought charges against me she and I were
6  on a communicating and socializing basis as a
7  coworker and friends.  She spent several hours a
8  day in my office talking about her boyfriend and
9  her personal matters in her life.  Often times I
10  would even console her on some of the problems
11  that she was going through with her friend or
12  boyfriend.  I would often spend time with her
13  because I really thought she needed a friend to
14  talk about her boyfriend or friend so because of
15  this relationship that we had I could have never
16  guessed in a million years that she was capable
17  of bringing such a serious action as a red A."
18          Didn't you just testify earlier
19  that you had no relationship with Miss Wolke?
20      A.    Just a coworker relationship.
21      Q.    But you wrote in this letter that
22  you spent hours with her talking about her
23  boyfriend?
24      A.    She spent hours, she spent hours
25  in my office.

Page 235

1          (Brief interruption.)
2      Q.    All right, so you wrote this
3  letter when you were trying to clarify your
4  snake comment to Miss Lotts, right?  So why did
5  you indicate that you spent time with her and
6  you guys talked about her boyfriend and all
7  that?
8      A.    This was when...she gave me the
9  Christmas present and between that time I was,
10  like, hoping that everything would, you know,
11  pan itself out, so she would come in the back --
12  I wasn't the only one that she was talking to,
13  she would just come in our office and she would
14  be having a conversation and I would be
15  listening, you know, being part of what the
16  conversation was.
17      Q.    So to this date --
18      A.    It wasn't like she came to sit
19  next to me.
20      Q.    So are you amending your previous
21  statement where you said you had no dealings
22  with her at work?
23      A.    Well, when I said no dealings,
24  don't mean -- you can't have no dealings with
25  anyone if you working in...contact with them and

Page 236

1  she's the Director of Nursing, indirect...I
2  didn't have no personal relationship with her.
3      Q.    So talking about boyfriends, is
4  that considered a job related?
5      A.    She talked about her boyfriend to
6  everybody.
7      Q.    Okay.  And that included you.
8      A.    I was in the room when she talked
9  about it.
10      Q.    Okay.  You mention in your
11  Complaint that you -- actually, it -- strike
12  that.
13          Is it your contention that NJDC
14  didn't do enough to address your concerns?
15      A.    After the fact.
16      Q.    Okay.
17      A.    After I was damage.
18      Q.    And you don't deny that on March
19  5th, 2005 Roxanne Lotts wanted to have a meeting
20  between you and Wolke, but you had a previously
21  scheduled doctor's appointment so you couldn't
22  do it.
23      A.    No.
24      Q.    But you testified that you had a
25  scheduled doctor's appointment, that's why you

Page 237

1  couldn't have the meeting.
2      A.    Rephrase the question.
3      Q.    Do you deny that on March 5th,
4  2005 Roxanne Lotts scheduled a meeting to have
5  you and Wolke meet, but you couldn't do it
6  because you had a doctor's appointment?
7      A.    I deny -- do I deny...
8      Q.    Yeah.
9      A.    Not having a meeting?  No.
10      Q.    Okay.
11      A.    I deny not having a meeting
12  because I had a doctor appointment.
13      Q.    So the meeting was scheduled,
14  though.
15      A.    The meeting was scheduled, yeah.
16      Q.    But because you had something
17  already scheduled.
18      A.    But -- scheduled at that time on
19  that day, but it wasn't previously scheduled, it
20  wasn't scheduled a day before or a week before,
21  it was scheduled that morning, that hour, that
22  time.
23      Q.    Okay.  And do you deny that Marcia
24  Parchment got involved in the process because of
25  the snake comment so she investigated the

Page 238

1  matter.
2      A.    Do I deny...no, I don't deny.
3      Q.    Okay.  And we read the document by
4  Marcia Parchment, Exhibit 32, which said you're
5  supposed to be in a temporary work station, but
6  you were out on leave, so that didn't happen and
7  that Lotts was to assume direct supervision of
8  you.
9           Do you deny that, too?
10     A.    I don't understand what you
11  saying.
12     Q.    Do you deny that Marcia Parchment
13  investigated the workplace violence issue?
14     A.    She did investigate.
15     Q.    Okay.  On two occasions.
16     A.    She did investigate.
17     Q.    Okay.  I want to show you what's
18  going to be marked Exhibit 35.
19           (Whereupon, Exhibit 35 is marked
20  for identification.)
21     Q.    Is it your assertion that Carole
22  Wolke was never disciplined or punished for her
23  actions against you?
24     A.    Okay.  Question again?
25           MR. YI:  Can you read back the

Page 239

1      question, please?
2           (Whereupon, the pending question is
3  read back by the reporter.)
4      A.    I don't know.  What happened with
5  Carole.
6      Q.    Okay, what does this e-mail from
7  the CEO of NJDC indicate?
8      A.    That's what they're saying, but I
9  don't -- I didn't know anything about that when
10  I was working.
11     Q.    So at least they said they were
12  going to -- quote, I will be advising Miss Lotts
13  to meet with Gary Engle, action appropriate for
14  the circumstances.
15           And that was after the DHS report
16  came out that said your allegations were
17  unfounded, however, they found Miss Wolke to
18  have made an inappropriate statement; is that
19  right?
20     A.    That was in 2006.
21     Q.    Right.  Because you filed your
22  investigation -- you filed your discrimination
23  complaint in March of 2005, correct?
24     A.    Yes, and that's --
25     Q.    You didn't file it in October of

Page 240

1  2004, correct?
2      A.    No.
3      Q.    You didn't file it in November of
4  2004.
5      A.    No, I did, informal, though.
6      Q.    I'm not talking about formal.  Did
7  you file it in December of 2004.
8      A.    Informal, yes.
9      Q.    Okay, but you wrote letters to
10  Roxanne Lotts --
11     A.    And formal complaint --
12     Q.    -- but you didn't write --
13     A.    -- requesting for help.
14     Q.    But you didn't write one to the
15  investigation -- DHS investigator.
16     A.    No.
17     Q.    But you waited until March of 2005
18  to do that --
19     A.    Yes.
20     Q.    -- when you went on leave so you
21  weren't --
22     A.    No.
23     Q.    -- even at work there.
24     A.    No, after she -- after I got sick
25  from her getting a red A and how they tried to

Page 241

1  railroad me, how it seemed like Carole was being
2  able to railroad me on the job and then I had to
3  get sick and had to take -- my pressure was
4  going up too high and I couldn't...stay at work.
5      Q.    So your position today still is no
6  one took your complaint seriously and
7  investigated it?
8      A.    Not at the beginning when I
9  requested.  It was only after I made my initial,
10  formal complaint, after I made my formal
11  complaint, then things start happening, but --
12     Q.    But you waited until March of '05
13  to make a formal complaint.
14     A.    Yeah.
15     Q.    Okay.
16     A.    All my informal complaints nothing
17  happened, but it was after my formal complaint.
18     Q.    I want you to look at Paragraph 27
19  of your Complaint.
20     A.    Twenty-seven?
21     Q.    Exhibit A, right there
22  (indicating).
23     A.    Oh.  Um-hum.
24     Q.    "As a direct and proximate result
25  of the defendant's willful, knowing and

Page 242

1  intentional discrimination against her, the
2  plaintiff has suffered and will continue to
3  suffer pain and suffering in extreme and severe
4  mental anguish and emotional distress and she
5  has suffer and will continue to suffer a loss of
6  earnings and job opportunities and benefits.
7  Plaintiff is thereby entitled to general and
8  compensatory damages in amounts to be proven at
9  trial."
10       You testified that since your
11  early retirement in September of 2007 your only
12  income is the pension?
13       A.    Yes.
14       Q.    Have you looked for any other
15  jobs?
16       A.    No.
17       Q.    Have you --
18       A.    I did, but...
19       Q.    Okay.
20       A.    I did.
21       Q.    Continue.
22       A.    I did.
23       Q.    Okay, what jobs were you looking
24  for?
25       A.    What job did I look for?

Page 243

1       Q.    (Nods in the affirmative).
2       A.    Uh, working at a cafeteria in the
3  school.
4       Q.    You applied for it and they denied
5  it?
6       A.    Yes.
7       Q.    And why did they deny it?
8       A.    I don't know.
9       Q.    Okay.  You state that you continue
10  to suffer pain and suffering.
11       A.    Um-hum.
12       Q.    Describe that for me.
13       A.    Well, I get upset a lot when I
14  think about it, what had happened and why it
15  happened.
16       Q.    Okay.  You also talked about
17  compensatory damages.  Did you lose any salary
18  because of the alleged discrimination?
19       A.    Yeah, when I had to, uh, be out of
20  work, I didn't get my regular pay.  I the didn't
21  get my regular pay, I...I migha got disability.
22       Q.    So when you had to get surgery, is
23  that because of the discrimination and you lost
24  pay because of that?
25       A.    No.

Page 244

1       Q.    And when you had to care for your
2  mother, was it because of the discrimination?
3       A.    No.
4       Q.    How many sick days do you think
5  you might have taken?
6       A.    I don't recall.  Total?  I don't
7  recall.
8       Q.    Did you lose any job benefits as a
9  result of the discrimination that you alleged
10  you suffered?
11       A.    Well, I was in, um...I had to pay
12  my insurance when I was out, my medical
13  insurance.  I was in, um, deferred comp which
14  was a automatic deduction from my,
15  um...paycheck.
16       Q.    Did you lose any seniority?
17       A.    I don't think so.
18       Q.    So since you were principal clerk
19  typist did you apply for any promotional
20  opportunities?  Besides the principal clerk
21  typist position.
22       A.    Principal clerk transcriber.
23       Q.    Yeah.
24       A.    No.
25       Q.    Okay.  Have you ever been

Page 245

1  hospitalized including visits to the emergency
2  room in the past ten years?
3       A.    Yes.
4       Q.    When?
5       A.    Oh, God, I don't recall.  For
6  surgery?  Just for surgery.
7       Q.    Okay.  Do you recall if that was
8  mid-2000s or before 2000?
9       A.    November...it was one surgery I
10  had during that time, just one that I remember,
11  I don't recall the exact dates of the other.  I
12  think it was prior to those.
13       Q.    Have you had any major illnesses
14  in the past ten years?
15       A.    No.
16       Q.    Okay.
17       A.    Just...
18       Q.    And you said you had surgery,
19  though, in the past ten years.  And that
20  was...okay, I won't -- I don't need to go into
21  the details of that.  Are you currently suffer
22  from any medical condition?
23       A.    Just headaches like I have right
24  now and, uh, bouts of depression off and on.  In
25  the stress of this, what I been going through

Page 246

1  through these years.
2      Q.    Is this lawsuit causing you
3  stress?
4      A.    Yes, I would say, yeah.
5      Q.    Do you -- are you currently
6  suffering from psychological conditions?
7      A.    Just...emotional would be
8  psychological?  Would emotional be
9  psychological?  I could get --
10     Q.    Is your depression related to your
11  emotions?
12     A.    I can get...teary-eyed when I
13  think about all that I been through.  If I
14  can...
15     Q.    Um-hum.
16     A.    Get -- that I was done wrong and
17  it shouldn't have happened to me because of...
18     Q.    Taking care of -- do you still
19  have six children living at your house?
20     A.    I shouldn't have had to go through
21  this --
22     Q.    Okay, my new question --
23     A.    -- when somebody's wrong.
24     Q.    I know, you can...I think you've
25  talked about that at length, but do you have six

Page 247

1  children living currently with you?
2      A.    Just four now.
3      Q.    Just four children.
4      A.    And my uncle and my --
5      Q.    And are you still having to go to
6  school hearings and assorted matters because of
7  them?
8      A.    Well, not as much now, they
9  getting older.  Just some time, like...pffff.
10     Q.    Do any of them get into trouble
11  with the law?
12     A.    Well, my seventeen-year-old, he
13  was having problems.  Not with the law, but, you
14  know, he always -- he's seventeen now.
15     Q.    Okay.
16     A.    But, no, um...
17     Q.    And these problems, did they cause
18  you any distress?
19     A.    No, 'cause I'm used to -- I can
20  handle, um...I can handle being a caregiver.  My
21  distress is when I'm done wrong and...and people
22  know when the person is wrong and all this
23  covering up and I'm sitting here going through
24  all this.
25     Q.    Have you seen any psychologists or

Page 248

1  psychiatrists in the past ten years?
2      A.    Yes, I was, um, under...a
3  therapist.
4      Q.    Okay.  What's the person's name?
5      A.    Bill Powell.
6      Q.    Powell?
7      A.    Powell.
8      Q.    Do you know the address?
9      A.    Mm...I could look in here.
10     Q.    Yeah, that's fine.
11     A.    2130 Millburn Avenue, Maplewood,
12  New Jersey.
13     Q.    Is that the address of the doctor,
14  the consent form I sent to you?
15     A.    Yes.
16     Q.    Okay, okay.  And how many times
17  did you see him?
18     A.    I don't recall, just for a while
19  when, most, mostly when it first happened in
20  2000 and when I went on leave I was really under
21  his care a lot during that time.
22     Q.    And that was treatment for what,
23  depression?
24     A.    Emotional trauma and depression
25  and trying to understand.

Page 249

1      Q.    Other than Mr. Powell, any other
2  persons that you've seen either as a therapist
3  or counsellor in the past ten years?
4      A.    No.
5      Q.    Do you think if you were provided
6  with a job right now you would be able to work?
7      A.    I think I could.
8      Q.    What kind of hobbies do you have
9  outside of work?
10     A.    I like to read the bible a lot and
11  I like to read...history, historical, I like law
12  and...
13     Q.    Do you participate in any church
14  activities, services, choir, any of those?
15     A.    Just, um, chaplain, I'm a
16  chaplain.
17     Q.    You're a chaplain?
18     A.    Yes.
19     Q.    For...for what?
20     A.    I can't believe I forget the name
21  of it.
22     Q.    You can just describe it, I'm not
23  really looking into specifics.
24     A.    Oh.
25     Q.    Is it a voluntary --

Page 250

1    A.    Community --
2    Q.    -- job?
3    A.    Yeah, the community organization.
4    Q.    How many hours do you think you do
5  your chaplain work?  A week?
6    A.    Oh...well, since this incident I
7  really haven't fulfilled it like I should have,
8  so...I just kinda go to the meetings and...
9    Q.    Okay.  What household
10  activities -- you're a caretaker of --
11    A.    Caregiver.
12    Q.    Caregiver of four children, right?
13  So what kind of activities -- do you feed, cook
14  for them and do all the laundry and stuff?
15    A.    Yeah, yeah, I do my housework.
16    Q.    Just typical caregiver's...
17    A.    Yeah.
18    Q.    Okay.
19    A.    Take 'em to choir practice, Girl
20  Scouts, uh...
21    Q.    Have you been able to drive a car?
22    A.    Yes.
23    Q.    Do you have difficulty sleeping?
24    A.    Yes.
25    Q.    What kind of problems have you

Page 251

1  been having?
2    A.    Just...really just this case,
3  just...didn't know it was gonna go to this
4  extent of this.
5    Q.    So this lawsuit has been kind of
6  keeping you up at night?
7    A.    Yeah.
8    Q.    Okay.
9    A.    Just a lot of work keeping up with
10  it.
11    Q.    Any other medication -- have you
12  been taking any medications in the last five
13  years for your symptoms?
14    A.    Just at the beginning, um...I was
15  prescribed something to relax me.
16    Q.    What was that?
17    A.    Um...can't recall, um.
18    Q.    Is it a depressant drug or --
19    A.    Yeah, it was like anti-depressant
20  drug, um...
21    Q.    It's okay, I just need to know
22  that if you...if you give me a brief moment,
23  we're almost done, I just want to make sure I've
24  covered everything and then we can meet with
25  Judge Salas, so off the record a second.

Page 252

1    A.    Um-hum.
2        (Whereupon, an off-the-record
3    discussion takes place.)
4    Q.    I just want to ask you one last
5  time if you understood my questions today.
6    A.    Most of them.
7    Q.    And I gave you an opportunity to
8  look at the documents and...
9    A.    Yes.
10    Q.    Okay, and let's see, what else is
11  there.  And you swore to tell the truth and
12  everything you said today was the truth?
13    A.    Yes.
14    Q.    And you understand that today's
15  testimony can be used against you if there is a
16  trial.
17    A.    Yes.
18    Q.    Okay.  And anything else you want
19  to add before we conclude and go meet Judge
20  Salas?
21    A.    No.
22        MR. YI:  Okay, then we are done.
23  Thank you.
24        (Proceedings concluded at
25    3:40 p.m.)

Page 253

1        C E R T I F I C A T E
     I, TABITHA DENTE, a Certified Shorthand
2  Reporter and Notary Public of the State of New
3  Jersey, do hereby certify that prior to the
4  commencement of the examination, the witness was
5  duly sworn by me to testify to the truth, the
6  whole truth and nothing but the truth.
7    I DO FURTHER CERTIFY that the foregoing
8  is a true and accurate transcript of the
9  testimony as taken stenographically by and
10  before me at the time, place and on the date
11  hereinbefore set forth, to the best of my
12  ability.
13    I DO FURTHER CERTIFY that I am neither a
14  relative nor employee nor attorney nor counsel
15  of any of the parties to this action, and that I
16  am neither a relative nor employee of such
17  attorney or counsel, and that I am not
18  financially interested in the action.
19    _____
20        TABITHA DENTE, CSR NO. 1592
21  ??
22  ??
23  ??
24  ??
25  1