1. Where do you currently live?

   I have great concerns with giving my address. I have been threatened to be killed by the women in writing.  Although I cannot prove anything my right tire was slashed six (6) times and sugar was put in the gas tank of my car, totally ruining my car.   Bruce Werkheiser can get in touch with me if need be.

2. What is current work status?

   Retired.

3. On or about the Fall of 2004, did plaintiff Phyllis Atkinson begin reporting to you?

   Phyllis Atkinson started to report to me as of December 2003 not the fall of 2004. Her immediate supervisor Yvonne Bivins, Head Nurse at the Health Care Center resigned and since I was Ms. Bivins immediate supervisor, I stepped in and supervised the nurses and clerical staff under Ms. Bivins charge.

4. As of 2004 what were Ms. Atkinson's job duties of a Principal Clerk Transcriber?

   Phyllis Atkinson had job responsibilities as depicted in her PAR.  Mainly she was in charge of making medical appointments along with transportation for the clients on the main campus who needed to see outside specialists/consultants. She also had the responsibility to provide a weekly medical appointment calendar to the Cottages. Roxanne Lotts, Nurses and the ADRL office.

5. Prior to September 28, 2004, had you ever assisted Ms. Atkinson with regard to any of her paper work?

   On occasion I would assist Phyllis Atkinson getting the proper paperwork for the medical appointment and set up necessary transportation.

6. In March of 2004, did you provide Ms. Atkinson with a performance assessment review (PAR)?

   Yes

7.  Why did you drop her PAR number from 27 to a 24?

When I reviewed her PAR and the specific job responsibilities, the prior supervisor, Yvonne Bivins, had written specifically that Phyllis Atkinson should input client data into the computer.  She had made a few errors with the client appointments that resulted in missed appointments, causing clients not being able to see Specialists, information not being relayed to transportation and causing clients undue stress.  Ms. Atkinson had not input data into the computer regarding client information.  To achieve an outstanding rating the employee would have to perform her job responsibilities without error and with no guidance from her supervisor.

8.  Why did you give PAR ratings to any Caucasian employees of the North Jersey Developmental Center (hereinafter NJDC) in March 2004?

Don't understand the question.  I gave PAR ratings to people that I supervised at that time.

9.  Of the Caucasian employees of NJDC that you gave PAR ratings to, did any of their PAR ratings go down?

I can't recall

10. When did you learn that Ms. Atkinson had made a complaint to Director of Nursing Ms. Roxanne Lotts with regard to the reduction of her PAR rating?

Ms. Lotts was the reviewer which means she would have to counter sign the PAR.  Phyllis Atkinson did not come to me she went directly to Roxanne Lotts and argued with her.  I was not privy to this I was told by Roxanne Lotts that she would handle it.

11.  What actions, if any did you take, in response to learning that Ms. Atkinson had made a complaint against you?

None to my recollection.

12. Did you ever tell Ms. Atkinson that she did not need her own computer and/or her own desk?

No

13. During years 2004 and 2005, isn't it true that Caucasian co-worker Ms. Corrado received a new desk and a new chair before Ms. Atkinson?

Donna Carrado was the informed consent nurse.  I did not order a chair or a desk for Donna Corrado.  Roxanne Lotts did.  I had nothing to do with that.

14. In or about March 2004, Ms. Atkinson made an annual vacation request that included the Wednesday before Thanksgiving and the first Monday immediately after Thanksgiving.  Did you approve Ms. Atkinson with regard to her annual vacation request?

Phyllis Atkinson dated her annual vacation request 3/22/04 and Roxanne Lotts as noted by her initials received Phyllis Atkinson's request 3/30/04.  Per procedure all annual vacation requests were to be submitted to their supervisor's no later than 3/15/04.  Failure to comply with the procedure may result in your vacation request being denied.  The only November 2004 request Phyllis Atkinson made was 11/17/04-11/22/04.  Subsequently she dated a request 11/19/04 asking for days off surrounding the Thanksgiving holiday.  Because other employees followed procedure with filing their annual vacation request Phyllis Atkinson was denied due to lack of staff.  Ultimately I understand that Roxanne Lotts gave Phyllis Atkinson permission to be off the Monday after Thanksgiving.  Also, I did not have Phyllis Atkinson annual vacation request she handed it in to Roxanne Lotts as evident by her knowledge of receiving same with date and initial.

15. Did you notify Ms. Atkinson with regard to her written annual vacation request of March 2004, specifically regarding her request to take off the Wednesday before Thanksgiving and the first Monday immediately after Thanksgiving?

Cannot recall.

16. Ultimately, at any time during year 2004, did you grant a request of Ms. Atkinson, whether in writing or orally, to be allowed to take off Wednesday before Thanksgiving and the first Monday immediately after Thanksgiving?

Can't recall.

17. In calendar year 2004, did you approve the annual vacation request of any other employees of NJDC?

Yes.

18. In calendar year 2004, did you notify other employees of NJDC regarding their annual vacation request?

   Yes.

19. Did Lynda Garvald, Donna Corrado and Michael Buonagurio receive their written 2004 annual vacation requests back?

   Yes, they submitted according to procedure, prior to 3/15.

20. Did you deny any oral and/or written vacation request of any employee of NJDC in addition to allegedly denying the request of Ms. Atkinson?

   Yes.

21. Did there come a time when Ms. Atkinson alleged that you discriminated against her because of her race?

   Yes.

22. Have you ever treated Caucasian employees of NJDC more favorably than you treated African American employees?

   No.

23. When did you learn of such a complaint of racial discrimination brought against you by Ms. Atkinson?

   When Roxanne informed me of the threatening letter.

24. Did any NJDC and/or State of New Jersey employee and/or agent ever interview you in connection with an investigation of the of racial discrimination complaint brought against you by Ms. Atkinson?

   Yes, EEO.

25. Discovery in this case has revealed that prior to this litigation; there were two prior complaints of racial discrimination and/or harassment that had been brought against you by Ollie Kendrick and Valerie Richberg.  What were the alleged facts that Ms. Kendrick and Ms. Richberg asserted against you?

   Can't recall, however, I know that the Union will submit complaints actually encourage the worker when the worker is being disciplined for their performance.

26. Assuming that you disagreed with the factual basis provided in Ollie Kendrick's racial discrimination and/or harassment complaints, what do you contend really occurred with regard to the facts provided in Ms. Ollie Kendrick's complaint against you?

    I have no knowledge regarding this.

27. Assuming that you disagreed with the factual basis provided in Valerie Richberg's racial discrimination and/or harassment complaints, what do you contend really occurred with regard to the facts provided in Ms. Valerie Richberg's complaint against you?

    Again, I have no knowledge or cannot recall the complaints.

28. Did you have retaliate against Ms. Atkinson for raising discrimination complaints against you?

    No, I was informed by my supervisor that I no longer was to supervise her and not to speak with her, which I complied.

29. On or about February 14, 2005, did you give Ms. Atkinson a "Red A" for attendance reasons?

    Yes.

30. To your knowledge, prior to that date, is it your testimony that Ms. Atkinson had attendance problems?

    Yes.

31. If your answer to question 28 was the affirmative, how would you describe Ms. Atkinson's attendance issues, if any, prior to February 2005?

    She had a major problem with her attendance her time to work was 9:15 – 5:15 she was consistently late to work, call out late we would not know from one day to another if she was going to come to work.

32. To your knowledge, and/or memory, had Ms. Atkinson ever received formal and/or informal disciplinary action with regard to her attendance prior to February 2005?

    I am unsure because I had not researched it; however, Margaret Murphy RN, Judy Zarra RN, Yvonne Bivins RN, and Mike Buonagurio RN all had a difficult time dealing with Phyllis Atkinson and her attendance.

33. As of and before February 2005, were you aware of any exigent circumstances which would warrant a degree of leniency with regard to any attendance issues that Ms. Atkinson may have been experiencing?

   Phyllis Atkinson son was in a very bad motorcycle accident and she had to take him to physical therapy.  I don't know what year.  She had foster kids at home and would have to take them to doctor appointments, school, etc. and since she worked for the state with foster care she felt she was doing state work and allowances should be made.  She took advantage.

34. Did you and/or Ms. Lotts discuss and/or consider any mitigating circumstances in Ms. Atkinson's personal life prior to issuing a "Red A" in February of 2005?

   Again, we did not hear from her until 1:00 pm then she showed up I was instructed by Roxanne Lotts, my supervisor to give her a "Red A" for the first half of the day due to not giving proper notice for her absence.

35. Was receiving a "Red A" a type of reprimand and/or suspension?

   A "Red A" is issued to an employee when they have a day off without permission and with no pay due to their failure to properly notify their employer.

36. Is it true if an employee of NJDC receives a "Red A" three times in their personnel file that individual's employment may be terminated?

   No, not true.  They would have to have 5 "Red A" days in a row and then they would be terminated.

37. Do you stand by your decision to give Ms. Atkinson the "Red A"?

   Absolutely, cannot run an organization without following procedure/protocol.

38. Why was the "Red A" removed from Ms. Atkinson's personnel file?

   It was an administrative decision without my knowledge.

39. Who decided to remove the "Red A" from Ms. Atkinson's personnel file?

   Have no idea, Roxanne, Gary Engel and Bruce Werkheiser all in a meeting.  I was not involved in the meeting.

40. Do you have any knowledge as to whether Ms. Atkinson sought to transfer to another position where she would not have to report to you in 2005?

I know Roxanne Lotts wanted her to transfer to another department but Phyllis Atkinson would not.

41. What was the result of this transfer request?

Have no idea.

42. Did you ever contribute any input as to Ms. Atkinson's 2005 transfer request?

Unaware that Phyllis Atkinson asked for transfer.

43. What were your input and/or opinion with regard to Ms. Atkinson's 2005 transfer request?

Again, unaware of Phyllis Atkinson request.

44. Did you ever file a charge of disciplinary action taken against Ms. Atkinson in 2005?

Yes, as instructed by Gary Engel a written warning for "Red A"

45. What was the nature of your charge?

Written Warning

46. What was the outcome of this disciplinary action against Ms. Atkinson in 2005?

Bruce Werkheiser removed it due to miscommunication.

47. Had you ever sought to bring any disciplinary action against Ms. Atkinson prior to her raising a complaint against you with the Director of Nursing Ms. Lotts?

I was not in charge Roxanne Lotts was Director of Nursing and she was well aware of Phyllis Atkinson's actions.

48. Were any of Ms. Atkinson's job duties/responsibilities taken away from her when she returned from disability on or about September 1, 2007?

Roxanne Lotts had to run the department while Phyllis Atkinson was out and Roxanne Lotts took her job duties away from her not me.

49. If your answer to question 46 above was in the affirmative, then describe, those changes to Ms. Atkinson's job duties/responsibilities when she returned from disability on or after September 1, 2007?

Again, I had nothing to do with it.  Roxanne Lotts assigned or took away job duties.

50. Did you ever ghost write a letter of good report on behalf of Caucasian employee Ms. Corrado during the years 2005 through 2008?

Can't recall.

**CERTIFICATION**

I certify that the foregoing statements by me are true.  I understand that if any of the foregoing statements is willfully false, I may be subject to punishment.

Dated: 3/29/10

Carole Wolke