RECEIVED

AUG - 2 2010

AT 8:30_____M
WILLIAM T. WALSH
CLERK

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

PHYLLIS ATKINSON                    :
                                    :
                                    :      Hon. Peter G. Sheridan
                                    :      United States District Judge
                    Plaintiff,      :
                                    :   CIVIL ACTION NO. 07-04326 (PGS)
        vs.                         :
                                    :
NORTH JERSEY                        :
DEVELOPMENTAL CENTER                :
                                    :
                    Defendant.      :
                                    :

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT**

---

                    Phyllis Atkinson, Pro Se
                    317 East 30th Street
                    Paterson, New Jersey 07504
                    (973) 460-0382

        On the Brief

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

LEGAL ARGUMENT

I.      PLAINTIFF HAS ESTABLISHED A <u>PRIMA FACIE</u> CASE OF
        RETALIATION UNDER TITLE VII .................................................................1

        A.      Plaintiff Engaged In Protected Activity .............................................1
        B.      Plaintiff Sustained Material Adverse Action ......................................7
        C.      Plaintiff Can Show Causal Connection..............................................14
                1. Temporal Proximity ...................................................................14
                2. Timing Plus Pattern Of Antagonism Or Animus........................17
                3. Evidence Gleaned From The Record As A Whole......................18
        D.      Defendant's Non-Discriminatory Reasons .........................................19
        E.      Pretext ...............................................................................................19
                1. Prong One ...................................................................................20
                2. Prong Two...................................................................................20

II.     PLAINTIFF HAS MET HER BURDEN OF PROOF IN SUPPORT OF HER
        DISCRIMINATION CLAIM. ..........................................................................21
        A.      Adverse Action ...................................................................................23
        B.      Causal Nexus ......................................................................................26
        C.      Plaintiff Can Prove Pretext ...............................................................28

III.    PLAINTIFF'S TITLE VII CLAIMS SHOULD NOT BE LIMITED TO THE
        ALLEGATIONS RAISED IN HER EEOC CHARGE .....................................31

IV      PLAINTIFF ASSERTS FACTS IN DISPUTE THAT WOULD SUPPORT AN
        AWARD FOR PUNITIVE DAMAGES ...........................................................32

CONCLUSION.....................................................................................................33

## TABLE OF AUTHORITIES

### CASES

Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996) ..................... 2

Barber v. CSX Distribution Services, 68 F.3d 694 (3d Cir. 1995) ......................................4

Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 331 (3ʳᵈ Cir. 1995) ................29

Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)...1, 7, 10, 12, 13, 23, 24

Carlson v. Twp. of Lower Alloways Creek, No. 06-3779, 2009 WL 2496523,
at *9 (D.N.J. Aug. 12, 2009) ...............................................................................28

Coulton v. University of Pennsylvania, 2006 U.S. Dist. LEXIS 12459,
2006 WL 759701, at *5 (E.D. Pa. Mar. 21, 2006) ...........................................21

Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130,
135-36 (3d Cir. 2006) ..........................................................................    1, 4, 7

Davis v. City of Newark, 285 Fed. Appx. 899, 903-904 (3d Cir. 2008) ...........................23

Drwal v. Bor. of W. View, Pa, 617 F. Supp. 2d 397, 422 (W.D. Pa. 2009) .....................15

Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1993)....... 22, 29

Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000) ..........................27

Fasold v. Justice, 409 F.3d 178, 185 (3d Cir. 2005)...........................................................21

Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) ...........................................20, 22, 29

George v. Genuine Parts Co., No. 04-108, 2007 WL 217684, at *12
(W.D. Pa. Jan. 25, 2007)....................................................................................27

Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 318-19 (3d Cir. 2000).............22

Iadimarco v. Runyon, 190 F.3d 151, 161 (3d Cir. 1999)...............................................21, 22

Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989)................................................15, 17

Johnson v. McGraw-Hill Cos., 451 F. Supp.2d 681, 710 (W.D. Pa. 2006)........................8

Jones v. School District, 198 F.3d 403, 411 (3d Cir. 1999).................................................23

Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997)..................19, 29

Kellerman v. UPMC St. Margaret, 317 Fed.Appx. 290, 292-93 (3d Cir. 2009) ..............15

Kolstad v. American Dental Association, 527 U.S. 526, 119 S.Ct. 2118,
2121, 2128 (1999). ..........................................................................................33

Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) ...............................15, 27

Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 60 (4th Cir. 1998) .....      4

Le v. Univ. of Pa., 321 F.3d 403, 409 (3d Cir. 2003). ......................................................32

Marzano v. Computer Science Corp., 91 F.3d 497, 508 (3d Cir. 1996)...........................21

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ...............................................21

McKinnon v. Gonzales, 642 F. Supp. 2d 410, 435 (D.N.J. 2009)......................................24

Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-82 (1998)...............11, 13, 26

Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976),
 cert. denied, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753, *reh. denied,*
430 U.S. 911, 97 S.Ct. 1187, 51 L.Ed.2d 589 (1977)........................................................31

Pa. State Police v. Suders, 542 U.S. 129 (2004)...............................................................24

Robinson v. PFPC, Inc., No. 08-5113, 210 U.S. Dist. LEXIS 19303, at *7
(E.D. Pa. Mar. 4, 2010)......................................................................................................22

Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296-97 (3d Cir. 1997) ...................23, 24

Robinson v. SEPTA, 982 F.2d 892, 894 (3d Cir. 1993)....................................................15

Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997) ......................................................25

Stanziale v. Jargowsky, 200 F.3d 101, 105 (3rd Cir. 2000)..............................................29

Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990).......................7

Tarr v. FedEx Ground Package System, Inc., 2010 WL 331846 at * 9
(W.D. Pa. Jan. 28, 2010), ..................................................................................................18

Verdin v. Weeks Marine Inc., 124 Fed. Appx. 92, 95 (3d Cir. 2005) .............................22

Weston v. Pennsylvania, 251 F.3d 420, 432 (3d Cir. 2001) ..................................20, 24, 28

Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 322 (3d Cir. 2008) .....   2

Williams v. Phila. Hous. Auth., 380 F.3d 751, 760 (3d Cir. 2004) ...................................27

**CONSTITUTION/STATUTES**

42 U.S.C. § 1981a(b)(1)...............................................................................   32

42 U.S.C. § 2000e-2(a)(1) and (2)..............................................................23

## PRELIMINARY STATEMENT

In this civil action, plaintiff Phyllis Atkinson ("Plaintiff"), alleges that defendant North Jersey Developmental Center ("NJDC") discriminated and retaliated against plaintiff on the basis of her race (Black), in violation of Title VII of the Civil Rights Act of 1964. Plaintiff has submitted an Affidavit (Atkinson Cert., Ex. G) as well as additional facts in dispute starting on paragraph 134 to the end of her Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment. Plaintiff asserts that she has supplied this court with sufficient genuine issues of material fact which would allow this Court to deny defendant's motion.

## LEGAL ARGUMENT

### POINT I

### PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF RETALIATION UNDER TITLE VII

**A.**     **Plaintiff Engaged In Protected Activity.**

"[R]etaliation claims extend to those who oppose discrimination against others." Jackson, 544 U.S. at 180. Accordingly, "[p]rotected activities," as described in the first element, "include complaints of discrimination to the courts, government agencies, or the funding recipient." Dawn L., 586 F. Supp. 2d at 374 (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). "So long as it is `possible to discern from the context of the statement' that an individual opposed an unlawful practice, public expressions of opposition, including interviews with the press, are also protected." Dawn L., 586 F. Supp. 2d at 374 (quoting Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135-36 (3d Cir. 2006) (further citations omitted)).

1

A plaintiff alleging a claim of retaliation need not demonstrate that the conduct he opposed was actually a violation of the law, so long as he possessed a reasonable, good faith belief that the underlying actions of the employer actually violated the law. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996). "To put it differently, if no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination, then the complaint is not protected." Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 322 (3d Cir. 2008).

Plaintiff asserts that she first engaged in protected activity when she wrote her September 28, 2004 letter to NJDC Director of Nursing Services Roxanne Lotts. Ms. Lotts was in charge of her department and the supervisor of Carole Wolke, plaintiff's direct supervisor. This initial letter does not specifically assert that Ms. Wolke had discriminated against her due to her race, but it does provide that Ms. Wolke has shown favoritism to other co-employees while arbitrarily lowering her PAR score.

Plaintiff provides in her affidavit that shortly after she delivered her September 28, 2004 letter or in the beginning of October of 2004, plaintiff met with Ms. Lotts to discuss her letter. Plaintiff told her about her conversation with Ms. Wolke, and she told Ms. Lotts that she did not understand why Ms. Wolke reduced her PAR considering all of the work that she completed. Plaintiff asserted that the job that Ms. Corrado now had was a position that Ms. Atkinson use to perform on top of the other duties that Ms. Atkinson still was responsible for. She did not understand how Ms. Wolke could lower her PAR score and yet, not change Ms. Corrado's PAR score even though Ms. Corrado did much less volume of work than she did. Plaintiff told Ms. Lotts that she thought that Ms. Wolke was treating her differently from Ms. Corrado due to the fact that she favors

Ms. Corrado because she was Caucasian and plaintiff was Black. Plaintiff also stated that she overheard Ms. Wolke stating that Ms. Corrado's position was much more important than the job that plaintiff was responsible for. When those duties had been part of Ms. Atkinson's job responsibilities, Ms. Wolke never acknowledged her work as anything special. But now that a white employee had the duties, suddenly Ms. Wolke was telling others that Ms. Corrado needed a new computer, a new desk and her own office. (Affidavit of Phyllis Atkinson, Ex. E., Yi Cert., Ex. 2 March 28, 2005 complaint letter at Atkinson EEO 73-74)

Within days after the first meeting with Ms. Lotts, plaintiff attended a second meeting with Ms. Lotts and Ms. Wolke to go over the issues laid out in her letter. During the course of this meeting which took place in October of 2004, and in the presence of both Ms. Lotts and Ms. Wolke, plaintiff asserted that Ms. Wolke was treating Donna Corrado, who is Caucasian better than the way she was treating plaintiff. Plaintiff went on to state that Donna received a better PAR score than she had. Plaintiff also stated that she felt offended by these actions. Additionally, plaintiff mentioned that Ms. Wolke made plaintiff feel as if Ms. Wolke was a racist and was discriminating against plaintiff. At this point, Ms. Wolke started crying and said that "it hurts me when Phyllis tells everyone that I'm a racist." This statement was also documented in Ms. Lotts' letter of April 4, 2005 to Maria Parchment. (Yi Cert., Ex. 3 at Atkinson EEO 16) Plaintiff responded that she had not told anyone other than Ms. Lotts that she felt that she was being discriminated against. Plaintiff asserted that she told Ms. Lotts that Ms. Wolke did not treat her the same way that she treats Ms. Corrado, who is white. Plaintiff also

mentioned that Ms. Wolke degrades her as if she was a "nobody", and she treats other employees in the department with respect. (Yi Cert., Ex. A. Atkinson Dep. 73:16-20; Ex. 3 at Atkinson EEO 16; Atkinson Cert., Ex. E)

Title VII's anti-retaliation provisions protect employees who participate in Title VII's statutory processes or who otherwise oppose employment practices made illegal by Title VII. Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 60 (4th Cir. 1998). Opposition to an illegal employment practice must identify the employer and the challenged practice, if not specifically, at least by context. Curay Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 134-35 (3d Cir. Del. 2006). For example, in Barber v. CSX Distribution Services, 68 F.3d 694 (3d Cir. 1995), the Third Circuit held that a letter written by Barber to his employer's human resources department was not protected activity because it did not specifically complain about age discrimination. Id. at 701. Barber's letter complained about unfair treatment and expressed his dissatisfaction with the fact that someone else was awarded the position, but it did not specifically complain about age discrimination. Id. The Court found the letter was too vague to constitute opposition to an unlawful employment practice because it neither "explicitly or implicitly" alleged that a protected characteristic was the basis for the adverse employment action. The Court held that "a general complaint of unfair treatment does not translate into a charge of illegal age discrimination." Id.

Defendant asserts that plaintiff's letter of September 28, 2004, does not qualify as a "protected" complaint of discrimination as it does not make any allegation of racial discrimination. Defendant also notes that plaintiff did not send the letter to Ms. Wolke

and Ms. Wolke testified that she did not receive the plaintiff's letter and therefore, it could not have been the foundation upon which Ms. Wolke engaged in acts of retaliation.

Plaintiff asserts that if the only protected activity of plaintiff had been her letter of September 28, 2004, then plaintiff would understand defendant's argument. But, in additional to the initial September letter, plaintiff followed through with additional communications, first only to Ms. Lotts and then also with Ms. Wolke. These additional communications took place during the end of September 2004 and/or into the beginning of October 2004. Additionally, as Ms. Wolke was present during one of these meetings shortly after plaintiff delivered the September 2004 letter, she cannot legitimately assert that she was unaware of the fact that plaintiff was alleging that Ms. Wolke was accusing her of discriminating against her due to the fact that plaintiff was Black. In fact, Ms. Lotts recollects in a later letter that shortly after September 28, 2004, "Carole told Phyllis that it hurts her, when she tells everybody that she's a Racist." (Yi Cert., Ex. 3 at Atkinson EEO 16) By the first day of December 2004, Ms. Wolke was communicating to plaintiff that "I am tired of you calling me a racist." (Yi Cert., Ex. 12) Thereafter, plaintiff wrote a second letter to Ms. Lotts asserting that she felt that Ms. Wolke discriminates against her the way that a racist would. Plaintiff stated that the basis of this belief was due to past incidences that had occurred between the two of them. Wolke. (Yi Cert., Ex. 12)

Plaintiff engaged in numerous additional acts of protected activity prior to the March 29, 2005, date that defendant contends was defendant's first notification of plaintiff's claim of race discrimination. In a meeting held on December 30, 2004, plaintiff gave Ms. Lotts an example of how Ms. Wolke treated Caucasian employees in a

more favorable manner than she treated Black employees.  Plaintiff mentioned to Ms. Lotts that this is what plaintiff was referring to as to how Ms. Wolke discriminates against Blacks "as opposed to Donna [Corrado] who is white."  Plaintiff said: "she thinks I'm nobody because I'm black."  Plaintiff told Ms. Lotts, I told you that she treats me like she is a racist.  At this point, Emma Jones, a Black nurse, who was also attending the meeting said, "I know how you feel because I had an incident that happened to me, where a computer that was ordered for me was given to Ms. Corrado who is white."  At this point, Ms. Wolke started to break down with tears.  Ms. Jones then asked her to hold in the tears and let Ms. Atkiinson continue to state her concerns.  (Atkinson Cert., Ex. G, Ex. K).

On February 27, 2005, plaintiff wrote a letter to Ms. Lotts regarding the Written Warning that she received from Ms. Wolke.  Plaintiff advised Ms. Lotts that Ms. Wolke gave her the Written Warning in retaliation for raising her previous complaint letters of September 28, 2004 and December 1, 2004.  Plaintiff specifically stated that in those complaint letters, she requested protection from retaliation from Ms. Wolke.  Plaintiff reminded Ms. Lotts that in her complaint letter of December 1, 2004, she described in detail how Ms. Wolke repeatedly threatened plaintiff verbally using the words "I will fix you" over and over again.  Plaintiff reiterated again that a thorough investigation would reveal that a lot of her rights as an employee have been violated by Ms. Wolke.  ) Plaintiff contends that the above letter constitutes a notice to Ms. Lotts that plaintiff was being retaliated against for making her earlier written and verbal complaints of race discrimination.

Despite defendant's argument that plaintiff was not actually alleging discrimination, it is difficult to understand how defendant can argue that plaintiff Phyllis Atkinson did not engage in a protected activity because she did not allege race discrimination until March 29, 2005. Indeed, the record is clear that not only did plaintiff communicate this to Ms. Lotts and Ms. Wolke, Ms. Wolke herself repeatedly indicated that she was aware of the fact that plaintiff's accusations against her was on the account of race discrimination. (Atkinson Cert., Ex. E, Ex. H)

The Third Circuit has recognized that protected conduct includes more than the formal filing of charges before the EEOC. See Curay Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 134 135 (3d Cir. Del. 2006). Indeed, in Barber it cited with approval the Second Circuit's language in Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990), in which the court held that Title VII's opposition clause is triggered by formal EEOC proceedings "as well [as] informal protests of discriminatory employment practices . . . including making complaints to management." In the instant case, a jury could reasonably conclude that plaintiff was putting defendant on notice that she was complaining of unlawful discrimination by September or October 2004.

**B.**    **Plaintiff Sustained Material Adverse Action**

The second element of a retaliation claim centers on Burlington Northern & Sante Fe Railway Co. v. White, 548 U.S. 53 (2006), in which the Supreme Court held that Title VII's anti-retaliation provision "does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." Burlington N., 548 U.S. at 57. The words "discriminate against" appearing within the text of the anti-

retaliation provision were construed to prohibit a broad category of retaliatory actions taken by an employer. *Id.* at 61-63. "Title VII's anti-retaliation provision does not merely prohibit an employer from discriminating against an individual `with respect to his [or her] compensation, terms, conditions, or privileges of employment,' but instead sweeps broadly enough to prohibit other `materially adverse' actions taken in retaliation for activity protected under the statute." <u>Johnson v. McGraw-Hill Cos.</u>, 451 F. Supp.2d 681, 710 (W.D. Pa. 2006). A plaintiff pursuing a retaliation claim must show that the alleged retaliatory action "would have been *materially* adverse to a reasonable employee or job applicant." <u>Burlington N.</u>, 548 U.S. at 57 (emphasis added). This standard has been formulated to "screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Id.* at 70.

Defendant NJDC argues that plaintiff was never subjected to a materially adverse action. (Defs.' Brief 7-13.) The question whether a retaliatory action is "materially adverse" under <u>Burlington Northern</u> is a question of fact. <u>Burlington N.</u>, 548 U.S. at 71 ("Based on this record, a *jury* could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee.") (emphasis added).

Plaintiff contends that her supervisor Carole Wolke engaged in a pattern of retaliation commencing on or about the end of September of 2004, when Ms. Wolke became aware of the fact that plaintiff was asserting that Ms. Wolke committed acts of racial discrimination against her. Furthermore, on December 1, 2004, plaintiff approached Ms. Wolke to inform her about a client's appointment. When plaintiff

8

approached Ms. Wolke about the client, Ms. Wolke rudely blurted out to plaintiff that "I will not be helping you out anymore because, I am tired of you calling me a racist." Plaintiff reminded plaintiff that she was conversing with her on a work-related matter. Ms. Wolke told plaintiff that she did not care that it was a work-related matter and she told plaintiff to leave her alone. Ms. Wolke continued by accusing plaintiff of calling her a racist. She told plaintiff that if plaintiff kept calling her a racist "she would fix me." Plaintiff took that to be a threat and a misuse of her authority over plaintiff. Plaintiff told Ms. Wolke that she did not call her a racist, but did believe that she was discriminating against plaintiff as a racist would do. Plaintiff told Ms. Wolke that she felt this way based on previous incidences that had occurred between the two of them. Ms. Wolke continued to verbally threaten plaintiff. She repeated to plaintiff over and over again that "I will fix you, just wait and see." (Yi Cert., Ex. 12) These comments made plaintiff extremely upset. Plaintiff was fearful as to what Ms. Wolke would do including the possibility that Ms. Wolke would take some sort of physical action to do her harm. She shared these concerned with her co-worker, Marie Watts. (Atkinson Cert, Ex. G)

Plaintiff contends that there were a number of incidences over the course of the next seven months which materially changed the terms and conditions of her employment which would have been *materially* adverse to a reasonable employee or job applicant. The first incident was Wolke's denial of plaintiff's request for vacation on November 19, 2004. Plaintiff contends that she followed the same custom and practice that she had utilized for the prior twenty years of her employment in notifying her employer about her requested vacation time off. Ms. Wolke denied her request allegedly because plaintiff's request had been submitted one week late in March of 2004, even though other NJDC

employees had also been late in getting their requests in.  Plaintiff had to communicate with Ms. Lotts to intervene with this situation.  Plaintiff asserts that this incident caused plaintiff a great deal of stress and appeared to be maliciously motivated by Ms. Wolke. Plaintiff was also cognizant of the fact that by this point in time Ms. Wolke claimed that plaintiff was claiming she was a racist and communicating that fact with other NJDC employees.  Respectfully, plaintiff contends that this incident rises to the level of a materially adverse employment action that would dissuade a reasonable employee from making or supporting a charge of discrimination.

On December 1, 2004, plaintiff's supervisor, Ms. Wolke refused to deal with plaintiff regarding a work-related matter.  Ms. Wolke told plaintiff that "I will not be helping you out anymore because, I am tired of you calling me a racist."  On this same date, Ms. Wolke repeated over and over again the phrase: "I will fix you, just wait and see."  Plaintiff immediately wrote a letter regarding these issues to Ms. Wolke's supervisor, Ms. Lotts.  In her letter, plaintiff reminded Ms. Lotts that plaintiff had made several verbal complaints about Ms. Wolke's behavior to her.  Plaintiff asserted in her letter that she was being discriminated against by Ms. Wolke and that her threats were causing plaintiff to have anxiety attacks.  (Yi Cert., Ex. 12)  To her shock and dismay, Ms. Lotts did not respond to plaintiff's letter at all.  Nor did Ms. Lotts take any action to institute an investigation of plaintiff's charges. Ms. Lotts would wait another three months before she initiated an investigation regarding plaintiff's racial discrimination and retaliation complaints.  (Yi Cert., Ex. 3 at Atkinson EEO 16-17; Atkinson Cert., Ex. G] Plaintiff asserts that Ms. Wolke's actions constitute of a materially adverse employment action in that Ms. Wolke had made a direct threat against plaintiff and had directly

refused to work with plaintiff on work related matters.  See, <u>Burlington Northern & Santa Fe Railway v. White</u>, 548 U.S. 53, 69 (2006), (citing <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81-82 (1998)). The Court described how a change in working conditions may affect certain workers: "A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." <u>Id.</u>

In December of 2004, Ms. Wolke told plaintiff and other NJDC employees that plaintiff did not need to have her own computer, her own desk and her own office. (Atkinson Cert., Ex. G) While it is true that Ms. Lotts did not allow Ms. Wolke to take these things away, this action by Ms. Wolke made it crystal clear to plaintiff that Ms. Wolke was still seeking to "fix her" for raising her racial discrimination complaints. Additionally, as Ms. Lotts had received plaintiff's earlier complaints of racial discrimination and retaliation, Ms. Lotts had an obligation to take action against Ms. Wolke for seeking to impose acts of retaliation against plaintiff.  It is Ms. Lotts' failure to take any steps to rectify the pattern of retaliation or to institute an investigation of discrimination which caused plaintiff to continue to suffer emotional distress and anxiety attacks which lead to an adverse change in working conditions for plaintiff.

On February 15, 2005, Ms. Wolke's pattern of retaliation continued when she improperly and maliciously misused NJDC policies and issued plaintiff with a Red A" Written Warning.  A review of the relevant policies reveals that a "Red A" Written Warning should only be utilized when an employee calls out sick for an extended period of time without appropriate authorization.  The work unit is required to follow an established procedure to either authorize the absence, return the employee to work; or to

initiate the termination process. Plaintiff came into work that day late due to a school meeting that she had to attend regarding one of her emotionally disabled foster children. Therefore, this Written Warning should not have been utilized under these circumstances. Defendant asserts that this cannot constitute an adverse employment action because it was merely a reprimand about plaintiff's lateness and was ultimately rescinded several months later. However, plaintiff contends that this action taken by Ms. Wolke is similar to the factual situation found in Burlington Northern.

The United States Supreme Court in Burlington Northern and Santa Fe Ry. Co. vs. White, 548 U.S. 53, 126 S.Ct. 2405 U.S. (2006), decided the issue of whether a 37-day unpaid investigatory suspension of employee, later rescinded with back pay, rose to level of materially adverse employer action, was for the jury, in employee's Title VII retaliation action. The Court held that a reasonable employee could have found like period of time without paycheck to be serious hardship that would act as deterrent to protected activity. The Court provided the following rationale for finding a temporary 37 day unpaid suspension constituted an adverse employment action:

> Neither do we find convincing any claim of insufficient evidence. White did receive backpay. But White and her family had to live for 37 days without income. They did not know during that time whether or when White could return to work. Many reasonable employees would find a month without a paycheck to be a serious hardship. And White described to the jury the physical and emotional hardship that 37 days of having "no income, no money" in fact caused. 1 Tr. 154 ("That was the worst Christmas I had out of my life. No income, no money, and that made all of us feel bad. ... I got very depressed"). Indeed, she obtained medical treatment for her emotional distress. A reasonable employee facing the choice between retaining her job (and paycheck) and filing a discrimination complaint might well choose the former. That is to say, an indefinite suspension

> without pay could well act as a deterrent, even if the
> suspended employee eventually received backpay. Cf.
> Mitchell, 361 U.S., at 292, 80 S.Ct. 332 ("[I]t needs no
> argument to show that fear of economic retaliation might
> often operate to induce aggrieved employees quietly to
> accept substandard conditions"). Thus, the jury's
> conclusion that the 37-day suspension without pay was
> materially adverse was a reasonable one.

> Id. At 2417-18.

In the present case, while plaintiff did not suffer the emotional hardship of not being paid, nevertheless, a reasonable jury could view this action of Ms. Wolke to be designed to prevent plaintiff from filing any new notices of discrimination and/or retaliation with Ms. Lotts. This action by Ms. Wolke was designed to deter plaintiff, through fear, from engaging in any additional protected activity, and when seen as a pattern of retaliation, must be considered to be an adverse employment action.

By March of 2005, plaintiff was frustrated with Ms. Lotts' inability or unwillingness to address her complaints of discrimination, harassment and retaliation against Ms. Wolke. Therefore, on March 28, 2005, she filed a Discrimination Complaint with the NJ Department of Personnel. Plaintiff attached a nine page letter to her complaint outlining her race discrimination complaints starting from April 2004 through March 2005. (See Yi Cert., Ex. 2 at Atkinson EEO 72 through 81.) Plaintiff contends, however, by the time that she had to file this formal discrimination complaint, she was suffering from anxiety, depression and stress. Plaintiff would continue to work at NJDC for two more years, but due to the stress that she suffered as a result of the retaliation committed against her by Ms. Wolke, she was out on medical leaves for approximately half of the remaining months that she was employed by NJDC.

Plaintiff asserts that from March 2005 until the end of her employment, defendant took away most of her job responsibilities and rendered her an outcast.  Additionally, for the last two years of her employment, no one gave her any more bi-annual PAR evaluations, no one provided her with a new set of job duties, no one even supervised her. She wrote letters to the NJDC CEO Bruce Werkheiser and advised him that she was not being given work to occupy her time and that her job duties had still not been reassigned back to her.  During the final two years of her employment, she was never given back any of her duties and spent most of her time sitting in her office and not having sufficient work to occupy her time.      The Court in <u>Burlington Northern</u>, 548 U.S. at 69 (citing <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81-82 (1998)), described how a change in working conditions may affect certain workers: "A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." <u>Id.</u>  The question whether a retaliatory action is "materially adverse" under <u>Burlington Northern</u> is a question of fact. <u>Id.</u> at 71 ("Based on this record, a *jury* could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee.") (emphasis added).   Plaintiff contends that a jury could reasonably conclude that the reduction of most of her job responsibilities would have been a materially adverse action to a reasonable employee.

**C.       Plaintiff Can Show Causal Connection**

1.       Temporal Proximity

A suggestive temporal proximity between the protected activity and an alleged retaliatory act can be adequate to meet the causal link requirement. <u>Woodson</u>, 109 F.3d at

920, quoting Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) ("temporal proximity between the protected activity and the termination is sufficient to establish a causal link."). However, the "mere passage of time is not legally conclusive proof against retaliation." Id. quoting Robinson v. SEPTA, 982 F.2d 892, 894 (3d Cir. 1993). "While there is no *per se* rule about relying on temporal proximity to establish causation in retaliation cases, the probative value depends on `how proximate the events actually were, and the context in which the issue came before us.'" Kellerman v. UPMC St. Margaret, 317 Fed.Appx. 290, 292-93 (3d Cir. 2009) quoting Farrell, 206 F.3d at 279.

Notably, however, the "mere passage of time is not legally conclusive proof against retaliation." Robinson v. Se. Pa Transp. Auth., Red. Arrow Div., 982 F.2d 892, 894 (3d Cir. 1993). A plaintiff may demonstrate causation by showing an intervening pattern of harassment, antagonism, or hostility. Id. at 895; see also Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) ("[w]hen temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus."); Drwal v. Bor. of W. View, Pa, 617 F. Supp. 2d 397, 422 (W.D. Pa. 2009).

As to the temporal proximity, defendant asserts that all complaints made by plaintiff before her March 29, 2005, discrimination complaint were devoid of any mention of discrimination and therefore are not examples of "protected activity."

Plaintiff contends that Carole Wolke commenced a pattern of retaliatory conduct which began shortly after she was notified by Ms. Lotts of plaintiff's letter of September 28, 2004 and continued unabated until the Spring of 2005 when the majority of plaintiff's job duties were taken away. Shortly after September 28, 2004, Ms. Lotts held a meeting

15

with Ms. Wolke and plaintiff wherein Ms. Wolke asked plaintiff why she was calling her a racist. Thereafter, on November 19, 2004, Ms. Wolke denied plaintiff's request for vacation on November 19, 2004. Plaintiff contends that she had followed the same custom and practice that she had utilized for the prior twenty years of her employment in notifying her employer about her requested vacation time off. Ms. Wolke denied her request allegedly because plaintiff's request had been submitted one week late in March of 2004, even though other NJDC employees had also been late in getting their requests in. Ms. Wolke did this in November even though on two occasions before plaintiff had submitted her September complaint letter, Ms. Wolke had allowed two vacation requests of plaintiff even though they were both submitted after March of 2004.

The next incident which supports plaintiff's contention that there was a pattern of ongoing retaliation occurred on December 1, 2004. On that date, Ms. Wolke told plaintiff that she was refusing to deal with plaintiff regarding a work-related matter. Ms. Wolke told plaintiff that "I will not be helping you out anymore because, I am tired of you calling me a racist." On this same date, Ms. Wolke repeated over and over again the phrase: "I will fix you, just wait and see." Then, during a December 30, 2004, meeting, Ms. Wolke told plaintiff, in the presence of other NJDC employees including Ms. Lotts, that plaintiff did not need to have her own computer, her own desk and her own office. Ms. Wolke told them that plaintiff could instead work out of the nurses' station.

Ms. Wolke's acts of retaliation continued on February 15, 2005, where she misused a NJDC policy to issue plaintiff with a Written Warning. This written warning was ultimately rescinded after plaintiff filed a formal discrimination complaint with the NJ Department of Human Services in the end of March 2005, but for several months, the

written warning remained in her personnel file.  Finally, in March of 2005, Ms. Wolke took away most of plaintiff's job duties and stopped evaluating plaintiff any further. Even after Ms. Wolke ceased being plaintiff's direct supervisor, plaintiff was required to work without a new job description, with most of her job duties taken away and with no one supervising her or evaluating her with PAR scores.  Plaintiff was rendered an outcast and even letters to the NJDC CEO were unavailing in obtaining the restoration of her job duties.

Thus, in this case, temporal proximity must be viewed as "unusually suggestive" and support the inference of a causal connection between the protected activity and the adverse action. See Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) ("temporal proximity between the protected activity and the termination is sufficient to establish a causal link"  Plaintiff has submitted facts which support her contention that Ms. Wolke engaged in acts of retaliation within weeks if not months of plaintiff's September 28, 2004 complaint letter and which continued until the end of her employment in 2007.

2.     Timing Plus Pattern Of Antagonism Or Animus

In the event that temporal proximity between the protected activity and the adverse action is not sufficient, "courts may look to the intervening period for other evidence of retaliatory animus" in order to satisfy the causal connection element of the *prima facie* case of retaliation. Krouse, 126 F.3d at 503-04. In this regard, "our role is not to act as fact finder," but "instead, we must consider the evidence taken in the light most favorable to the non-movant and determine whether [the plaintiff] can show causation." Farrell, 206 F.3d at 271.

In support of his argument to establish causal connection, Plaintiff argues that Ms. Wolke repeatedly told her: "I will fix you, wait and see." Ms. Wolke mentioned this during a conversation where she accused plaintiff of calling her a racist. Plaintiff responded that she had never called her a racist to any NJDC employee. Plaintiff went on to tell Ms. Wolke that her actions made plaintiff feel that she was treating plaintiff like a racist. Ms. Wolke also refused to talk and interact with plaintiff during the fall and winter of 2004 and 2005. These actions, on the part of Ms. Wolke, directly support plaintiff's theory of a pattern of antagonism or animus.

### 3.    Evidence Gleaned From The Record As A Whole

A third way in which a plaintiff may establish the causal connection between the protected activity and the adverse action is that the plaintiff may also "show that from the evidence gleaned from the record as a whole, the trier of the fact [sic] should infer causation." Central Dauphin, 2009 WL 4730399, at *9, citing DeFlaminis, 480 F.3d at 267. In Farrell, the Third Circuit instructed that when examining the causation prong of a retaliation case, "we have been willing to explore the record in search of evidence, and our case law has set forth no limits on what we have been willing to consider." 206 F.3d at 281. "We are to look to other kinds of evidence that a plaintiff can proffer such as intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." Tarr v. FedEx Ground Package System, Inc., 2010 WL 331846 at * 9 (W.D. Pa. Jan. 28, 2010), quoting LeBoon, 503 F.3d at 232-33.

Upon careful review of the record, plaintiff maintains that this Court will discover inconsistencies in the employer's articulated reasons sufficient that a reasonable jury could infer the causation necessary to Plaintiff's *prima facie* case.

### D.      Defendant's Non-Discriminatory Reasons

Once a plaintiff offers sufficient proof of a prima facie case, a court must analyze step two of the McDonnell Douglas framework where the burden of production — but not the burden of persuasion — shifts to the defendant, who must offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for discharging the employee. *See* Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997). If the defendant  cannot satisfy this burden, summary judgment must be denied. Here, Defendants have asserted that the actions taken against plaintiff were legitimate and appropriate and related to work performance and attendance problems of plaintiff.

### E.      Pretext

Once an employer has come forward with evidence of legitimate, non-discriminatory grounds for termination then the burden shifts back to the plaintiff to demonstrate that these grounds were pretextual. Accordingly, plaintiff, Phyllis Atkinson may survive summary judgment by "submitting evidence `from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action.'" *Id.* (quoting <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994).)

### 1.    Prong One

Plaintiff seeks to show that defendant's articulated reasons of poor work performance and attendance issues were not the real reason for Ms. Wolke's actions, but were instead merely a pretext for retaliation. *See* <u>Weston v. Pennsylvania</u>, 251 F.3d 420, 432 (3d Cir. 2001). A key element in plaintiff's argument is that Ms. Wolke's assertion that "I will fix you, just wait and see" (Yi Cert., Ex. 12) is a true threat that supports plaintiff's position that Ms. Wolke was motivated by malice and hatred which were caused by plaintiff's written complaint of September 28, 2004, and her subsequent verbal and written complaints to Ms. Lotts.  Additionally, plaintiff asserts that prior to September 28, 2004, plaintiff had never been disciplined in any way for poor work performance or attendance problems.  The conditions which caused plaintiff to often come in late to work were due to issues related to her seven foster children and which Ms. Lotts and all administration at NJDC have had knowledge about for many years. Likewise, the accusation that plaintiff was not inputting enough documents into her computer was never an issue prior to the time that plaintiff started complaining to Ms. Lotts about race discrimination and retaliation.

### 2.    Prong two

Plaintiff asserts that Ms. Wolke's December 1, 2004, comment "I will fix you, just wait and see" is affirmative evidence indicating that the defendant was motivated by a discriminatory or retaliatory animus and satisfies the second prong of the <u>Fuentes</u> test.

*See* Fasold v. Justice, 409 F.3d 178, 185 (3d Cir. 2005). Based upon the evidence, plaintiff asks this court to conclude that a reasonable jury could render a verdict in favor of plaintiff with respect to her retaliation claims and summary judgment should be denied.

## POINT II

### PLAINTIFF HAS MET HER BURDEN OF PROOF IN SUPPORT OF HER DISCRIMINATION CLAIM

Plaintiff, Phyllis Atkinson's race discrimination claims are to be analyzed under the burden-shifting analysis developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Under McDonnell Douglas, a plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence, Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-253 (1981), which merely requires that she "present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based on a trait that is protected under Title VII [of the Civil Rights Act of 1964]." Iadimarco v. Runyon, 190 F.3d 151, 161 (3d Cir. 1999). "The evidentiary burden at this stage is rather modest: it is to demonstrate to the court that [P]laintiff's factual scenario is compatible with discriminatory intent — i.e., that discrimination could be a reason for the employer's action." Coulton v. University of Pennsylvania, 2006 U.S. Dist. LEXIS 12459, 2006 WL 759701, at *5 (E.D. Pa. Mar. 21, 2006) (quoting Marzano v. Computer Science Corp., 91 F.3d 497, 508 (3d Cir. I 996)

(emphasis in original)); <u>see also</u> <u>Ezold v. Wolf, Block, Schorr & Solis-Cohen,</u> 983 F.2d 509, 523 (3d Cir. 1993).

To establish a <u>prima facie</u> case of race discrimination, plaintiff, Ms. Atkinson must show that: (1) she is a member of a protected class, (2) she was qualified for the position, and that (3) she was subject to an adverse employment action (4) under circumstances that give rise to an inference of discrimination. <u>Verdin v. Weeks Marine Inc.,</u> 124 Fed. Appx. 92, 95 (3d Cir 2005) (citing <u>Goosby v. Johnson & Johnson Med., Inc.,</u> 228 F.3d 313, 318-19 (3d Cir. 2000)). If the plaintiff succeeds in showing the <u>prima facie</u> case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. <u>Burdine,</u> 450 U.S. at 252-253. This is a "relatively light burden" because the defendant "need not prove that the tendered reason actually motivated its behavior," but only that it may have. <u>Robinson v. PFPC, Inc.,</u> No. 08-5113, 210 U.S. Dist. LEXIS 19303, at *7 (E.D. Pa. Mar. 4, 2010) (quoting <u>Fuentes v. Perskie,</u> 32 F.3d 759, 763 (3d Cir. 1994)). If the defendant carries this burden, the presumption of unlawful discrimination is rebutted. <u>St. Mary's Honor Ctr.,</u> 509 U.S. at 507 (quoting <u>Burdine,</u> 450 U.S. at 255 & n. 10 (internal citation omitted)). Then, in order to defeat summary judgment, the plaintiff must show that the defendant's stated reason for its action was pretextual, by pointing to "some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Iadimarco,</u> 190 F.3d at 166 (quoting <u>Fuentes v. Perskie,</u> 32 F.3d 759, 764 (3d Cir. 1994)).

A.   <u>Adverse Action</u>

Defendant first argues that plaintiff suffered no "adverse employment action sufficient to evoke the protection of Title VII." <u>Jones v. School District</u>, 198 F.3d 403, 411 (3d Cir. 1999).  The Supreme Court has defined an "adverse" or "tangible" employment action to constitute "a significant change in employment status, such has hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>Burlington Indus. v. Ellerth</u>, 524 U.S. 742, 761 (1998). Following this reasoning, the Third Circuit has instructed that to support a claim of gender discrimination under Title VII, the adverse action must be "sufficiently severe as to alter the employee's `compensation, terms, conditions, or privileges of employment,' or to `deprive or tend to deprive [her] of employment opportunities or otherwise adversely affect [her] status as an employee'." <u>Davis v. City of Newark</u>, 285 Fed. Appx. 899, 903-904 (3d Cir. 2008) (quoting <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1296-97 (3d Cir. 1997)), <u>abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53 (2006) (quoting 42 U.S.C. § 2000e-2(a)(1) and (2)). In that connection,

> an adverse employment action must be one that produces a material employment disadvantage. Termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet the standard, as would circumstances amounting to a constructive discharge. Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage do not satisfy the prong.

23

McKinnon v. Gonzales, 642 F. Supp. 2d 410, 435 (D.N.J. 2009) (citations omitted). Furthermore, not every "insult, slight, or unpleasantness gives rise to a valid Title VII claim." Robinson, 120 F.3d at 1297.

The term "adverse employment action" in the context of retaliation claims traditionally was understood to refer to a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing significant change in benefits." Weston v. Pennsylvania, 251 F.3d 420, 430-31 (3d Cir. 2001); see Pa. State Police v. Suders, 542 U.S. 129 (2004) (holding that under Title VII, a hostile work environment or constructive discharge may serve for adverse action). The United States Supreme Court, however, in Burlington Northern & Santa Fe Railway v. White, 548 U.S. 53 (2006), interpreted the anti-retaliation provisions of Title VII not to be limited to the traditional employment-related actions identified above. Id. at 67-69. Instead, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. Id. at 68.

In Burlington Northern, the Supreme Court stressed that an employment action is *materially* adverse when it is a significant, rather than trivial harm. Id. Specifically, "an employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id. (citing 1 BARBARA LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 669 (3d ed. 1996) (observing that "courts have held that personality conflicts at work that generate antipathy" and

"'snubbing' by supervisors and co-workers" are not actionable)). The Title VII anti-retaliation provision seeks to provide plaintiffs with "unfettered access," free from interference by employers, to Title VII's remedial mechanisms. Id. (citing Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997)). To further this goal, the anti-retaliation provision prohibits employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. Id. (citing Robinson, 519 U.S. at 346). "[P]etty slights, minor annoyances, and simple lack of good manners" will not normally create such deterrence. Id.

Plaintiff alleges several adverse employment actions occurred in retaliation for filing her September 29, 2004 letter to Ms. Lotts. These incidents have been fully discussed above. However, the most significant event that constitutes the greatest adverse action occurred in the Spring of 2005. Upon returning from a medical leave due to depression, stress and anxiety, plaintiff was told that she would not be receiving all of her job duties back. For the next two years or so, plaintiff continued her employment but she was considered an outcast within the department. No one did any more bi-annual PAR evaluations on her, no one provided her with a new set of job duties, no one even supervised her. She wrote letters to the NJDC CEO Bruce Werkheiser and advised him that she was not being given work to occupy her time and that her job duties had still not been reassigned back to her. During the final two years of her employment, she was never given back any of her duties and spent most of her time sitting in her office and not having sufficient work to occupy her time. (See Atkinson Ex. G).

When explaining why the standard for adverse employment actions must be phrased in general terms, the Supreme Court stated in Burlington Northern:

25

> [T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."

Burlington Northern, 548 U.S. at 69 (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-82 (1998)). The Court described how a change in working conditions may affect certain workers: "A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." Id.

Viewing the evidence in a light most favorable to plaintiff, it is a question of fact for the jury to determine whether, a reasonable employee would find that being prohibited from resuming her job duties and not being evaluated or supervised by NJDC staff were materially adverse actions. Plaintiff asks that this Court hold that there is a genuine issue of material fact with respect to whether the withholding of job duties was an adverse employment action.

**B.   Causal Nexus**

Defendant argues that plaintiff cannot establish the third element of a prima facie case of retaliation. Defendant asserts plaintiff failed to adduce sufficient evidence to establish a causal connection between her protected activity and the adverse employment actions. With respect to the existence of a causal link between plaintiff's protected activity and defendant's adverse actions, two factors are relevant: (1) timing and/or (2) evidence of ongoing antagonism. Abramson, 260 F.3d at 288 ("Temporal proximity . . . is sufficient

26

to establish the causal link. [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.").

In the first factor, there must be a close temporal proximity between the protected activity and the adverse employment action. I d. While the court of appeals has not specified a strict formula for what is considered to be too long of a gap between protected activity and adverse action, courts have held that a time span of several months is too great. See Williams v. Phila. Hous. Auth., 380 F.3d 751, 760 (3d Cir. 2004) (two months too long to permit an inference of causation); George v. Genuine Parts Co., No. 04-108, 2007 WL 217684, at *12 (W.D. Pa. Jan. 25, 2007) (finding that though suggestiveness is highly sensitive to the facts of each case, a three-month gap "is not so close as to be unusually suggestive of retaliatory motive, especially where an obvious and unimpeached non-retaliatory motive exists"). Timing, however, in connection with other types of suggestive evidence, is sufficient to demonstrate the causal link. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000); see Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997) (holding that "when temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus.").

In this case, on February 28, 2005, plaintiff filled out a NJ Grievance Procedure Form.  In her grievance form, plaintiff provided the following statement of grievance: "discrimination on PAR rating, verbal abuse, harassment, unjust "Red A" on my work record, written warning about "Red A" on my work record, false accusation and threats." Plaintiff also attached a letter of even date with her grievance and sent it to the NJDC

Employee Relations Office.  Plaintiff also complained about suffering emotional distress and headaches in connection with the above mentioned discrimination and harassment. Plaintiff contends that the length of time between plaintiff's reporting acts of discrimination to the NJDC Employee Relations Office (the first complaint that plaintiff made to an NJDC employee other than Ms. Lotts) and the decision to take away plaintiff's job duties in March of 2005 took less than one month.  In light of <u>Abramson</u>, the court holds that there is a genuine issue of material fact for a jury to resolve whether the temporal proximity between the protected activity and the adverse employment action is sufficient to demonstrate the causal link. <u>See Carlson v. Twp. of Lower Alloways Creek</u>, No. 06-3779, 2009 WL 2496523, at *9 (D.N.J. Aug. 12, 2009) (holding that one month between protected activity and adverse employment action was evidence of causation).

Even if timing alone is insufficient to establish causation, plaintiff presented sufficient additional evidence of defendant's antagonistic behavior. In September 2004 and again in December 2004, Ms. Wolke complained to plaintiff about calling her a racist and told her that she would fix plaintiff "just wait and see."  Viewed collectively, this evidence overcomes any doubt raised by the temporal separation of protected activity and the adverse employment action. <u>See Weston</u>, 251 F.3d at 432.

**C.    <u>Plaintiff Can Prove Pretext</u>**

To defeat the Defendant's summary judgment motions, the Plaintiff must point to some evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's

action." Stanziale v. Jargowsky, 200 F.3d 101, 105 (3rd Cir. 2000); Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 331 (3rd Cir. 1995).

A plaintiff can establish the first prong by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them `unworthy of credence.'" Fuentes v. Perskie, 32 F.3d 759, 765 (3rd Cir. 1994) (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3rd Cir. 1992)). A plaintiff may not, however, "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-09 (3rd Cir. 1997) (quoting Fuentes, 32 F.2d at 765). In other words, the plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." Keller, 130 F.3d at 1109.

To satisfy the second prong, the plaintiff must point to evidence "that proves . . . discrimination in the same way that critical facts are generally proved — based solely on the natural probative force of the evidence." Keller, 130 F.3d at 1111. The plaintiff can establish the second prong by showing that the employer in the past subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not within his class more favorably, or that the employer discriminated against other members of his protected class. Fuentes, 32 F.3d at 765.

In this case, plaintiff asserts that plaintiff had been disciplined more harshly than other employees who engaged in similar conduct but were not disciplined.   Plaintiff

submitted facts to the record which indicate that Ms. Wolke did not discipline Caucasian employees for attendance issues, but gave plaintiff a Warning Letter for coming late one day even though plaintiff had a legitimate excuse for coming in late. All employees, regardless of their job functions had to follow the attendance policies of NJDC. Therefore, an argument that plaintiff was not "similarly situated" to the Caucasian employees that she argued were treated more favorably is not a relevant argument.

Additionally, plaintiff contends that Ms. Wolke's assertion that "I will fix you, just wait and see" (Yi Cert., Ex. 12) was a threat that supports plaintiff's position that Ms. Wolke was motivated by malice and hatred which were cause by plaintiff's written complaint of September 28, 2004 and her subsequent verbal and written complaints to Ms. Lotts. Additionally, plaintiff asserts that prior to September 28, 2004, plaintiff had never been disciplined in any way for poor work performance or attendance problems. The conditions which caused plaintiff to often come in late to work were due to issues related to her seven foster children and which Ms. Lotts and all administration at NJDC have had knowledge about for many years. Likewise, the accusation that plaintiff was not inputting enough documents into her computer was never an issue prior to the time that plaintiff started complaining to Ms. Lotts about race discrimination and retaliation.

Based upon the evidence, plaintiff asks this court to conclude that a reasonable jury could render a verdict in favor of plaintiff with respect to her discrimination claim and summary judgment should be denied.

**POINT III**

**PLAINTIFF'S TITLE VII CLAIMS SHOULD NOT BE LIMITED TO THE ALLEGATIONS RAISED IN HER EEOC CHARGE**

Defendant asserts that in her EEOC Charge of Discrimination, the earliest date of alleged discrimination commenced on February 14, 2005 and that plaintiff's claims of discrimination/retaliation stopped as of June 1, 2005.

The Third Circuit has held that

> the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of proceedings before the Commission.

Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976), cert. denied, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753, *reh. denied,* 430 U.S. 911, 97 S.Ct. 1187, 51 L.Ed.2d 589 (1977) (citations omitted).

A review of plaintiff's EEOC Charge of Discrimination (Yi Cert., Ex. D) reveals that plaintiff asserted improper favoritism on the part of Ms. Wolke as of September 2004. Her charge also provides that Ms. Wolke threatened her with retaliation in December of 2004 when she stated "I'll fix you, I'll get you one way or another." Additionally, plaintiff asserted in her charge that upon returning from sick leave in June of 2005, all of her job duties/responsibilities were taken from her.

As in Ostapowicz, plaintiff contends that any additional information supplied in her Second Amended Complaint "may fairly be considered [an] explanation of the original charge . . . ." *Id., supra* at 399. Whether the actual EEOC investigation uncovered any evidence of retaliation is of no consequence. In Hicks v. ABT Associates,

*supra,* the Third Circuit rejected the view that the EEOC investigation sets an outer limit on the scope of the civil complaint. Rather, we held that a district court may assume jurisdiction over additional charges if they are reasonably within the scope of the complainant's original charges and if a reasonable investigation by the EEOC would have encompassed the new claims. In the instant case, defendant does not argue that the discrimination or retaliation charge is beyond the scope of the EEOC charge.

Therefore, plaintiff asserts that the mere adding of additional events to already existing claims of retaliation and discrimination is not a sufficient reason to bar any of plaintiff's claims.

## POINT IV

### PLAINTIFF ASSERTS FACT IN DISPUTE THAT WOULD SUPPORT AN AWARD FOR PUNITIVE DAMAGES

A Title VII plaintiff may recover punitive damages for intentional discrimination where "the complaining party demonstrates that the respondent engaged in . . . discriminatory practices with malice or with reckless indifference to . . . federally protected rights." 42 U.S.C. § 1981a(b)(1); Le v. Univ. of Pa, 321 F.3d 403, 409 (3d Cir. 2003). Plaintiff asserts that a review of the alleged actions of Ms. Wolke, not in the least her direct promise of retaliation towards the plaintiff on December 1, 2004, constitute a jury question as to whether Ms. Wolke engaged in discriminatory practices with malice or with reckless indifference to plaintiff's Title VII rights.

Defendant also asserts in its brief that Ms. Lotts' managerial decisions were "good-faith efforts to comply with Title VII." Recognizing civil rights law as an effort to

promote prevention as well as remediation and observing the principles underlying the Restatement's limits on vicarious liability for punitive damages, in 1999 the Supreme Court held that, "in the punitive damages context, an employer could not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's `good-faith efforts to comply with [civil rights laws].'" Kolstad v. American Dental Association, 527 U.S. 526, 119 S.Ct. 2118, 2121, 2128 (1999). The Supreme Court continued that "[g]iving punitive damages protection to employers who make good-faith efforts to prevent discrimination . . . accomplishes [the civil rights laws'] objective of `motivat[ing] employers to detect and deter [civil rights] violations.'" Id. (internal citations omitted).

In the instant case, it is respectfully submitted that a reasonable jury could find that Ms. Lotts did not act in good faith in responding to plaintiff, Phyllis Atkinson's complaints. Ms. Lotts refused to take action to investigate Ms. Wolke. She refused to take action to stop Ms. Wolke from continuing to retaliate against plaintiff even though plaintiff had repeatedly, verbally and in writing, advised Ms. Lotts that Ms. Wolke was retaliating against her. For this reason, plaintiff requests this Court to deny defendant's application to bar plaintiff from seeking punitive damages in this case.

## CONCLUSION

For all of the foregoing reasons, Defendant's motion for summary judgment should be denied.

Respectfully submitted,

Phyllis Atkinson

July 30, 2010