PHYLLIS ATKINSON, PRO SE
317 East 30 Street
Paterson, New Jersey  07504

By:  Phyllis Atkinson
Pro Se, I
(973) 460-0382

RECEIVED

AUG - 2 2010

AT 8:30_____M
WILLIAM T. WALSH
CLERK

---

PHYLLIS ATKINSON                 :         Civil Action No. 06-5485 (PGS)
                                 :
                                 :              Civil Action
                                 :
              Plaintiff,         :
                                 :         **COUNTER STATEMENT**
                                 :         **OF MATERIAL FACTS IN**
vs.                              :         **OPPOSITION OF  MOTION**
                                 :         **FOR SUMMARY JUDGMENT**
                                 :
                                 :
NORTH JERSEY                     :
DEVELOPMENTAL CENTER             :
                                 :
                                 :
              Defendant.         :
                                 :
                                 :
                                 :

---

## PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACTS

### Responses to Movant Facts:

1.      Plaintiff admits the facts of paragraph one of movant's statement of facts.

2.      Plaintiff admits the facts of paragraph two of movant's statement of facts.

3.      Plaintiff admits, in part, the facts of paragraph three of movant's statement
of fact.  In addition, plaintiff's EEOC Charge of Discrimination also asserted
that upon becoming plaintiff's supervisor in 2004, Ms. Carol Wolke created a
hostile working environment and that she harassed and threatened plaintiff.
Moreover, the Charge of Discrimination also asserts that plaintiff was

discriminated against by Ms. Wolke because of plaintiff's race (Black) and that Ms. Wolke retaliated against her for raising her initial complaints of Ms. Wolke's hostile work environment, harassment and threats.

4.      Plaintiff admits the facts of paragraph four of movant's statement of fact.

5.      Plaintiff admits the facts of paragraph five of movant's statement of fact.

6.      Plaintiff admits the facts of paragraph six of movant's statement of fact.

7.      Plaintiff admits the facts of paragraph seven of movant's statement of fact.

8.      Plaintiff admits the facts of paragraph eight of movant's statement of fact.

9.      Plaintiff admits the facts of paragraph nine of movant's statement of fact.

10.     Plaintiff admits, in part, the facts of paragraph ten of movant's statement of fact. Additionally, the primary job duties of a principal clerk transcriber also included transportation arrangements and providing consent forms to guardians of clients via mail and distributing them personally. Once signed, the principal clerk transcriber had to make sure that these forms are returned to the clerk and then the clerk would forward these consent forms to the doctor or hospital that was performing the surgery and/or procedure on the NJDC client.

11.     Plaintiff admits, in part, the facts of paragraph eleven of movant's statement of fact. Plaintiff asserts that during the meeting she explained to Ms. Wolke and Ms. Lotts that when emergency surgery and/or procedures became necessary for one of the 400 plus NJDC clients, then plaintiff's duty to secure consent forms for said surgery and/or procedure would take priority over plaintiff's data sheet input duties. Therefore, on occasion, plaintiff's data sheet

entries were incomplete. Plaintiff asserts that at this meeting these supervisors acknowledged and accepted this fact.

12.    Plaintiff denies the facts of paragraph twelve of movant's statement of facts. Ms. Bivens resigned from her employment with NJDC, she did not retire. (See Yi Cert., Ex. A. Atkinson Dep. 62-1-3 and Ex. C, Wolke Dep. at Response No. 3).

13.    Plaintiff admits the facts of paragraph thirteen of movant's statement of fact.

14.    Plaintiff admits the facts of paragraph fourteen of movant's statement of fact.

15.    Plaintiff denies the facts of paragraph fifteen of movant's statement of fact.   Plaintiff denies that Carole Wolke communicated to her any of these alleged reasons for the reduction of the plaintiff's PAR score. Plaintiff asserts that Wolke's alleged reasons are fabrications created after the fact. At no point in time did Ms. Wolke ever place any of these alleged reasons in writing. Nor did Wolke issue a written warning and/or disciplined plaintiff in any way in connection with any of these alleged reasons.   Plaintiff asserts that if the accusations mentioned by Ms. Wolke had been authentic, then Ms. Wolke, as her supervisor had an obligation to the NJDC and the clients of the NJDC to seek discipline against plaintiff for this behavior.

16.    Plaintiff admits, in part, the facts of paragraph sixteen of movant's statement of fact. Ms. Bivians explained to plaintiff that her duty to input client data into the computer system was to be done as a lower priority as compared

to: (1) answering telephones for the Dr. Chrucky, the medical health director, Dr. Bauriz, Dr. Prudente, Dr. Altid, Dr. Wilson, the pharmacy department, the dental department, the dietician department, podiatry clinic, optometrist clinic, GYN clinic, orthopedic clinic, dermatology clinic, ENT clinic, and all nurses located in the Health Care Center; (2) filling in nursing department time sheets, (3) complete medical transcriptions for six consulting doctors for each of the clinics in the building; (4) draft documents related to medical trips (including emergencies) for any of the 400+ NJDC clients and (5) sending out and receiving executed consent forms for any number of the 400+ NJDC patients.

17.     Plaintiff denies the facts of paragraph seventeen of movant's statement of facts.  Plaintiff asserts that Ms. Wolke told her that the reason why she reduced plaintiff's PAR rating was because she had the discretion to do so.  She gave plaintiff no reasons other than that she could do whatever she wished regarding plaintiff's performance evaluation and that she was evidently more critical than Ms. Bivians had been.

18.     Plaintiff admits the facts of paragraph eighteen of movant's statement of fact.

19.     Plaintiff admits the facts of paragraph nineteen of movant's statement of fact.

20.     Plaintiff admits, in part, the facts of paragraph twenty of movant's statement of fact.  Plaintiff denies that Ms. Lotts attempted in April, May and June of 2004 to meet with her to discuss her PAR.

4

21.     Plaintiff admits, in part, the facts of paragraph twenty of movant's statement of fact.   In this letter to Ms. Lotts, plaintiff also asserted that Ms. Wolke did not provide her with an explanation as to why her PAR score had dropped.   She also told Ms. Lotts that Ms. Wolke had not treated her fairly and that she had shown favoritism to other co-workers by either leaving their PAR rating the same or by raising the scores of co-employees.

22.     Plaintiff admits the facts of paragraph twenty-two of movant's statement of fact.

23.     Plaintiff admits the facts of paragraph twenty-three of movant's statement of fact.   Plaintiff only wrote a letter to Ms. Lotts after she received a non-responsive answer from Ms. Wolke regarding her PAR score.

24.     Plaintiff admits the facts of paragraph twenty-four of movant's statement of fact.

25.     Plaintiff admits, in part, the facts of paragraph twenty-five of movant's statement of fact.   The documents located in Yi Cert., Ex. A., Atkinson Dep. 88:1-4, Ex. 1 at Atkinson EEO 87 do not support movant's assertion that plaintiff stated that her final PAR score could only be lowered if she was presented with "warnings" to apprise her about problems.   Plaintiff's position was that Ms. Wolke should have advised her about alleged work performance issues during the course of the year and that Ms. Wolke had not presented her with any work performance issues prior to April of 2004.

26.     Plaintiff admits, in part, the facts of paragraph twenty-six of movant's statement of fact.   Movant took the deposition excerpt out of context.   During

the deposition, plaintiff was talking about her prior supervisor, Ms. Bivians. Plaintiff asserts that when she received the PAR document from Ms. Wolke in April of 2004, she fully read and understood the entire PAR document.

27.　　Plaintiff admits the facts of paragraph twenty-seven of movant's statement of fact.

28.　　Plaintiff admits the facts of paragraph twenty-eight of movant's statement of fact.

29.　　Plaintiff admits the facts of paragraph twenty-nine of movant's statement of fact.

30.　　Plaintiff admits the facts of paragraph thirty of movant's statement of fact.

31.　　Plaintiff denies the facts of paragraph thirty-one of movant's statement of fact. Plaintiff did not state in her deposition or in her September 28, 2004 letter to Ms. Lotts that she could not finish all her work within a thirty-five hour workweek. Plaintiff provided in her deposition and to Ms. Lotts that depending on the day, some days she could not get every job duty completed. Plaintiff could work on inputting data into the computer when her other duties, which had a greater priority, did not take up too much of her time. If she received an unusually high number of telephone calls or there were more than the usual amount of clients needed to be transported to an outside hospital on a given day, then these events would prevent plaintiff from completing all data input work.

32.　　Plaintiff denies the facts of paragraph thirty-two of movant's statement of fact. Movant's seeks to take plaintiff's testimony out of context. Plaintiff did not complain about her workload at any time. In her September 28, 2004 letter

to Ms. Lotts, plaintiff complained of the way that Carole Wolke was mistreating her, how she was showing favoritism to other co-employees and how she was offending plaintiff. The argument was never that her PAR score was wrong because she was being overworked. The argument was that her new supervisor was not treating her fairly.

33.     Plaintiff denies the facts of paragraph thirty-three of movant's statement of fact. Movant seeks to take plaintiff's testimony out of context again. Plaintiff asserted to Ms. Lotts that depending on the day, certain uncontrollable events (e.g. emergency transportation paperwork to be completed by her and to go with a client being taken to an emergency room) would cause her to not complete all of her work. It was in light of these circumstances that plaintiff would ask for overtime.

34.     Plaintiff denies the facts of paragraph thirty-four of movant's statement of fact. Movant seeks to take plaintiff's testimony out of context again. Plaintiff stated in her deposition that when compared to the other principal clerk transcriber, Sheila McCray, plaintiff's job duties were more diverse and required plaintiff to maintain a faster pace depending on the day. Ms. McCray only had to answer phones for two individuals, the Director of Nursing and Assistant Director of Nursing, as opposed to plaintiff who answered phones for all other nurses in the building, the various departments in the building and all of the building's clinics. Ms. McCray did not have to input data sheets into the NJDC computer. Ms. McCray did not have to draft documents related to medical trips for NJDC clients. Ms. McCray did not have to provide consent

forms to guardians of clients via mail and distributing them personally. Ms. McCray did not have to deal with transportation related documents at all.

35.     Plaintiff denies the facts of paragraph thirty-five of movant's statement of fact. Plaintiff stated in her deposition that no one had complained about incomplete data sheets until after plaintiff complained to Ms. Lotts that Carole Wolke was mistreating her, how she was showing favoritism to other co-employees and how she was offending plaintiff. The argument was never that her PAR score was wrong because she was being overworked. The argument was that her new supervisor was not treating her fairly. (Yi Cert., Ex. A. Atkinson Dep. 54:15-55:3).

36.     Plaintiff admits the facts of paragraph thirty-six of movant's statement of fact.

37.     Plaintiff denies the facts of paragraph thirty-seven of movant's statement of fact. Plaintiff complained to Ms. Lotts that Carole Wolke was mistreating her, showing favoritism to other co-employees and offending her. The argument was never that her PAR score was wrong because she was being overworked. The argument was that her new supervisor was not treating her fairly. (Yi Cert., Ex. A. Atkinson Dep. 54:15-55:3). Prior to complaining to Ms. Lotts, no supervisor ever complained to plaintiff about not being able to complete her required assignments in the course of a work week. Plaintiff asserts that no supervisor ever complained about plaintiff not completing enough data sheets until only after plaintiff complained to Ms. Lotts in writing about Carole Wolke.

8

38.    Plaintiff denies the facts of paragraph thirty-eight of movant's statement of fact.

39.    Plaintiff admits the facts of paragraph thirty-nine of movant's statement of fact.

40.    Plaintiff admits the facts of paragraph forty of movant's statement of fact. Plaintiff also asserts that Ms. Wolke did not talk down to them. She allowed them to come in at different times without disciplining them for their time. She allowed them to have extended lunches and conduct personal activities during the day. She never made them feel like they were walking on egg shells as she made plaintiff feel.

41.    Plaintiff admits the facts of paragraph forty-one of movant's statement of fact. However, plaintiff worked in the same department with Mr. Buongiorno and Ms. Corrado and they were subject to the same rules and policies as plaintiff was. The procedure for vacation requests, breaks and lunches were the same for all three of them.

42.    Plaintiff admits, in part, the facts of paragraph forty-two of movant's statement of fact. Plaintiff asked Ms. Corrado whether she was happy about her PAR score and whether she got a good rating from Carole Wolke. Ms. Corrado said that she had.   (Yi Cert., Ex. A. Atkinson Dep. 90:2-6 and 13-18.) Additionally, plaintiff asserts that she asked Ms. Corrado whether Ms. Wolke had decreased her PAR score from her previous PAR score. Ms. Corrado told her that she had not.

43.    Plaintiff admits, in part, the facts of paragraph forty-three of movant's statement of fact.  Plaintiff specifically asked and was told by Ms. Corrado that her PAR score had not been lowered by Ms. Wolke.

44.    Plaintiff denies the facts of paragraph forty-four of movant's statement of fact.  Plaintiff asserts that she did not understand Mr. Yi's question at her deposition.  Plaintiff does not mind that Ms. Corrado received a good score.

45.    Plaintiff admits the facts of paragraph forty-five of movant's statement of fact.  Plaintiff was satisfied with the result, she was not "happy" in having to go through the ordeal.

46.    Plaintiff denies the facts of paragraph forty-six of movant's statement of fact.  Movant seeks to take plaintiff's testimony out of context again.  Plaintiff testified that Ms. Wolke just said things that would belittle her as if she was a nobody.  (Yi Cert., Ex. A. Atkinson Dep. 73:16-20.)

47.    Plaintiff denies the facts of paragraph forty-seven of movant's statement of fact.  Movant's misstates the deposition transcript.  Plaintiff does not even refer to Ms. Corrado in the page and lines cited by movant's.

48.    Plaintiff  admits the facts of paragraph forty-eight of movant's statement of fact.

49.    Plaintiff admits the facts of paragraph forty-nine of movant's statement of fact. Plaintiff could not apply for the position because one requirement of the position is that the individual hold a RN or a LPN license which plaintiff did not possess.

50.   Plaintiff admits, in part, the facts of paragraph fifty of movant's statement of fact.  Plaintiff was not interested in applying for the position.

51.   Plaintiff admits the facts of paragraph fifty-one of movant's statement of fact.

52.   Plaintiff admits the facts of paragraph fifty-two of movant's statement of fact.

53.   Plaintiff admits the facts of paragraph fifty-three of movant's statement of fact.

54.   Plaintiff admits, in part, the facts of paragraph fifty-four of movant's statement of fact.  Ms. Wolke stated that the plaintiff did not need a desk or computer.  Plaintiff contends that Ms. Wolke's attempt to take away her desk, computer and office was an act of racial discrimination or was an act of retaliation for plaintiff's verbal and written September 2004 complaints to Ms. Lotts.  Ms. Wolke did not seek to re-organize the workplace status of any non-Black employees in the department.

55.   Plaintiff admits the facts of paragraph fifty-five of movant's statement of fact.  Plaintiff asserts that other co-employees of her department also had their vacation requests in late, including, Sheila McCray, Linda Gervald and Emma Jones.

56.   Plaintiff denies the facts of paragraph fifty-six of movant's statement of fact.  Prior to plaintiff being denied her vacation request, she is unaware of anyone else having their late vacation requests denied during the 27 years that she was employed by NJDC.  Plaintiff also asserts that during years prior to

11

2004, she had put her vacation requests in after March 15, 2004, and they had never been denied. Plaintiff's earlier vacation requests were omitted from the file that was supplied by NJDC to her and the EEOC.

57.    Plaintiff admits the facts of paragraph fifty-seven of movant's statement of fact.

58.    Plaintiff denies the facts of paragraph fifty-eight of movant's statement of fact. Movant's statement does not make sense. It appears to be a fragment of a longer sentence.

59.    Plaintiff, admits in part, the facts of paragraph fifty-nine of movant's statement of fact. Plaintiff asserts that she was entitled to her annual vacation time because it was stated to her by the Assistant CEO, Bernice Davis that if she did not receive her annual vacation time form back in a reasonable time, then plaintiff should consider it approved. Plaintiff asserts that she had this conversation with Ms. Davis on or about December 2004.

60.    Plaintiff denies the facts of paragraph sixty of movant's statement of fact. Plaintiff asserts that she supplied her 2004 vacation request for 11/24 through 11/30. These dates were included in the first request that plaintiff made. Plaintiff also denies that there were other employees who had submitted their requests for the same date before her. Finally, plaintiff asserts that because only Ms. McCray had the same job duties and title as plaintiff did, the issue of a lack of staff coverage was non-existent.

61.     Plaintiff denies the facts of paragraph sixty-one of movant's statement of fact. Plaintiff denies that these employees had submitted their vacation requests before her. Movant does not provide any non-hearsay proof to support this fact.

62.     Plaintiff admits the facts of paragraph sixty-two of movant's statement of fact. Ms. Lotts gave plaintiff the vacation time requested because Ms. Lotts determined that Ms. Wolke had misrepresented to her that plaintiff did not request those days in a vacation request for 2004. This was a statement that Ms. Lotts made to plaintiff in November of 2004.

63.     Plaintiff admits the facts of paragraph sixty-three of movant's statement of fact.

64.     Plaintiff admits the facts of paragraph sixty-four of movant's statement of fact. Additionally, between plaintiff's first letter of September 28, 2004, and letter of December 1, 2004, plaintiff spoke to supervisor Ms. Lotts and verbally requested that she remove Carole Wolke from having authority over her as her supervisor. Plaintiff told Ms. Lotts that she felt that Ms. Wolke was treating her differently because of her race and discriminating against her because she is Black.

65.     Plaintiff admits the facts of paragraph sixty-five of movant's statement of fact. Movant's statement is confusing and hard to understand. In plaintiff's letter she wrote: "Ms. Wolke continued the conversation by accusing me of calling her a racist, she stated to me if I keep calling her a racist she would fix me."

13

66.     Plaintiff denies the facts of paragraph sixty-six of movant's statement of fact.  Movant misstates the deposition transcript.  Plaintiff denies that she was arguing or that she was emotional.  Plaintiff asserts that her voice was loud because "I talk loud anyway."

67.     Plaintiff admits the facts of paragraph sixty-seven of movant's statement of fact.

68.     Plaintiff admits, in part, the facts of paragraph sixty-eight of movant's statement of fact.  Plaintiff recalls Ms. Wolke being out for a day or two in December of 2004 after the incident.

69.     Plaintiff admits the facts of paragraph sixty-nine of movant's statement of fact.

70.     Plaintiff admits the facts of paragraph seventy of movant's statement of fact.

71.     Plaintiff admits, in part, the facts of paragraph seventy-one of movant's statement of fact.  Plaintiff goes on to state in her deposition that "however, I always call when I won't be on time and I work my seven hours."

72.     Plaintiff admits, in part, the facts of paragraph seventy-two of movant's statement of fact.   During the early 2000s, Ms. Lott's predecessor, Nancy Ward, allowed plaintiff to have her time changed from 9:00 a.m. to 5:00 p.m, to 9:15 a.m. to 5:15 p.m. due to plaintiff's child care situation.  Ms. Ward told plaintiff that if there was an emergency, to call her and let her know.  That was followed through regarding plaintiff's child care issues.  Plaintiff was the foster parent of seven children with significant emotional disabilities.  Ms. Ward and

14

Ms. Lotts never disciplined plaintiff about any lateness because they were aware of the type of children that plaintiff was taking care of and because plaintiff always let them know when she was going to be late.

73.     Plaintiff admits, in part, the facts of paragraph seventy-three of movant's statement of fact.   Plaintiff denies speaking to Ms. Lotts about the issue of tardiness at the September 2004 meetings.

74.     Plaintiff denies the facts of paragraph seventy-four of movant's statement of fact.  Movant misstates the deposition transcript.  The transcript does not mention the issue of tardiness at that page and those lines.

75.     Plaintiff admits the facts of paragraph seventy-five of movant's statement of fact.

76.     Plaintiff admits, in part, the facts of paragraph seventy-six of movant's statement of fact.   Plaintiff admits that she did not call in within an hour that she was going to be late.  Plaintiff denies that she violated 408 A-1.  This policy was intended to cover absences, not lateness.

77.     Plaintiff admits the facts of paragraph seventy-seven of movant's statement of fact.

78.     Plaintiff admits the facts of paragraph seventy-eight of movant's statement of fact.

79.     Plaintiff denies the facts of paragraph seventy-nine of movant's statement of fact.  A Five Day "Red "A" Termination Process should only be utilized when an employee calls out sick for an extended period of time without appropriate authorization.

80.    Plaintiff admits, in part, the facts of paragraph eighty of movant's statement of fact.   Ms. Lotts does not admit that she directed Ms. Wolke to issue the Red A.   Ms. Lotts mentions the word "we" which would implicate both Ms. Lotts and Ms. Wolke in this decision.

81.    Plaintiff admits, in part, the facts of paragraph eighty-one of movant's statement of fact. Plaintiff admits that that is what was alleged by Ms. Wolke, however, plaintiff denies that it is true.   During the early 2000s, Ms. Lott's predecessor, Nancy Ward, allowed plaintiff to have her time changed from 9:00 a.m. to 5:00 p.m., to 9:15 a.m to 5:15 p.m. due to plaintiff's child care situation. Ms. Ward told plaintiff that if there was an emergency, to call her and let her know.    That was followed through regarding plaintiff's child care issues. Plaintiff was the foster parent of seven emotionally disturbed children.   Ms. Ward and Ms. Lotts never disciplined plaintiff about any lateness because they were aware of the type of children that plaintiff was taking care of and because plaintiff always let them know when she was going to be late.

82.    Plaintiff admits the facts of paragraph eighty-two of movant's statement of fact.

83.    Plaintiff admits the facts of paragraph eighty-three of movant's statement of fact.

84.    Plaintiff admits the facts of paragraph eighty-four of movant's statement of fact.

85.     Plaintiff admits the facts of paragraph eighty-five of movant's statement of fact.

86.     Plaintiff admits the facts of paragraph eighty-six of movant's statement of fact.

87.     Plaintiff admits the facts of paragraph eighty-seven of movant's statement of fact.

88.     Plaintiff admits the facts of paragraph eighty-eight of movant's statement of fact.

89.     Plaintiff admits the facts of paragraph eighty-nine of movant's statement of fact.

90.     Plaintiff admits the facts of paragraph ninety of movant's statement of fact.

91.     Plaintiff admits the facts of paragraph ninety-one of movant's statement of fact.

92.     Plaintiff admits, in part, the facts of paragraph ninety-two of movant's statement of fact. The transcript page and lines do not discuss the issue of Ms. Wolke's continued harassment. Plaintiff alleges that Mr. Buongiorno's attitude and treatment of her changed at this time. Prior to becoming her supervisor, Mr. Buongiorno was professional and never questioned her about her abilities to do work. In February of 2005, after plaintiff filed a charge of discrimination against Ms. Wolke, Mr. Buongiorno's behavior towards her changed. Plaintiff could tell that he just did not want to be involved. He started micro-managing plaintiff and made it hard for plaintiff to function.

93.     Plaintiff admits, in part, the facts of paragraph ninety-three of movant's statement of fact. When plaintiff questioned Mr. Buongiorno as to why she had

to report to him about the data that had to be put into the computer and told him that she never had to do that before, Mr. Buongiorno's response was: "I have a boss too." By this statement, plaintiff asserts that he was talking about his direct supervisor, Carole Wolke, who was directing her through him.

94.    Plaintiff admits the facts of paragraph ninety-four of movant's statement of fact.

95.    Plaintiff admits the facts of paragraph ninety-five of movant's statement of fact. Plaintiff already had a doctor's appointment scheduled for that day and she advised Ms. Lotts that she was going to fill out the necessary paperwork to be relieved from her duties and go to the doctor.

96.    Plaintiff admits the facts of paragraph ninety-six of movant's statement of fact. Plaintiff's physician, Dr. Schlossberg, placed plaintiff on a medical leave due to anxiety attacks and depression.

97.    Plaintiff admits the facts of paragraph ninety-seven of movant's statement of fact.

98.    Plaintiff admits the facts of paragraph ninety-eight of movant's statement of fact.

99.    Plaintiff admits the facts of paragraph ninety-nine of movant's statement of fact. The report also recommended that Ms. Wolke should be referred to NJDC's Employment Advisory Services to receive psychological assistance. (Yi Cert., Ex. 4 at Atkinson EEO 25).

100.   Plaintiff admits the facts of paragraph one hundred of movant's statement of fact.

101.    Plaintiff admits, in part, the facts of paragraph one hundred and one of movant's statement of fact. Plaintiff's letter of complaint asserted that she was being treated differently now that she had filed a discrimination complaint against Ms. Wolke. She was concerned that she was being retaliated against and she placed all of these concerns in her letter to Ms. Lotts.

102.    Plaintiff admits, in part, the facts of paragraph one hundred and two of movant's statement of fact. Plaintiff admits that she did not get all of her job duties back. Plaintiff asserts in her letter that Ms. Lotts instructed her not to resume her job duties back.

103.    Plaintiff admits the facts of paragraph one hundred and three of movant's statement of fact.

104.    Plaintiff admits, in part, the facts of paragraph one hundred and four of movant's statement of fact. When plaintiff questioned Mr. Buongiorno as to why she had to report to him about the data that had to be put into the computer and told him that she never had to do that before, Mr. Buongiorno's response was: "I have a boss too." By this statement, plaintiff asserts that he was talking about his direct supervisor, Carole Wolke, who was directing her through him.

105.    Plaintiff admits the facts of paragraph one hundred and five of movant's statement of fact. In this letter, plaintiff requested that Ms. Wolke be reprimanded to the fullest extent of the law and requested that Ms. Wolke be removed from having any authority over her directly, or indirectly through Mr. Buongiorno.

106.   Plaintiff admits the facts of paragraph one hundred and six of movant's statement of fact.

107.   Plaintiff admits the facts of paragraph one hundred and seven of movant's statement of fact.

108.   Plaintiff admits, in part, the facts of paragraph one hundred and eight of movant's statement of fact.   Plaintiff asserts that at that meeting, plaintiff mentioned that Carole Wolke told third persons that if she got her way, plaintiff would not be getting her job duties back and that she would ultimately be transferred out of the nursing department.

109.   Plaintiff admits the facts of paragraph one hundred and nine of movant's statement of fact.

110.   Plaintiff admits the facts of paragraph one hundred and ten of movant's statement of fact.

111.   Plaintiff admits the facts of paragraph one hundred and eleven of movant's statement of fact.

112.   Plaintiff denies the facts of paragraph one hundred and twelve of movant's statement of fact. Plaintiff states in her letter that Ms. Wolke's "behavior" reminded her of a poison snake.  Plaintiff was using the analogy to express herself and her concerns.

113.   Plaintiff admits the facts of paragraph one hundred and thirteen of movant's statement of fact.

114.   Plaintiff admits the facts of paragraph one hundred and fourteen of movant's statement of fact.

115.    Plaintiff admits the facts of paragraph one hundred and fifteen of movant's statement of fact.  Ms. Wolke also indicated that she had formally filed an official complaint to the EEO/AA office following her knowledge of this complaint.  (Yi Cert. Ex. 32 at Atkinson EEO 1)  However, the NJDC was notified that Ms. Wolke's EEO/AA complaint was not accepted as this complaint did not meet the criteria of an EEO complaint.  (Atkinson Cert.  Ex A at Atkinson EEO 13)

116.    Plaintiff admits, in part, the facts of paragraph one hundred and sixteen of movant's statement of fact.  Plaintiff never physically moved to a different work station apart from Ms. Wolke.  The two of them stayed in the same building.

117.    Plaintiff admits, in part, the facts of paragraph one hundred and seventeen of movant's statement of fact.  Plaintiff also stated in the letter that she regretted the choice of words that she used in the letter and that she was in no way making a threat to harm Ms. Wolke.  (Yi Cert. Ex. 33 at Atkinson EEO 193)

118.    Plaintiff admits the facts of paragraph one hundred and eighteen of movant's statement of fact.

119.    Plaintiff admits the facts of paragraph one hundred and nineteen of movant's statement of fact.

120.    Plaintiff admits the facts of paragraph one hundred and twenty of movant's statement of fact.

121.    Plaintiff admits the facts of paragraph one hundred and twenty-one of movant's statement of fact.

122.     Plaintiff admits the facts of paragraph one hundred and twenty-two of movant's statement of fact.

123.     Plaintiff admits the facts of paragraph one hundred and twenty-three of movant's statement of fact.

124.     Plaintiff admits the facts of paragraph one hundred and twenty-four of movant's statement of fact.

125.     Plaintiff admits the facts of paragraph one hundred and twenty-five of movant's statement of fact.

126.     Plaintiff admits the facts of paragraph one hundred and twenty-six of movant's statement of fact.

127.     Plaintiff admits the facts of paragraph one hundred and twenty-seven of movant's statement of fact.  Plaintiff states that immediately prior to this point in her deposition she stated that she felt threatened by Ms. Wolke.  (Yi. Cert., Ex. A. Atkinson Dep. 158:14-16)

128.     Plaintiff admits the facts of paragraph one hundred and twenty-eight of movant's statement of fact.

129.     Plaintiff admits the facts of paragraph one hundred and twenty-nine of movant's statement of fact.

130.     Plaintiff admits the facts of paragraph one hundred and thirty of movant's statement of fact.

131.     Plaintiff admits the facts of paragraph one hundred and thirty-one of movant's statement of fact.  DHS asserted that an independent witness corroborated the statement by Ms. Wolke that she told plaintiff "I will get you,"

or words to that effect and that the appropriate administrative and/or disciplinary action will be taken regarding the inappropriate remark made by Ms. Wolke.

132.   Plaintiff admits the facts of paragraph one hundred and thirty-two of movant's statement of fact.

133.   Plaintiff admits the facts of paragraph one hundred and thirty-three of movant's statement of fact.

**Plaintiff's Additional Material Facts:**

134.   Plaintiff became employed with the NJDC in 1980.   During the first twenty-four years of her service with the organization, she had been praised and received many commendations both from the NJDC and other levels of local and state government.   Plaintiff received two letters of employee recognition from NJDC CEO Gregory Fenton in 1999 and 2000.   She received a citation from the General Assembly of the State of New Jersey in April of 2003.   She received a NJ Community Service Award from the Dept. of Human Services in 2004.   In July of 2004, she was chosen by Dept. of Human Services Commissioner, James M. Davy to participate in a workgroup regarding resource families for the Division of Youth and Family Services.   (Atkinson Certification, Exhibit B, Ex. G).

135.   On September 17, 2004, plaintiff received two letters of recommendation in connection with plaintiff's application into an educational program.   Upon the successful completion of this course, plaintiff would obtain a Child Protective Services Certificate of Competence.   These letters were written by

NJDC Medical Director Roman Chrucky, M.D. and Director of Nursing Services, Roxanne Lotts, RN. (Atkinson Cert., Ex. C, Ex. G).

136.  Upon Ms. Lotts becoming the head of Ms. Atkinson's department, plaintiff advised her of the fact that she was the foster mother of seven children. Plaintiff notified Ms. Lotts of the fact that all seven of her foster children were emotionally disturbed. These children required special emotional needs along with having behavioral issues that had to be dealt with on a daily basis. Plaintiff supplied Ms. Lotts with documentation regarding the seven foster children that she cared for. This was the reason why Ms. Atkinson frequently requested flexibility in her scheduled working start time. Up until plaintiff's initial complaint of September 28, 2004, Ms. Lotts and the other supervisors who had authority over Ms. Atkinson were cognizant and compassionate about plaintiff's requests for flexibility in her work schedule. (Atkinson Cert., Ex. D, Ex. G).

137.  Ms. Wolke provided in her written deposition that it was NJDC practice that annual vacation requests were to be submitted by employees to their supervisors no later than March 15, 2004. Defendant provides no policy that supports Ms. Wolke's contention. Plaintiff asserts that Ms. Wolke's own actions contradict the response provided in her written deposition. On two occasions in 2004, Ms. Wolke approved vacation requests which had been submitted by Ms. Atkinson on dates subsequent to March 15, 2004. The only difference between these two vacation requests and plaintiff's vacation request in November 2004, is that Ms. Wolke's denial of the vacation request took

place after plaintiff presented Ms. Lotts with her discrimination complaint letter of September 28, 2004. (Atkinson Cert., Ex. F, Ex. G).

138.    Plaintiff's interim PAR for 2003-2004 was a score of 27. (Yi Cert., Exhibit 1 at Atkinson EEO 52). That was the last PAR score given to her before Ms. Wolke became her supervisor. After plaintiff received a PAR score of 24 from Ms. Wolke in April of 2004, she asked Donna Corrado if Ms. Wolke did her PAR. Ms. Corrado said yes. Ms. Atkinson then asked Ms. Corrado did Ms. Wolke drop your score at all. Ms. Corrado told plaintiff that her score had not been dropped. Plaintiff, then approached Ms. Wolke and directly asked her why she reduced plaintiff's PAR rating. Ms. Wolke's response was that she reduced it because she could. While she was saying this, she shrugged. Plaintiff mentioned to Ms. Wolke that when her previous supervisor did plaintiff's PAR she rated her fairly. Ms. Wolke's response was "I don't care I rate differently." Plaintiff then asked Ms. Wolke if she had a problem with plaintiff's work performance. Ms. Wolke said that there had been a few problems. Plaintiff asked her if she could be more specific. Ms. Wolke did not respond. (Yi Cert., Ex. 2 March 28, 2005 complaint letter at Atkinson EEO 72; Atkinson Cert., Ex. G)

139.    On or about May 2004, plaintiff began asking Ms. Lotts for a meeting with her to discuss her PAR rating. Ms. Lotts said, okay, I'll get to it. Plaintiff kept on asking her and Ms. Lotts kept on putting it off. Plaintiff asserts that at no time did Ms. Lotts schedule a meeting that plaintiff said she could not attend.

Finally, in September of 2004, plaintiff wrote her complaint letter. (Atkinson Cert., Ex. G)

140.     In September after she delivered her September 28, 2004 letter or in the beginning of October of 2004, plaintiff met with Ms. Lotts to discuss her letter. Plaintiff told her about her conversation with Ms. Wolke, and she told Ms. Lotts that she did not understand why Ms. Wolke reduced her PAR considering all of the work that she completed. Plaintiff asserted that the job that Ms. Corrado now had was a position that Ms. Atkinson use to perform, on top of the other duties that Ms. Atkinson still was responsible for. She did not understand how Ms. Wolke could lower her PAR score and yet, not change Ms. Corrado's PAR score even though Ms. Corrado did much less volume of work than she did. Plaintiff told Ms. Lotts that she thought that Ms. Wolke was treating her differently from Ms. Corrado due to the fact that she favors Ms. Corrado because she was Caucasian and plaintiff was Black. Plaintiff also stated that she overheard Ms. Wolke stating that Ms. Corrado's position was much more important than the job that plaintiff was responsible for. When those duties had been part of Ms. Atkinson's job responsibilities, Ms. Wolke never acknowledged her work as anything special. But now that a White employee had the duties, suddenly Ms. Wolke was telling others that Ms. Corrado needed a new computer, a new desk and her own office. (Affidavit of Phyllis Atkinson, Ex. G., Yi Cert., Ex. 2 March 28, 2005 complaint letter at Atkinson EEO 73-74)

141.     Shortly after Ms. Lotts and plaintiff met, on or about October 2004, plaintiff met with Ms. Lotts, and Ms. Wolke to discuss plaintiff's letter of

September 28, 2004. Ms. Wolke stated that the reason why plaintiff's score was reduced was because plaintiff was not up to date with the data sheet input. In response, plaintiff went over all of her work duties and explained that the entry of data sheet input had never been a priority and that other events such as preparing medical calendar, scheduling appointment, making medical transportation arrangements and answering telephones were a priority over the entry of data into the computer. Plaintiff also stated that when important data information comes in, such as change of address, change of guardianship or change of telephone number, plaintiff always kept that information up to date because that was important information to have at hand. Additionally, all new patient information was immediately placed in a notebook that was created and was available to all of the nurses. This information was subsequently placed in the computer system when plaintiff had time to do so. Ms. Lotts then asked, when do you think that you'll be able to work on the data sheets? Plaintiff responded by asking if it were possible to get overtime to focus on only data sheets. Ms. Lotts said yes, plaintiff could do that and to let her know when plaintiff was planning to work overtime. Thereafter, plaintiff worked approximately two to three hours a week overtime just focusing on data sheets. Then plaintiff went over the complaints that she placed in her letter. (Yi Cert., Ex. A. Atkinson Dep. 49:3-15, Ex. 3 at Atkinson EEO 16; Atkinson Cert., Ex. G)

142.    Also during this same meeting, and in front of Ms. Lotts and Ms. Wolke, plaintiff stated that Carole was treating Donna Corrado, who is White better

than plaintiff, because Donna received a better PAR score.  Plaintiff stated that she felt offended and that Ms. Wolke made plaintiff feel like Ms. Wolke was a racist and was discriminating against plaintiff.  At this point, Ms. Wolke started crying and said that it hurts her when plaintiff tells everyone that she's a racist. Plaintiff responded that she did not tell anyone other than Ms. Lotts and she told Ms. Lotts that Ms. Wolke does not treat me the same way that she treats Ms. Corrado, who is White.  Plaintiff stated that Ms. Wolke degrades her as if she was a "nobody", and she treats other employees in the department with respect. (Yi Cert., Ex. A. Atkinson Dep. 73:16-20; Ex. 3 at Atkinson EEO 16; Atkinson Cert., Ex. G)

143.   On or about March 22, 2004, plaintiff filled out her annual vacation time request form.   She requested November 23 through November 30 off for vacation.  She also requested to have December 23 through December 27 off. On April 23, 2004, plaintiff requested April 26 to be taken as a vacation day. On May 21, 2004, plaintiff requested to have May 24 to be taken as a vacation day.  Ms. Wolke and plaintiff discussed the fact that plaintiff had submitted her vacation request initially in March of 2004.  Plaintiff never received an annual vacation request from Ms. Wolke.  In April of 2004, plaintiff asked Ms. Wolke when she would be getting her annual vacation request back.  Ms. Wolke told her that she would get around to it.  Plaintiff thereafter felt that it was necessary to place her vacation requests in writing and get something signed back from Ms. Wolke, so she submitted "request for time off" forms for each specific

vacation period.  (Yi Cert., Ex. A, Atkinson Dep. 150:10-16; Atkinson Cert., Ex. G)

144.   On November 19, 2004, plaintiff presented Ms. Wolke with her "request for time off" form for the dates November 23 through November 30.  On the same day, Ms. Wolke denied this vacation request.  Plaintiff stated to Ms. Wolke that she had requested this time off in her annual vacation time request form in March of 2004.  Ms. Wolke did not respond other than to state that she was not giving the vacation to plaintiff.  (Atkinson Cert., Ex. G, Ex. H)

145.   Also on November 19, 2004, plaintiff went to see Ms. Lotts and told her that Ms. Wolke was denying her vacation request.  Plaintiff told Ms. Lotts that she for the past twenty years, always requested and was always approved for Thanksgiving week off on vacation.  She told Ms. Lotts that Ms. Wolke had just denied her.  Ms. Lotts stated that she would look into the situation.  The next day Ms. Lotts stated that Ms. Wolke had told her that plaintiff had never requested those dates in her annual vacation request form.  Plaintiff responded by stating, "if that was true, then why didn't she show you my annual vacation request form?"  Upon hearing that, Ms. Lotts told plaintiff that she would approve the vacation request.  During this conversation plaintiff reminded Ms. Lotts that this was just another example of how Ms. Wolke was not treating her correctly.  (Yi Cert., Ex. 2 March 28, 2005 complaint letter at Atkinson EEO 75-78; Atkinson Cert., Ex. G)

146.   On December 1, 2004, plaintiff approached Ms. Wolke to inform her about a client's appointment.  When plaintiff approached Ms. Wolke about the

client, Ms. Wolke rudely blurted out to plaintiff that "I will not be helping you out anymore because, I am tired of you calling me a racist." Plaintiff reminded Ms. Wolke that she was conversing with her on a work-related matter. Ms. Wolke told plaintiff that she did not care that it was a work-related matter and she told plaintiff to leave her alone. Ms. Wolke continued by accusing plaintiff of calling her a racist. She told plaintiff that if plaintiff kept calling her a racist "she would fix me." Plaintiff took that to be a threat and a misuse of her authority over plaintiff. Plaintiff told Ms. Wolke that she did not call her a racist, but did believe that she was discriminating against plaintiff as a racist would do. Plaintiff told Ms. Wolke that she felt this way based on previous incidences that had occurred between the two of them. Ms. Wolke continued to verbally threaten plaintiff. She repeated to plaintiff over and over again that "I will fix you, just wait and see." (Yi Cert., Ex. 12) These comments made plaintiff extremely upset. Plaintiff was fearful as to what Ms. Wolke would do including the possibility that Ms. Wolke would take some sort of physical action to do her harm. She shared these concerned with her co-worker, Marie Watts. (Atkinson Cert, Ex. G and Ex. I)

147.    Plaintiff wrote a letter to Ms. Lotts on December 1, 2004. Plaintiff specifically told Ms. Lotts that she would like to exercise her right to be protected from threats and harassment from Ms. Wolke. She reminded Ms. Lotts in this letter that plaintiff had made several verbal complaints about Ms. Wolke's behavior to her. Plaintiff also mentioned that she had given Ms. Lotts a written complaint (September 28, 2004) as well. Plaintiff concluded her letter

by stating that she was being discriminated against by Ms. Wolke and that her threats were causing her to have anxiety attacks. (Yi Cert., Ex. 12)    Plaintiff contends that at this point in time, Ms. Lotts had an obligation to contact the NJDC harassment officer and inform this officer about plaintiff's demand that action be taken to deal with this situation. (Yi Cert., Ex. 3)  It was Ms. Lotts' obligation at this point to institute an investigation of Ms. Atkinson's charges. Ms. Lotts did not respond to plaintiff's letter of December 1, 2004.  However, Ms. Lotts does mention in her April 4, 2005 correspondence to Maria Parchment that she had received a December 1, 2004, "Letter of Complaint." Ms. Lotts would wait three more months before she initiated an investigation regarding plaintiff's racial discrimination and retaliation complaints. (Yi Cert., Ex. 3. Atkinson EEO 16-17; Atkinson Cert., Ex. G, Ex. E, Ex. J)

148.    In December of 2004, Ms. Wolke was the supervisor over six individuals at the NJDC Health Care Center Department.  Three individuals were Black and three were Caucasian.  The three Black employees were plaintiff, principal clerk transcriber Shelia McCray and nurse Emma Jones.    The three Caucasian employees were, nurses Donna Corrado, Michael Buongiorno and Linda Geverald.  In the Fall of 2004, Mr. Fenton, the then CEO of NJDC, ordered a computer specifically for nurse Emma Jones with an instruction forwarded to Ms. Wolke that it should be given to Ms. Jones when the computer arrived.  In December of 2004, the computer was delivered to the department.  Despite the directive from Mr. Fenton, Ms. Wolke gave the computer to Ms. Corrado, one of the three Caucasian nurses.  Interestingly enough, this non-Black nurse was

an individual whose job was created by splitting off a portion of plaintiff's former job duties. In other words, Ms. Corrado's job was branched from Ms. Atkinson's position. And yet, Ms. Wolke found this Caucasian nurse to be more deserving of a computer than Ms. Jones, who had been promised the computer in the first place. (Atkinson Cert., Ex. G, Ex. K; Yi Cert., Ex. 2 March 28, 2005 complaint letter at Atkinson EEO 75)

149.    In mid-December 2004, Ms. Wolke approached plaintiff and told her that she felt that plaintiff did not need a desk, computer or office of her own to perform her job duties. Ms. Wolke told plaintiff that she could work out of the Health Care Center's nurses' station. This made plaintiff upset and she communicated this fact verbally to Ms. Lotts in a meeting dated December 30, 2004. At this meeting, the issue of Ms. Wolke giving away Ms. Jones' computer to Ms. Corrado was also discussed. At the meeting, Ms. Wolke stated that plaintiff did not need an office, desk or computer of her own. Ms. Wolke did not see why plaintiff could not just work out of the nurses' station. Ms. Lott turned to plaintiff and said, "do not worry about it, you are not going to lose your office, computer or your desk. I will not allow that." Plaintiff stated at this meeting, that this is what she was referring to how she discriminates against plaintiff as opposed to Donna [Corrado] who is White. Plaintiff said: "she thinks I'm nobody because I'm Black." Plaintiff told Ms. Lotts, I told you that she treats me like she is a racist. Nurse Emma Jones then said, I know how you feel because I had an incident that happened to me, where a computer that was ordered for me was given to Ms. Corrado who is White. At this point, Ms.

32

Wolke started to break down with tears. Ms. Jones then asked her to hold in the tears and let Ms. Atkinson continue to state her concerns. (Atkinson Cert., Ex. G).

150.    During the early 2000s, Ms. Lott's predecessor, Nancy Ward, allowed plaintiff to have her time changed from 9:00 a.m. to 5:00 p.m., to 9:15 a.m. to 5:15 p.m. due to plaintiff's child care situation. Ms. Ward told plaintiff that if there was an emergency, to call her and let her know. That was followed through regarding plaintiff's child care issues. Plaintiff was the foster parent of seven children with significant emotional disabilities. Ms. Ward and Ms. Lotts never disciplined plaintiff about any lateness because they were aware of the type of children that plaintiff was taking care of and because plaintiff always let them know when she was going to be late. (Atkinson Cert., Ex. G).

151.    On February 14, 2005, plaintiff called in to let the NJDC operator know that she would be one hour late because she was dealing with an emergency at home. That morning the school where one of plaintiff's foster children was attending called her to tell her that she had to come in immediately to attend a meeting about her foster child. Once she arrived at the school she realized that it might take a little longer than she expected. Plaintiff then called nurse Michael Buongiorno and asked him for approval for an administrative day. Subsequently, the meeting at the school ended. Plaintiff called back Mr. Buongiorno and told him that she was going to be able to come in that afternoon. (Atkinson Cert., Ex. L at 231-232)

152.    On February 15, 2005, plaintiff received a Written Warning signed by supervisor Carole Wolke.  Ms. Wolke asserted the following in the Written Warning: "On 2/14/05 you failed to notify the operator an hour prior to the beginning of your shift of your Intended lateness.  You came to work and signed in at 1:30 pm.  Your shift is 9:00 a.m. – 5:00 p.m.  You received a 'Red A' for the day." (Yi Cert., Ex. 3A)

153.    A Five Day "Red "A" Termination Process should only be utilized when an employee calls out sick for an extended period of time without appropriate authorization.  The work unit is required to follow an established procedure to either authorize the absence, return the employee to work; or to initiate the termination process.  Plaintiff contends that the Five Day "Red A" Termination Process was not followed and was an act of malice and retaliation on the part of Ms. Wolke.  (Atkinson Cert., Ex. M)

154.    In her written deposition, Ms. Wolke denies responsibility for the issuance of the Written Warning that plaintiff received on February 15, 2005.  She states that she was only following the orders of Ms. Lotts.  (Yi Cert., Ex. 5 at Atkinson EEO 153)  Ms. Lotts does not admit that she directed Ms. Wolke to issue the Red A.  Ms. Lotts mentions the word "we" which would implicate both Ms. Lotts and Ms. Wolke in this decision. (Yi. Cert., Ex. 6)  After plaintiff received the Written Warning, she called Ms. Lotts and Ms. Lotts told her that Ms. Wolke had given her the Red A. (Atkinson Cert., Ex. G).

155.    During the last two weeks of February 2005, plaintiff met briefly with Ms. Lotts.  Plaintiff told Ms. Lotts that she was not the only person who came in

late.  She went on to state that she was aware of incidences where Donna Corrado and Carole Wolke took extended lunches and falsified their time sheets to cover up the extra time that they took for lunch.  Additionally, plaintiff told Ms. Lotts that Ms. Wolke allowed White employees to come in or go home at different times without disciplining them for their time.  She also allowed Caucasian employees to have extended lunches and conduct personal activities during the work day.  She never made White people feel like they were walking on egg shells as she made plaintiff and the other Black employees feel.  (Atkinson Cert., Ex. G).

156.    Black co-employee, Sheila McCray, asserted in her affidavit that she could validate plaintiff's claims of racial harassment.  This was because Ms. McCray experienced this type of treatment on various occasions where Ms. Wolke treated her differently from non-Black employees.  Ms. McCray stated that Ms. Wolke would allow non-Black co-workers to come in late and sign in at their scheduled time.  In other words, she would allow them to sign in as if they had arrived at work on time so that they would not be disciplined for being late.  She would also allow non-Black co-workers to leave the job during work hours for personal and non-work related reasons.  She would also allow non-Black co-workers extended lunch hours.  She would treat Black employees less favorably.  Whenever a Black employee would take lunch beyond the mandatory time limits for lunch, then Ms. Wolke would report those employees as being late.  According to Ms. McCray, Ms. Wolke would alter the time of Black employee's work schedule to show that they returned to work late.  She

35

did this without notifying the Black workers of her change. She would not deduct time from non-Black employee's work schedules when they would return back from lunch beyond the specified time period. Ms. McCray affirmed that she had personal knowledge of this fact as she was the timekeeper during those years when Ms. Wolke and Ms. Atkinson worked in the same unit at NJDC. (Atkinson Cert. Ex N)

157.   On February 27, 2005, plaintiff wrote a letter to Ms. Lotts regarding the Written Warning that she received from Ms. Wolke. Plaintiff advised Ms. Lotts that Ms. Wolke gave her the Written Warning in retaliation for raising her previous complaint letters of September 28, 2004 and December 1, 2004. Plaintiff specifically stated that in those complaint letters, she requested protection from retaliation from Ms. Wolke. Plaintiff reminded Ms. Lotts that in her complaint letter of December 1, 2004, she described in detail how Ms. Wolke repeatedly threatened plaintiff verbally using the words "I will fix you" over and over again. Plaintiff reiterated again that a thorough investigation would reveal that a lot of her rights as an employee have been violated by Ms. Wolke.) Plaintiff contends that the above letter constitutes a notice to Ms. Lotts that plaintiff was being retaliated against for making her earlier written and verbal complaints of race discrimination. At this point, Ms. Lotts had an obligation to contact the NJDC harassment officer and inform this officer about plaintiff's demand that action be taken to deal with this situation. (Yi Cert., Ex. 3) It was Ms. Lotts' obligation at this point to institute an investigation of Ms. Atkinson's charges. Ms. Lotts did not respond to plaintiff's letter of February

27, 2005.  Plaintiff would have to wait for several months before she learned that the Written Warning had been rescinded. (Atkinson Cert., Ex. G, Ex. L)

158.    On February 28, 2005, plaintiff filled out a NJ Grievance Procedure Form. In her grievance form, plaintiff provided the following statement of grievance: "discrimination on PAR rating, verbal abuse, harassment, unjust Red A on my work record, written warning about Red A on my work record, false accusation and threats."  Plaintiff also attached a letter of even date with her grievance and sent it to the NJDC Employee Relations Office.  Plaintiff also complained about suffering emotional distress and headaches in connection with the above mentioned discrimination and harassment. (Atkinson Cert., Ex. O)

159.    On or about March of 2005 Mr. Michael Buongiorno became her supervisor.  Plaintiff had known Mr. Buongiorno for a number of years. However, she alleges that Mr. Buongiorno's attitude and treatment of her changed at this time.  Prior to becoming her supervisor, Mr. Buongiorno was professional and never questioned her about her abilities to do work.   In February of 2005, after plaintiff filed her grievance against Ms. Wolke, Mr. Buongiorno's behavior towards her changed.  Plaintiff could tell that he just did not want to be involved.  He started micro-managing plaintiff and made it hard for plaintiff to function. (Atkinson Cert., Ex. G).

160.    By March of 2005, plaintiff was frustrated with Ms. Lotts inability or unwillingness to address her complaints of discrimination, harassment and retaliation against Ms. Wolke.  Therefore, on March 28, 2005, she filed a Discrimination Complaint with the NJ Department of Personnel.  Plaintiff

attached a nine page letter to her complaint outlining her race discrimination complaints starting from April 2004 through March 2005. (See Yi Cert., Ex. 2 at Atkinson EEO 72 through 81.)

161.    In the Spring of 2005, plaintiff went out on medical leave due to depression, stress and anxiety that she sustained in connection with the discrimination, harassment and retaliation that she suffered via the actions of Ms. Wolke and the inaction of Ms. Lotts. Upon returning from her extended sick leave in June of 2005, plaintiff communicated with Ms. Lotts and advised her that upon her return from medical leave, she did not receive all of her job duties back. Plaintiff memorialized this conversation with Ms. Lotts in a letter dated June 17, 2005. In that letter, plaintiff asserts that Ms. Lotts instructed her not to resume her job duties back. (See Yi Cert., Ex 31).

162.    For the next two years, plaintiff continued her employment but she was considered an outcast, no one did any more bi-annual PAR evaluations, no one provided her with a new set of job duties, no one even supervised her. She wrote letters to the NJDC CEO Bruce Werkheiser and advised him that she was not being given work to occupy her time and that her job duties had still not been reassigned back to her. During the final two years of her employment, she was never given back any of her duties and spent most of her time sitting in her office and not having sufficient work to occupy her time. (See Atkinson Ex. P).