PHYLLIS ATKINSON, PRO SE
317 East 30 Street
Paterson, New Jersey 07504

By: Phyllis Atkinson
Pro Se, I
(973) 460-0382

RECEIVED
AUG - 2 2010
AT 8:30
WILLIAM T. WALSH M
CLERK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
VICINAGE OF NEWARK

PHYLLIS ATKINSON

        Plaintiff,

vs.

NORTH JERSEY
DEVELOPMENTAL CENTER

        Defendant.

Hon. Peter G. Sheridan
United States District Judge

Civil Action No. 06-5485 (PGS)

**AFFIDAVIT OF PHYLLIS ATKINSON**

I, Phyllis Atkinson, of full age, being duly sworn upon my oath, appear and say:

1. I am the pro se plaintiff in this matter and have personal knowledge of the facts to this litigation. I am supplying this Affidavit in opposition to defendant's motion for summary judgment.

2. I became employed with the NJDC in 1980. During the first twenty-four years of my service with the organization, I had been praised and received many commendations both from the NJDC and other levels of local and state government. I received two letters of

employee recognition from NJDC CEO Gregory Fenton in 1999 and 2000. I received a citation from the General Assembly of the State of New Jersey in April of 2003. I received a NJ Community Service Award from the Dept. of Human Services in 2004. In July of 2004, I was chosen by Dept. of Human Services Commissioner, James M. Davy to participate in a workgroup regarding resource families for the Division of Youth and Family Services.

3. On September 17, 2004, I received two letters of recommendation in connection with my application into an educational program. Upon the successful completion of this course, I would obtain a Child Protective Services Certificate of Competence. These letters were written by NJDC Medical Director Roman Chrucky, M.D. and Director of Nursing Services, Roxanne Lotts, RN.

4. Upon Ms. Lotts becoming the head of my department, I advised her of the fact that I was the foster mother of seven children. I notified Ms. Lotts of the fact that all seven of my foster children were emotionally disturbed. These children required special emotional needs along with having behavioral issues that had to be dealt with on a daily basis. I supplied Ms. Lotts with documentation regarding the seven foster children that I cared for. This was the reason why I frequently requested flexibility in my scheduled working start time. Up until my initial complaint of September 28, 2004, Ms. Lotts and the other supervisors who had authority over me were cognizant and compassionate about my requests for flexibility in my work schedule.

5. Ms. Wolke provided in her written deposition that it was NJDC practice that annual vacation requests were to be submitted by employees to their supervisors no later than March 15, 2004. Defendant provides no policy that supports Ms. Wolke's contention. I assert that Ms. Wolke's own actions contradict the response provided in her written deposition. On

two occasions in 2004, Ms. Wolke approved vacation requests which had been submitted by me on dates subsequent to March 15, 2004. The only difference between these two vacation requests and my vacation request in November 2004 is that Ms. Wolke's denial of the vacation request took place after I presented Ms. Lotts with my discrimination complaint letter of September 28, 2004.

6. My interim PAR for 2003-2004 was a score of 27. Atkinson Cert., Exhibit 1 at Atkinson EEO 52. That was the last PAR score given to me before Ms. Wolke became my supervisor. After I received a PAR score of 24 from Ms. Wolke in April of 2004, I asked Donna Corrado if Ms. Wolke did her PAR. Ms. Corrado said yes. I then asked Ms. Corrado did Ms. Wolke drop your score at all. Ms. Corrado told me that her score had not been dropped. I then approached Ms. Wolke and directly asked her why she reduced my PAR rating. Ms. Wolke's response was that she reduced it because she could. While she was saying this, she shrugged. I mentioned to Ms. Wolke that when my previous supervisor did my PAR she rated me fairly. Ms. Wolke's response was "I don't care I rate differently." I then asked Ms. Wolke if she had a problem with my work performance. Ms. Wolke said that there had been a few problems. I asked her if she could be more specific. Ms. Wolke did not respond.

7. On or about May 2004, I began asking Ms. Lotts for a meeting with her to discuss my PAR rating. Ms. Lotts said, okay, I'll get to it. I kept on asking her and Ms. Lotts kept on putting it off. I assert that at no time did Ms. Lotts schedule a meeting that I said she could not attend. Finally, in September of 2004, I wrote my complaint letter.

8. In September after I delivered my September 28, 2004 letter, or in the beginning of October of 2004, I met with Ms. Lotts to discuss my letter. I told her about my conversation

3

with Ms. Wolke, and she told Ms. Lotts that she did not understand why Ms. Wolke reduced my PAR considering all of the work that I completed. I asserted that the job that Ms. Corrado now had was a position that I use to perform, on top of the other duties that I still was responsible for. I did not understand how Ms. Wolke could lower my PAR score and yet, not change Ms. Corrado's PAR score even though Ms. Corrado did much less volume of work than I did. I told Ms. Lotts that I thought that Ms. Wolke was treating me differently from Ms. Corrado due to the fact that she favors Ms. Corrado because she was Caucasian and I was Black. I also stated that I overheard Ms. Wolke stating that Ms. Corrado's position was much more important than the job that I was responsible for. When those duties had been part of my job responsibilities, Ms. Wolke never acknowledged my work as anything special. But now that a White employee had the duties, suddenly Ms. Wolke was telling others that Ms. Corrado needed a new computer, a new desk and her own office.

9.   Shortly after Ms. Lotts and I met, on or about October 2004, I met with Ms. Lotts, and Ms. Wolke to discuss my letter of September 28, 2004. Ms. Wolke stated that the reason why my score was reduced was because I was not up to date with the data sheet input. In response, I went over all of my work duties and explained that the entry of data sheet input had never been a priority and that other events such as preparing medical calendar, scheduling appointment, making medical transportation arrangements and answering telephones were a priority over the entry of data into the computer. I also stated that when important data information comes in, such as change of address, change of guardianship or change of telephone number, I always kept that information up to date because that was important information to have at hand. Additionally, all new patient information was immediately placed in a notebook that was created and was available to all of the nurses. This information was

subsequently placed in the computer system when I had time to do so. Ms. Lotts then asked, when do you think that you'll be able to work on the data sheets? I responded by asking if it were possible to get overtime to focus on only data sheets. Ms. Lotts said yes, I could do that and to let her know when I was planning to work overtime. Thereafter, I worked approximately two to three hours a week overtime just focusing on data sheets. Then I went over the complaints that I placed in my letter.

10. Also during this same meeting, and in front of Ms. Lotts and Ms. Wolke, I stated that Carole was treating Donna Corrado, who is White better than me, because Donna received a better PAR score. I stated that I felt offended and that Ms. Wolke made me feel like Ms. Wolke was a racist and was discriminating against me. At this point, Ms. Wolke started crying and said that it hurts her when I tell everyone that she's a racist. I responded that I did not tell anyone other than Ms. Lotts and I told Ms. Lotts that Ms. Wolke does not treat me the same way that she treats Ms. Corrado, who is White. I stated that Ms. Wolke degrades me as if I was a "nobody", and she treats other employees in the department with respect.

11. On or about March 22, 2004, I filled out my annual vacation time request form. I requested November 23 through November 30 off for vacation. I also requested to have December 23 through December 27 off. On April 23, 2004, I requested April 26 to be taken as a vacation day. On May 21, 2004, I requested to have May 24 to be taken as a vacation day. Ms. Wolke and I discussed the fact that I had submitted my vacation request initially in March of 2004. I never received an annual vacation request from Ms. Wolke. In April of 2004, I asked Ms. Wolke when I would be getting my annual vacation request back. Ms. Wolke told me that she would get around to it. I thereafter felt that it was necessary to place my vacation

requests in writing and get something signed back from Ms. Wolke, so I submitted "request for time off" forms for each specific vacation period.

12. On November 19, 2004, I presented Ms. Wolke with my "request for time off" form for the dates November 23 through November 30. On the same day, Ms. Wolke denied this vacation request. I stated to Ms. Wolke that I had requested this time off in my annual vacation time request form in March of 2004. Ms. Wolke did not respond other than to state that she was not giving the vacation to me.

13. Also on November 19, 2004, I went to see Ms. Lotts and told her that Ms. Wolke was denying my vacation request. I told Ms. Lotts that I for the past twenty years always requested and was always approved for Thanksgiving week off on vacation. I told Ms. Lotts that Ms. Wolke had just denied me. Ms. Lotts stated that she would look into the situation. The next day Ms. Lotts stated that Ms. Wolke had told her that I had never requested those dates in my annual vacation request form. I responded by stating, "if that was true, then why didn't she show you my annual vacation request form?" Upon hearing that, Ms. Lotts told me that she would approve the vacation request. During this conversation I reminded Ms. Lotts that this was just another example of how Ms. Wolke was not treating me correctly.

14. On December 1, 2004, I approached Ms. Wolke to inform her about a client's appointment. When I approached Ms. Wolke about the client, Ms. Wolke rudely blurted out to me that "I will not be helping you out anymore because, I am tired of you calling me a racist." I reminded Ms. Wolke that she was conversing with me on a work-related matter. Ms. Wolke told me that she did not care that it was a work-related matter and she told me to leave her alone. Ms. Wolke continued by accusing me of calling her a racist. She told me that if I kept calling her a racist "she would fix me." I took that to be a threat and a misuse of her authority

over me. I told Ms. Wolke that I did not call her a racist, but did believe that she was discriminating against me as a racist would do. I told Ms. Wolke that I felt this way based on previous incidences that had occurred between the two of them. Ms. Wolke continued to verbally threaten me. She repeated to me over and over again that "I will fix you, just wait and see." (Yi Cert., Ex. 12) These comments made me extremely upset. I was fearful as to what Ms. Wolke would do including the possibility that Ms. Wolke would take some sort of physical action to do her harm. I shared these concerned with my co-worker, Marie Watts.

15. I wrote a letter to Ms. Lotts on December 1, 2004. I specifically told Ms. Lotts that I would like to exercise my right to be protected from threats and harassment from Ms. Wolke. I reminded Ms. Lotts in this letter that I had made several verbal complaints about Ms. Wolke's behavior to me. I also mentioned that I had given Ms. Lotts a written complaint (September 28, 2004) as well. I concluded my letter by stating that I was being discriminated against by Ms. Wolke and that her threats were causing me to have anxiety attacks. (Yi Cert., Ex. 12) I contend that at this point in time, Ms. Lotts had an obligation to contact the NJDC harassment officer and inform this officer about my demand that action be taken to deal with this situation. (Yi Cert., Ex. 3) It was Ms. Lotts' obligation at this point to institute an investigation of my charges. Ms. Lotts did not respond to my letter of December 1, 2004. However, Ms. Lotts does mention in her April 4, 2005 correspondence to Maria Parchment that she had received a December 1, 2004, "Letter of Complaint." Ms. Lotts would wait three more months before she initiated an investigation regarding my racial discrimination and retaliation complaints.

16. In December of 2004, Ms. Wolke was the supervisor over six individuals at the NJDC Health Care Center Department. Three individuals were Black and three were

Caucasian. The three Black employees were I, principal clerk transcriber Shelia McCray and nurse Emma Jones. The three Caucasian employees were, nurses Donna Corrado, Michael Buongiorno and Linda Geverald. In the Fall of 2004, Mr. Fenton, the then CEO of NJDC, ordered a computer specifically for nurse Emma Jones with an instruction forwarded to Ms. Wolke that it should be given to Ms. Jones when the computer arrived. In December of 2004, the computer was delivered to the department. Despite the directive from Mr. Fenton, Ms. Wolke gave the computer to Ms. Corrado, one of the three Caucasian nurses. Interestingly enough, this non-Black nurse was an individual whose job was created by splitting off a portion of my former job duties. In other words, Ms. Corrado's job was branched from my position. And yet, Ms. Wolke found this Caucasian nurse to be more deserving of a computer than Ms. Jones, who had been promised the computer in the first place.

17.  In mid-December 2004, Ms. Wolke approached me and told me that she felt that I did not need a desk, computer or office of my own to perform my job duties. Ms. Wolke told me that I could work out of the Health Care Center's nurses' station. This made me upset and I communicated this fact verbally to Ms. Lotts in a meeting dated December 30, 2004. At this meeting, the issue of Ms. Wolke giving away Ms. Jones' computer to Ms. Corrado was also discussed. At the meeting, Ms. Wolke stated that I did not need an office, desk or computer of my own. Ms. Wolke did not see why I could not just work out of the nurses' station. Ms. Lott turned to me and said, "do not worry about it, you are not going to lose your office, computer or your desk. I will not allow that." I stated at this meeting, that this is what I was referring to, how she discriminates against me as opposed to Donna [Corrado] who is White. I said: "she thinks I'm nobody because I'm Black." I told Ms. Lotts, I told you that she treats me like she is a racist. Nurse Emma Jones then said, I know how you feel because I had an incident that

8

happened to me, where a computer that was ordered for me was given to Ms. Corrado who is White. At this point, Ms. Wolke started to break down with tears. Ms. Jones then asked her to hold in the tears and let me continue to state my concerns.

18. During the early 2000s, Ms. Lotts' predecessor, Nancy Ward, allowed me to have my time changed from 9:00 a.m. to 5:00 p.m., to 9:15 a.m. to 5:15 p.m. due to my child care situation. Ms. Ward told me that if there was an emergency, to call her and let her know. That was followed through regarding my child care issues. I was the foster parent of seven children with significant emotional disabilities. Ms. Ward and Ms. Lotts never disciplined me about any lateness because they were aware of the type of children that I was taking care of and because I always let them know when I was going to be late.

19. On February 14, 2005, I called in to let the NJDC operator know that I would be one hour late because I was dealing with an emergency at home. That morning the school where one of my foster children was attending called me to tell me that I had to come in immediately to attend a meeting about my foster child. Once I arrived at the school I realized that it might take a little longer than I expected. I then called nurse Michael Buongiorno and asked him for approval for an administrative day. Subsequently, the meeting at the school ended. I called back Mr. Buongiorno and told him that I was going to be able to come in that afternoon.

20. On February 15, 2005, I received a Written Warning signed by supervisor Carole Wolke. Ms. Wolke asserted the following in the Written Warning: "On 2/14/05 you failed to notify the operator an hour prior to the beginning of your shift of your Intended lateness. You came to work and signed in at 1:30 pm. Your shift is 9:00 a.m. – 5:00 p.m. You received a 'Red A' for the day." (Yi Cert., Ex. 3A)

21. A Five Day "Red "A" Termination Process should only be utilized when an employee calls out sick for an extended period of time without appropriate authorization. The work unit is required to follow an established procedure to either authorize the absence, return the employee to work; or to initiate the termination process. I contend that the Five Day "Red A" Termination Process was not followed and was an act of malice and retaliation on the part of Ms. Wolke.

22. In my written deposition, Ms. Wolke denies responsibility for the issuance of the Written Warning that I received on February 15, 2005. She states that she was only following the orders of Ms. Lotts. (Yi Cert., Ex. 5 at Atkinson EEO 153) Ms. Lotts does not admit that she directed Ms. Wolke to issue the Red A. Ms. Lotts mentions the word "we" which would implicate both Ms. Lotts and Ms. Wolke in this decision. (Yi. Cert., Ex. 6) After I received the Written Warning, I called Ms. Lotts and Ms. Lotts told me that Ms. Wolke had given me the Red A.

23. During the last two weeks of February 2005, I met briefly with Ms. Lotts. I told Ms. Lotts that I was not the only person who came in late. She went on to state that she was aware of incidences where Donna Corrado and Carole Wolke took extended lunches and falsified their time sheets to cover up the extra time that they took for lunch. Additionally, I told Ms. Lotts that Ms. Wolke allowed White employees to come in or go home at different times without disciplining them for their time. She also allowed Caucasian employees to have extended lunches and conduct personal activities during the work day. She never made White people feel like they were walking on egg shells as she made me and the other Black employees feel.

24. Black co-employee, Sheila McCray, asserted in her affidavit that she could validate my claims of racial harassment. This was because Ms. McCray experienced this type of treatment on various occasions where Ms. Wolke treated her differently from non-Black employees. Ms. McCray stated that Ms. Wolke would allow non-Black co-workers to come in late and sign in at their scheduled time. In other words, she would allow them to sign in as if they had arrived at work on time so that they would not be disciplined for being late. She would also allow non-Black co-workers to leave the job during work hours for personal and non-work related reasons. She would also allow non-Black co-workers extended lunch hours. She would treat Black employees less favorably. Whenever a Black employee would take lunch beyond the mandatory time limits for lunch, then Ms. Wolke would report those employees as being late. According to Ms. McCray, Ms. Wolke would alter the time of Black employee's work schedule to show that they returned to work late. She did this without notifying the Black workers of her change. She would not deduct time from non-Black employee's work schedules when they would return back from lunch beyond the specified time period. Ms. McCray affirmed that she had personal knowledge of this fact as she was the timekeeper during those years when Ms. Wolke and I worked in the same unit at NJDC.

25. On February 27, 2005, I wrote a letter to Ms. Lotts regarding the Written Warning that I received from Ms. Wolke. I advised Ms. Lotts that Ms. Wolke gave me the Written Warning in retaliation for raising my previous complaint letters of September 28, 2004 and December 1, 2004. I specifically stated that in those complaint letters, I requested protection from retaliation from Ms. Wolke. I reminded Ms. Lotts that in my complaint letter of December 1, 2004, I described in detail how Ms. Wolke repeatedly threatened me verbally using the words "I will fix you" over and over again. I reiterated again that a thorough

investigation would reveal that a lot of my rights as an employee have been violated by Ms. Wolke.) I contend that the above letter constitutes a notice to Ms. Lotts that I was being retaliated against for making my earlier written and verbal complaints of race discrimination. At this point, Ms. Lotts had an obligation to contact the NJDC harassment officer and inform this officer about my demand that action be taken to deal with this situation. (Yi Cert., Ex. 3) It was Ms. Lotts' obligation at this point to institute an investigation of my charges. Ms. Lotts did not respond to my letter of February 27, 2005. I would have to wait for several months before I learned that the Written Warning had been rescinded.

26. On February 28, 2005, I filled out a NJ Grievance Procedure Form. In my grievance form, I provided the following statement of grievance: "discrimination on PAR rating, verbal abuse, harassment, unjust Red A on my work record, written warning about Red A on my work record, false accusation and threats." I also attached a letter of even date with my grievance and sent it to the NJDC Employee Relations Office. I also complained about suffering emotional distress and headaches in connection with the above mentioned discrimination and harassment.

27. On or about March of 2005, Mr. Michael Buongiorno became my supervisor. I had known Mr. Buongiorno for a number of years. However, I allege that Mr. Buongiorno's attitude and treatment of me changed at this time. Prior to becoming my supervisor, Mr. Buongiorno was professional and never questioned me about my abilities to do work. In February of 2005, after I filed my grievance against Ms. Wolke, Mr. Buongiorno's behavior towards me changed. I could tell that he just did not want to be involved. He started micro-managing me and made it hard for me to function.

28.  By March of 2005, I was frustrated with Ms. Lotts' inability or unwillingness to address my complaints of discrimination, harassment and retaliation against Ms. Wolke. Therefore, on March 28, 2005, I filed a Discrimination Complaint with the NJ Department of Personnel. I attached a nine page letter to my complaint outlining my race discrimination complaints starting from April 2004 through March 2005.

29.  In the Spring of 2005, I went out on medical leave due to depression, stress and anxiety that I sustained in connection with the discrimination, harassment and retaliation that I suffered via the actions of Ms. Wolke and the inaction of Ms. Lotts. Upon returning from my extended sick leave in June of 2005, I communicated with Ms. Lotts and advised her that upon my return from medical leave, I did not receive all of my job duties back. I memorialized this conversation with Ms. Lotts in a letter dated June 17, 2005. In that letter, I assert that Ms. Lotts instructed me not to resume my job duties back.

30.  For the next two years, I continued my employment but I was considered an outcast, no one did any more bi-annual PAR evaluations, no one provided me with a new set of job duties, no one even supervised me. I wrote letters to the NJDC CEO Bruce Werkheiser and advised him that I was not being given work to occupy my time and that my job duties had still not been reassigned back to me. During the final two years of my employment, I was never given back any of my duties and spent most of my time sitting in my office and not having sufficient work to occupy my time.

31.  The above mentioned acts of defendant NJDC, by and through its employee, Carole Wolke, has had a significant impact on my emotional state of mind. As a direct and proximate result of Ms. Wolke's intentional and malicious following through of her promise to "fix" me, I have suffered and worked through a great deal of stress, anxiety and depression. I

was out of work for approximately fifteen months from the Spring of 2005 until my retirement date in 2007 due to the stress, anxiety and depression that I had sustained. I feel victimized, betrayed and humiliated due to all the events that I had to endure just because, in good faith, I stood up against acts of oppression and racial discrimination.

I certify that the foregoing statements made by me are true. I am fully aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: July 30, 2010

PHYLLIS ATKINSON
Pro Se Plaintiff

Sworn and Subscribed to before me on this 30th day of July, 2010

GLORIA ARMSTRONG
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 28, 2014