PHYLLIS ATKINSON, PRO SE
317 East 30 Street
Paterson, New Jersey 07504

By: Phyllis Atkinson
Pro Se, I
(973) 460-0382

RECEIVED

AUG - 2 2010

AT 8:30_____M
WILLIAM T. WALSH
CLERK

---

PHYLLIS ATKINSON

              Plaintiff,

vs.

NORTH JERSEY
DEVELOPMENTAL CENTER

              Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 06-5485 (PGS)

<u>Civil Action</u>

**CERTIFICATION OF
PHYLLIS ATKINSON IN
OPPOSITION OF MOTION
FOR SUMMARY JUDGMENT**

---

I, Phyllis Atkinson, of full age, being duly sworn according to law, hereby depose and state:

1.    I am a pro se plaintiff in the above-captioned matter.

2.    Annexed hereto as Exhibit A is a true and correct copy of the Workplace Violence Report Summary.

3.    Annexed hereto as Exhibit B is a true and correct copy of Employee Recognition dated April 24, 2000.

4.    Annexed hereto as Exhibit C is a true and correct copy of recommendation letters from Dr. Roman Chrucky and Nurse Roxanne Lotts.

5.      Annexed hereto as Exhibit D is a true and correct copy of Request for Adjusted Time to Nurse Roxanne Lotts dated April 14, 2003 with supporting documents.

6.      Annexed hereto as Exhibit E is a true and correct copy of my October 20, 2003 letter to Mrs. Lotts regarding shift change.

7.      Annexed hereto as Exhibit F is a true and correct copy of April 23, 2004 Request for Time Off, and May 21, 2004 Request for Time Off.

8.      Annexed hereto as Exhibit G is a true and correct copy of Affidavit of Phyllis Atkinson.

9.      Annexed hereto as Exhibit H is a true and correct copy of November 19, 2004 Request for Time Off.

10.     Annexed hereto as Exhibit I is a true and correct copy of Affidavit of Ms. Marie Watts.

11.     Annexed hereto as Exhibit J is a true and correct copy of Department of Human Services Internal Discrimination Complaint Procedures.

12.     Annexed hereto as Exhibit K is a true and correct copy of Affidavit of Ms. Emma Jones.

13.     Annexed hereto as Exhibit L is a true and correct copy of February 27, 2005 letter to Roxanne Lotts regarding Red A and written warning.

14.     Annexed hereto as Exhibit M is a true and correct copy of Five Day "Red A" Termination Process.

15.     Annexed hereto as Exhibit N is a true and correct copy of Affidavit of Ms. Sheila McCray.

16.     Annexed hereto as Exhibit O is a true and correct copy of letter dated February 28, 2005 to Ms. Gary Engels regarding Grievance and copy of Grievance Procedure Form.

17.     Annexed hereto as Exhibit P is a true and correct copy of letters to Bruce Werkheiser, dated December 21, 2005 and October 30, 2006.

I hereby certify that the foregoing statements made by me are true.  I understand that if any of the foregoing statements made by me are false, I am subject to punishment.


                                        PHYLLIS ATKINSON, PRO SE


Dated:  July 30, 2010

3

# EXHIBIT A



# WORKPLACE VIOLENCE REPORT SUMMARY

**I.**    **Type of Incident:**
   ❑   Physical
   ❑   Verbal
   ❑   Property Damage
   ❑   Other

**II.**    **Location of Incident:** Health Care Center

**III.**    **Involved Parties:** Phyllis Atkinson and Carole Wolke

**IV.**    **Brief Summary of Incident:** On March 2, 2005 this writer was notified by Andrew Sarchio, Human Resource Manager, of a situation that may rise to the level of Workplace Violence and/or Hostile Work environment. Mr. Sarchio indicated that he was currently sitting with Ms. Roxanne Lotts, DON, who was expressing some concerns about this situation. Mr. Sarchio indicated that he was referring this situation to my attention. The incident involves several encounter based on the documentation of Ms. Phyllis Atkinson to Roxanne Lotts expressing her concerns about the nature of her relationship with Ms. Carole Wolke, ADON. The documents in question are three memos dated September 28, 2004, December1, 2004 and February 27, 2005. Ms. Atkinson unjust treatment from Ms. Wolke as it relates to her performance evaluation, obvious favoritism, being threatened and harassed in the presence of others and being unfairly disciplined for a Red "A" day based on miscommunication.

**V.**    **Summary of Statements and Interviews:** This writer was only able to interview Ms. Wolke and Ms. Lotts, Ms. Atkinson has been out on a sick leave since this incident was brought to the attention of this office. This writer also attempted to reach out to two staff that were reported to be in the area at the time of at least one of the exchange between Ms. Atkinson and Ms. Wolke. Upon notification of this situation this writer requested any documentation from Mrs. Lotts office that spoke to the situations described in the three memos.
On March 31, 2005 this writer and Angela Palmeri met with Mrs. Wolke and Mrs. Lotts. This writer explained the reason for this meeting and the nature of the complaint that the Center was responding to. Mrs. Loots indicated that from a supervisor perspective when each of these situations was brought to her attention she did attempt to address the issues, however she was not always successful due to postponement of meeting due to sick calls and vacations. Mrs. Lotts indicated that she did have the perception after the meeting that the issues were adequately addressed. Mrs. Lotts also indicated that she has offered Ms. Atkinson the opportunity to transfer to another area on campus if she was so unhappy with her current work situation. Mrs. Lotts indicated in her effort to resolve this situation she attempted to arrange a meeting with Ms. Atkinson and her Union President, however these were failed attempts due to scheduling difficulties. Mrs. Lotts indicated that she was involved in the last incident which was

ATKINSON EEO 8

**NORTH JERSEY DEVELOPMENTAL CENTER**

**Wolke/Atkinson Addendum:**

**Summary of Statement and Interviews continue:** On August 5, 2005 Ms. Atkinson arrived at this writer's office to provide the previously requested statement on the interoffice communication that is currently in question dated June 17, 2005 directed to Mrs. Lotts, DON. This communication discussed concerns about the changes in her major job responsibilities and the scrutinisation of her daily work out-put upon her return to work. The threat in question was contained within this communication. Ms. Atkinson provided a letter and in a verbal interview with this writer indicated that her reference to a poisonous snake was not a threat on Ms. Wolke's life. Ms. Atkinson indicated that she used the statement as an analogy to express her frustration with a situation that did not appear to be getting any better after her complaints and her expressed fear of Ms. Wolke's abuse of her authority.

Ms. Atkinson indicated the choice of her words was without a doubt in poor judgment in retrospect, but she was merely trying to ensure that her voice was heard. She clearly stated that she wishes no harm to Ms. Wolke and apologized for the poor choice of her words. Ms. Atkinson further indicated that she is aware of the Center's zero tolerance for violence in the workplace and she certainly had no intention to violate that policy and jeopardize over twenty years of state service. Ms. Atkinson acknowledge how these words could be misinterpreted, and she goes on to state that she means Ms. Wolke no harm and would like this issue resolved as quickly as possible. Ms. Atkinson indicated that this has been a very stressful time for her and it is to her benefit at this issue gets resolved.

This Center was notified that Ms. Wolke's EEO/AA complaint related to this memo was not accepted, as this complaint did not meet the criteria of an EEO complaint. NJDC was advised to refer this matter to the Human Service Police for an objective review of the facts to assess criminal intent.  Mr. Werkheiser, CEO then proceeded to try to get this situation under control as quickly as possible. He faxed the memo in question to the Human Service Police for their review. Ms. Wolke was advised she was entitled to explore external systems as a means of satisfying her comfort level as it relates to this issues. Ms. Wolke was advised that Human Service Police would review the information to explore criminal intent; she was advised to discuss this matter with the Human Service Police.

On Thursday August 19th, Ms. Wolke informed this writer that she did discuss the matter with the Human Service Police; however, they did not file a complaint as they did not assess the memo as a threat on her life. Ms. Wolke did express her concerns about this situation , as in her opinion she does not get the impression that everything was done to safeguard what could be an explosive situation.

Based on Ms. Atkinson's interview, letter and the status of the relationship, it would be supported that the choice of words was not intended to be taken literally, but was a figure of speech. Ms. Atkinson has no history of violent outburst at NJDC, which would further support the premise that she used a poor choice of words. The Center will continue to take measures to safeguard both parties until this issue is resolved.

**Recommendations:**
- o   Ms. Atkinson will be returned to her office with the previous safeguards remaining; both parties will remain separate; no verbal or written interaction; Ms. Wolke will not have any

**NORTH JERSEY DEVELOPMENTAL CENTER**

direct or indirect supervision of Ms. Atkinson and both parties will report any direct contact to their immediate supervisors.

o  Ms. Lotts, DON should review the content and the poor choice of words within the memo with Ms. Atkinson and explore a verbal or written counseling due to the Center's zero tolerance for violations of the workplace violence policy.

o  Ms. Lotts, DON will ensure clarity as it relates Ms. Atkinson's work responsibilities and further ensure that there will be no excessive scrutiny of Ms. Atkinson's work performance.

o  Ms. Lotts, DON will address rumor control in a general sense at the departmental meeting.

o  Ms. Lotts, DON will remain vigilant of this situation to ensure the integrity of this investigation.

ATKINSON EEO 14

# EXHIBIT B





**Employee Recognition**

OUR MISSION

WE THE STAFF OF NJDC are committed to enriching the quality of our clients' lives and to meeting their individual needs.

We strive to provide support, open communication, leadership, and competent interaction to clients and each other.

We will insure that the NJDC community promotes fairness, dignity, respect, and an appreciation of our diversity.

**Name:** *PHYLLIS ATKINSON*                    **Date:** *April 24, 2000*

I am pleased to recognize you for being caught doing the right things by Elizabeth Keeley, LPN.  Specifically, Ms. Keeley nominated you for your willingness and support during an emergency "55" code on March 16, 2000 in the Health Care Center.  Your quick actions in supporting the team effort enabled them to give their very best care to the patient, and for the patient to remain calm was truly a blessing.

You are to be commended for your endeavors, as described above.  We want you to know that you have demonstrated the essence of the Center's Mission; your efforts are both valued and appreciated.  Activities such as these enhance the Center as an organization, contribute to the spirit of employee loyalty, and foster NJDC's commitment to being a quality Developmental Center.

Accordingly, your name will be entered into the next recognition drawing for staff and clients, *Caught Doing the Right Things*, as our acknowledgment of your commitment to the Center and the people we serve.

On behalf of the North Jersey Developmental Center Administration, and with a great sense of personal pride for your worthy deed, I again offer sincerest thanks for your special efforts.  We look forward to your continued support and participation in our continued endeavors.

Sincerely,

Gregory Fenton
Chief Executive Officer

c:  Supervisor
    Office of Personnel Services

ATKINSON PERS 411

*NJDC is an Equal Opportunity Employer*



**Employee Recognition**

OUR
MISSION

WE THE STAFF
OF NJDC,

are committed to

enriching the quality of

our clients' lives and to

meeting their individual

needs.

We strive to provide

support, open

communication,

leadership, and

competent interaction

to both clients and co-

workers.

We will insure that the

NJDC community

promotes fairness,

dignity, respect, and an

appreciation of our

diversity.

**Name:** *PHYLLIS ATKINSON*          **Date:** *September 27, 1999*

I am pleased to recognize you for being caught doing the right things by Roxanne Lotts, Director of Nursing Services.    Specifically, Ms. Lotts reported on September 17, Hurricane Floyd created a shortage of Nursing Staff and resources; however during this emergency, you worked above and beyond the call of duty. Thank you for a job well done!

You are to be commended for your endeavors, as described above.  We want you to know that you have demonstrated the essence of the Center's Mission; your efforts are both valued and appreciated.  Activities such as these enhance the Center as an organization, contribute to the spirit of employee loyalty, and foster NJDC's commitment to being a quality Developmental Center.

Accordingly, your name will be entered into the next recognition drawing for staff and clients, ***Caught Doing the Right Things***, as our acknowledgment of your commitment to the Center and the people we serve.

On behalf of the North Jersey Developmental Center Administration, and with a great sense of personal pride for your worthy deed, I again offer sincerest thanks for your special efforts.   We look forward to your continued support and participation in our continued endeavors.

Sincerely,

Gregory Fenton
Chief Executive Officer

c:  Supervisor
Office of Personnel Services

ATKINSON PERS 414

*NJDC is an Equal Opportunity Employer*





# New Jersey

# General Assembly

## Citation

Commendations and praise are extended to

### H. Atkinson

by the citizenry of the 35th New Jersey Legislative District,
through their elected representatives,
for bringing honor and pride to yourself, your family and the
community upon the completion of the
Paterson Police Departments

*"Domestic Violence Response Team Program"*

Alfred E. Steele
_____
Alfred E. Steele, Member of the General Assembly

April 10, 2003
_____
Date

Nellie Pou
_____
Nellie Pou, Member of the General Assembly




# State of New Jersey

## Community Service Award 2004

presented to

### Phyllis Atkinson

## Department of Human Services



Ida L. Castro
Commissioner, Department of Personnel

James E. McGreevey
Governor



## State of New Jersey

OFFICE OF THE GOVERNOR
PO BOX 001
TRENTON NJ 08625-0001

JAMES E. MCGREEVEY
*Governor*

June 21, 2004

Phyllis Atkinson
New Jersey Department of Human Services

Dear Phyllis:

It is my pleasure to extend warm greetings and congratulations on being selected as a recipient of the Community Service Award.

Those who dedicate their time, efforts and skills to help others are among the most valued members of any community.  Individuals who work tirelessly on behalf of and in the best interest of the greater good of the community undoubtedly impact and improve countless lives.  Public service is a worthy cause and we are all fortunate to benefit from the dedication of public servants like you.

I join with your colleagues in applauding your commitment to the citizens of our State, and I thank you for a job well done.  Best hopes for good health and much happiness in the future.

With all good wishes,

James E. McGreevey



## State of New Jersey

DEPARTMENT OF HUMAN SERVICES
PO BOX 700
TRENTON NJ 08625-0700

JAMES E. MCGREEVEY
*Governor*

JAMES M. DAVY
*Commissioner*

July 2, 2004

Phyllis Atkinson
317 East 30th Street
Paterson, NJ 07504

Dear Ms. Atikinson:

I would like to thank you for reaching out to me to introduce yourself and to offer the wisdom of your experience in rearing our children. Without a doubt, foster parents are one of our first providers of safety for children who need protection. It is unquestionably a difficult job made even harder if there is an unresponsive system of support. We hope to fix that system starting now.

I am going to accept your offer of assistance as we begin to implement the reform of our foster care system. A committee will be set up in the next couple of weeks to set up tasks and a time table to meet the goals outlined in the Child Welfare Reform Plan. The plan has been approved by the Federal Court who will oversee our progress.

Please expect a call from a representative from my office to provide you with details about the committee.

Again, thank you for your role in enhancing the lives of our children.

Sincerely,

James M. Davy
Commissioner

PeopleFIRST
NJ Department of Human Services

*New Jersey Is An Equal Opportunity Employer • Printed on Recycled Paper and Recyclable*



### State of New Jersey
#### DEPARTMENT OF HUMAN SERVICES
#### DIVISION OF YOUTH AND FAMILY SERVICES

JAMES E. MCGREEVEY
*Governor*

P.O. Box 717
*Trenton, New Jersey 08625-0717*

JAMES M. DAVY
*Commissioner*
EDWARD E. COTTON
*Assistant Commissioner*

September 2, 2004

Roxanne Lotts
Director of Nursing Services
North Jersey Developmental Center
169 Minisink Road
Totowa, New Jersey 07511

Dear Ms. Lotts:

I am writing at the request of Ms. Phyllis Atkinson who has been asked to participate in a workgroup regarding resource families for the Division of Youth and Family Services (DYFS).

As you may be aware, New Jersey's child welfare agency is in the midst of transformation. Several workgroups have been formed with a variety of stakeholders to assist DYFS through this reform.

Ms. Atkinson was recommended by Commissioner Davy's office to serve and participate in the Resource Family Training workgroup.

If you have any questions, please feel free to contact me at 609-292-9564.  Thank you.

Sincerely,

James J. Corbett
Program Support Specialist

# EXHIBIT C



# State of New Jersey
### DEPARTMENT OF HUMAN SERVICES
### DIVISION OF DEVELOPMENTAL DISABILITIES
#### NORTH JERSEY DEVELOPMENTAL CENTER

JAMES E. McGREEVEY
*Governor*

JAMES M. DAVY
*Commissioner*

BRUCE E. WERKHEISER
*Chief Executive Officer*

TEL (973) 256-1700

TDD USERS CAN CALL
THROUGH THE NJ RELAY
1-800-852-7899

*In reply, respond to:*

P.O. Box 169
TOTOWA, NJ 07511

September 17, 2004

To Whom It May Concern:

I, Dr. Chrucky, a co-worker and personal friend of Phyllis Atkinson, would like to recommend Phyllis, for the Child Protective Services Certificate of Competence.

Phyllis has received numerous awards over the years for her community service, including an award from the Governors' office.

She is presently a Foster Mother and has done an excellent job in the lives of these children.  In 1998, she was awarded outstanding Foster Mother of the year.  She also has received a number of commendations throughout her years of community service.  I highly recommend her for this program.

Sincerely,

Roman Chrucky, M. D.
Medical Director



## State of New Jersey
### DEPARTMENT OF HUMAN SERVICES
### DIVISION OF DEVELOPMENTAL DISABILITIES
#### NORTH JERSEY DEVELOPMENTAL CENTER

JAMES E. McGREEVEY
*Governor*

JAMES M. DAVY
*Commissioner*

BRUCE E. WERKHEISER
*Chief Executive Officer*

TEL (973) 256-1700

TDD USERS CAN CALL
THROUGH THE NJ RELAY
1-800-852-7899

*In reply, respond to:*

P.O. BOX 169
TOTOWA, NJ 07511

September 17, 2004

To Whom It May Concern:

I Mrs. Roxanne Lotts, Supervisor of Phyllis Atkinson, would like to recommend Phyllis for the Child Protective Services Certificate of Competence.

Phyllis has been an employee for the North Jersey Developmental Center, Department of Human Service for over (20) twenty years she is a Foster Mother for the Division of Youth and Family Service for over (15) fifteen years. Phyllis is a trained and certified First Response Team Crisis Intervention and a member of the Paterson Police Department Domestic Violence Response Team, volunteering her service to victims of domestic violence abuse. She also serves as a Chaplain, for the United Chaplain International World Wide Outreach Inc. in Newark New Jersey.

As a co-worker Phyllis has exhibit genuine commitment to her job and her community, she was appointed by Commissioner Davy to serve and participate in The Resource Family Training Workgroup for the New Jersey's child welfare agency.

She has received a number of commendations including a Foster Mother of the year award from the Division of Youth and Family Service, and a Community Service award from the Governors' Office. I highly recommend her for this program.

Sincerely,

Roxanne Lotts, RN
Director of Nursing Services

*New Jersey Is An Equal Opportunity Employer • Printed on Recycled Paper and Recyclable*

# EXHIBIT D

April 14, 2003

**TO:** Roxanne Lotts, RN, DON
**From:** Phyllis Atkinson, Secretary
**SUBJECT:** Request for Adjusted Time

Dear Roxanne,

As you are well aware I am the foster mother to seven children.
(2) 1 year old

|       |            |
|-------|------------|
| (1)   | 4 year old |
| (1)   | 5 year old |
| (1)   | 6 year old |
| (1)   | 11 year old |
| (1)   | 12 year old |

These children require special emotional needs along with behavioral issues that must be dealt with on a daily basis. I am required and often attend meetings in the early morning at the children's school. I often have to meet with the Child Study Team (CST), sit in counseling, Social Workers, Case Managers, Law by Guardians, Judges and even make court appearances. Not to mention just trying to get through the morning chaos of just getting out the door for a normal school day ( hair, getting them dressed, feeding etc.).

I am requesting a 2 hour adjusted duty time. My normal work hours are from 9:00am to 5:00pm. I would like to work from 11:00am to 7:00pm.

Your anticipated cooperation is greatly appreciated.

Respectfully,

Phyllis Atkinson

Copy

# DR. MARTIN LUTHER KING, JR. ELEMENTARY SCHOOL
## 851 EAST 28TH STREET
## PATERSON, NEW JERSEY 07513

### OFFICE REFERRAL

STUDENT _Akeem Young_ GRADE _3_ ROOM # _217_

ADDRESS _317 E 30th Street_ _07513_
        NUMBER/STREET                    ZIP CODE

PARENT'S NAME _Phyllis Atkinson_ TELEPHONE # _256-1700_

_C.Turi_ , _C.Turi_                              X 4146

HOMEROOM TEACHER          REPORTING TEACHER

### ACTION OF STUDENT

X CONTINUOUSLY LATE TO CLASS
__ ABSENT FROM CLASS WITHOUT PERMISSION
__ ABUSIVE, DISRESPECTFUL LANGUAGE OR GESTURES
__ LOITERING IN HALLS
__ FIGHTING
__ MISCONDUCT ON PLAYGROUND
X DANGEROUS HORSEPLAY IN CLASS/HALL
__ IMPROPER ATTIRE

X CONTINUOUSLY DISRUPTIVE
__ DEFACING SCHOOL PROPERTY
X CONTINUOUS/WILLFUL DISOBEDIENCE
X REFUSAL TO FOLLOW TEACHER DIRECTIONS
__ DEFIANCE OF AUTHORITY

TEACHER COMMENTS/BRIEF DESCRIPTION OF INCIDENT:

_Akeem would not stop whistling. He was disturbing the class. He was very rude and disrespectful all day. He made very disturbing comments at the end of the day. He said one day he was going to shoot_

### ACTION PREVIOUSLY TAKEN BY TEACHER

X REPEATED WARNINGS
X PARENTAL CONTACT
X ADMINISTRATIVE REFERRAL
__ NONE(EXPLAIN)

X REPRIMAND
X COUNSELOR REFERRAL _Mrs. Downi..._
__ OTHER(EXPLAIN)

_He also said he wanted to shoot me and my student teacher, Ms. Lair._

### ADMINISTRATIVE DISPOSITION

__ SET UP PARENTAL CONFERENCE   __ PARENT PHONE CALL   __ SUSPENSION
__ OTHER(SEE BELOW)

_He got mad because he couldn't get his way._

Mr. Conforth,

Akeem said
he was going
to fu__ me
up and he
keeps telling
the class to
shut the fu__
up. He keeps →
whistling and __



## State of New Jersey

DEPARTMENT OF HUMAN SERVICES
DIVISION OF YOUTH AND FAMILY SERVICES
Northern Region Adoption Resource Center
22 Mill Street * Paterson, New Jersey * 07501
(973) 742-0063

JAMES E. MCGREEVEY
*Governor*

GWENDOLYN L. HARRIS
*Commissioner*

DORIS JONES
*Acting Director*

July 24, 2002

Phyllis Atkinson
317 East 30th Street
Paterson, NJ 07501

Dear Ms. Atkinson:

I have tried several times to reach you by telephone, both at work and at home.  It has been recommended that a bonding evaluation between you, Kavon and Ivory be completed before a decision can be made as to the Division's plan for Kavon & Ivory.

The bonding evaluation may help with getting approval for Kavon to be placed in long term foster care.  The Division is not willing to separate Kavon & Ivory and a bonding evaluation could help favor your desire for Kavon to be placed in long term foster care.

Dr. Williams will be conducting this evaluation, as he has already completed the psychological evaluations with Kavon and Ivory.  Dr. Williams is available to come to the **Division office** on **August 16, 2002** at **12:00 p.m**.  I am aware of your work schedule and understand that you may have to alter your work schedule to attend this appointment. The evaluation will take no more than hour and can probably be completed on your lunch hour.

Please contact me immediately upon receipt of this letter so that I can formally schedule this appointment with Dr. Williams or reschedule if this appointment is not convenient for you.  I thank you in advance for your cooperation.

*New Jersey Is An Equal Opportunity Employer  ●  Printed on Recycled Paper and Recyclab¹*

I can be reached at 1-800-392-2658, extension 2062. If I am unavailable please contact my supervisor, George Ann Barkley, at extension 2024.

Sincerely,

Amy Curcio
Family Service Specialist II

George Ann Barkley
Supervising Family Service
Specialist

# EXHIBIT E

DATE:      October 20, 2003

TO:        Mrs Lotts, DNS

FROM:      PHYLLIS ATKINSON, PCT

RE :       SHIFT CHANGE

I am presently scheduled to be on duty at 9:00 and off at 5pm, but due to circumstances, concerning the necessary care of my children who are mentally and physically challenge, and an elderly aunt, who suffers from Alzheimer. I am finding it quite difficult to meet my scheduled work time, often times in the early a.m. I have to meet with teachers social workers and go to the hospital in order to meet the needs of my kids and aunt

I am now finding it almost impossible to meet my present work time.
Which leads me to my request, for a one-hour shift change.

I am requesting that my shift be change to 10:00 to 6pm

 I am confident that I can adjust to this new time without any problems. I apologize for any inconvenience that this may have cause you.

# EXHIBIT F

## NORTH JERSEY DEVELOPMENTAL CENTER

### REQUEST FOR TIME OFF

__EMPLOYEE__

NAME: _Phyllis Atkinson_   DIVISION: _____   DATE: _4/23/04_

UNIT: _1_

Dates Requested: _4/26/04_   THRU   _4/27/04_

| Charge | Balance | | Requested | | Remaining |
|---|---|---|---|---|---|
| ☑ Vacation Leave – In Hours | _____ | - | _7_ | = | _____ |
| ☐ Compensatory Time – In Hours | _____ | - | _____ | = | _____ |
| ☐ Sick Leave – In Hours | _____ | - | _____ | = | _____ |
| ☐ Administrative Leave – In Hours | _____ | - | _____ | = | _____ |
| ☐ Release – In Hours | N/A | | _____ | | N/A |

Purpose of Release: _____

_____

During my absence _____  Ext No. _____  Will be in charge

__SUPERVISOR__

DATE: _4/23/04_

Approved: _Carole Wolfe Rn ADON_

(signature)

Denied: _____

(signature)

Reason for Denial: _____

_____

# NORTH JERSEY DEVELOPMENTAL CENTER

# REQUEST FOR TIME OFF

**EMPLOYEE**

DATE: 5/21/04

NAME: Phyllis Atkinson   DIVISION: _____   UNIT: 1

DATES REQUESTED: 5/24/04

| CHARGE | BALANCE | | REQUESTED | | REMAINING |
|---|---|---|---|---|---|
| ☒ Vacation Leave – In Hours: | _____ | - | 7 | - | _____ |
| ☐ Compensatory Time – In Hours: | _____ | - | _____ | - | _____ |
| ☐ Sick Leave – In Hours: | _____ | - | _____ | - | _____ |
| ☐ Administrative Leave – In Hours: | _____ | - | _____ | - | _____ |
| ☐ Release – In Hours: | N/A | | | | N/A |

Purpose of Release: _____

During My Absence _____ Ext. # _____ Will Be In Charge

**SUPERVISOR**

DATE: 5/21/04

APPROVED: _Carole Walker RN_
{SIGNATURE}

DENIED: _____
{SIGNATURE}

REASON FOR DENIAL: _____

# EXHIBIT G

PHYLLIS ATKINSON, PRO SE
317 East 30 Street
Paterson, New Jersey 07504

By: Phyllis Atkinson
Pro Se, I
(973) 460-0382


# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# VICINAGE OF NEWARK


PHYLLIS ATKINSON           :
                                         :
                                         :     Hon. Peter G. Sheridan
                                         :     United States District Judge
              Plaintiff,         :
                                           :     Civil Action No. 06-5485 (PGS)
vs.                                         :
                                           :     **AFFIDAVIT OF PHYLLIS ATKINSON**
                                           :
NORTH JERSEY                       :
DEVELOPMENTAL CENTER     :
                                           :
             Defendant.         :
                                           :


I, Phyllis Atkinson, of full age, being duly sworn upon my oath, appear and say:

1.      I am the pro se plaintiff in this matter and have personal knowledge of the facts to this litigation.  I am supplying this Affidavit in opposition to defendant's motion for summary judgment.

2.      I became employed with the NJDC in 1980.  During the first twenty-four years of my service with the organization, I had been praised and received many commendations both from the NJDC and other levels of local and state government.  I received two letters of

employee recognition from NJDC CEO Gregory Fenton in 1999 and 2000. I received a citation from the General Assembly of the State of New Jersey in April of 2003. I received a NJ Community Service Award from the Dept. of Human Services in 2004. In July of 2004, I was chosen by Dept. of Human Services Commissioner, James M. Davy to participate in a workgroup regarding resource families for the Division of Youth and Family Services.

3.    On September 17, 2004, I received two letters of recommendation in connection with my application into an educational program. Upon the successful completion of this course, I would obtain a Child Protective Services Certificate of Competence. These letters were written by NJDC Medical Director Roman Chrucky, M.D. and Director of Nursing Services, Roxanne Lotts, RN.

4.    Upon Ms. Lotts becoming the head of my department, I advised her of the fact that I was the foster mother of seven children. I notified Ms. Lotts of the fact that all seven of my foster children were emotionally disturbed. These children required special emotional needs along with having behavioral issues that had to be dealt with on a daily basis. I supplied Ms. Lotts with documentation regarding the seven foster children that I cared for. This was the reason why I frequently requested flexibility in my scheduled working start time. Up until my initial complaint of September 28, 2004, Ms. Lotts and the other supervisors who had authority over me were cognizant and compassionate about my requests for flexibility in my work schedule.

5.    Ms. Wolke provided in her written deposition that it was NJDC practice that annual vacation requests were to be submitted by employees to their supervisors no later than March 15, 2004. Defendant provides no policy that supports Ms. Wolke's contention. I assert that Ms. Wolke's own actions contradict the response provided in her written deposition. On

2

two occasions in 2004, Ms. Wolke approved vacation requests which had been submitted by me on dates subsequent to March 15, 2004. The only difference between these two vacation requests and my vacation request in November 2004 is that Ms. Wolke's denial of the vacation request took place after I presented Ms. Lotts with my discrimination complaint letter of September 28, 2004.

6.      My interim PAR for 2003-2004 was a score of 27. Atkinson Cert., Exhibit 1 at Atkinson EEO 52. That was the last PAR score given to me before Ms. Wolke became my supervisor. After I received a PAR score of 24 from Ms. Wolke in April of 2004, I asked Donna Corrado if Ms. Wolke did her PAR. Ms. Corrado said yes. I then asked Ms. Corrado did Ms. Wolke drop your score at all. Ms. Corrado told me that her score had not been dropped. I then approached Ms. Wolke and directly asked her why she reduced my PAR rating. Ms. Wolke's response was that she reduced it because she could. While she was saying this, she shrugged. I mentioned to Ms. Wolke that when my previous supervisor did my PAR she rated me fairly. Ms. Wolke's response was "I don't care I rate differently." I then asked Ms. Wolke if she had a problem with my work performance. Ms. Wolke said that there had been a few problems. I asked her if she could be more specific. Ms. Wolke did not respond.

7.      On or about May 2004, I began asking Ms. Lotts for a meeting with her to discuss my PAR rating. Ms. Lotts said, okay, I'll get to it. I kept on asking her and Ms. Lotts kept on putting it off. I assert that at no time did Ms. Lotts schedule a meeting that I said she could not attend. Finally, in September of 2004, I wrote my complaint letter.

8.      In September after I delivered my September 28, 2004 letter, or in the beginning of October of 2004, I met with Ms. Lotts to discuss my letter. I told her about my conversation

3

with Ms. Wolke, and she told Ms. Lotts that she did not understand why Ms. Wolke reduced my PAR considering all of the work that I completed. I asserted that the job that Ms. Corrado now had was a position that I use to perform, on top of the other duties that I still was responsible for. I did not understand how Ms. Wolke could lower my PAR score and yet, not change Ms. Corrado's PAR score even though Ms. Corrado did much less volume of work than I did. I told Ms. Lotts that I thought that Ms. Wolke was treating me differently from Ms. Corrado due to the fact that she favors Ms. Corrado because she was Caucasian and I was Black. I also stated that I overheard Ms. Wolke stating that Ms. Corrado's position was much more important than the job that I was responsible for. When those duties had been part of my job responsibilities, Ms. Wolke never acknowledged my work as anything special. But now that a White employee had the duties, suddenly Ms. Wolke was telling others that Ms. Corrado needed a new computer, a new desk and her own office.

9.      Shortly after Ms. Lotts and I met, on or about October 2004, I met with Ms. Lotts, and Ms. Wolke to discuss my letter of September 28, 2004. Ms. Wolke stated that the reason why my score was reduced was because I was not up to date with the data sheet input. In response, I went over all of my work duties and explained that the entry of data sheet input had never been a priority and that other events such as preparing medical calendar, scheduling appointment, making medical transportation arrangements and answering telephones were a priority over the entry of data into the computer. I also stated that when important data information comes in, such as change of address, change of guardianship or change of telephone number, I always kept that information up to date because that was important information to have at hand. Additionally, all new patient information was immediately placed in a notebook that was created and was available to all of the nurses. This information was

subsequently placed in the computer system when I had time to do so. Ms. Lotts then asked, when do you think that you'll be able to work on the data sheets? I responded by asking if it were possible to get overtime to focus on only data sheets. Ms. Lotts said yes, I could do that and to let her know when I was planning to work overtime. Thereafter, I worked approximately two to three hours a week overtime just focusing on data sheets. Then I went over the complaints that I placed in my letter.

10.    Also during this same meeting, and in front of Ms. Lotts and Ms. Wolke, I stated that Carole was treating Donna Corrado, who is White better than me, because Donna received a better PAR score. I stated that I felt offended and that Ms. Wolke made me feel like Ms. Wolke was a racist and was discriminating against me. At this point, Ms. Wolke started crying and said that it hurts her when I tell everyone that she's a racist. I responded that I did not tell anyone other than Ms. Lotts and I told Ms. Lotts that Ms. Wolke does not treat me the same way that she treats Ms. Corrado, who is White. I stated that Ms. Wolke degrades me as if I was a "nobody", and she treats other employees in the department with respect.

11.    On or about March 22, 2004, I filled out my annual vacation time request form. I requested November 23 through November 30 off for vacation. I also requested to have December 23 through December 27 off. On April 23, 2004, I requested April 26 to be taken as a vacation day. On May 21, 2004, I requested to have May 24 to be taken as a vacation day. Ms. Wolke and I discussed the fact that I had submitted my vacation request initially in March of 2004. I never received an annual vacation request from Ms. Wolke. In April of 2004, I asked Ms. Wolke when I would be getting my annual vacation request back. Ms. Wolke told me that she would get around to it. I thereafter felt that it was necessary to place my vacation

5

requests in writing and get something signed back from Ms. Wolke, so I submitted "request for time off" forms for each specific vacation period.

12.    On November 19, 2004, I presented Ms. Wolke with my "request for time off" form for the dates November 23 through November 30.  On the same day, Ms. Wolke denied this vacation request.  I stated to Ms. Wolke that I had requested this time off in my annual vacation time request form in March of 2004.  Ms. Wolke did not respond other than to state that she was not giving the vacation to me.

13.    Also on November 19, 2004, I went to see Ms. Lotts and told her that Ms. Wolke was denying my vacation request.  I told Ms. Lotts that I for the past twenty years always requested and was always approved for Thanksgiving week off on vacation.  I told Ms. Lotts that Ms. Wolke had just denied me.  Ms. Lotts stated that she would look into the situation. The next day Ms. Lotts stated that Ms. Wolke had told her that I had never requested those dates in my annual vacation request form.  I responded by stating, "if that was true, then why didn't she show you my annual vacation request form?"  Upon hearing that, Ms. Lotts told me that she would approve the vacation request.  During this conversation I reminded Ms. Lotts that this was just another example of how Ms. Wolke was not treating me correctly.

14.    On December 1, 2004, I approached Ms. Wolke to inform her about a client's appointment.  When I approached Ms. Wolke about the client, Ms. Wolke rudely blurted out to me that "I will not be helping you out anymore because, I am tired of you calling me a racist." I reminded Ms. Wolke that she was conversing with me on a work-related matter.  Ms. Wolke told me that she did not care that it was a work-related matter and she told me to leave her alone.  Ms. Wolke continued by accusing me of calling her a racist.  She told me that if I kept calling her a racist "she would fix me."  I took that to be a threat and a misuse of her authority

over me.  I told Ms. Wolke that I did not call her a racist, but did believe that she was discriminating against me as a racist would do.  I told Ms. Wolke that I felt this way based on previous incidences that had occurred between the two of them.  Ms. Wolke continued to verbally threaten me.  She repeated to me over and over again that "I will fix you, just wait and see." (Yi Cert., Ex. 12)  These comments made me extremely upset.  I was fearful as to what Ms. Wolke would do including the possibility that Ms. Wolke would take some sort of physical action to do her harm.  I shared these concerned with my co-worker, Marie Watts.

15.   I wrote a letter to Ms. Lotts on December 1, 2004.  I specifically told Ms. Lotts that I would like to exercise my right to be protected from threats and harassment from Ms. Wolke.  I reminded Ms. Lotts in this letter that I had made several verbal complaints about Ms. Wolke's behavior to me.   I also mentioned that I had given Ms. Lotts a written complaint (September 28, 2004) as well.  I concluded my letter by stating that I was being discriminated against by Ms. Wolke and that her threats were causing me to have anxiety attacks. (Yi Cert., Ex. 12)  I contend that at this point in time, Ms. Lotts had an obligation to contact the NJDC harassment officer and inform this officer about my demand that action be taken to deal with this situation.  (Yi Cert., Ex. 3)  It was Ms. Lotts' obligation at this point to institute an investigation of my charges.  Ms. Lotts did not respond to my letter of December 1, 2004. However, Ms. Lotts does mention in her April 4, 2005 correspondence to Maria Parchment that she had received a December 1, 2004, "Letter of Complaint."  Ms. Lotts would wait three more months before she initiated an investigation regarding my racial discrimination and retaliation complaints.

16.   In December of 2004, Ms. Wolke was the supervisor over six individuals at the NJDC Health Care Center Department.   Three individuals were Black and three were

7

Caucasian. The three Black employees were I, principal clerk transcriber Shelia McCray and nurse Emma Jones. The three Caucasian employees were, nurses Donna Corrado, Michael Buongiorno and Linda Geverald. In the Fall of 2004, Mr. Fenton, the then CEO of NJDC, ordered a computer specifically for nurse Emma Jones with an instruction forwarded to Ms. Wolke that it should be given to Ms. Jones when the computer arrived. In December of 2004, the computer was delivered to the department. Despite the directive from Mr. Fenton, Ms. Wolke gave the computer to Ms. Corrado, one of the three Caucasian nurses. Interestingly enough, this non-Black nurse was an individual whose job was created by splitting off a portion of my former job duties. In other words, Ms. Corrado's job was branched from my position. And yet, Ms. Wolke found this Caucasian nurse to be more deserving of a computer than Ms. Jones, who had been promised the computer in the first place.

17.    In mid-December 2004, Ms. Wolke approached me and told me that she felt that I did not need a desk, computer or office of my own to perform my job duties. Ms. Wolke told me that I could work out of the Health Care Center's nurses' station. This made me upset and I communicated this fact verbally to Ms. Lotts in a meeting dated December 30, 2004. At this meeting, the issue of Ms. Wolke giving away Ms. Jones' computer to Ms. Corrado was also discussed. At the meeting, Ms. Wolke stated that I did not need an office, desk or computer of my own. Ms. Wolke did not see why I could not just work out of the nurses' station. Ms. Lott turned to me and said, "do not worry about it, you are not going to lose your office, computer or your desk. I will not allow that." I stated at this meeting, that this is what I was referring to, how she discriminates against me as opposed to Donna [Corrado] who is White. I said: "she thinks I'm nobody because I'm Black." I told Ms. Lotts, I told you that she treats me like she is a racist. Nurse Emma Jones then said, I know how you feel because I had an incident that

happened to me, where a computer that was ordered for me was given to Ms. Corrado who is White. At this point, Ms. Wolke started to break down with tears. Ms. Jones then asked her to hold in the tears and let me continue to state my concerns.

18.      During the early 2000s, Ms. Lotts' predecessor, Nancy Ward, allowed me to have my time changed from 9:00 a.m. to 5:00 p.m., to 9:15 a.m. to 5:15 p.m. due to my child care situation. Ms. Ward told me that if there was an emergency, to call her and let her know. That was followed through regarding my child care issues. I was the foster parent of seven children with significant emotional disabilities. Ms. Ward and Ms. Lotts never disciplined me about any lateness because they were aware of the type of children that I was taking care of and because I always let them know when I was going to be late.

19.      On February 14, 2005, I called in to let the NJDC operator know that I would be one hour late because I was dealing with an emergency at home. That morning the school where one of my foster children was attending called me to tell me that I had to come in immediately to attend a meeting about my foster child. Once I arrived at the school I realized that it might take a little longer than I expected. I then called nurse Michael Buongiorno and asked him for approval for an administrative day. Subsequently, the meeting at the school ended. I called back Mr. Buongiorno and told him that I was going to be able to come in that afternoon.

20.      On February 15, 2005, I received a Written Warning signed by supervisor Carole Wolke. Ms. Wolke asserted the following in the Written Warning: "On 2/14/05 you failed to notify the operator an hour prior to the beginning of your shift of your Intended lateness. You came to work and signed in at 1:30 pm. Your shift is 9:00 a.m. – 5:00 p.m. You received a 'Red A' for the day." (Yi Cert., Ex. 3A)

21.    A Five Day "Red "A" Termination Process should only be utilized when an employee calls out sick for an extended period of time without appropriate authorization. The work unit is required to follow an established procedure to either authorize the absence, return the employee to work; or to initiate the termination process. I contend that the Five Day "Red A" Termination Process was not followed and was an act of malice and retaliation on the part of Ms. Wolke.

22.    In my written deposition, Ms. Wolke denies responsibility for the issuance of the Written Warning that I received on February 15, 2005. She states that she was only following the orders of Ms. Lotts. (Yi Cert., Ex. 5 at Atkinson EEO 153) Ms. Lotts does not admit that she directed Ms. Wolke to issue the Red A. Ms. Lotts mentions the word "we" which would implicate both Ms. Lotts and Ms. Wolke in this decision. (Yi Cert., Ex. 6) After I received the Written Warning, I called Ms. Lotts and Ms. Lotts told me that Ms. Wolke had given me the Red A.

23.    During the last two weeks of February 2005, I met briefly with Ms. Lotts. I told Ms. Lotts that I was not the only person who came in late. She went on to state that she was aware of incidences where Donna Corrado and Carole Wolke took extended lunches and falsified their time sheets to cover up the extra time that they took for lunch. Additionally, I told Ms. Lotts that Ms. Wolke allowed White employees to come in or go home at different times without disciplining them for their time. She also allowed Caucasian employees to have extended lunches and conduct personal activities during the work day. She never made White people feel like they were walking on egg shells as she made me and the other Black employees feel.

24.     Black co-employee, Sheila McCray, asserted in her affidavit that she could validate my claims of racial harassment.  This was because Ms. McCray experienced this type of treatment on various occasions where Ms. Wolke treated her differently from non-Black employees.  Ms. McCray stated that Ms. Wolke would allow non-Black co-workers to come in late and sign in at their scheduled time.  In other words, she would allow them to sign in as if they had arrived at work on time so that they would not be disciplined for being late.  She would also allow non-Black co-workers to leave the job during work hours for personal and non-work related reasons.  She would also allow non-Black co-workers extended lunch hours.  She would treat Black employees less favorably.  Whenever a Black employee would take lunch beyond the mandatory time limits for lunch, then Ms. Wolke would report those employees as being late.  According to Ms. McCray, Ms. Wolke would alter the time of Black employee's work schedule to show that they returned to work late.  She did this without notifying the Black workers of her change.  She would not deduct time from non-Black employee's work schedules when they would return back from lunch beyond the specified time period.  Ms. McCray affirmed that she had personal knowledge of this fact as she was the timekeeper during those years when Ms. Wolke and I worked in the same unit at NJDC.

25.     On February 27, 2005, I wrote a letter to Ms. Lotts regarding the Written Warning that I received from Ms. Wolke.  I advised Ms. Lotts that Ms. Wolke gave me the Written Warning in retaliation for raising my previous complaint letters of September 28, 2004 and December 1, 2004.  I specifically stated that in those complaint letters, I requested protection from retaliation from Ms. Wolke.  I reminded Ms. Lotts that in my complaint letter of December 1, 2004, I described in detail how Ms. Wolke repeatedly threatened me verbally using the words "I will fix you" over and over again.  I reiterated again that a thorough

11

investigation would reveal that a lot of my rights as an employee have been violated by Ms. Wolke.)   I contend that the above letter constitutes a notice to Ms. Lotts that I was being retaliated against for making my earlier written and verbal complaints of race discrimination. At this point, Ms. Lotts had an obligation to contact the NJDC harassment officer and inform this officer about my demand that action be taken to deal with this situation.  (Yi Cert., Ex. 3) It was Ms. Lotts' obligation at this point to institute an investigation of my charges.  Ms. Lotts did not respond to my letter of February 27, 2005.  I would have to wait for several months before I learned that the Written Warning had been rescinded.

26.     On February 28, 2005, I filled out a NJ Grievance Procedure Form.   In my grievance form, I provided the following statement of grievance: "discrimination on PAR rating, verbal abuse, harassment, unjust Red A on my work record, written warning about Red A on my work record, false accusation and threats."  I also attached a letter of even date with my grievance and sent it to the NJDC Employee Relations Office.  I also complained about suffering emotional distress and headaches in connection with the above mentioned discrimination and harassment.

27.     On or about March of 2005, Mr. Michael Buongiorno became my supervisor.  I had known Mr. Buongiorno for a number of years.  However, I allege that Mr. Buongiorno's attitude and treatment of me changed at this time.   Prior to becoming my supervisor, Mr. Buongiorno was professional and never questioned me about my abilities to do work.   In February of 2005, after I filed my grievance against Ms. Wolke, Mr. Buongiorno's behavior towards me changed.  I could tell that he just did not want to be involved.  He started micro-managing me and made it hard for me to function.

28.    By March of 2005, I was frustrated with Ms. Lotts' inability or unwillingness to address my complaints of discrimination, harassment and retaliation against Ms. Wolke. Therefore, on March 28, 2005, I filed a Discrimination Complaint with the NJ Department of Personnel. I attached a nine page letter to my complaint outlining my race discrimination complaints starting from April 2004 through March 2005.

29.    In the Spring of 2005, I went out on medical leave due to depression, stress and anxiety that I sustained in connection with the discrimination, harassment and retaliation that I suffered via the actions of Ms. Wolke and the inaction of Ms. Lotts. Upon returning from my extended sick leave in June of 2005, I communicated with Ms. Lotts and advised her that upon my return from medical leave, I did not receive all of my job duties back. I memorialized this conversation with Ms. Lotts in a letter dated June 17, 2005. In that letter, I assert that Ms. Lotts instructed me not to resume my job duties back.

30.    For the next two years, I continued my employment but I was considered an outcast, no one did any more bi-annual PAR evaluations, no one provided me with a new set of job duties, no one even supervised me. I wrote letters to the NJDC CEO Bruce Werkheiser and advised him that I was not being given work to occupy my time and that my job duties had still not been reassigned back to me. During the final two years of my employment, I was never given back any of my duties and spent most of my time sitting in my office and not having sufficient work to occupy my time.

31.    The above mentioned acts of defendant NJDC, by and through its employee, Carole Wolke, has had a significant impact on my emotional state of mind. As a direct and proximate result of Ms. Wolke's intentional and malicious following through of her promise to "fix" me, I have suffered and worked through a great deal of stress, anxiety and depression. I

was out of work for approximately fifteen months from the Spring of 2005 until my retirement

date in 2007 due to the stress, anxiety and depression that I had sustained.  I feel victimized,

betrayed and humiliated due to all the events that I had to endure just because, in good faith, I

stood up against acts of oppression and racial discrimination.

I certify that the foregoing statements made by me are true.  I am fully aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated:  July 30, 2010

PHYLLIS ATKINSON
Pro Se Plaintiff




Sworn and Subscribed to before me on
this 30th day of July, 2010


**GLORIA ARMSTRONG**
**NOTARY PUBLIC OF NEW JERSEY**
**MY COMMISSION EXPIRES JULY 28, 2014**

14

# EXHIBIT H

## NORTH JERSEY DEVELOPMENTAL CENTER

### REQUEST FOR TIME OFF

**EMPLOYEE**

NAME: _Phyllis Atkinson_   DIVISION: _____   **DATE:** _11/19/04_

UNIT: _____

Dates Requested: _11/24/04      11/23/04      11/29/04      11/30/04_

| Charge | Balance | | Requested | Remaining |
|---|---|---|---|---|
| ☐ Vacation Leave — In Hours | _____ | - _____ | = _____ | _____ |
| ☒ Compensatory Time — In Hours | _____ | - _____ | = _____ | _____ |
| ☐ Sick Leave — In Hours | _____ | - _____ | = _____ | _____ |
| ☐ Administrative Leave — In Hours | _____ | - _____ | = _____ | _____ |
| ☐ Release — In Hours | N/A | | _____ | N/A |

Purpose of Release: _Workday_

During my absence _____   Ext No. _____   Will be in charge _____

---

**SUPERVISOR**

**DATE:** _11/19/04_

Approved: _____

Denied: _Carole Wolfe_ _____ (signature)

(signature)

Reason for Denial: _____

# EXHIBIT I

PHYLLIS ATKINSON, PRO SE
317 East 30 Street
Paterson, New Jersey 07504

By: Phyllis Atkinson
Pro se, Plaintiff
(973) 460-0382

U.S. DISTRICT COURT

2010 MAR -5  P 3: 51

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
VICINAGE OF NEWARK

PHYLLIS ATKINSON                      :
                                      :
                                      :        Hon. Peter G. Sheridan
                                      :        United States District Judge
              Plaintiff,              :
                                      :        CIVIL ACTION NO. 06-5485 (PGS)
       vs.                            :
                                      :        **AFFIDAVIT OF MS. MARIE WATTS**
NORTH JERSEY                          :
DEVELOPMENTAL CENTER and :
CAROLE WOLKE                          :
                                      :
              Defendant.              :
                                      :

I, MARIE WATTS, of full age, being duly sworn upon my oath,
appear and say:

1.    I am a retired African American female employee of the North
Jersey Developmental Center (hereinafter "NJDC").

2.    I have been employed at the NJDC as a LPN Nurse on the 3rd
shift.  I worked under the supervision of Mrs. Carol Wolke.

3.    I worked under the management of Mrs. Carol Wolke, Assisting
Director of Nursing Services during the same period of time that
plaintiff; Phyllis Atkinson was employed for NJDC and reporting to
Ms. Wolke.

4.   I can confirm that on one occasion, Mrs. Atkinson came to me while she was clearly upset.   Mrs. Atkinson relayed to me a statement which she told me that Mrs. Wolke had just made to her.

5.   Mrs. Atkinson told me that Mrs. Wolke told her "I will fix you one way or another."

6.   As an experienced LPN, I recognized immediately, that Mrs. Atkinson was in a significant emotional and tearful state when she verbalized this information.   Mrs. Atkinson appeared to be fearful of Mrs. Wolke and the possibility that Mrs. Wolke would take some physical action to do her harm.

7.   At that time, I advised Mrs. Atkinson that she should report this incident to Mrs. Lotts, Director of Nursing Services.   I also recommended that she contact employee's relation department so that they could schedule her for counseling to help her with her emotional state.

I swear and affirm that the foregoing statements made by true.   I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_Marie Watts_
MARIE WATTS

Sworn and subscribed to before
me this 4ᵗʰ day of March, 2010

2



EDDY PIERRE
Notary Public
State of New Jersey
My commission expires January 15, 2014

# EXHIBIT J

DEPARTMENT OF HUMAN SERVICES
INTERNAL DISCRIMINATION COMPLAINT PROCEDURES

The following procedures are to be followed to address workplace discrimination complaints and prohibited activities outlined in the Governor's policy issued December 16, 1999 with Executive Order No. 106.

1. All employees have the right and are encouraged to immediately report suspected violations of the State Policy Prohibiting Discrimination, Harassment or Hostile Environments in the Workplace (N.J.A.C. 4A:7-3.1).

2. Employees can report incidents of discrimination to the appropriate Equal Employment Opportunity (EEO) office for their geographic region* or to any supervisory employee at the facility, office or unit.

| | |
|---|---|
| *Northern Region EEO Office<br>(973) 648-3237 | Offices/Facilities in: Bergen, Essex, Hudson, Hunterdon, Morris, Passaic, Sussex and Warren Counties |
| *Central Region EEO Office<br>(609) 292-5807 | Offices/Facilities in: Burlington, Mercer, Middlesex, Monmouth, Ocean, Somerset and Union Counties |
| *Southern Region EEO Office<br>(609) 561-7250 ext. 1 | Offices/Facilities in: Atlantic, Camden, Cape May, Cumberland, Gloucester and Salem Counties |

3. Employees should make every effort to report complaints promptly. Delays in reporting may not only hinder a proper investigation, but may also unnecessarily subject the victim to continued unlawful conduct.

4. Supervisory employees should immediately report all alleged violations of the State Policy Prohibiting Discrimination, Harassment or Hostile Environments in the Workplace, whether reported by an employee or observed directly, to the Regional EEO Office for the office/Facility.

5. If reporting a complaint to any of the persons set forth above presents a conflict of interest, the complaint may be filed directly with the Department of Personnel, Division of EEO/AA, P.O. Box 315, Trenton, NJ 08625. An example of such a conflict would be where the individual against whom the complaint is made is involved in the intake, investigative or decision making process.

6. While not mandatory, in order to facilitate a prompt, thorough and impartial investigation, all complainants should fill out a Discrimination Complaint Processing Form (DPF-481). [Complaint Form]

7. The Assistant Commissioner Human Resources will issue a final determination letter to all parties, giving the results of the investigation and any remedial steps taken. The division of EEO/AA, Department of Personnel, shall be furnished with a copy of the complaint and the final letter of determination.

8. Confidentiality, to the extent practical and appropriate under the circumstances, will be maintained throughout all phases of the intake, investigation and remediation process. Any breach of confidentiality by any party involved in this procedure may be considered an act of obstruction, and may subject that employee to disciplinary action.

9. Any employee can file a complaint directly with external agencies that investigate discrimination/harassment charges in addition to utilizing this internal procedure. The time frames for filing

complaints with external agencies indicated below are provided for informational purposes only. Employees should contact the specific agency to obtain exact time frames. The deadlines run from the last date of unlawful harassment or discrimination. These deadlines have no relationship to the date an internal complaint was filed resolved.

DHS Employees may file complaints with the following agencies:

**N. J. Department of Law & Public Safety
Division on Civil Rights (DCR)
180 days for violation of State law**

Trenton Regional Office
140 East Front Street
6th Floor - P.O. Box 089
Trenton, New Jersey 08625-0089
(609) 292-4605

Atlantic City Satellite Office
26 Pennsylvania Avenue
Atlantic City, NJ 08401
(609) 441-3100

Camden Regional Office
One Port Center
2 Riverside Drive, Suite 402
Camden, NJ 08103
(856) 614-2550

Newark Regional Office
31 Clinton Street
P.O. Box 46001
Newark, NJ 07102
(973) 648-2700

Paterson Regional Office
100 Hamilton Plaza
Paterson, NJ 07505
(973) 977-4500

**United States Equal Employment
Opportunity Commission (EEOC)
300 days for violation of Federal Law**

Newark District Office
1 Newark Center
21st Floor
Newark, NJ 07102-5233
(973) 645-6385

Philadelphia District Office
The Bourse Building, Suite 400
21 S. Fifth Street
Philadelphia, PA 19106-2515
(215) 451-5800

Issued:
Revised:
See N.J.A.C. 4A:7-3.2

# EXHIBIT K

PHYLLIS ATKINSON, PRO SE
317 East 30 Street
Paterson, New Jersey 07504

By: Phyllis Atkinson
Pro se, Plaintiff
(973) 460-0382

U.S. DISTRICT COURT

2010 MAR -5 P 3: 51

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## VICINAGE OF NEWARK

| | |
|---|---|
| PHYLLIS ATKINSON : | |
| : | |
| : | Hon. Peter G. Sheridan |
| : | United States District Judge |
| Plaintiff, : | |
| : | CIVIL ACTION NO. 06-5485 (PGS) |
| vs. : | |
| : | **AFFIDAVIT OF MS. EMMA JONES** |
| NORTH JERSEY : | |
| DEVELOPMENTAL CENTER and : | |
| CAROLE WOLKE : | |
| : | |
| Defendant. : | |

I, EMMA JONES, of full age, being duly sworn upon my oath, appear and say:

1.    I am an African American female employee of the North Jersey Developmental Center (hereinafter "NJDC").

2.    I have been employed at the NJDC for thirty-one years working as a licensed practice nurse.

3.    I worked under the management of Mrs. Carol Wolke, Assisting Director of Nursing Services during the same period of time that plaintiff, Phyllis Atkinson was employed for NJDC and reporting to Ms. Wolke.

4.   I can confirm the differential actions that existed in the way that Ms. Wolke treated Mrs. Atkinson on various occasions.

5.   I was present and personally observed a nurses meeting that included Mrs. Lotts, Director of Nursing Services at NJDC, Ms. Carol Wolke, and Mrs. Atkinson.   That meeting involved a conversation wherein Ms. Wolke questioned Ms. Atkinson's need for an office and computer.

6.   Ms. Wolke stated that Mrs. Atkinson did not need an office or computer.   Mrs. Atkinson had an office and computer starting from the first day that she was hired for her position.   This was prior to Mrs. Wolke coming into our particular unit to work.

7.   Ms. Wolke spoke to Mrs. Lotts opposing Ms. Atkinson working in such luxury as having an office and an a personal computer. Mrs. Lotts responded to Mrs. Wolke by stating that it was essential for Mrs. Atkinson to have an office and computer and that she would not take her office or computer away.

8.   Mr. Fenton, CEO of NJDC, ordered a computer specifically for me in with instruction forwarded to Mrs. Wolke that it should be given to me when the computer arrived.

9.   When my computer came in, despite the directive from Mr. Frenton, Mrs. Wolke gave it to a non-African American co-worker.

10.  Interestingly enough, the non-African American worker, was an individual whose job was created from Mrs. Atkinson's position. In other words, the non-African American worker's job branched

2

from Mrs. Atkinson's job.  And yet, Mrs. Wolke saw this White NJDC
worker deserving of a computer, but did not see how Mrs. Atkinson
was also deserving of an office and a computer.

I swear and affirm that the foregoing statements made by
true.  I am aware that if any of the foregoing statements made by
me are willfully false, I am subject to punishment.


_____
EMMA JONES


Sworn and subscribed to before
me this    day of March, 2010


_____

3/4/10          1/17/2012

3

# EXHIBIT L

February 27, 2005


To:      Mrs. Roxanne Lotts, DON

From:    Ms Phyllis Atkinson, PCT

Re:      Red A and written warning

In reference to the red A that I received on February 14, 2005 and the written warning from Ms Wolke, ADON, dated February 15, 2005; it is unfair! And it is unjust. I feel that it is retaliation from Ms Wolke, because of the previous complaint letters that I wrote against Ms Wolke on September 28, 2004 and December 1, 2004. It was in those letters that I requested to be protected from Ms Wolke threats and harassments. I have made several verbal complaints to you about Ms Wolke, requesting desperately to be protected from her unprofessional behavior, yet I stand today defending myself from the very thing I requested to be protected from, just as I had feared her threats became a reality.

It is to my understanding according to the N.J.D.C policy that a red A is given for no call, and no show, how is it justified that I received a red A?


On February 14, 2005 I had an emergency; I realized that I was not going to be on duty at my schedule time so I made a call to the N.J.D.C operator informing her that I was going to be late. After a short while had passed I was still dealing with my crises, so I made a call back to N.J.D.C and spoke directly to my supervisor, I requested for an Administrator leave day, but immediately after ending that call my problem was resolved, so I called back to my work area and spoke with my supervisor again requesting him to cancel the Administrator leave day, because I am able to come on duty. Not only did I

ATKINSON EEO 231

make several calls notifying my supervisor making him aware of what was happening, but I also came to work.

According to N.J.D.C policy, as an employee of N.J.D.C you are expected to call in one hour before your scheduled time on duty if you are going to be out sick, not if you have an emergency. No one can possibly no when an emergency will occur so that would be a ridiculous request. To have someone call in one hour before an emergency to let the job know they will be late. The only way that could be done if you know about the emergency previously.

It was to my understanding that the original accusation that Ms Wolke made against me, was that I asked her to falsify the time sheet.  If Ms Wolke who is an Administrator for N.J.D.C and has the authority to correct me, or charge me at the time that the incidence occurred, would have given indication that she had good intention, of doing her job, also Ms Wolke who is an Administrator of N.J.D.C and my in-direct supervisor, having the authority to release me from my duty, instead she allowed me to continue working without giving me any indication that I was not within N.J. D.C policy and procedures.  Ms Wolke converse with me several times during that day, and never utter a word that I was not within N.J.D.C. policy and procedure. In fact she laugh and talk with me as if everything was fine for the most part of that day, when I got ready to leave at the end of that day, I noticed that the mail bag which was full of out going mail, was hanging on the Hcc nurses station door, as I had did so many times previously I would take the mail over at the end of my shift and distributed it into the mail boxes which takes about twenty minutes or less depending on the amount of mail. Well because it was raining that evening, and it was at the end of the day, and I did not feel like returning back to the Hcc to sign out, I asked Ms Wolke to sign me out, giving me the expression that everything was okay I left and told her that I would call her on her cell phone to remind her but, I forgot to call her back so the next morning I check to see if she had signed me out and was informed that I receive an red A. I immediately call Ms Wolke and I asked her why didn't she sign me out, and she told me that she forgot

because she was conducting a meeting. I had no idea that it was Ms Wolke who was charging me with the red A.

I feel that if Ms Wolke felt that strongly against what I was asking her to do, She as an Administrator for the N.J.D.C should and could have corrected me then.

If a thorough investigation was to be done you will find that a lot of my rights as a employee were violated by Ms Wolke, I had every right to be informed that I was not going to get paid for that day and should have been excused from work as soon as I reported in, I can't help but to think that this is the reason why she decided to take another route to make her threats a reality. Ms Wolke's original accusations against me were not genuine.

The complaint letter that I wrote you in December 1, 2004, I describe to you in detail of how Ms Wolke repeatedly threaten me verbally using the words "I will fix you." over and over again.

Ms Wolke has caused an enormously amount of stress in my life, to the extent that I am feeling physically sick. I am experiencing anxiety attacks mental confusion, when I am on the job and a number of other health problem. Working from day to day not knowing what she might try next is very frightening, I requested for protection from these threats, but she managed to succeed in carry them out.  I was hoping that the complaint that I had against Ms Wolke would have be resolve, before Ms Wolke had the opportunity to carry out her threats.

Because Ms Wolke was allowed to bring unjustly charges against me and caused me to receive a written warning and a red A; I am left with no other alternative, but to take this complaint to another level under no circumstances will I allow unjustly charges to remained written on my work record without defending myself.

Throughout the twenty-five years that I have worked at N.J.D.C I have been Pre- judge as being aggressive, but I am not an aggressive person, I am an assertive person. I am a secure person, and my self-esteem in myself is very high; Because of these strong characteristics I have been miss-judge by those who lack them, I have been called arrogant and hard to deal with. But it is a known fact in America that people will judge you on what they hear about you, I learned a long time ago not to judge people according to what I hear about them, but on the facts alone and the only way you can determine true facts is to hear both sides of the story.

If I were to judge my co-workers, on what I heard about them, I would have little or no respect for most of them.

I am known for my honesty among most of my peers, and I try to deal with situation and circumstance in the right way. I am a Christian, and I struggle everyday to live a Christ like life, like anyone I have my issues and weakness, "perfect" far from it but I certainly don't spend my time plotting against my co-workers, it is very difficult to live a Christian life around people such as Ms Wolke, when I wrote my last complaint against Ms Wolke, in December 1, 2004 I had decided then that I will only deal with Ms Wolke on a work related level only, but because she gave me a Christmas gift and she wrote a little note on the name tag  requesting that she wanted to make amends and be my friend. I made the un-wise decision to socialize with her again in general conversation.  I Believed that Ms Wolke was sincere when she wrote that note, but now I realize I was deceived by Ms Wolke, she never had any good intention when she ask me to be her friend again.

As I wrote in my previous complaint letter I have a right to be protected from this type of behavior from someone who is representing N.J.D.C. Administrative Department. She continue as of this day to harass me and make my job miserable she is checking the calendar and involving the Hcc supervisor to constantly ask me question about a medical trip that is not due. I cannot work under this type of stress and I will not continue to put my health at risk because of her unjustly action.

ATKINSON EEO 234

What's appalling to me is that I made several complaints against her on several occasions and nothing has ever been done yet to protect me from her un-professional behavior. She made one accusation against me, and action is taken against me immediately as if I committed a major crime. I almost feel like I 'm waiting to get lynch by N. J.D.C what's up with that? Is my question, and now the time has come for me to seek and find the answer at the next level.

Attached you will find a copy of the two previous letters that I wrote and a copy of the Christmas name tag that Ms Wolke used to lure me back into her web of deception.

I had problems with my par with Ms Wolke

I had problems with working overtime with Ms Wolke

I had problems with my vacation being approved and a number of other problems.

I would appreciate your attention in this matter as soon as possible

Cc: file
    A f f i R ment Action
    Union

ATKINSON EEO 235

# EXHIBIT M

OPS-011
ADDENDUM 2

## FIVE DAY "RED A" TERMINATION PROCESS

When an employee calls out sick for an extended period of time without appropriate authorization, the work unit is required to follow an established procedure to either authorize the absence; return the employee to work; or to initiate the termination process. To initiate the "five Red A" process:

**I. Work Unit**

A. If an employee begins an unauthorized absence, the employee's <u>department/work unit</u> should immediately call the Health Care Center/Medical Director's Office, Payroll Department, or Personnel Office to determine if the employee submitted a medical certificate.

B. If a medical certificate has not been received by the Center, the work unit should contact the employee at the phone number of record. If contact is made, the employee should be advised that, <u>if this is a medical situation</u>, a medical certificate needs to be submitted within 48 hours of the contact telephone call. Without this document the employee will not be able to receive medical clearance to return to work. Further, failure to submit the medical certification could be interpreted as job abandonment and result in a resignation "not in good standing." Immediately following this call, a letter repeating what was said in the call should be sent to the employee by certified AND regular mail – along with two(2) attachments: the "Fact Sheet for Medical Leaves of Absence and Family Leave" and a "Request for Leave of Absence" form (BM2).

C. If the employee cannot be reached, a "24 hour letter" should be sent to the employee requesting that the employee contact the work unit supervisor upon receipt of the letter and, if appropriate, submit medical documentation within 48 hours of receipt of the letter. *The letter should be sent overnight and regular mail* (obtain "overnight" mailing forms from the Business Office). A copy of the Center's "Fact Sheet for Medical leave of Absence and Family Leave" should be attached to this letter to ensure that the employee has been informed of their family leave rights and responsibilities.

D. If the employee cannot be reached, or if the employee fails to timely provide the required documentation, the work unit should submit a request for issuance of a five (5) day unauthorized absence "Preliminary Notice of Disciplinary Action." This request is sent to the Office of Personnel Services via a 416 form with the attached copies of the "24 hour letter" and any other documentation/notes supporting the requested action.

## II. Payroll Office

A. As soon as the five (5) day unauthorized absence period is reached, the Payroll Office will contact the Office of Personnel Services to determine if there is medical documentation that supports the reason for the employee's absence. If this is unknown, the Payroll Office will then call the employee's work unit for an explanation and to request that the employee's timesheet be properly recorded.

## III. Office of Personnel Services

A. The Office of Personnel Services receives the 416 form request for issuance of a "Preliminary Notice for Disciplinary Action" based on five (5) consecutive days of unauthorized absence. Personnel staff will review the supporting documentation for this action to determine its completeness and, if verified, issue the "Notice" to the employee.

B. The "Notice" will be sent via certified and regular mail.

**Attachment #3  OPS-011**

7/03/07

## FACT SHEET FOR MEDICAL LEAVES OF ABSENCE AND FAMILY LEAVE

### EMPLOYEE PROCEDURES FOR LEAVE OF ABSENCE:

- Submit a completed BM2 form or a statement written by a physician, dentist, ect., signed and dated on letterhead stationary, certifying that the employee cannot perform the essential functions of his/her job, length of absence required and date employee can return to work. The employee should provide advance notice when the leave is foreseeable. Absences of ten or more consecutive days are considered a Leave of Absence.
- Questions regarding continued pay status and medical benefits should be directed to the Payroll/Timekeeping Departments, ext. 4572.
- Report to Health Care Center for medical clearance upon returning from a five (5) or more consecutive work day personal absence. *Employees returning with medical restrictions must report to the Office of Personnel Services to obtain the necessary adjusted duty forms.*

### CONTINUOUS LEAVE OF ABSENCE PROCESSED UNDER FAMILY LEAVE:

- North Jersey Developmental Center's leave of absence and family leave policies allow employees to take time off from work, with or without pay, due to personal illness or for the care of eligible family members.
- Submit a completed BM2 form to the Office of Personnel Services. Diagnosis is required for Family Leave. For the care of an immediate family member, the health care provider must also include a statement as to what assistance the family member will need because of their condition, ie: nutritional needs, transportation, basic medical needs, etc. You must also provide a statement as to what care you will provide for the immediate family member based on the care provider's medical statement. This must be submitted with the leave request, or no later than within 15 days of the time it is requested by the Center.
- All approved medical leave requests will be applied against Family Leave, providing the employee meets the eligibility requirements.
- FMLA/FLA covers eligible employees for up to 12 weeks leave for personal illness and care for immediate family members.
- For Family Leave eligibility an employee must be employed by the state for at least (1) year and meet the required number of hours worked in the previous 12 months. ( State Family Leave: 1,000 worked hours, Federal Family Leave 1,250 worked hours)

OPS-3/06

## INTERMITTENT FAMILY LEAVE:

- Submit a completed BM2 form to the Office of Personnel Services.  Diagnosis is required for Family Leave.  For the care of an immediate family member, the health care provider must also include a statement as to what assistance the family member will need because of their condition, ie: nutritional needs, transportation, basic medical needs, etc.  You must also provide a statement as to what care you will provide for the immediate family member based on the care provider's medical statement.  This must be submitted with the leave request, or no later than within 15 days of the time it is requested by the Center.
- Intermittent FMLA/FLA is subject to renewal and may be processed for a maximum of six months at one time.
- When calling out for family leave, the employee must specifically tell the Operator that the call out is for family leave and **must** also specify if the call out is for themselves or, if for a family member, the family member's name.  A call out for family leave will automatically be counted against the employee's sick time.  If the employee has exhausted their sick time, they may put in a request to their supervisor to use other approved earned time to remain in pay status.
- Usage of earned time for the care of a family member will be counted against sick time, unless prior arrangements are made with the employee's supervisor to use other approved earned time.
- Report to Health Care Center for medical clearance upon returning from a five (5) or more consecutive work day personal absence.  *Employees returning with medical restrictions must report to the Office of Personnel Services to obtain the necessary adjusted duty forms*
- For Family Leave eligibility an employee must be employed by the state for at least (1) year and meet the required number of hours worked in the previous 12 months.  ( State Family Leave:  1,000 worked hours, Federal Family Leave 1,250 worked hours)

**24 HOUR LETTER/NO PHONE CONTACT FOR**
**UNAUTHORIZED ABSENCES**
**(SAMPLE)**

Dear_____:

It is noted that you have been absent from work from _____ to _____, without authorization.

Several attempts have been made to contact you at your NJDC phone number of record - _____. We were unsuccessful in reaching you because either the phone number is not a working number, or you did not respond to our voice messages to return our call.

If your absence is due to medical reasons, medical documentation must be submitted within 48 hours of receipt of this letter. Enclosed, for your information, is a "Fact Sheet for Medical Leaves of Absence and Family Leave."

Under Civil Service Rule: 4A:2-6.2 b, "Any employee who is absent from duty for five (5) or more consecutive business days without *notice and* the approval of his or her supervisor shall be considered to have abandoned his or her position and shall be recorded as a resignation not in good standing."

You are required to contact me upon receipt of this letter at (973)256-1700, EXT._____ to make the appropriate arrangements. If you do not do so, you will have been considered to have abandoned your job and we will have no other choice than to separate you from employment.

Very truly yours,

_____     ***and if required***     _____
Department Supervisor Signature                              Discipline Supervisor Signature

Overnight and Regular Mail

07/03/07

## FOLLOW-UP LETTER TO PHONE CONVERSATION FOR
## UNAUTHORIZED ABSENCES
### (SAMPLE)

Dear _____:

This letter is to confirm the telephone conversation that we had on _____ regarding your absences of _____ to _____.

The purpose of the call was to determine the reason for your absences. You are reminded that absences due to medical reasons require immediate medical documentation before you can receive medical clearance to return to work.

Under Civil Service Rule: 4A:2-6.2 b, "Any employee who is absent from duty for five (5) or more consecutive business days without notice and the approval of his or her supervisor shall be considered to have abandoned his or her position and shall be recorded as a resignation not in good standing."

Failure to submit medical certification within the agreed upon 48 hour period will be interpreted as job abandonment and result in a resignation 'not in good standing'.

Enclosed, for your information, is a "Fact Sheet for Medical Leaves of Absence and Family Leave" and a "Request for Leave of Absence" form.

Very truly yours,


_____          *and if required*   _____
Department Supervisor Signature              Discipline Supervisor Signature

Overnight and Regular Mail

07/03/07

E.  Acceptable Medical Evidence, for instances of non-family leave requests shall be a written statement by the attending physician, dentist, etc., signed and dated on letterhead stationary, certifying that the employee cannot perform the functions of his/her job. Certification of a family member's serious illness is sufficient if it states: the date the serious condition commenced, probable duration; and medical facts (does not require a diagnosis). FMLA/FLA requests must indicate the specific reason to determine eligibility. If the employee's leave exceeds the FMLA time period, additional certification requirements would then be imposed.

F.  Pregnancy Disability shall be an approved leave of absence, either with or without pay, for a period an employee is unable to perform her duties due to pregnancy disability, as certified to as acceptable by medical evidence.

G.  Part Time Employee shall mean an employee whose regular hours of duty are less than the regular normal work week for the job title or agency.

H.  Days shall mean calendar day unless otherwise specified.

I.  Family Leave Act - See administration policy OPS-002, Family Leave, or N.J.A.C. 4A:6-1.21 for a listing of definition and terms.

## II.  Accrual of Sick Leave Credit

A.  Initial Month of Employment

1.  Newly hired full time employees shall accrue one (1) working day for the initial month of employment if they begin work on the first through 8th day of the calendar month.

2.  Employees who begin employment on the 9th through 23rd day of the month shall accrue one half (1/2) working day for that month.

3.  Employees who begin employment after the 23rd of the month shall accrue no paid sick leave for that month.

B.  Following the Initial Month Through the End of 1st Calendar Year
After the initial month of employment to the end of that calendar year, an employee shall accrue one (1) workday for each month of service during that year.

C.  2nd Calendar Year of Employment and Thereafter
An employee shall receive fifteen (15) sick leave credits, one and one quarter days accrued per month, at the beginning of the calendar year in anticipation of continued employment.

D.  Accrual of Sick Leave Credit: Part Time employees
Part time employees will accrue sick leave credit pro-rata based on the percentage of time worked as indicated by the work week and work title of the employee.

E.  Failure to Complete Full Year of Employment
An employee who leaves State service before the end of the calendar year shall have his/her leave prorated based on time earned. An employee who is on the payroll for greater than twenty-three (23) days shall earn a full month's allowance, and earn one-half month's allowance if he/she is on the payroll from the 9th through 23rd day of the month.

F.  Carry Over
Sick leave credit will be carried over from one calendar year to the next calendar year without loss of credit.

G.  Compensation for Unused Sick Leave at Retirement SCOR:
Shall be under the authority of Chapter 150 P.L. 1973 in accordance with N.J.A.C. 4A:6-3.1-4.

Note 1:  In accordance with N.J.A.C. 4A:6-1.3 Sick Leave, sick leave credits will not accrue after an employee has resigned or retired, although his/her name may be retained on the payroll until the exhaustion of vacation or other compensatory leave.

Note 2:     A supervisor shall limit the use of sick leave and/or require proof of illness if:

a.     an employee has a history of excessive absenteeism from the previous year and it is likely the excess will continue into the coming year. May ask for proof of illness for a maximum 12 month period, subject to periodic supervisor review, from the date excessive use was identified.

b.     the employee will not complete the full year of employment, thereby not earning a full year's sick leave credit; or

c.     the employee has been absent more than five (5) consecutive working days.

d.     acceptable medical evidence has not been received for each absence in excess of fifteen days. May ask for proof of illness until the end of the calendar year.

Note 3:     When an employee is on leave of absence without pay, there is no accrual of sick leave.

Note 4:     An employee who is absent five consecutive days without approval of their supervisor, or who fails to return to duty within five consecutive business days after expiration of an authorized leave of absence, may be resigned not in good standing.

## III.     Overdrawn Sick Leave Credit

A.     **Termination of Employment**

Any employee who terminates and has overdrawn his/her sick leave credits (as specified in paragraph II. E) will be required to reimburse the Department of Human Services for all such overdrawn sick leave credits. The Department of Human Services shall have the right to take whatever action as deemed necessary to recover any and all moneys due. In order to recover these moneys the employee's name and address will be submitted to the Department's SET-OFF Individual Liabilities (SOIL) program for collection.

B.     **Continued Employment**

Employees who have exhausted their sick leave who call in sick and who have their attendance designated as an authorized absence will not be permitted to work other than the regularly scheduled workdays remaining in the week in which the absence occurs (AFSCME represented employees may work overtime if their name comes up on the rotation schedule). Prescheduled overtime, such as holidays, may be worked. In addition, "call in" employees will not be permitted to charge vacation in lieu of an authorized absence when they make a request on the day they are scheduled to come to work. This is based on the rule which indicates that vacation must be scheduled and approved in advance by the supervisor. The use of non-emergency administrative leave and compensatory time is also not permitted in these situations. (AFSCME represented employees may request in writing the use of Vacation or Administrative Leave in place of an authorized absence upon their return to duty).

## IV.     Allowable Use of Sick Leave Credits

A.     **Use by an Employee**

An employee may use sick leave credits in increments of one (1) hour for the 1st hour and increments of one-half (1/2) hour thereafter for absences due to:

1.     Personal illness;

2.     Off-the-job injury;

3.     Exposure to contagious disease

4.   Care, for a reasonable amount of time, for a seriously ill member of the employee's immediate family as defined in paragraph I C of this policy;

5.   Sick Leave use for death in the employee's immediate family shall not exceed five (5) working days (unless otherwise justified). An employee's supervisor shall have the right to request appropriate and reasonable documentation in order to verify the absence;

6.   Pregnancy Disability shall be an approved leave of absence, either with or without pay, for a period the employee is unable to perform her duties due to the pregnancy disability, providing acceptable physician certification;

7.   Sick leave credits may be used by a disabled employee for absences related to the acquisition or use of an aide for the disability provided that the aid is necessary to function on the job. Reasonable proof may be required to document such cases.

Note 5:   Sick leave absences in excess of twelve (12) months may qualify the employee for benefits under the Federal Social Security Act. Employees should contact their local Social Security office for further information.

## V.   Reporting Sick Leave Absence

A.   Illness before reporting on duty

1.   In all cases of illness whether of short or long term duration, every employee is required to provide notification of absence. The employee, or a member of his family, must advise the Center Telephone Operator of the reason for the absence and expected date of return to duty. NOTIFICATION OF ABSENCE SHOULD BE MADE AT THE EARLIEST POSSIBLE TIME, BUT IN NO EVENT AFTER THE USUAL REPORTING TIME. HOWEVER, DUE TO THE NEED FOR THE CENTER TO MAINTAIN ADEQUATE COVERAGE IN CERTAIN OF ITS OPERATING AREAS, IT IS ESSENTIAL THAT EMPLOYEES OCCUPYING POSITION TITLES REQUIRING ADVANCE NOTICE COVERAGE SHOULD PROVIDE ADVANCE NOTICE OF ABSENCE NO LESS THAN ONE (1) HOUR BEFORE THEIR NORMAL REPORTING TIME.

2.   In order to meet reporting obligations pursuant to F.I. C.A. exclusion, it will be the responsibility of the person functioning as Telephone Operator to ask the person calling in sick the reason for the sick call if such is not given. If the reason is either illness, care of an ill family member or death in the immediate family (as defined above), this information will be relayed to the section supervisor whose responsibility it will be to inform the section timekeeper.

3.   Employees are required to call in on a daily basis if an estimated date of return is not given when the initial sick call is made.

B.   Illness While on Duty

1.   An employee who becomes ill while on duty shall immediately notify his/her immediate supervisor.

2.   If necessary, the supervisor will issue a Med-32 form to the employee and request that the employee report to the Health Care Center. If the employee is sent off duty for the balance of the shift a medical certificate may be required. (For example - employee is on Med. Cert. status). If required, the employee must present the completed form upon return to duty. Absence beyond this time must be supported by medical documentation.

3.   The Medical Department will enter the time that the employee is sent off duty in the Doctor's log and then call the supervisor to advise of this action.

C.   Advance Notification of Absence

When it is known in advance that sick leave absence will be required for a consecutive period of work days, the employee shall submit , in writing, a request explaining the reason for the absence. Such request must be accompanied by a physician certificate outlining the reasons for and duration of such absence. (This applies to AFSCME, CWA and IFPTE represented employees who have a need for 10 or more days. A period of 5 or more days applies to all other employees).

D.   The appointing authority or designee may require an employee who has been absent because of personal illness to be examined by a physician (at Center's expense) as a condition of return to duty. Such examination will establish whether the employee is capable of performing normal duties and that their return will not jeopardize the health of other employees. This examination will be mandatory for employees who have been treated for a communicable disease (see OPS-001).

E.   Employees who have signs/symptoms of a communicable disease will be prohibited from working. Communicable disease is any malady which is required to be reported to the New Jersey Department of Health. Suspected cases should be reported to the Center's Medical Director for verification.

## VI.   Verification - Sick Leave Absence

A.   An employee will be required to provide acceptable medical evidence for:

1.   Absences of five (5) or more consecutive working days, or

2.   The employee's supervisor has reason to believe the employee is abusing sick leave, or

3.   If an employee has been absent on sick leave for periods totaling an aggregate of fifteen (15) days in one twelve (12) month period.

Note 6:   When an illness is of a chronic or reoccurring nature requiring absences of one (1) day or less, proof of illness shall be required for every six (6) month period. Such proof of illness must specify the nature of the illness and that it is likely to cause periodic absences from employment.

Note 7:   When submitting a medical certificate, the employee has the option of presenting the certificate to their immediate supervisor, Health Care Center, or the Office of Personnel Services – except when the employee is returning to work outside of regular business hours, then the medical certificate must be presented to the Health Care Center.

B.   Excessive Absenteeism

For purposes of this policy, excessive absenteeism shall be defined as paid or unpaid days away from the job for illness or injury which exceeds six (6) absences in six (6) pay periods which would not otherwise require a doctor's certificate (i.e. absences of five or more days which already requires a doctor's certificate or for chronic illness for which the employee already supplied such certificate). Upon reaching the six (6) days, the employee shall be advised, in writing, that further sick leave absence will require acceptable medical evidence for each day (s) of absence for the next 6 pay periods.

Excessive absenteeism shall also be defined as the use of ten (10) paid or unpaid sick days in twelve (12) pay periods not otherwise requiring a doctor's certificate. Upon reaching the (10) days, the employee shall be advised, in writing, that further sick leave absence will require

acceptable medical evidence for each day (s) of absence for the next 12 pay periods.

Note 8:   This does not preclude, as appropriate, corrective disciplinary action for chronic and excessive absenteeism or abuse of such absence in accordance with applicable department policies.

The six and twelve pay periods indicated above are "rolling" periods back from the last date of sick leave absence.

Note 9:   The submission of a medical certificate will generally be required during the established 6 or 12 pay period requirement. Thereafter, based on periodic supervisor review, this obligation can be extended (based on written justification) or ended.

Supervisors must submit NJDC form A-134 to the Office of Personnel Services in order to request the issuance of a one-day medical letter. (Must be supported by calendar documentation).

Note 10:   Sick days used when proof of illness was voluntarily submitted will be counted when calculating excessive use of leave.

Sick days used for death in immediate family will not be included in calculations of excessive absenteeism.

C.   Failure to Submit Acceptable Medical Evidence
Failure by an employee to provide acceptable verification of their illness as requested will result in the absence being considered unauthorized. In such circumstances disciplinary action may be initiated in accordance with the Department's Administrative Order 4:08 Disciplinary Action Program.

## VII.   Administration of Sick Leave
To ensure that sick leave privileges are properly utilized, the following shall constitute the sick leave verification procedure:

1.   Employees shall provide the Office of Personnel Services with a copy of their current address and telephone number. Employees shall also be responsible for notifying their supervisor of any change in their address or telephone number even if the change is temporary in nature. If an employee does not have a phone, they must inform the supervisor of a telephone number at which they can be reached.

2.   Employees who are unable to report for duty due to personal illness, accident, exposure to contagious disease or for short periods to care for a seriously ill member of their immediate family shall report their absence in accordance with established procedures and any applicable contractual provisions.

3.   Employees will not be subject to routine calls at home when absent due to illness/injury. However, the Center reserves the right to contact employees when necessary and appropriate.

4.   Employees who do not comply with the provisions of this policy, or who fail to keep an appointment with a state appointed physician, shall be subject to corrective and disciplinary actions. Specifically, after counseling and warnings, the first offense shall warrant an official reprimand. The second offense shall be suspension from work without pay for five working days. The third offense shall be suspension without pay for fifteen working days. The fourth offense shall be termination from service. The appropriate penalty shall be determined by

counting the number of infractions of this policy committed within a twelve month period immediately preceding the infraction in question.

## VIII.  Sick Leave Reduction

A. Programs

In accordance with title 4A:6-6.9 it is the policy of the Department of Human Services to mandate the development and implementation of sick leave reduction programs. Such programs should provide recognition for perfect attendance for an established period of time, i.e. monthly, quarterly, annually. Incentives must include, but not limited to, the awarding of certificates of appreciation and/or memoranda which provide recognition for perfect attendance, to be given out at award ceremonies, and can be placed in an employee's personnel file. Additionally, any individuals who participated in the development, implementation and management of an effective sick leave reduction program or supervisory officer who effectuated a sick leave reduction in their respective units, should receive proper recognition.

B. Program Approval

While the development of such programs is mandatory, all programs must first receive the approval of the Department's Office of Human Resources prior to implementation. All programs, once approved, should be publicized promptly to all employees to solicit their participation. Notices should include the additional benefit of the SCOR (Supplemental Compensation on Retirement) program.

C. Management's Responsibilities

The performance evaluation form for all unit managers should reflect the responsibility for monitoring the use of sick leave by staff and for initiating appropriate action when abuse is suspected. Abuse of sick leave must be addressed through requests for medical documentation and the application of Administrative Order 4:08.

## ATTACHMENTS

1. One Day Medical Certificate Request.
2. BM2
3. Addendum 1
4. Addendum 2

_Bruce Werkheiser_

_____

Bruce Werkheiser
Chief Executive Officer

Case 2:06-cv-05485-PGS-ES   Document 75-4   Filed 08/02/10   Page 76 of 89 PageID: 816

Plaintiff's claims against the State are barred by the
**Eleventh** Amendment to the United States Constitution, and therefore, they
must be dismissed. The **Eleventh** Amendment provides that "[t]he
Judicial power of the United States shall not be construed to
extend to any suit in law or equity, commenced or prosecuted
against one of the United States by Citizens of another State, or
by Citizens or Subjects of any Foreign State." U.S. CONST.
amend. **XI**. "[T]he **Eleventh** Amendment . . . has been interpreted to
render states . . . generally immune from suit by private parties
in federal court." Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess,
**297 F.3d 310**, **323** (3d Cir. 2002). There are, however, three
exceptions to **Eleventh** Amendment immunity: "(1) congressional
abrogation, (2) waiver by the state, and (3) suits against
individual state officers for prospective injunctive and
declaratory relief to end an ongoing violation of federal law."
Id.
Page 3

  Here, none of the exceptions to **Eleventh** Amendment immunity
applies, and therefore Plaintiff's claims against the state must
be dismissed. The first exception does not apply because
**42 U.S.C. § 1983** did not abrogate states' sovereign immunity. See
Quern v. Jordan, **440 U.S. 332**, **338-41** (1979). The second
exception does not apply because the State of New Jersey has not
waived its immunity to suit in federal court. See, e.g., Garcia
v. Richard Stockton Coll. of N.J., 210 F. Supp. 2d 545, 549-550
(D.N.J. 2002). The third exception does not apply because
Plaintiff has sued the State, not individual state officers, and
he is seeking monetary, not injunctive relief.

## OPS-011
## "ADDENDUM 1"

### SICK LEAVE PRACTICES

1.  It is first important to recognize that sick leave is to be used to cover illnesses, not other barriers to attending work as scheduled.

    If a personal emergency arises, administrative leave time is the appropriate leave time to utilize. Supervisors and workers are asked to coordinate their communications to permit the use of AL time for personal emergencies whenever possible. Employee requests for use of unscheduled (emergency) Administrative Leave will be conditionally approved. Final approval will be dependent on the employee's submission of acceptable documentation.

2.  Information and feedback is the first step to positive performance.

    All staff are to be provided with the opportunity to review their yearly time record every three months. Supervisors are to ensure that staff avail themselves of this opportunity and are provided with answers to their leave time questions.

3.  Early recognition, discussion and goal setting support improved performance.

    A staff member who may be excessively absent may be experiencing a difficulty, assuming that obvious explanations, such as surgery or regularly scheduled medical treatments, do not apply.

    Supervisors are to routinely meet with employees when performance, in this case attendance, does not meet expectations. Early recognition and private, courteous, discussion of performance will often serve to solve problems.

    The point, here, is that if supervisors do not see performance, and the well being of their employees, as sufficiently important to attend to, it is unrealistic for the organization to expect employees to attach importance to these real concerns. Many issues are exhibited in the attendance pattern of workers. NJDC is a people oriented facility and, as such, chooses to take a proactive stance toward worker performance.

*Attachment #2   OPS-011*
*11/05*

# NORTH JERSEY DEVELOPMENTAL CENTER

### One-Day Medical Certificate Request

_____                    _____
Department Head authorizing signature                           Date of Request

This is to request that the NJDC Office of Personnel Services issue a
One-Day Medical Certificate letter to the below listed employee:

EMPLOYEE NAME:        _____

TITLE:                _____

WORK UNIT:            _____

The above named employee used his/her use of sick time, specifically as follows:

Used_____ days for the period

beginning _____ and ending _____. *

* Must attach calendar which indicates dates of absences.

This use of sick time occurred during the following time period:

☐  Six Pay Periods

☐  Twelve Pay Periods

☐  During Calendar year 20___ (Requires medicals for remainder of calendar year)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
*Criteria:  sick days used to qualify for a one-day medical:*
          6 days in 6 pay periods
         10 days in 12 pay periods
         15 days within a calendar year.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

*Attachment 1  OPS-O11 Form A-13-1 Revised  08/04*

# EXHIBIT N

PHYLLIS ATKINSON, PRO SE
317 East 30 Street
Paterson, New Jersey 07504

By: Phyllis Atkinson
Pro se, Plaintiff
(973) 460-0382

U.S. DISTRICT COURT

2010 MAR -5  P 3: 51

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
VICINAGE OF NEWARK

PHYLLIS ATKINSON               :
                               :
                               :     Hon. Peter G. Sheridan
                               :     United States District Judge
              Plaintiff,       :
                               :     CIVIL ACTION NO. 06-5485 (PGS)
     vs.                       :
                               :     **AFFIDAVIT OF MS. SHEILA MCCRAY**
NORTH JERSEY                   :
DEVELOPMENTAL CENTER and       :
CAROLE WOLKE                   :
                               :
              Defendant.       :
                               :

I, Sheila McCray, of full age, being duly sworn upon my oath,
appear and say:

1.   I am a retired African American female employee of the North
Jersey Developmental Center (hereinafter "NJDC").

2.   I had been employed at the NJDC in the position of Principal
Clerk Transcriber (secretary) in the Health Care Center for Mrs.
Lotts, Director of Nursing and Mrs. Wolke, Assistant Director of
Nursing at NJDC.

3.   I worked under the management of Mrs. Carol Wolke, during the
same period of time that plaintiff; Phyllis Atkinson was employed
for NJDC and reporting to Ms. Wolke.

4.   As a co-employee at NJDC, I can validate Mrs. Phyllis Atkinson's claims of racial harassment.   This is because I experienced on various occasions when Mrs. Wolke treated me differently from non-black employees.   Additionally, I have personally observed on numerous occasions where Mrs. Wolke treated other black employees differently than she would treat non-Black employees.

5.   It is my personal experience that Mrs. Wolke would allow non-Black co-workers to come in late, and sign in at their scheduled time.   In other words, she would allow them to sign in as if they had arrived at work on time so that they would not be disciplined for being late.   She would also allow non-Black co-workers to leave the job during work hours for personal and non-work related reasons.   She would also allow non-Black co-workers extended lunch hours.   She would treat Black employees less favorably.   Whenever a Black employee would take lunch beyond the mandatory time limits for lunch, then Mrs. Wolke would report those employees as being late.

6.   Mrs. Wolke would alter the time of Black employee's work schedule to show that they returned to work late.   She did this without notifying the Black workers of her change.   She would not deduct time from non-Black employee's work schedules when they would return back from lunch beyond the specified time period.

2

7.   I know this to be the case because I was the timekeeper during those years where Mrs. Wolke and Mrs. Atkinson worked in the same unit at NJDC.

8.   It is known to all NJDC employees that the center has a unit that is called the Meese building.  It is also a known fact that the vast majority of nurses that work in the Meese Building were black.   I recall personally hearing Mrs. Wolke stating on one occasion that if she ever became the Director of Nursing Services that she would get rid of all of the nurses in the Meese Building.

9.   In 2006, I was interviewed by the Department of Human Services in reference to Mrs. Atkinson's internal charges of racial discrimination against Mrs. Wolke.

10.  I was asked this question by the investigator – did I feel like I was being treated differently about not receiving a new desk until the non-Black co-worker received her desk?   At the time, I answered that it did not matter to me.  I also answered that I did not want a new desk anyway.  But the true answer to that question was that it did matter to me.  I felt that Mrs. Wolke was treating me differently and less favorably than she treated non-Black workers.

11.  I admit that I was afraid to speak my true feelings at the time.   I feared that it might cause Mrs. Wolke to retaliate against me somehow or that I would lose my job.  I had known other employees who told me that Mrs. Wolke had falsified information

3

against them in order to create problems for them.  As I was still employed at NJDC at the time, I admit that I kept quiet to avoid retaliation.

I swear and affirm that the foregoing statements made by true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

SHEILA MC CRAY

Sworn and subscribed to before

me this    day of March, 2010

3/4/10

EN 1/14/2012

4

# EXHIBIT O

February 28, 2005


To:     Ms Gary Engels
        Ero Department

From: Ms Phyllis Atkinson
        Nursing Department


Re:     Grievance


I would like to take out a grievance against Ms Wolke, ADON of the Nursing

Department. My complaint is her constant threats, harassment and verbal abuse.
I have made several complaints, verbal and written against Ms Wolke for this type of

behavior to cease, and as of today it still exists.  Recently she was able to carry out one of

her threats against me, by giving me a red A, which according to the NJDC policy it

cannot be justified.  Her continuing harassment and verbal abuse is causing me to have

mental and emotion problems, I am also experiencing headaches which means now it is

affecting my physical  health. Attached you will find a copy of the previous complaint

letters that I wrote against her and you will find a copy of the written warning for the red

A. that she gave to me unjustly, also you will find a copy of the note that she wrote to me

in December which lure me back into her web of deception.  I would appreciate your

immediate attention in this matter.


ATKINSON EEO 27

Case 2:10-cv-08280 Document 1-OR filed 03/02/10 Page 86 of 89 PageID: 826

# GRIEVANCE PROCEDURE FORM

| | |
|---|---|
| **Employee Name:** *(Last, First, Middle Initial)* ATKINSON, PHYLLIS | **Title:** PRINCIPAL CLERK TRANSCRIBER |

**Address** 317 E. 30th Street, Paterson N.J 07504

**Department:** DHS, NURSING

**Division, Institution or Agency:** DDD

**DATE OF GRIEVANCE:**
2/28/05

**SUBJECT OF GRIEVANCE:** [X] NON-CONTRACTUAL [XX] CONTRACTUAL
If grievance is contractual, state article and paragraph of contract which you claim has been violated: 408 A-1

**EMPLOYEE'S STATEMENT OF GRIEVANCE:** *(Attach additional sheets if necessary)*
DISCRIMINATION ON PAR RATING, VERBAL ABUSE, HARASSMENT, UNJUST RED A ON MY WORK RECORD, WRITTEN WARNING ABOUT RED ON MY WORK RECORD. FALSE ACCUSATION AND THREATS

**TO CORRECT MY GRIEVANCE THE FOLLOWING SHOULD BE DONE:**
RED A, REMOVED FROM MY WORK RECORD, DISCRIMINATION, VERBAL ABUSE, THREATS AND HARASSMENT TO CEASE
WRITTEN WARNING REMOVED FROM MY WORK RECORD

[ ] I WILL REPRESENT MYSELF (OR) [X] MY REPRESENTATIVE WILL BE:

Name JAMES CLIFTON, SHEILA KING   Title UNION REP

**Employee Organization** If Any CWA

● **SIGNATURE OF EMPLOYEE** _____   **DATE** 2/28/05

## STEP 1

**ANSWER BY IMMEDIATE SUPERVISOR:**

SIGNATURE _____
*(Immediate Supervisor)*   *(Date of Hearing)*   *(Date Decision Rendered)*

I acknowledge settlement of my grievance.

● **SIGNATURE OF EMPLOYEE** _____   **DATE** _____

## STEP 2

[ ] I APPEAL DECISION AND REQUEST STEP 2 HEARING   DATE OF APPEAL   APPEAL RECEIVED BY (FOR SUPERVISION)   DATE RECEIVED

**EMPLOYEE'S REPRESENTATION FOR STEP 2 HEARING:**

Name _____   Title _____

**Employee Organization** (If Any)

**ANSWER BY INTERMEDIATE SUPERVISOR:**

ATKINSON EEO 26

SIGNATURE _____
*(Immediate Supervisor)*   *(Date of Hearing)*   *(Date Decision Rendered)*

I acknowledge settlement of my grievance.

● **SIGNATURE OF EMPLOYEE** _____   **DATE** _____

DPF-251 / REVISED 3-87   (THIS COPY FOR PERSONNEL OFFICE)   *(Complete Other Side)*

# EXHIBIT P

December 21, 2005

Dear Mr. Werkheiser

I am writing you this letter because I am scheduled to return back on duty, January 09, 2006 9:15 to 5:15, I would like to meet with you before hand if it is at all possible, to discuss a few matters concerning my job. I am reluctant to return to work; because of the traumatic horrible mishaps that has happen to me, the overwhelmed stress had compelled me to go out on temporarily disability, the stress of it all has had such an impact on my mental state that I am feeling uncertain at this time to rather, I will ever fully recover. Due to my previously unheard out cries for help, I have now been condition to believe that self-preservation is my job.

Mr. Werkheiser, I am still feeling apprehensive, and in secured about my work place, but needless to say, I do have to return to work, and that is the reason that I am writing you this letter, will you please work with me? To help me work through this matter, I would really be thankful for it. If it should happen that I don't get to meet with you before I return back to work, it would be a great help to me, if you would approve a shift change for me, I am trying to avoid any chaos and gossip that might cause me to have a relapse on my return, I would like to work on the third shift (11:45) on a temporarily basis or until I feel safe in my work environment.

Because my health has suffered tremendously mentally, and physically it is my hope, for health reason, that you will honor my request, I am presently receiving therapy to help me deal with the pain and suffering that was inflicted upon me. Mr. Werkheiser, I really think it would be detrimental to my mental state if a positive change does not occur in my work environment. I can be reach at 973-460-0382 (C) or 973-341-7560. (H)

Respectfully submitted

Phyllis Atkinson

file:
Sarah Evans, union

ATKINSON EEO 179



October 30, 2006

Bruce Werkheiser, CEO
North Jersey Developmental Center
PO Box 169
Totowa, NJ 07511

Dear Mr. Werkheiser:

Consequent to our conversation on October 19, 2006 I have agreed to be relocated to the MIS unit as per your previous suggestion. I am still finding it very difficult to heal in my present environment, and the fact that my job duties were not reassigned to me is evidence that the matter between Ms Wolke and me have not been resolved.

I think it is unfair that *I* have to transfer, as my life has been turned upside down every since the campaign of harassment by Carol Wolke. It seems that it is just easier to turn *my* life upside down than it is to do the right thing.

What I have learned from this experience is that life is just not fair. Right or wrong, decisions are going to be made based on what is more convenient for the people in charge. I am not thrilled about this transfer, but I think that it would be wiser for me to make a change that could possibly help me out of this unhappy situation. I am hoping that I will be treated with more fairness and respect in the MIS unit than I am presently experiencing now in the Health Care Center.

Since I will be undergoing life-threatening surgery this Thursday, November 2, 2006, I will be on Disability Leave afterwards. I will keep you apprised of my date of return, so that the transition to the MIS unit will be as smooth as possible. Thank you for your care and concern.

Very Truly Yours,

Phyllis Atkinson
PO Box 961
Paterson, NJ 07544

CC: Annelee Dechter, ACEO
    Mabel M. Moore, Staff Representative-CWA Local 1040
    Gary Engel, ERC-NJDC

ATKINSON EEO 19