NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PHYLLIS ATKINSON,<br><br>    Plaintiff,<br><br>vs.<br><br>NORTH JERSEY DEVELOPMENTAL CENTER,<br><br>    Defendant. | Civil Action No.: 06-5485 (PGS)<br><br>**OPINION** |

   This matter comes before the Court on Defendant North Jersey Developmental Center's ("Defendant") motion for summary judgment ("Defendant's Motion for Summary Judgment"). On April 21, 2009, Plaintiff Phyllis Atkinson ("Plaintiff") filed a Second Amended Complaint against Defendant ("Plaintiff's SAC") in which Plaintiff alleged that: (1) Defendant retaliated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); and (2) Defendant racially discriminated against Plaintiff in violation of Title VII.[1] For the reasons set forth below, this

---

[1] Plaintiff's SAC included additional claims, and named an additional defendant. Specifically, Plaintiff's SAC included a claim for retaliation under the New Jersey Law Against Discrimination ("NJLAD"), as well as a claim for racial discrimination under the NJLAD. Moreover, Plaintiff's SAC named Plaintiff's supervisor Carole Wolke ("Ms. Wolke") as a defendant in the litigation. On June 2, 2009, however, this Court dismissed both the NJLAD claims, and dismissed Ms. Wolke from the lawsuit entirely. As such, the only claims that need to be evaluated in this Opinion are the two Title VII claims against Defendant.

Court hereby grants Defendant's Motion for Summary Judgment, thereby dismissing both of the above-referenced claims against Defendant.

I.  Statement of the Facts

Plaintiff is an African-American woman who began her employment with Defendant as a clerk transcriber in August of 1980.[2] Defendant is a New Jersey public institution for the mentally disabled. In the fall of 2004, while Plaintiff still held the position of clerk transcriber, Ms. Wolke, the Assistant Director of Nursing at Defendant, became Plaintiff's immediate supervisor. Ms. Wolke is a Caucasian woman.

Plaintiff alleges that Ms. Wolke retaliated and discriminated against Plaintiff in the following ways: (1) Ms. Wolke gave Plaintiff an unjustifiably low 2004 Performance Assessment Review ("PAR") score; (2) Ms. Wolke stated in a heated conversation with Plaintiff that Ms. Wolke would "fix" Plaintiff; (3) Ms. Wolke reprimanded Plaintiff with a "Red A" written warning for arriving late to work; (4) Ms. Wolke denied Plaintiff's vacation requests; and (5) Ms. Wolke altered Plaintiff's job duties.

The 2004 PAR Score

On April 23, 2004, Ms. Wolke completed Plaintiff's PAR score for the time-frame between March 1, 2003 and February 28, 2004, assigning Plaintiff a PAR score of "24". The PAR scale ranges from a low score of "10" to a high score of "30". A low score of "10" signifies that the

---

[2] Plaintiff's job responsibilities included answering telephones, filling out time sheets, inputting data into the computer, completing medical transcriptions, and helping plan medical trips for patients.

employee performed no essential criteria for any of the employee's major job responsibilities.[3]  A medium score of "20" signifies that the employee achieved the essential criteria for each of the employee's major job responsibilities.  A score of "30" signifies that the employee significantly exceeded the essential criteria for each of the employee's major job responsibilities.  In issuing Plaintiff a score of "24," Ms. Wolke noted that Plaintiff achieved the essential criteria for six of her major job responsibilities, and that Plaintiff significantly exceeded the essential criteria for four of her major job duties.

Plaintiff's March '03 - February '04 PAR score of "24" represented an improvement over Plaintiff's previous two PAR scores.  Plaintiff's PAR score for the March '02 - February '03 period was "23," while Plaintiff's PAR score for the March '01 - February '02 period was  "21." Despite the fact that Plaintiff's March '03 - February '04 score constituted an improvement, Ms. Atkinson was upset with her PAR score, and requested a meeting with Ms. Wolke to discuss the PAR score. Plaintiff and Ms. Wolke never met to discuss the March '03 - February '04 PAR score. In her evaluation of Plaintiff, however, Ms. Wolke noted several specific areas in which Plaintiff could improve her job performance.  Specifically, Ms. Wolke stated that Plaintiff should work on "open communication with supervisor," ensuring that she input data into the computer currently and "review[ing] [such data input] quarterly for any updates," and "attend[ing] classes when assigned."

Still frustrated by her March '03 - February '04 PAR score, on September 28, 2004, Plaintiff wrote a letter to Director of Nursing Roxanne Lotts ("Ms. Lotts") in which Plaintiff expressed her discontent with her March '03 - February '04 PAR score.  In her letter, Plaintiff contended that Ms.

---

[3] According to Plaintiff's March '03 - February '04 PAR score, major job responsibilities included, but were not limited to, the employee's ability to effectively communicate with co-workers and work well in a  team.

Wolke scored Plaintiff unfairly, and had demonstrated favoritism to other employees. Frustrated with what she perceived to be an unjustifiably low PAR score, Plaintiff noted that she was "over whelmed [sic] with paperwork," and that Ms. Wolke "appear[ed] to have no regard to the amount of work that [Plaintiff] [was] responsible for doing." Plaintiff did not send a copy of this letter to Ms. Wolke and Ms. Wolke has testified that she did not receive this letter.

Plaintiff's March '03 - February '04 PAR score was ultimately raised to a "27," and Plaintiff was "satisfied with [this] result."

The December 1, 2004 Incident

On December 1, 2004, Plaintiff and Ms. Wolke were involved in a heated incident. Ms. Wolke had heard that Plaintiff had told several of Plaintiff's co-workers that Plaintiff believed that Ms. Wolke was a "racist." On December 1, 2004, Ms. Wolke confronted Plaintiff and expressed her frustration and concern over these allegations. Moreover, Plaintiff recounts that Ms. Wolke told Plaintiff that if Plaintiff continued characterizing Ms. Wolke as a racist that Ms. Wolke would "fix" Plaintiff. An employee who witnessed the incident confirmed the highly charged tension of the confrontation by acknowledging that both Ms. Wolke and Plaintiff were "arguing" and appeared "emotional."

Later in the day, on December 1, 2004, Plaintiff wrote another letter to Ms. Lotts, in which she relayed the facts of the earlier confrontation with Ms. Wolke. Plaintiff stated in the letter that she denied calling Ms. Wolke a racist but that she had told Ms. Wolke that Plaintiff "do[es] feel like [Ms. Wolke] discriminates against [Plaintiff] like a racist because of past incidents that occurred with [Ms. Wolke]. . . ." (emphasis added).

<u>Alleged Denial of Plaintiff's Vacation Requests</u>

On March 22, 2004, Plaintiff filed a vacation request for the dates around Thanksgiving - November 23- 24, 2004, and November 29-30, 2004.  Because Plaintiff's supervisors allegedly did not respond to this request, on November 19, 2004, Plaintiff re-filed another request for these same vacation dates. Defendant's vacation request procedure mandated that all employees make such requests no later than March 15, 2004.  Plaintiff failed to request the above-referenced vacation dates by March 15, 2004.  On November 19, 2004, Ms. Wolke denied Plaintiff's request for the vacation dates.

Despite Ms. Wolke's initial denial, a supervisor at Defendant ultimately granted Plaintiff the November 2004 vacation dates that Plaintiff requested.

<u>The Red "A" Warning for Plaintiff's Tardiness</u>

On February 14, 2005 at 10:42 a.m., Plaintiff notified an employee at Defendant that Plaintiff would be one hour late for work.  At approximately 1:20 p.m., Plaintiff called an employee at Defendant requesting an emergency administrative leave day.  A supervisor at Defendant granted this request.  Soon thereafter, however, Plaintiff resolved her emergency, and reported to work at 1:35 p.m.

When Plaintiff arrived to work, Ms. Wolke reprimanded Plaintiff by issuing her a disciplinary "Red A."  According to Defendant's procedure, a "Red A" issued whenever an employee was "absent from work as scheduled without giving proper notice of intended absence." Plaintiff was due for work at 9:00 a.m., but did not notify her employer of her absence until 10:42 a.m.  The "Red A" was ultimately rescinded from Plaintiff's record.

### Defendant's Alleged Alteration of Plaintiff's Job Duties

Plaintiff further alleges that Defendant made discriminatory comments regarding Defendant's allocation of desks and computers.  Plaintiff contends that Ms. Wolke allegedly approached Plaintiff and instructed Plaintiff that Plaintiff did not need to have a desk or computer because Plaintiff could adequately perform her work out of the health care center's nurses' station.  Despite Defendant's alleged statement, Plaintiff at this time had a desk and computer, and continued to have a desk and computer.  Furthermore, Plaintiff contends that Defendant wrongfully provided a new desk to a Caucasian woman, Donna Corrado ("Ms. Corrado"), who became the HIPAA Complaints Officer (a position different from that held by Plaintiff).  Despite this apparent frustration over Defendant assigning a new desk to Ms. Corrado, Plaintiff has acknowledged that, soon thereafter, she too received a new desk.

Plaintiff took a medical leave of absence without pay from March 5, 2005 to May 5, 2005 for anxiety attacks and depression.  When she returned, Plaintiff wrote a letter to Ms. Lotts in which Plaintiff mentioned that, upon her return, Plaintiff "did not receive [her] job duties back . . . ." Plaintiff assured Ms. Lotts, however, that this did not upset her because "[her] job duties were overwhelming . . . ." Ms. Lotts ultimately scheduled a meeting with Plaintiff, at which Ms. Lotts instructed Plaintiff that the employee who was now responsible for these "taken" job duties had assumed Plaintiff's job duties while Plaintiff was on medical leave.  Moreover, Ms. Lotts noted that she had taken into consideration Plaintiff's previous complaints regarding her overwhelming workload in deciding to assign work responsibilities previously handled by Plaintiff.

II.    <u>Discussion</u>

**<u>Standard on a Motion for Summary Judgment</u>**

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue of material fact, and the evidence establishes the movant's entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of fact exists only if a reasonable jury could return a verdict for the non-movant *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Such genuine issue of fact is material only if it may affect the outcome of the suit based upon substantive law. *Ibid.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor'." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

After the movant has satisfied this initial burden, the non-moving party must establish that there exists a genuine issue of material fact. *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109 (3d Cir. 1985). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Rather, the non-moving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). A genuine issue of fact exists only where the evidence set forth by the non-moving party is such that a reasonable fact finder could, in fact, find for the non-moving party. *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.*, 812 F.2d 141, 144 (3d Cir. 1987) (citing *Anderson,* 477 U.S. at 242).

**Summary Judgment Is Granted with Respect to Plaintiff's Retaliation Cause of Action**

Title VII's anti-retaliation provision provides in pertinent part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice . . . ." 42 U.S.C. § 2000e-3(a). In order to demonstrate a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that: (1) the plaintiff engaged in some form of protected activity; (2) the plaintiff's employer took a materially adverse employment action against the plaintiff; and (3) there exists a causal connection between the plaintiff's protected activity and the employer's action. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n,* 503 F.3d 217, 231 (3d Cir. 2007) (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006)).[4]

---

[4]

If a plaintiff successfully establishes a prima facie case of retaliation, a burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802 (1973) applies. *Moore*, 461 F.3d at 342. The Third Circuit has explained:

> "If the employee establishes [a] *prima facie* case of retaliation, . . . the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct and, if it does so, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action . . . To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions."

*Moore*, 461 F.3d 331, 342 (internal quotations and citations omitted).

For the reasons set forth in this Opinion, Plaintiff has failed to establish a prima facie case of retaliation. As such, this Court need not proceed in detail to the second or third steps of the burden-shifting analytical framework. For the sake of completeness, however, this court finds that Defendant has set forth numerous "legitimate, non-retaliatory reasons" for its actions. Similarly, this Court is convinced that Plaintiff cannot proffer evidence that Defendant's explanations for Defendant's conduct are false, and that Plaintiff fails to demonstrate that retaliation was the real reason for Defendant's actions.

**<u>Plaintiff Did Not Take Part in Any Protected Activity</u>**.

A plaintiff engages in a "protected activity" only where the plaintiff "participate[s] in certain Title VII proceedings . . . [or] oppose[s] discrimination made unlawful by Title VII . . . ." *Moore*, 461 F. 3d at 341. A plaintiff therefore does *not* participate in a protected activity whenever he/she complains about "workplace conditions that were wholly unrelated to discrimination." *DeLuzio v. Family Guidance Ctr. of Warren Cnty.*, 2010 WL 1379766, at *13 (D. N.J. Mar. 30, 2010). Similarly, a plaintiff's action does not rise to the level of protected activity when a plaintiff alleges that en employer "treated people 'differently'" but does not "provide details or facts to explain the alleged disparate treatment." *Ibid.* (citation omitted). In order for an act to constitute a protected activity, the plaintiff "must have an 'objectively reasonable' belief that the activity s/he opposes constitutes unlawful discrimination under Title VII.." *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 322 (3d. Cir. 2008) (citation omitted).

In the instant matter, Plaintiff failed to participate in any protected activity. Although Plaintiff wrote two letters to Ms. Wolke in which Plaintiff chronicled her workplace frustrations, neither of these letters constitute protected activity. In the September 28, 2004 letter, Plaintiff lamented that Ms. Wolke issued Plaintiff an unfairly low PAR score, and exhibited favoritism towards other employees. Moreover, Plaintiff wrote that Ms. Wolke did not alleviate Plaintiff's burdensome workload. Despite the concerns expressed by Plaintiff in the September 28, 2004 letter, it is an undisputed fact that the letter is entirely devoid of any allegation of racial discrimination. As such, the letter cannot constitute protected activity.

Similarly, Plaintiff's second letter - dated December 1, 2004 - does not constitute "protected activity." Although Plaintiff wrote that she had told Ms. Wolke that she felt that Ms. Wolke

"discriminate[d] against [Plaintiff] like a racist because of past incidents that occurred . . . .," this does not constitute a clear charge of racial discrimination. In fact, Plaintiff's ambiguous statement about Defendant's treatment of Plaintiff "like a racist" due to unspecified "past incidents" hardly rises to the requisite level of "protected activity." As Defendant accurately notes, "[t]his letter is hardly a clear statement of opposition to practices opposed under Title VII . . . ." (Defendant's Brief in Support of Defendant's Motion for Summary Judgment, p. 7 ["Defendant's Brief"] (emphasis added) (citation omitted)). As such, Plaintiff has failed to set forth any evidence that she participated in a protected activity.

### Defendant Did Not Take Any Materially Adverse Action Against Plaintiff.

A materially adverse employment action is an employment action that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). According to the Supreme Court, "*material* adversity" signifies an important distinction between "significant" and "trivial" workplace problems. *Id.* at 54 (emphasis in original). Because "[t]rivial" actions do not constitute materially adverse actions, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 68; *see also McKinnon v. Gonzales*, 642 F.Supp.2d 410, 426 (D. N.J. 2009) (stressing that allegations of "micromanaging," "increased scrutiny," and "reprimands about plaintiff's lateness" do not constitute "materially adverse actions") (internal quotations and citations omitted).

Defendant did not take a materially adverse employment action against Plaintiff. Plaintiff's claim that Ms. Wolke retaliated against Plaintiff by issuing an allegedly unjustifiably "low" March

10

'03 - February '04 PAR score is without merit. As mentioned, Plaintiff's March '03 - February '04 PAR score of "24" actually constituted an improvement over Plaintiff's previous two PAR scores of "23" and "21." Furthermore, Defendant ultimately raised Plaintiff's March '03 - February '04 PAR score to "27" - a nearly perfect employment rating. Considering these undisputed material facts, nothing about Defendant's March '03 - February '04 PAR scoring of Plaintiff could possibly be considered "materially adverse."

Furthermore, Ms. Wolke's emotional statement that she would "fix" Plaintiff is not a materially adverse employment action. Such a comment - made in the midst of a heated argument - cannot be considered a materially adverse employment action in violation of Title VII. *Vore v. Indiana Bell Tel. Co., Inc.,* 32 F.3d 1161, 1162 (7th Cir. 1994) ("[Title VII] does not guarantee a utopian workplace, or even a pleasant one . . . In short, personality conflicts between employees are not the business of the federal courts"). Although this remark no doubt upset Plaintiff, Plaintiff's frustration alone does not render this statement a materially adverse employment action. *See Hartsell v. Duplex Products, Inc.,* 123 F.3d 766, 773 (4th Cir. 1997) ("Title VII does not guarantee a happy workplace, only one free from unlawful discrimination").

Plaintiff's additional allegations of materially adverse employment actions are equally devoid of merit. Although Plaintiff contends that Defendant wrongfully issued Plaintiff a "Red A" for her tardiness, it is an undisputed material fact that Defendant ultimately removed this "Red A" from Plaintiff's records. Similarly, despite Defendant's initial hesitance to provide certain specific vacation days to Plaintiff, Defendant ultimately acquiesced to Plaintiff's demands, and permitted Plaintiff to take vacation at the requested time. Furthermore, Plaintiff cannot claim that Defendant's

reduction of Plaintiff's job duties was an "adverse" action considering that it was Plaintiff herself who stated that her job duties were overly burdensome.

Because none of Defendant's acts are to be considered materially adverse employment actions, Plaintiff cannot satisfy this element of the prima facie case for retaliation.

### **Plaintiff Cannot Prove that Plaintiff's Protected Activity Caused Defendant to Enact a Materially Adverse Employment Action Against Plaintiff.**

Even if this Court were convinced that Plaintiff engaged in a "protected activity" and Defendant enacted a materially adverse employment action against Plaintiff, no such "protected activity" caused Defendant to enact a materially adverse employment action. First, Plaintiff cannot prove any causal nexus between the September 28, 2004 letter and any materially adverse employment action. Even if this Court finds that the September 28, 2004 letter constituted "protected activity," Ms. Wolke had no knowledge of the letter. As such, this September 28, 2004 letter could not possibly have caused Ms. Wolke to take any materially adverse employment action. Moreover, Ms. Wolke signed Plaintiff's March '03 - February '04 PAR score on April 23, 2004, a date five months prior to Plaintiff's September 28, 2004 letter, in which Plaintiff informally complained about Ms. Wolke's treatment of Plaintiff. As such, it is illogical to contend that Defendant issued Plaintiff a "low" March '03 - February '04 PAR score as a result of Plaintiff's September 28, 2004 letter to Ms. Lotts. Similarly, Plaintiff cannot state a causal connection between the later December 1, 2004 letter and Ms. Wolke's statements that she would "fix" Plaintiff. As Plaintiff herself would have to concede, Plaintiff only penned this December 1, 2004 letter after Ms. Wolke made her remark.

Furthermore, there is no causal connection between the December 1, 2004 letter and Ms. Wolke's decision to place a "Red A" on Plaintiff's attendance sheet. Even if the December 1, 2004

letter is to be considered an exercise in "protected activity," Defendant placed the "Red A" on Plaintiff's attendance sheet on February 15, 2005 - approximately two and a half months after Defendant's December 1, 2004 letter. As Plaintiff herself acknowledges, the Third Circuit provides that a period of two months between a protected activity and a retaliatory act is "too long to permit an inference of causation." (Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment ["Plaintiff's Brief"], p. 27 (citing *Williams v. Philadelphia Hous. Auth. Police Dep't.*, 380 F.3d 751, 760 (3d Cir. 2004)).

This significant gap of time between the alleged protected activity and retaliatory act signifies that Plaintiff cannot rely only upon "temporal proximity" between the December 1, 2004 letter and the "Red A" reprimand in order to prove causation. *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273-274 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be *very* close . . . .") (citations omitted) (emphasis added). Without this "very close" temporal proximity, Plaintiff must set forth "other evidence of retaliatory animus." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997). Despite Plaintiff's contention, her opposition papers fail to "present[] sufficient additional evidence of [Defendant's] antagonistic behavior." (Plaintiff's Brief, p. 28.)

Plaintiff's additional arguments that Defendant denied her vacation requests and modified Plaintiff's job duties as a result of Plaintiff's involvement in protected activity are equally devoid of merit. As a result, Plaintiff has failed to draw a causal link between any activity protected under Title VII and any retaliatory act taken by Defendant.

Plaintiff therefore cannot demonstrate a prima facie case of retaliation under Title VII. Not only did Plaintiff fail to engage in some form of protected activity, but Defendant never took a materially adverse employment action against Plaintiff. Moreover, Plaintiff has failed to demonstrate that Plaintiff's protected activity caused Defendant to take a discriminatory action. It therefore follows that Plaintiff cannot set forth a prima facie claim of retaliation under Title VII. As such, Defendant's Motion for Summary Judgement is granted with respect to Plaintiff's cause of action for retaliation under Title VII.

<u>Summary Judgment Is Granted with Respect to Plaintiff's Discrimination Cause of Action.</u>

Title VII in pertinent part provides:

> It shall be an unlawful employment practice for an employer-
>
> (1)  to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2)  to limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a). Plaintiff can establish a prima facie case of racial discrimination under Title VII only if Plaintiff demonstrates that: (1) Plaintiff is a member of a protected class; (2) Plaintiff is qualified for the position in question[5]; (3) Plaintiff suffered from an adverse employment decision;

---

[5] This Court acknowledges that Plaintiff, as an African-American, is part of a "protected class." However, because Plaintiff cannot set forth that she suffered a materially adverse employment action and cannot demonstrate that non-members of a protected class enjoyed better treatment than Plaintiff, this Court need not address whether Plaintiff was qualified for the position in question

and (4) existing circumstances give rise to an inference of unlawful discrimination. *McDonnell Douglas Corp,* 411 U.S. at 802; *Abbasi v. SmithKline Beecham Corp,* 2010 WL 1246316, at *5 (E.D. Pa. Mar. 25, 2010) (citing *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410-11 (3d Cir. 1999))[6].

### Defendant Did Not Subject Plaintiff to an Adverse Employment Decision.

A plaintiff suffers an adverse employment action where an employer "produces a material employment disadvantage." *McKinnon,* 642 F.Supp.2d at 435 (citations omitted). This Court acknowledges that "[t]ermination, cuts in pay or benefits, and changes that affect an employee's future career prospects" all constitute adverse employment actions. *Ibid.* (emphasis omitted) (citations omitted). Less serious "changes in duties or working conditions . . . which cause no materially significant disadvantage," however, do not rise to the level of adverse employment actions. *Ibid.* (citations omitted).

Plaintiff cannot prove that she suffered an adverse employment decision. Although Plaintiff contends that "the most significant event that constitute[d] the greatest adverse action [against

---

[6]

If Plaintiff were successful in establishing a prima facie claim of racial discrimination, the same general burden-shifting framework articulated in footnote 4 would govern this Court's analysis. Specifically, if Plaintiff were to establish a prima facie claim of racial discrimination, "the burden then [would] shift to [Defendant] to articulate some legitimate, nondiscriminatory reason" for [Defendant's] action. *McDonnell Douglas Corp.*, 411 U.S. at 802. If Defendant were to satisfy this burden, the burden of production would then shift back to Plaintiff, who would need to come forward with admissible evidence showing that Defendant's articulated, nondiscriminatory reasons were not the true reasons for the adverse action because Plaintiff's race was the motivating factor behind the adverse action taken by Defendant. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 507-08 (1993).

For the reasons set forth in this Opinion, Plaintiff has failed to establish a prima facie case of racial discrimination. As such, this Court need not proceed in detail to the second or third steps of the burden-shifting analytical framework. For the sake of completeness, however, this court finds that Defendant has articulated sufficient nondiscriminatory rationales for its actions. Similarly, this Court is convinced that Plaintiff cannot proffer evidence that Defendant's explanations for Defendant's conduct are false, and that Plaintiff's race was the motivating factor behind the adverse action taken by Defendant.

Plaintiff]" was the reduction of Plaintiff's job duties, it was Plaintiff herself who requested that Defendant reduce her job duties. (Plaintiff's Brief, p. 25.) As mentioned above, Plaintiff - in her September 28, 2004 letter to Ms. Lotts- specifically lamented that she felt burdened by too many job duties. Plaintiff stated: "[Ms. Wolke] appears to have no regard to the amount of work that I am responsible for doing . . . I am over whelmed [sic] with paperwork." Because Defendant reduced Plaintiff's job duties to help Plaintiff, Defendant's action cannot be considered an adverse employment decision that harmed Plaintiff.

Although Plaintiff claims that Defendant's most adverse employment action was the reduction of Plaintiff's job duties, this Court has reviewed all other facts alleged in this dispute. After viewing these facts, it is evident that Plaintiff cannot satisfy her burden in putting forth evidence of any adverse employment action.

### **Plaintiff Cannot Establish An Inference of Unlawful Discrimination.**

An employee can establish an inference of unlawful discrimination by demonstrating that his/her employer treated non-members of the protected class more favorably than the employee. *Goosby v. Johnson & Johnson Med., Inc.,* 228 F.3d 313, 318-19 (3d Cir. 2000) (citation omitted); *Verdin v. Weeks Marine Inc.*, 124 Fed. Appx. 92, at *2 (3d. Cir. 2005) (citation omitted). Opting to take this approach here, Plaintiff submits that "[Plaintiff] had been disciplined more harshly than other employees [who were not African-American] who engaged in similar conduct but were not disciplined." (Plaintiff's Brief, p. 29.) Moreover, Plaintiff contends that Ms. Wolke consistently treated Plaintiff (and other African-American employees) differently from her Caucasian counterparts:

> " [Ms. Wolke] allowed White employees to come in or go home at different times without disciplining them for their time. [Ms. Wolke] allowed white employees to come in or go home at different times without disciplining them for their time. [Ms. Wolke] also allowed Caucasian employees to have extended lunches and conduct personal activities during the work day. She never made White people feel

16

> like they were walking on egg shells as she made me and the other black employees feel."

(Affidavit of Phyllis Atkinson, p. 10, ¶ 23).

Plaintiff's assertions regarding such disparate treatment fail to resonate with the court. Not only do many of these assertions appear self-serving, but they also contain inadmissible hearsay and are made without personal knowledge. Moreover, many of these claims expressly contradict prior deposition testimony. For example, Plaintiff's opposition papers assert that Defendant discriminated against Plaintiff and other African-Americans in Defendant's allocation of desks. Plaintiff recounts that she was "upset" to learn that Defendant did not believe that Plaintiff needed her own desk at work (Counter Statement of Material Facts in Opposition of Motion for Summary Judgment, p. 32, ¶ 149.) Moreover, Plaintiff states that she previously told Ms. Lotts that she was upset about Defendant's comments regarding the proper allocation of desks at work. (*Ibid.*) Despite these recent contentions in opposition to Defendant's Motion for Summary Judgment, however, Defendant ably points out that Plaintiff testified at her deposition that she never believed that Defendant actually acted discriminatorily in the assignment of desks:

> Q. Okay, what else is there? How about the desk? Are you saying that white counterparts were given desks and you weren't?
> A. No.
> Q. All right.
> A. That never was -

(Defendant's Reply to Plaintiff's Counter-Statement of Facts and Additional Facts, p. 14, ¶¶ 148-149, C (citation omitted)). Plaintiff has thus failed to demonstrate that employees outside of Plaintiff's protected class actually received favorable treatment. Plaintiff therefore cannot demonstrate a prima facie case of discrimination under Title VII.

Plaintiff has failed to demonstrate that Defendant took a materially adverse employment action against Plaintiff, and has failed to create an inference of racial discrimination. Because

Plaintiff cannot set forth a prima facie claim of retaliation under Title VII, Defendant's Motion for Summary Judgement is granted with respect to Plaintiff's discrimination claim under Title VII.

III.     Conclusion

In light of the foregoing, Defendant's Motion for Summary Judgment is granted. Count I of the SAC alleging retaliation under Title VII is dismissed. Count II of the SAC alleging race discrimination under Title VII is also dismissed.


                                        *s/Peter G. Sheridan*
                                        PETER G. SHERIDAN, U.S.D.J.


October 5, 2010